# Exhibit A

```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION

SHEALONDRA BIBLE,            ]
       Plaintiff,           ]
                            ]
v.                          ]  CASE NO. 4:21-CV-00804
                            ]
DIRECT ENERGY, ET AL,       ]
NRG LLC,                    ]
       Defendant.           ]
```

--------------------------------------------------------


             ORAL AND VIDEOTAPED DEPOSITION OF


                    SHEALONDA BIBLE


                    JUNE 16, 2022

--------------------------------------------------------

     ORAL DEPOSITION OF SHEALONDA BIBLE, produced as a

witness at the instance of the Defendant, and duly

sworn, was taken in the above-styled and numbered cause

on the 16th of June, 2022, from 10:03 a.m. to 3:41 p.m.,

before Shawn Kelley, CSR No. 3448 in and for the State

of Texas, by machine shorthand and computer-aided

transcription, at 5120 Woodway Drive, Suite 10010,

Houston, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Nell McCallum & Associates Inc. Houston (713) 861-0203

```
 1                         APPEARANCES
 2      For the Plaintiff:
 3            Eddie Hodges, Jr.
 4            Attorney at Law
 5            Kennard Law
 6            5120 Woodway Drive, Suite 10010
 7            Houston, Texas  77056
 8      For the Defendant:
 9            Marlene C. Williams
10            Attorney at Law
11            Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
12            500 Dallas Street, Suite 3000
13            Houston, Texas  77002
14      Also Present:
15            Keitha Hanks, Videographer (713) 861-4700
16                     ------------
17                         INDEX
18
19   EXAMINATION BY MS. WILLIAMS                  4
20   EXAMINATION BY MR. HODGES                  226
21   FURTHER EXAMINATION BY MS. WILLIAMS        229
22   FURTHER EXAMINATION BY MR. HODGES          233
23
24   [Exhibit 1 marked, September 25, 2015 offer    65
25   letter from Kristin Johnson to Shea Baham]
```

**NELL McCALLUM & ASSOCIATES, INC.**

1    [Exhibit 2 marked, August 14, 2017 email from    107
2    Daniel Kochman to Shea Baham with attached
3    email string]
4    [Exhibit 3 marked, Your On Track Incentive    143
5    Plan documents]
6    [Exhibit 4 marked, July 31, 2019 Notice of    208
7    Layoff]
8    [Exhibit 5 marked, Direct Energy Equal    214
9    Employment Opportunity Policy]
10   [Exhibit 6 marked, Direct Energy    215
11   Non-Discrimination/Anti-Harassment Policy]
12   [Exhibit 7 marked, Direct Energy Workplace    215
13   Investigations Policy]
14   [Exhibit 8 marked, Centrica Our Code]    218
15   [Exhibit 9 marked, Acknowledgment Form for    219
16   code of conduct]
17   [Exhibit 10 marked, Centrica Speak Up    220
18   Procedure]

19
20
21
22
23
24
25

1    A.  I don't recall.  I believe it was -- I believe I

2  found out after I filed the complaint.

3    Q.  Okay.  So you filed the complaint and then

4  learned that it was Jeff Fralix who was selected.  Is

5  that your best recollection?

6    A.  That's my best recollection, right, but it was --

7  it was, I'd say, well known that he was going to be

8  selected by her.

9    Q.  Well known to whom?

10    A.  Applicants.  I'm -- yeah, just --

11    Q.  By all the applicants?

12    A.  I'm -- it was a -- it was an assumption that --

13  that that was going to happen.

14    Q.  By whom?  Who assumed?

15    A.  I know I did and other applicants did, too.

16    Q.  Who were the other applicants who assumed that

17  Melinda Reeves was going to select Jeff Fralix?

18    A.  Martine Savage, Kristin Johnson, that's all I

19  recall.

20    Q.  And what -- why did you assume that Ms. Reeves

21  going to select Jeff Fralix for the VP of HR role?

22    A.  Because they were good friends.

23    Q.  And you assumed that before you applied for the

24  position?

25    A.  Yes, so I applied in spite of that assumption,

**NELL McCALLUM & ASSOCIATES, INC.**

1   because I wanted a chance to -- to be interviewed and

2   to -- to demonstrate my skills and capabilities and have

3   that opportunity to -- to share my story, yes.

4       Q.  Okay.  And so you applied -- when you applied,

5   you had -- you already had the assumption that Jeff

6   Fralix would be selected for the position; is that -- is

7   that right?

8       A.  Yes.

9       Q.  Okay.  And do you know if Martine Savage assumed

10  that Jeff Fralix would be selected for the position --

11      A.  I don't --

12      Q.  -- when she applied?

13      A.  I don't know.  I mean, I'd have to -- I -- I

14  don't know.

15      Q.  Okay.

16      A.  Yeah.

17      Q.  And Kristin Johnson, do you know if she assumed

18  that Jeff Fralix would be selected for the position when

19  she applied?

20      A.  I don't know.

21      Q.  How did you learn that Martine Savage and Kristin

22  Johnson assumed that Jeff Fralix would be selected for

23  the position?

24      A.  So if you ask did I know, I don't know.  I just

25  know through some of our conversations it seemed that

1   that was the assumption, that it was going to be him.

2       Q.  Were these conversations before or after he was

3   selected for the position?

4       A.  Before.

5       Q.  Okay.  So before he was selected, you recall

6   having conversations Martine Savage and Kristin Johnson

7   where the three of you discussed the fact that it was

8   just assumed that Jeff Fralix would be selected?

9       A.  I know I had conversations with Kristin.  I'm not

10  sure if I had them with Martine.

11      Q.  Okay.

12      A.  But I -- but there were conversations had, and I

13  know I had some with Kristin, yes.

14      Q.  Okay.  And those conversations were before he was

15  actually selected or before you all learned that he had

16  been selected?

17      A.  Yes.

18      Q.  Okay.  Did you all have conversations after he

19  was selected about the fact that he was selected?

20      A.  Not that I recall.

21      Q.  And when I say did you all, I'm talking about

22  Martine Savage and Kristin Johnson?

23      A.  Oh, yeah, that's -- yeah, I -- that was my

24  assumption that you're asking, yeah, not that I recall.

25      Q.  Okay.  Okay.  And so you said -- you asked -- you

1  complaint, I felt like it was going to be hostile,

2  untenable work environment, and I requested an

3  opportunity to -- to leave.

4       MS. WILLIAMS:  Okay.  I'm going to object as

5  nonresponsive.

6       Q.  I forgot to mention that as a part of our

7  introduction.  There are --

8       A.  Yes, ma'am.

9       Q.  -- going to be times where your lawyer may make

10  objections, and there are going to be times where I

11  might make objections.  Unless your lawyer instructs you

12  otherwise, you'll still be required to answer --

13       A.  Yes.

14       Q.  -- the question.  I made an objection to your

15  answer as nonresponsive.  I just -- my question to you

16  was after you were -- well, let me -- Shawn, can you

17  read my last question back, because I don't quite

18  remember it.

19       [The record was read as requested]

20       MS. WILLIAMS:

21       Q.  Okay.  So that's my question.  After the

22  investigation was concluded, you made a request or you

23  requested the opportunity to leave the company; is that

24  right?

25       A.  Yes.

1    Q.   Okay.  Who did you make that request to?

2    A.   Jonathan Phillips and Sidney Watts.

3    Q.   I'm sorry, Jonathan --

4    A.   Phillips.

5    Q.   P-h-i-l-l-i-p-s?

6    A.   Yes.

7    Q.   Okay.  And then Sidney Watts?

8    A.   Sidney Watts.

9    Q.   Who is Jonathan Phillips?

10   A.   He was the employee relations director.

11   Q.   And when did you request the opportunity to leave

12   the company with Jonathan Phillips?

13   A.   It was when they talked to me about the -- the

14   results of the investigation.

15   Q.   And you said when they.  Who's they?

16   A.   Sidney.

17   Q.   So you had a meeting with -- a meeting where both

18   Jonathan and Sidney --

19   A.   Yes.

20   Q.   -- were present?

21   A.   Yes.

22   Q.   Okay.  Did you have any separate meetings with

23   Jonathan Phillips related to your request to leave the

24   company?

25   A.   Not that -- not that I recall.

1      Q.  Okay.  Did you have any separate meetings with

2   Sidney Watts related to your request to leave the

3   company?

4      A.  Not -- not that I recall.

5      Q.  Okay.  And did you meet with Jonathan and Sidney

6   together only one time related to your request to leave

7   the company?

8      A.  I believe so, yes.

9      Q.  When was this meeting?  I know it was after the

10   investigation they were giving you the results.  Do you

11   recall approximately when that occurred?

12      A.  I don't recall.

13      Q.  Would it have been sometime in 2017?

14      A.  Yes.

15      Q.  And what was their response about your request to

16   leave the company?

17      A.  That I -- they offered a standard severance

18   package, I think, if I recall correctly.  Yeah.

19      Q.  So they were receptive to your request to leave

20   the company?

21      A.  Yes.

22      Q.  Okay.  And in connection with your request to

23   leave the company in 2017, they offered you a severance

24   package?

25      A.  Yes.

```
1     Q.  Okay.  Do you recall the terms of that have
2  severance package?
3     A.  It would have been the standard one offered at
4  the time.
5     Q.  Do you know what the standard terms were at the
6  time?
7     A.  I don't recall, no.
8     Q.  And how did you respond to the offer?
9     A.  I did not take it.
10    Q.  Why did you not take it?
11    A.  Because of my level of experience and the terms,
12 I felt like it was -- not allow me enough time to find
13 another role commiserate with my experience and skills
14 and tenure in my field.
15    Q.  How much time were they offering to give you to
16 find another position?
17    A.  I don't recall.
18    Q.  Did either one of -- did either Jonathan or
19 Sidney tell you that you had to leave the company at the
20 time?
21    A.  No.
22    Q.  I'm sorry?
23    A.  No.
24    Q.  Did anyone tell you that you had to leave the
25 company at the time?
```

1    Q.  In total?

2    A.  I believe so, yes.

3    Q.  How much money have you earned or has the HR

4  consultant practice that you have earned through

5  assignments that you had?

6    A.  Between eight and ten thousand.

7    Q.  And that would include the Miss Academy work,

8  correct?

9    A.  Yes.

10   Q.  And it would also include the Collins Aerospace

11  work, correct?

12   A.  Yes.

13   Q.  Does Catalyst -- does your current employer know

14  that you're here today giving a deposition?

15   A.  No.

16   Q.  Do they know about your lawsuit against Direct

17  Energy?

18   A.  No.

19   Q.  Have you ever made a complaint against any prior

20  employer?

21   A.  No.

22   Q.  Okay.  When did you start, excuse me, with Direct

23  Energy?

24   A.  October 2015.

25   Q.  And you left September 2019, correct?

1    A.   Level 6.

2    Q.   Did you know what level -- well, what was Kristin

3  Johnson's position at the time she interviewed you, if

4  you recall?

5    A.   I don't recall her direct -- her exact title, but

6  she was my supervisor.

7    Q.   Okay.  So you would have come into the role

8  reporting to Kristin Johnson?

9    A.   Yes.

10    Q.   And do you recall what Jeff Fralix' role was when

11  you interviewed for the HR VP role?

12    A.   I believe he was in a talent acquisition role.

13    Q.   Do you know what his job grade classification was

14  at the time?

15    A.   I don't recall.

16    Q.   Do you know what Kristin Johnson's job grade

17  classification was at the time?

18    A.   A 5.

19    Q.   Was a -- is an L5 in Direct Energy structure a

20  more senior position than an L6 position?

21    A.   Yes.

22    Q.   So they have sort of an inverse classification,

23  where the lower the number the higher the ranking?

24    A.   Yes.

25    Q.   Okay.  What happened after you interviewed with

1    A.  Yes.

2    Q.  Okay.  Did you ultimately receive a written job

3  offer letter?

4    A.  I'm sure I did.

5        MS. WILLIAMS:  Okay.  I'm going to mark this

6  here.  Can I mark this as Exhibit 1?

7        [Exhibit 1 marked, September 25, 2015 offer

8  letter from Kristin Johnson to Shea Baham]

9    A.  I can --

10        MS. WILLIAMS:

11    Q.  Yes.

12    A.  Oh, okay.

13    Q.  Ms. Bible, I'm showing you what's been marked as

14  Exhibit 1 to your deposition.

15    A.  Yes.

16    Q.  Do you recognize that document?

17    A.  Yes.

18    Q.  What is that document?

19    A.  It looks like my offer letter.  Yeah.  Yep.

20    Q.  Okay.  And this is the offer letter that we were

21  just discussing that you said you recalled receiving?

22    A.  Yes.

23    Q.  Okay.  And it identifies that you started the --

24  you were offered the HR business partner position at

25  Direct Energy effective October 5th, 2015, correct?

1    A.  Yes, yes.

2    Q.  It also identifies your biweekly salary

3  annualized to 150,000, correct?

4    A.  Yes.

5    Q.  Okay.  And then other benefits, including the

6  incentive plan, benefits, 401(k), et cetera, right?

7    A.  Yes.

8    Q.  Okay.  Did you have any questions at the time the

9  offer was made about any of the terms?

10   A.  Yes.

11   Q.  What questions did you have?

12   A.  I asked if there could be a sign-on bonus.

13   Q.  And what was the answer?

14   A.  No.

15   Q.  Did you have any issues about that or --

16   A.  No.  Ultimately they granted a $5,000 sign-on

17  bonus, but it was part of the negotiation.  So, yeah.

18   Q.  So they said no, but then they gave you --

19  they --

20   A.  Through the negotiation, --

21   Q.  Okay.

22   A.  -- right.

23   Q.  So you asked for a sign-on bonus.  They said no?

24   A.  And then we came to the agreement on 5,000.

25   Q.  Okay.  So you ultimately did get a sign-on bonus?

1    Direct Energy solar business, if you recall?

2       A.  2015, '16, '17.  I would say through 2017 until

3    the business was dissolved.

4       Q.  So from 2015 until 2017?

5       A.  Yes.

6       Q.  And during the time that you were assigned and

7    supporting the solar business, were you reporting to

8    Kristin Johnson for that entire period?

9       A.  No.

10      Q.  Okay.  When you started you were reporting to

11   Kristin Johnson, correct?

12      A.  Yes.

13      Q.  When did you stop reporting to Kristin Johnson?

14      A.  When she moved into a different role, and I don't

15   recall what the name of that role was.

16      Q.  But it would have been before 2017?

17      A.  Yes.

18      Q.  Okay.  And then who did you start reporting to?

19      A.  Zandra Koeppel.

20      Q.  At the time that you started at Direct Energy,

21   was -- was Melinda Reeves there?

22      A.  Yes.

23      Q.  What was Melinda Reeves' position when you

24   started at Direct Energy?

25      A.  I believe SVP of human resources.

1    Q.  So the group that you were hired into reported up

2  to Melinda Reeves at the time you started?

3    A.  Yes.

4    Q.  And it continued that way until Melinda Reeves

5  left the company?

6    A.  Yes.

7    Q.  Okay.  Do you recall when Melinda Reeves left the

8  company?

9    A.  Perhaps 2018.

10    Q.  So you've described that in your capacity as an

11  HR business partner you provided advice and counsel to

12  leaders and employee -- employees in the HR space.  What

13  specifically did that entail for you?

14    A.  That would entail attending leadership team

15  meetings, consulting with leaders on -- on the business

16  as it related to human resources, sorting through

17  employee complaints, leadership development, leadership

18  coaching, employee development, anything that was HR

19  related, that's what I did.

20    Q.  Did you conduct investigations into employee

21  complaints?

22    A.  Sometimes, yes.

23    Q.  How many investigations would you say you've --

24  you conducted during the time you worked at Direct

25  Energy?

1    A.  If there was like a claim of discrimination or

2  something more complex, a hostile work environment, so

3  those types of complaints I would work in conjunction

4  with employee relations department.

5    Q.  Were there discrimination complaints that you

6  handled solo?

7    A.  No.

8    Q.  So every discrimination complaint you had you

9  handled it in conjunction with someone from employee

10 relations; is that right?

11   A.  Yes.

12   Q.  What kind of complaints did you handle solo?

13   A.  It could be like a -- a complaint about a manager

14 or employees, two employees, having disagreements.

15   Q.  Were you familiar -- in your capacity as an HR

16 business partner at Direct Energy, were you familiar

17 with Direct Energy's policies and procedures related to

18 discrimination complaints?

19   A.  Yes.

20   Q.  In fact, it would have been important for you to

21 be familiar with that, because that was a part of your

22 job, right?

23   A.  Yes.

24   Q.  And in your capacity as an HR business partner at

25 Direct Energy, were you also familiar with the company's

1  processes, procedures and policies related to workplace

2  investigations?

3      A.  Yes.

4      Q.  And, in fact, that would have been important for

5  you to be familiar with, because that was a part of your

6  job, as well, right?

7      A.  Yes.

8      Q.  Okay.  Would you say that you were very

9  proficient at managing investigations when they came to

10  you either solo or with the employee relations

11  representative?

12      A.  Could you -- what do you mean by --

13      Q.  I mean, were you good at that?

14      A.  Oh, absolutely.  I'm -- I'm great at my job.

15      Q.  Okay.  And were you also good at managing or

16  understanding the company's discrimination policies and

17  procedures and how -- how to appropriately respond to

18  claims of discrimination?

19      A.  Yes.

20      Q.  Was there any aspect of the company's

21  antidiscrimination policy that you weren't familiar

22  with?

23      A.  No.

24      Q.  Were there any aspects of the company's workplace

25  investigation policies that you weren't familiar with?

1    A.  No.

2    Q.  I'm sorry?

3    A.  No.

4    Q.  Okay.  And would you -- would you say that you

5    were extremely familiar with all of those, with the

6    discrimination policy?

7    A.  I would say that I was familiar with the

8    discrimination policy as well as the workplace --

9    Q.  Investigation --

10   A.  -- investigations, yes.

11   Q.  -- policy?

12   A.  Right.

13   Q.  Okay.  Well, in fact, maybe I jumped the gun a

14   little bit.  Did Direct Energy have policies in place

15   related to antidiscrimination?

16   A.  Yes, they had a policy in place with respect to

17   antidiscrimination and workplace hostile work

18   environments, workplace harassment.

19   Q.  And you were really familiar with those in your

20   capacity as an HR business partner; is that right?

21   A.  I was familiar with them, yes.

22   Q.  Not very familiar, just familiar?

23   A.  I would need to reread them.  I'm just --

24   Q.  But I mean during the time that you were there,

25   you were very familiar with those policies, --

1    A.  Yes.

2    Q.  -- right?  Because you -- in fact, --

3    A.  That's --

4    Q.  -- you had to work with them --

5    A.  Right.

6    Q.  -- regularly, right?

7    A.  Right, right, right.

8    Q.  Okay.  And then did Direct Energy also have a

9  policy related to workplace investigations during the

10  time that you were there?

11    A.  I don't know if they had a policy with respect to

12  it.  There -- I don't even know if there was a process.

13  I just know that if I worked with my employee relations

14  advisors.  Sometimes I took my complaints to them.

15  Sometimes they came in through the integrity or

16  complaint hotline.  Sometimes the employees called them

17  directly.

18    Q.  So you said you don't recall if there was an

19  actual written policy or process related to workplace

20  investigations; is that right?

21    A.  I don't recall.

22    Q.  If -- but in your experience there, there were

23  actual processes and procedures related to workplace

24  investigations, correct?

25    A.  Yes.

1    Q.  And during the time you were there you were very

2    familiar with what those policies and procedures were,

3    correct?

4    A.  Yes.

5    Q.  Did -- did -- and I'm asking this question to

6    determine whether it was something separate and distinct

7    from the policies we've already talked about or a part

8    of the same policies, but --

9    A.  Okay.

10   Q.  -- did -- did Direct Energy have sort of

11   reporting procedures, like an ethics complaint procedure

12   where employees could lodge complaints that they had

13   through some type of hotline or other process?

14   A.  Yes.

15   Q.  Was that something that's separate from the

16   antidiscrimination policy and workplace investigation

17   policy that we've talked about?

18   A.  Yes.

19   Q.  Okay.  So there was a separate, distinct policy

20   related to the ethics reporting procedures?

21   A.  It might have been mentioned in those policies,

22   but it was a separate process.

23   Q.  Okay.  And I was -- I was going to make that

24   distinction.

25   A.  Okay.

1      Q.   So thank you very much.  So it was its own

2   particular policy, correct, to your recollection?

3      A.   To my recollection, yes.

4      Q.   But, obviously, incorporated into the

5   discrimination policy and the investigation policy,

6   correct?

7      A.   Yes.

8      Q.   Okay.  Do you recall what -- was it called like

9   EthicsPoint, or do you recall what the name was?

10     A.   There's so many of them.  I -- I referred to it

11   as the ethics hotline.

12     Q.   Okay.  And would you say in your capacity as an

13   HR business partner you were very familiar with the

14   policy and procedures related to the ethics hotline at

15   Direct Energy?

16     A.   Yes.

17     Q.   Because, again, that would have been a part of

18   your responsibilities as an HR business partner to be

19   familiar with and implement those policies, correct?

20     A.   Yes.

21     Q.   Okay.  Did -- sorry, did Direct Energy have a

22   code of conduct during the time that you worked for the

23   company?

24     A.   Yes.

25     Q.   And was that code of conduct separate from the

1    policies we've described, we've been discussing?

2        A.  I'm not certain what would have been included

3    as -- I don't know.

4        Q.  Okay.  Sitting here right now, do you have a

5    recollection of it being something separate and distinct

6    from the antidiscrimination policy, for example?

7        A.  I believe they were separate.

8        Q.  Okay.  And in your capacity as an HR business

9    partner, were you very familiar with the code of conduct

10   at Direct Energy during the time you worked there?

11       A.  I was familiar with it, yes.

12       Q.  Okay.  Familiar, were you very familiar with it?

13       A.  I would not say that I could recite it.  So when

14   you asked me if I'm very familiar with something, I --

15   could I recite it or -- and I could not do that.  But

16   did I understand the intent of the policy?  Yes.

17       Q.  Okay.  And, in fact, that would have been

18   important -- it would have been important for you to be

19   familiar with the policy, because it would have been a

20   part of your responsibilities as an HR business partner

21   to implement some parts of the code of conduct from time

22   to time, correct?

23       A.  Yes.

24       Q.  When you started at Direct Energy, did you have

25   to go through any type of training related to the

1    company's policies?

2        A.  I'm sure there was.

3        Q.  Okay.  And do you recall during your employment

4    at Direct Energy, did you participate in any type of

5    annualized training or training on some other, you know,

6    schedule related to the company's policies?

7        A.  Yes.

8        Q.  How often was this training?

9        A.  Best I recall, every year.

10       Q.  Okay.  And so just so the record's clear, to the

11   best of your recollection, you recall receiving training

12   at the start of your employment at Direct Energy related

13   to the company's various HR policies, correct?

14       A.  I recall that there was training on various

15   policies.  I don't recall exactly when I received those.

16       Q.  Okay.  Every year, in any event, you did receive

17   training on the company's HR policies; --

18       A.  Every year --

19       Q.  -- is that correct?

20       A.  I'm sorry, I'm sorry.  Every year I recall

21   receiving training.  The type of training varied by

22   year.

23       Q.  What -- what training do you recall receiving

24   during the time that you worked at Direct Energy?

25       A.  I recall receiving training on -- what is it

1    called -- IT safety.  So using IT, technical stuff like

2    the technology being -- so that you don't get -- like

3    compromise the systems like that.

4          There was safety training.  And I also recall --

5    I don't recall code of conduct training, but I'm sure

6    that there was.  There had to be.  That's all I recall.

7    Q.  Do you recall training on the company's

8    antidiscrimination policy?

9    A.  I don't recall, but, yeah, there could have been,

10   yeah.

11   Q.  Okay.  What about on the company's investigation

12   policy?

13   A.  I don't recall, but there could have been

14   there, --

15   Q.  Okay.

16   A.  -- too, yeah.

17   Q.  And then on the -- the EthicsPoint policy, do you

18   recall that being a part of any training you received?

19   A.  I don't recall that one, either.

20   Q.  Okay.  How did you become familiar with the

21   company's policies, the ones we've been discussing?

22   A.  They were either online or written or -- yeah.

23   Q.  When you started at Direct Energy, you mentioned

24   that Melinda Reeves was the SVP of HR, correct?

25   A.  I believe that was her title, --

1    Q.  Okay.

2    A.  -- yes.

3    Q.  Do you know who the -- what the reporting

4    structure was kind of flowing down from Melinda Reeves

5    at the time you started?

6    A.  As best I recall, Kristin Johnson reported in to

7    her, Zandra reported in -- Zandra Koeppel reported in to

8    her, and some functional leaders reported in to her.

9    Q.  Were there other HR business partners in the

10   department when you started?

11   A.  Yes.

12   Q.  Who were they?

13   A.  I don't recall their names.

14   Q.  Do you recall any of -- did some of the HR

15   business partners report to Kristin Johnson as you did

16   and then some reported to Zandra?

17   A.  Yes.

18   Q.  Okay.  So they were split between the two of them

19   in terms of reporting?

20   A.  It was split based on the business.

21   Q.  Okay.

22   A.  So, yes.

23   Q.  Were Kristin and Zandra, to your understanding,

24   basically peer level?

25   A.  Yes.

1    Q.  Okay.  And then each of them had HR business
2  partners who reported up to them?
3    A.  Yes.
4    Q.  Okay.  Do you recall just roughly how many HR
5  business partners were in the department when you
6  started?
7    A.  I don't.
8    Q.  You -- you said earlier that for some -- for some
9  period of time you were supporting the solar business
10  group?
11    A.  Yes.
12    Q.  And you think that that ended sometime in 2017
13  when the business dissolved?
14    A.  Yes.
15    Q.  At the time the business dissolved, the solar
16  business dissolved, were you reporting to Kristin
17  Johnson or Zandra Koeppel?
18    A.  I think I was reporting to Zandra at that time.
19    Q.  Okay.  And then what -- what other business group
20  did you support after the solar business group was
21  dissolved?
22    A.  I supported the sales and marketing team.  I
23  supported the digital innovation team.  I supported the
24  strategy team.
25    Q.  These are all at different times, or did you

```
 1      Q.  I'm sorry?

 2      A.  Probably mid -- mid-30s.

 3      Q.  Do you know for a fact what her age is or are

 4   you --

 5      A.  No.

 6      Q.  -- just making a guess?

 7      A.  I don't know for a fact.

 8      Q.  Okay.  So do you know Brittany Smith's age?

 9      A.  No.

10      Q.  Okay.  Chenee Franklin, what is her race?

11      A.  Black.

12      Q.  Do you know Chenee Franklin's race -- I'm sorry,

13   age?

14      A.  No.

15      Q.  And Angie Moore, what is her race?

16      A.  White.

17      Q.  Do you know Angie Moore's age?

18      A.  No.

19      Q.  What is Melinda Reeves' race?

20      A.  I believe she's Caucasian.

21      Q.  Do you know Melinda Reeves' age?

22      A.  No.

23      Q.  Kristin Johnson, what is her race?

24      A.  Black.

25      Q.  Do you know her age?
```

1    A.  No.

2    Q.  Zandra Koeppel, what is her race?

3    A.  Hispanic.

4    Q.  Do you know her age?

5    A.  No.

6    Q.  Jeff Fralix, what is his race?

7    A.  White.

8    Q.  Do you know his age?

9    A.  He is -- I don't know exactly, no.

10   Q.  With respect to your age discrimination claim, I

11   think you testified earlier that your age claim is based

12   on the HR director role, correct?

13   A.  Yes.

14   Q.  And then the HR consultant roles?

15   A.  Yes.

16   Q.  There were two HR consultant roles in 2019 that

17   opened, correct?

18   A.  Yes.

19   Q.  Okay.  And so you're complaining about the fact

20   that you did not get either one of those, correct?

21   A.  Yes.

22   Q.  Okay.  Who got the HR director role?

23   A.  Angie Moore.

24   Q.  Okay.  And how do you know that she's younger

25   than you?

1    A.  I don't know her exact age.

2    Q.  Okay.  So when you allege that that role went to

3  a younger employee, you don't actually know if it went

4  to a younger employee, correct?

5    A.  Correct.

6    Q.  Okay.  The HR consultant roles, who -- who got

7  those roles?

8    A.  Brittany Smith and Chenee Franklin.

9    Q.  And you've testified that you don't know either

10  of their ages, correct?

11    A.  Correct.

12    Q.  So how do you know that the HR consultant roles

13  went to younger employees?

14    A.  I don't know their ages.

15    Q.  What is the basis -- what evidence do you have or

16  are you presenting to the jury that the HR director role

17  was given to a younger employee?

18    A.  Based upon Angie's tenure, as well as her stage

19  in life.  I know that she was younger than me.

20    Q.  How do you know that she was younger than you?

21  That is what I'm trying to understand.

22    A.  Direct Energy had a -- I don't know her exact

23  age.  So --

24    Q.  So what evidence are you presenting to the jury

25  to prove that the HR director role went to Angie, who

1     A.  Yes.

2     Q.  And that would be Jeff Fralix?

3     A.  Yes.

4     Q.  What evidence do you have that Jeff Fralix is

5  younger than you?

6     A.  Jeff and I had a conversation about his age.

7     Q.  Okay.  And what -- what did he tell you about his

8  age in that conversation?

9     A.  We discovered that he is one or two years younger

10  than I am.

11     Q.  How old were you at the time in 2017?  Sorry.

12  What is your date of birth?

13     A.  There we go.

14     Q.  Yes.

15     A.  November the 20th, 1970.  Why don't we figure

16  that out.

17     Q.  Okay.  So -- and at the time you were hired by

18  the company, it looks like you would have been about 45.

19  Does that sound right?

20     A.  44.

21     Q.  44?

22     A.  Going on 45, yes.

23     Q.  Okay.  And so in 2017 you would have been about

24  47?

25     A.  46, 47, yeah.

1   would also indicate that the company did not

2   discriminate against you because of your age, correct?

3       A.  Yes.

4       Q.  Okay.  How well did you know Melinda Reeves when

5   you worked at Direct Energy?

6       A.  Not very well.

7       Q.  Did you interact with her much during the time

8   that you both were there?

9       A.  About once a month we had one-on-one meetings or

10  skip-level meetings.

11      Q.  Okay.  And your interactions with her, generally

12  how would you describe those?

13      A.  They were okay.

14      Q.  Did you have any negative interactions with her

15  up till the time that you claim that you had a

16  conversation with her where she made a racist comment?

17      A.  Not that I recall.

18      Q.  When was the conversation where you claim she

19  made the racist comment?

20      A.  Around mid -- mid-2017.

21      Q.  Okay.  And that was following the VP of HR

22  application process, right?

23      A.  That was during the process.

24      Q.  Okay.  When you met with her, you had already --

25  you had learned that you did not get the VP of HR role?

1    A.  No.

2    Q.  You did not know?

3    A.  No.

4    Q.  Okay.  What was the point of you meeting with her

5    at that time?

6    A.  The point, I thought, was to have an interview

7    for the role.

8    Q.  Do you -- I know this is probably pushing it a

9    little bit.  Do you remember how you found out you did

10   not get -- from whom you found -- you learned that you

11   did not get the VP of HR role?

12   A.  I don't recall from who.

13   Q.  Do you -- do you know who Daniel Kochman is?

14   A.  Yes.

15   Q.  Okay.  Who's Daniel Kochman?

16   A.  He would have been a recruiter in talent

17   acquisition.

18   Q.  Okay.  Do you recall communicating with Daniel

19   Kochman about the status of the VP of HR role that you

20   applied for?

21   A.  Yes.

22   Q.  Okay.  How did you and Daniel Kochman communicate

23   about that?

24   A.  Via email.

25   Q.  Okay.  Do you recall learning from Daniel Kochman

1    that you did not get the VP of HR role?

2        A.  That sounds right, yeah.

3        Q.  Okay.  If there's an email that shows that he

4    notified you on or about August 13th that you did not

5    get the VP of HR role, would that sound about right to

6    you?

7        A.  Yes.

8        Q.  And I'm sorry, August 13th, 2017?

9        A.  Yes.

10       Q.  Okay.  And if there are records showing that you

11   met with Melinda Reeves on Tuesday, August 15th, 2017,

12   after you learned from Daniel Kochman that you didn't

13   get the role, would that sound about right?

14       A.  Yes.

15       Q.  Okay.  So to clarify the record, when you met

16   with Melinda Reeves on August 15th, you had already been

17   informed that you did not get the VP of HR role from

18   Daniel Kochman, correct?

19       A.  I recall meeting with her and being surprised

20   that I wasn't even going to be offered an interview for

21   the role.  So, yeah, so that's what I recall.  And I --

22       Q.  But my question is by the time you met with her,

23   you already had some indication that you were not going

24   to get the role, correct?

25       A.  I don't recall it that way.

1    Q.  Okay.

2    A.  Yeah.

3    Q.  Okay.  Tell me about this meeting that you had

4    with -- with Melinda Reeves where you claim she made a

5    racist comment.

6    A.  We -- we were whatever floor it was on, whatever

7    floor she sits on, in the --

8         REPORTER:  I'm sorry.

9         MS. WILLIAMS:

10   Q.  I'm sorry.

11   A.  I am so sorry.  Can I take a break?  I mean, I'll

12   answer this one, but I just want to take a break.  I

13   just feel like I need to get up and -- and stretch.

14   Q.  Sure.

15   A.  So --

16   Q.  Do you need a break now, or do you want to finish

17   this question and then we take a break?  I mean, I'd

18   prefer to get the question answered, if we can.

19   A.  I'll answer it.

20   Q.  And then --

21   A.  Yeah, yeah.

22   Q.  Okay.

23   A.  Yeah, yeah.  I just -- okay.  Realizing y'all

24   didn't understand whatever I just said, it's obvious,

25   okay, I need to stand up and go get some fresh air.

1        Okay.  With respect to the meeting, she started

2   off by telling me that I did -- that she really didn't

3   know me and that she felt like I intentionally missed

4   like one-on-one meetings with her and that I just turned

5   them down.

6        And I informed her that sometimes they were

7   scheduled when I was on a plane, because her assistant

8   did not look at calendars.  And just she told me that

9   she was the SVP of HR, and I took from that that I

10  needed to have -- I don't -- I don't know, but it

11  just -- it didn't -- it wasn't -- I didn't take it in a

12  positive manner.

13       And then she informed me that I wasn't going to

14  be interviewed for the role, and when I asked why,

15  because, you know, I'm like you said you don't know me,

16  and that's how you get to know somebody.  She told me

17  that she needed someone in the role who she could trust.

18  And all of my bells and whistles and red flags went off

19  in terms of the word trust in terms of being a black

20  woman and not being trustworthy.

21       And, yeah, I -- that's all I recall from the -- I

22  don't recall anything else.  And I recall walking away

23  feeling, yeah, dismissed, and, yeah, it wasn't a very

24  pleasant feeling after I walked away from that meeting.

25     Q.  Okay.  I have follow-up, but -- obviously, but

```
1    why don't we take the break --
2        A.  Thank you.
3        Q.  -- and then we can kind of pick up.
4        A.  Thank you.
5            MS. WILLIAMS:  Okay.
6            VIDEOGRAPHER:  It is 12:19, and we are off the
7    record.
8            [Recess]
9            VIDEOGRAPHER:  It is 12:45, and we are back on
10   the record.
11           MS. WILLIAMS:
12       Q.  Ms. Bible, we've had a break.  Is there anything
13   that you want to change or add to your previous
14   testimony?
15       A.  No.
16       Q.  Okay.  When we took the break, we were talking
17   about your meeting with Melinda Reeves, and you said
18   that she -- she made a couple of comments during the
19   meeting.  One was she told you she did not -- that she
20   did not know you; is that right?
21       A.  Yes.
22       Q.  Was it true that she did not know you very well?
23       A.  No.
24       Q.  You all knew each other well?
25       A.  I don't -- I mean, I wouldn't define it as well,
```

1  but she knew me.

2      Q.  Okay.  Did you think, when she said she didn't

3  know you, that she meant she didn't know you at all?

4      A.  I took it as she did not know my background in

5  terms of HR.

6      Q.  Okay.  Did she know your background as a -- in

7  HR?

8      A.  I don't know.

9      Q.  Okay.  So do you have any basis to believe that

10  when she said she didn't know about your background in

11  HR that she was not being truthful when she said that?

12      A.  No.

13      Q.  Okay.  And then she said that you

14  intentionally -- or she implied that you intentionally

15  missed meetings with her?

16      A.  Yes.

17      Q.  Okay.  Did you actually miss some meetings with

18  her?

19      A.  No, not intentionally.

20      Q.  Did you ever miss any meetings with her, whether

21  it was intentional or not?

22      A.  No, not that I recall.

23      Q.  Okay.  Did you ever, during that meeting, excuse

24  me, try to explain to her that you missed meetings

25  because there were some calendar issues with your

1    calendar and her assistant who was setting up the

2    meetings?

3        A.  I explained to her that sometimes when meetings

4    were scheduled I was not available.

5        Q.  Okay.  And so that would -- may have been the

6    meetings that you missed that she was referring to,

7    right?

8        A.  They would have been rescheduled.

9        Q.  Okay.  But those were the meetings that she was

10   referring to?

11       A.  That's my assumption, yes.

12       Q.  Okay.  And so there were some actual meetings

13   that were scheduled that you couldn't make that you had

14   to reschedule with her, correct?

15       A.  Absolutely, yes.

16       Q.  Okay.  And then you said she made a comment that

17   she wanted somebody in the role that she could trust?

18       A.  Yes.

19       Q.  And you said bells went off in your mind when she

20   said that?

21       A.  Yes.

22       Q.  Okay.  Why did bells go off in your mind when she

23   said she wanted somebody in the role that she could

24   trust?

25       A.  A, she did not know me, and, B, untrustworthiness

1    is a typical stereotype of a black person.

2    Q.  Okay.  So she didn't know you.  If you don't know

3    somebody, it's kind of hard to trust them, right?

4    A.  And so what basis she made her assumption was or

5    her -- her statement, it's like why -- why would she

6    make that?

7    Q.  Well, you said she didn't -- excuse me.  You said

8    she didn't know you, right?

9    A.  Right.

10   Q.  And so if she didn't know you, it's also possible

11   that she would not have a basis to trust you, right?

12   A.  Yes.

13   Q.  Okay.  Did she say anything else to you -- so

14   when she said she couldn't trust you, you thought -- you

15   took that -- is that the racist statement that she made

16   that you're claiming happened during that meeting?

17   A.  Yes.

18   Q.  Okay.  Did she say anything else in that meeting

19   that you're alleging was a racist statement?

20   A.  No.

21   Q.  So just the fact that she could not trust you?

22   A.  Yes.

23   Q.  Okay.  Did she mention your race during that

24   meeting at all?

25   A.  No.

1      Q.  Did you mention your race during that meeting?

2      A.  No.

3      Q.  When she said she couldn't trust you, you took

4   that to be a racist comment.  Did you take that to be a

5   comment that was discriminatory based on your age?

6      A.  No.

7      Q.  Okay.  Did she say anything during the meeting

8   about your age?

9      A.  No.

10     Q.  Did you say anything during the meeting about

11  your age?

12     A.  No.

13     Q.  In all of your employment at Direct Energy, has

14  anybody ever made any comments to you that was

15  derogatory regarding your race?

16     A.  Hold on, that's a span of four years.  Let me

17  think.  No.

18     Q.  And in your -- during your tenure with Direct

19  Energy, has anyone ever said -- did anyone ever say

20  anything to you that was derogatory regarding your age?

21     A.  No.

22     Q.  I'm sorry?

23     A.  No.

24     Q.  Okay.  So how long did the meeting with Melinda

25  Reeves last?

1      A.  I don't recall.  I would say probably 30 minutes,

2   maybe.

3      Q.  Okay.

4      A.  Yeah.

5      Q.  And how did you all end the meeting?  Did you all

6   have any plans for any follow-up meetings or any next

7   steps?

8      A.  Not that I recall.

9      Q.  And I think you testified that when you went into

10   the meeting you thought you were going to be

11   interviewed?  You thought that was your interview

12   meeting?

13      A.  Yes.

14         MS. WILLIAMS:  Okay.  I'm going to mark --

15         [Exhibit 2 marked, August 14, 2017 email from

16   Daniel Kochman to Shea Baham with attached email string]

17         THE WITNESS:  Thank you.

18         MS. WILLIAMS:

19      Q.  I'm showing you what's been marked as Exhibit 2

20   to your deposition.  Do you recognize this?  It's -- do

21   you recognize these pages?

22      A.  Let me see.  From Dan and other -- okay.  Yes.

23      Q.  Okay.

24      A.  Yes.

25      Q.  And, just for the record, can you describe for

1    the record what this document is?

2        A.   It's an email exchange between Dan Kochman and I.

3        Q.   Okay.

4        A.   Well, that's what it looks like.

5        Q.   And it's Bates labeled Bible 3 through Bible 8;

6    is that right?

7        A.   Oh, at the very bottom?

8        Q.   Yes.

9        A.   Yes.

10       Q.   Okay.  And it looks like it's the email

11   communication between you and Daniel started on August

12   3rd, and the last message was on Monday, August 14th,

13   2017; is that right?

14       A.   Yes.

15       Q.   Okay.  All right.  So I want to turn your

16   attention to the bottom of the first page of Exhibit 2,

17   the email message from Daniel on Sunday, August 13th.

18   Do you see that part?

19       A.   Yes.

20       Q.   And the second paragraph of his message he says I

21   wanted to let you know that Mel and I connected before

22   the weekend to discuss the internal candidates for the

23   VP, NAH role?

24       A.   Yes.

25       Q.   And then the next paragraph based on the internal

1   candidates in play Mel has decided to move forward with

2   a few other candidates at this time.  Do --

3        A.  Yes.

4        Q.  -- you see that?

5        A.  Yes.

6        Q.  Did I read that correctly?

7        A.  Yes.

8        Q.  And then you responded on August 14th in the

9   morning and said thank you for letting me know.

10       A.  Uh-huh.

11       Q.  I would love to hear more about what was lacking

12  from my application.

13       A.  Yes.

14       Q.  I'll find some time to connect when you return

15  from vacation?

16       A.  Yes.

17       Q.  Okay.  Does that refresh your recollection --

18       A.  Yes.

19       Q.  -- that when you went into the meeting with Mel,

20  Melinda, you already knew that you weren't being

21  interviewed for the job?

22       A.  Yes.

23       Q.  Okay.  Does that change your testimony then as to

24  whether or not you went into the meeting expecting to be

25  interviewed?

1      A.  Yes.

2      Q.  Okay.  So, to clarify, when you went into that

3  meeting, were you expecting to be interviewed?

4      A.  No.

5      Q.  And, in fact, you already knew that you were not

6  going to be interviewed, correct?

7      A.  Yes.

8      Q.  Based on your email exchange with Daniel?

9      A.  Yes.

10      Q.  Okay.  Do you know who else applied for the VP of

11  HR role?

12      A.  To the best of my recollection, Kristin Johnson

13  and Martine Savage applied.

14      Q.  Okay.  And I think you said they were both -- do

15  you know what level they were?

16      A.  L5.

17      Q.  Okay.  And then Jeff Fralix also applied?

18      A.  Obviously, yes.

19      Q.  Okay.

20      A.  And he was an L4.

21      Q.  And he was an L4.

22      A.  Uh-huh.

23      Q.  Do you know if anybody else applied?

24      A.  I don't know.

25      Q.  Do you know if any other L6 employees applied?

1      A.   I don't know.

2      Q.   Okay.  Okay.  So after your meeting with -- well,

3   when Daniel told you that you were not selected --

4      A.   Uh-huh, yes.

5      Q.   -- for the role, did you have any concerns at

6   that time?

7      A.   What type of concerns?

8      Q.   About being treated unfairly.

9      A.   I was concerned that I was not offered an

10   interview.

11      Q.   Do you know if there were other individuals who

12   were not offered interviews?

13      A.   I don't know.  I do know that Kristin and Martine

14   had interviews.

15      Q.   Okay.  But you don't know if there were other

16   candidates who applied who also did not get interviews?

17      A.   Correct.

18      Q.   Okay.  Is the -- did the fact that you did not

19   get an interview, did that cause you to believe you were

20   being discriminated against?

21      A.   Excuse me.  Yes.  Yes.

22      Q.   When did you develop the concern that not getting

23   the interview was discriminatory?

24      A.   Once I had a conversation with -- with Melinda

25   and she said that she didn't know me, but she still made

1    Q.  And you don't know Martine's age, correct?

2    A.  Right.

3    Q.  And you don't know Jeff Fralix's age?

4    A.  Correct.

5    Q.  Okay.  And you don't know if there were other

6    people who were -- who submitted applications for the VP

7    of HR role, correct?

8    A.  Correct.

9    Q.  Okay.  And you said that there was no one else

10   who had the level of skills and experience that you had

11   for the VP of HR role; is that right?

12   A.  Correct.

13   Q.  Was that your testimony?  Were you more

14   experienced than Kristin Johnson?

15   A.  Yes.

16   Q.  And -- and Martine Savage?

17   A.  Yes.

18   Q.  And Jeff Fralix?

19   A.  Absolutely.

20   Q.  What was -- what evidence do you have that you

21   were more experienced that Jeff Fralix?

22   A.  Our years of industry experience.

23   Q.  How long -- how many years of industry experience

24   did you have?

25   A.  What was that?  Probably 20 -- over 20 -- well, I

1   would say over 20.  So probably 22, 23 at the time.

2       Q.  How many years of industry experience did Jeff

3   Fralix have at the time?

4       A.  Less than I did.  So --

5       Q.  How much?

6       A.  Say, I don't know, 20.  I don't know.

7       Q.  How -- how much industry experience did Kristin

8   Johnson have?

9       A.  About the same as Jeff.

10      Q.  And then how much industry experience did Martine

11  Savage have?

12      A.  About the same as Kristin and Jeff.

13      Q.  So you all were in the 20 years of experience

14  range at the time of the VP -- at the time the VP of HR

15  role was posted?

16      A.  Yes.

17      Q.  Okay.  What makes you think that Jeff Fralix was

18  unqualified for the position?  Well, do you think Jeff

19  Fralix was unqualified for the position?

20      A.  Yes.

21      Q.  Okay.  What makes you think he was unqualified

22  for the position?

23      A.  Jeff was -- when I first started with Direct

24  Energy, one of the first meetings I attended Melinda was

25  describing the new HR organization to the HR team, and

1   in this meeting Jeff Fralix did not have a role.  I

2   think that's when he was in the talent, global talent

3   advisor role, and he didn't have a position, and she

4   started crying, because --

5       Q.  Melinda Reeves started crying?

6       A.  Yes, because, you know, her friend, dear Jeff,

7   was not --

8       Q.  I'm sorry, her friend what?

9       A.  Dear Jeff, our friend, dear Jeff, was not going

10  to be with the organization anymore.  Then a role opened

11  up miraculously, and he got another job.  But prior to

12  that he supported a group that I sat next to, and they

13  would turn and ask -- the vice president would ask me

14  questions, and I would say well, you know, you should

15  talk to Jeff.  And they would say well, I have, I

16  haven't heard from him or he's unresponsive.

17          And so there was a -- he had a reputation of

18  being unresponsive and -- what is the word --

19  superficial, so so, just did the bare minimum.

20          So then when the vice president of HR role was --

21  came open, again, he was going to be without a job, and

22  then he was the successful candidate for the role.

23      Q.  And you think he was successful because he was

24  friends with Melinda Reeves?

25      A.  Yes.  They had worked together at USAA for years.

1     Q.  How long after your meeting with Melinda Reeves

2  did you talk to Jeff -- I'm sorry, Jonathan Phillips

3  about your conversation with her and that you --

4  expressing that you were offended by what she said?

5     A.  I don't recall exactly how long it was

6  afterwards.

7     Q.  I mean, did you go to him immediately?

8     A.  No.

9     Q.  Why not?

10    A.  I wanted to process it and make sure that I was

11  being thoughtful about it and not overreacting, just

12  to --

13    Q.  Okay.  So approximately how long did it take you

14  to be thoughtful about it before you went to Jonathan

15  Phillips to tell him that you were offended by what

16  Melinda Reeves said?

17    A.  I don't recall exactly.  I would say probably

18  within two to four weeks.

19    Q.  Did Melinda Reeves do anything to you in those

20  two to four weeks that added to the concerns that you

21  had?

22    A.  No.

23    Q.  And when you went to Jonathan Phillips two to

24  four weeks later, did you -- did you call him, did you

25  meet with him in person, did you email him, which one,

1    or --

2    A.   We --

3    Q.   -- all of the above?

4    A.   We met in person.

5    Q.   Did he office in the same building with you?

6    A.   Yes.

7    Q.   And you scheduled a meeting with him?

8    A.   I don't believe I scheduled one, no.

9    Q.   Okay.  And so tell me about your meeting with

10   him.

11   A.   We went for a walk and ended up sitting in the

12   lobby of one of the -- the Greenway plaza buildings.

13   Q.   Uh-huh.  Did he know what -- in advance what you

14   were coming to talk to him about?

15   A.   No, I don't believe so.

16   Q.   Okay.  And just for timing purposes so I can make

17   sure, if your meeting with Melinda was sometime in

18   mid-August, --

19   A.   Uh-huh.

20   Q.   -- your meeting with Jonathan Phillips was

21   sometime late August to mid-September; is that right?

22   A.   As best I can recall.

23   Q.   Is it possible it was a little bit later?

24   A.   It's possible.

25   Q.   Okay.  And so you met in the lobby -- was anyone

1   else present when you met with Jonathan Phillips in the

2   lobby of Greenway Plaza?

3       A.  No.

4       Q.  And what did you tell him?

5       A.  I shared the exchange I had with -- with Melinda.

6       Q.  And what did he say?

7       A.  That he was obligated to report it.

8       Q.  Did you agree that he was obligated to report it?

9       A.  Yes.

10      Q.  Did you think you were obligated to report it?

11      A.  Yes.

12      Q.  Did you -- before you went to Jonathan Phillips,

13  had you reported this to anyone else?

14      A.  No.

15      Q.  And when he told you he was obligated to report

16  it, what was your reaction?

17      A.  I was concerned, because I knew that although I

18  share -- I tell like the clients I support that they

19  should use the investigation and complaint line, I had

20  never used it myself, and I was truly concerned that --

21  of the reaction that Melinda would have.

22      Q.  Did you have the ability to make a complaint

23  through the ethics line if you wanted to?

24      A.  Yes.

25      Q.  Okay.  You chose not to do that?

```
1     A.  Yes.

2     Q.  For what reason?

3     A.  I would have been easily identified.  So --

4     Q.  Is there a way to make an anonymous complaint?

5     A.  It would have been anonymous, but to the facts

6   that I would have been relaying would have clearly

7   pointed back to me.

8     Q.  Okay.  Did you tell him that you were concerned

9   for those reasons?

10    A.  Yes.

11    Q.  And what did he say?

12    A.  He understood why I'd be concerned.

13    Q.  And then what -- what did you all decide?

14    A.  He went and filed the complaint.

15    Q.  Was that the extent of your conversation with

16  him?

17    A.  I believe so, yes.

18    Q.  Okay.  How did -- how did he file the complaint?

19    A.  I'm not certain.

20    Q.  And after he filed the complaint, what happened

21  next?

22    A.  Shortly thereafter I was connected to -- I don't

23  know her specific role, but she was someone who asked

24  questions about the complaint.

25    Q.  Like an investigator?
```

1    A.  Yes.  Yes.  It was external to the company.

2    Q.  Okay.

3    A.  Uh-huh.

4    Q.  So you met with an investigator related to your

5    complaint?

6    A.  Yes.

7    Q.  Did you ever see the complaint that Jonathan

8    Phillips submitted?

9    A.  No.

10   Q.  Okay.  Did the -- based on your interactions with

11   the investigator, did she have an understanding as to

12   what your complaint was?

13   A.  It seems as -- yes.

14   Q.  And you said you think the investigator was

15   external to the company.  Do you recall her name?

16   A.  No, I don't recall her.

17   Q.  How many times did you meet with the

18   investigator?

19   A.  Once.

20   Q.  In person or over the phone?

21   A.  In person.

22   Q.  And the investigator asked you questions related

23   to your complaint; is that right?

24   A.  Yes.

25   Q.  And did you give her all of the -- were you able

1    Q.  And this is the conversation we discussed

2  earlier, correct?

3    A.  Yes.

4    Q.  And they -- what did they inform you about the

5  results of the investigation?

6    A.  That there was -- I don't -- I forgot their exact

7  words, but basically that nothing was going to happen.

8  And I told them that this is my fear from the beginning,

9  and now I have to continue to work in this environment.

10 I was in tears.  I was upset.  It was a clear glass.  I

11 was embarrassed.

12   Q.  When you told them you had to continue to work in

13 the environment, what environment are you talk -- are

14 you referring to?

15   A.  An environment where Melinda would have oversight

16 into my career.

17   Q.  After this complaint, did Melinda ever do

18 anything else to you that you thought was discriminatory

19 based on your race?

20   A.  No.

21   Q.  After this complaint, did Melinda ever do

22 anything else to you that you thought was discriminatory

23 based on your age?

24   A.  Not that I know of.

25   Q.  After this complaint, did Melinda ever

1    communicate in a way with you that you thought was

2    derogatory or offensive?

3        A.  No.

4        Q.  With respect to the VP of HR role, is Melinda the

5    only person that you think discriminated against you

6    with respect to that role, or were there others

7    involved?

8        A.  She was the only one.

9        Q.  Okay.  And so Jonathan and Sidney, you've

10   explained to them your fears and you were embarrassed.

11   What else happened during that meeting?

12       A.  I asked for a copy of the complaint and the

13   investigation.  I was told I couldn't have it, and

14   I ended up leaving.  I was really upset.  I was in

15   tears, and people are sitting outside, and there's

16   glass, so I was -- I just left.

17       Q.  You left for the day?

18       A.  I don't know.  Probably.  I know I left -- I

19   walked out of there.

20       Q.  Okay.  When you asked for the complaint and the

21   investigation, in your experience as an HR professional

22   at Direct Energy was it typical that the -- that

23   complaints and investigation reports would not be

24   distributed?

25       A.  I'm trying to think of a time when I -- yeah,

1      Q.   Okay.  When did that discussion take place?

2      A.   As a part of that meeting.

3      Q.   The same meeting before you left --

4      A.   Yes.

5      Q.   -- that meeting?

6           Okay.  And neither one of them told you that you

7      had to leave, correct?

8      A.   Correct.

9      Q.   In fact, up until the reorganization in 2019

10     where you applied for and did not get the roles, nobody

11     ever told you you had to leave the company, right?

12     A.   Correct.

13     Q.   Okay.  And when you told them that you wanted to

14     leave the company, they seemed to be, based on what you

15     described, supportive of that, yes?

16     A.   Ask the question again.  I'm sorry.

17     Q.   When you told them that you wanted to leave the

18     company --

19     A.   Yes.

20     Q.   -- they were supportive of that?

21     A.   Yes, if that's what I wanted to do.

22     Q.   But they weren't commanding it, right?

23     A.   Correct.

24     Q.   Okay.  And so when did you -- what did -- what

25     was their response when you told them you wanted to

```
1    find new employment.  You wanted more, correct?
2        A.  Yes.  I don't recall exactly how many months,
3    what was offered, but, yes, --
4        Q.  Okay.
5        A.  -- it wasn't -- it did not match what I thought I
6    needed to make the transition.
7        Q.  And so you made the decision to stay on at Direct
8    Energy as a result of that, correct?
9        A.  I made the decision to stay on and to -- and to
10   try to find other employment, yes.
11       Q.  Okay.  Were you actively looking for other
12   employment from that point on?
13       A.  Yes.
14       Q.  Until the time you actually left Direct Energy?
15       A.  Yes.
16       Q.  Were you ever successful in getting another
17   position that you applied for?
18       A.  No.
19       Q.  Okay.  How many positions do you -- did you apply
20   for when you were actively looking to leave Direct
21   Energy?
22       A.  I don't recall.
23       Q.  Roughly?
24       A.  I -- I have -- I can't even do a rough.  I do not
25   recall that one.
```

1     Q.  Were you pretty engaged, though, in the process

2  of looking for other employment?

3     A.  No.

4     Q.  Okay.

5     A.  I'd say I was minimal -- minimally engaged --

6     Q.  Okay.

7     A.  -- at that time.

8     Q.  But you did submit applications for other

9  positions at other companies?

10    A.  Yes.

11    Q.  Okay.  And none of those were successful?

12    A.  Yes.

13    Q.  Okay.  So after you learned about the results of

14 the investigation and the severance process didn't work

15 out, --

16    A.  Uh-huh.

17    Q.  -- you continued on in your role as HR business

18 partner, correct?

19    A.  Correct.

20    Q.  And you were, at that point, reporting to Jeff

21 Fralix now?

22    A.  Yes.

23    Q.  Okay.  When did you start reporting to Jeff

24 Fralix?

25    A.  When he started in the role.  So -- I'd say --

1    Q.  That would have been -- I'm sorry.

2    A.  -- early 2018.

3    Q.  Do you have any complaints about how Jeff Fralix

4    treated you when he was -- when you were reporting to

5    him?

6    A.  No.

7    Q.  Did he ever do anything to you that you think was

8    discriminatory based on your race?

9    A.  I do.

10   Q.  Okay.  What -- what did he do that you think was

11   discriminatory based on your race?

12   A.  It was -- we were -- we were having an all-hands

13   meeting, and before the meeting he told me that he

14   wanted me to not be Shea and that he said he was doing

15   it for my own good and basically just wanted me to

16   attend the meeting and be quiet.

17   Q.  When was this?

18   A.  January 2018.

19   Q.  January 2018?

20   A.  January, whenever the all-hands meeting was.

21   So -- it was prior to that.  I'm sorry.

22   Q.  I'm sorry, I'm just -- you said --

23   A.  January 2018.

24   Q.  So this would have been about the time that he

25   became your -- your supervisor?

1    correct?

2       A.  Yes.

3       Q.  And you would have continued reporting to Jeff

4    Fralix effectively until the time you left?

5       A.  Yes.

6       Q.  Okay.  And you said you received a raise for the

7    year 2016 when you were reporting to Kristin Johnson; is

8    that right?

9       A.  Yes.

10      Q.  And did you receive a raise when you were

11   reporting to Zandra in the year 2017?

12      A.  That would have been effective, what, 2018?  No.

13      Q.  And did you receive a raise when you were

14   reporting to Jeff Fralix for the year 2018?

15      A.  No.

16      Q.  Okay.  And is it your testimony that it was race

17   discrimination when you did not get a raise under Jeff

18   Fralix in 2018?

19      A.  I thought that your question was did I -- did he

20   treat me unfairly.

21      Q.  Okay.  Was it unfair that he didn't give you a

22   raise based on your performance in the year 2018?

23      A.  Yes.

24      Q.  Do you think that that was based on your race?

25      A.  I don't know what it was based on.

1    Fralix and then the complaint you had against Melinda

2    Reeves, --

3       A.  Uh-huh.

4       Q.  -- did anyone else discriminate against you based

5    on your race at Direct Energy?

6       A.  No.

7       Q.  And the comment that Jeff made about you not

8    being Shea and being quiet, do you think that was based

9    on your age or just based on your race?

10      A.  My race.

11      Q.  Okay.  Why don't we do this.  Mark this.

12          [Exhibit 3 marked, Your On Track Incentive Plan

13   documents]

14      A.  Thank you.  Who can read this little biddy

15   writing?  There we go.  Now we can read it.

16          MS. WILLIAMS:

17      Q.  Do you recognize these documents?

18      A.  Yes.

19      Q.  Okay.  Can you describe for us what these

20   documents are?

21      A.  It is a description of the Centrica On Track

22   program for each year for level 6 for 2017 -- excuse me,

23   two thousand -- yeah, wait, 2016 and through the time

24   that I left.

25      Q.  Okay.  And the documents are Bates labeled Direct

1    Energy 77 through 83; is that right?

2        A.  83, correct.

3        Q.  Okay.  And just for further clarification for the

4    record, for the year 2016 you have the On Track

5    incentive plan followed by a letter dated in 2017

6    related to your 2016 performance, correct?

7        A.  Correct.

8        Q.  And then there is a 2017 On Track incentive plan

9    document followed by a letter dated in 2018 regarding

10   your 2017 performance, correct?

11       A.  Correct.

12       Q.  And then finally there is a 2018 On Track

13   incentive plan document followed by a letter dated in

14   2019 regarding your 2018 performance, correct?

15       A.  Correct, yes.

16       Q.  Okay.  And these documents would indicate that --

17   what your performance rating was, correct?

18       A.  Correct.

19       Q.  Your salary review, correct?

20       A.  Correct.

21       Q.  A lump sum payment you received, correct?

22       A.  Yes.

23       Q.  And then your OTIP award, correct?

24       A.  Correct.

25       Q.  All right.  If you'll look at page -- the second

```
 1   page of Exhibit 3, the one that's Bates numbered 78.
 2      A.  Correct.
 3      Q.  So this is -- 2016 was your first full year,
 4   correct?
 5      A.  Correct.
 6      Q.  All right.  And it looks like under salary review
 7   it indicates that Zandra is informing you that your
 8   annual gross salary remain unchanged, right?
 9      A.  Yes.
10      Q.  Okay.  So for 2017, based on your 2016
11   performance, you did not get a change in your gross
12   salary, correct?
13      A.  Correct.
14      Q.  You did receive a lump sum award, yes?
15      A.  Correct.
16      Q.  And you also received an OTIP award?
17      A.  Correct.
18      Q.  Okay.  And then if we'll move on to the document
19   that's marked Bates number Direct Energy 80 --
20      A.  Okay.
21      Q.  Okay?  It has your performance rating there?
22      A.  Yes.
23      Q.  And it also has salary review, correct?
24      A.  Yes.
25      Q.  And it shows there that your annual salary
```

```
 1    remained -- remained unchanged at 153?

 2       A.  Yes.

 3       Q.  Correct?

 4       A.  Yes, correct.

 5       Q.  And then you received a lump sum award?

 6       A.  Yes.

 7       Q.  And you also received an OTIP award?

 8       A.  Yes.

 9       Q.  Okay.  And then finally for 2018 it shows that

10    your performance rating on the document that's Direct

11    Energy 82?

12       A.  Correct.

13       Q.  And it also indicates that your annual salary

14    remain unchanged?

15       A.  Yes.

16       Q.  And that you got a lump sum award?

17       A.  Yes.

18       Q.  And an OTIP award?

19       A.  Yes.

20       Q.  And it looks to me like the lump sum award you

21    got in 2019 based on your performance in 2018 was the

22    highest lump sum award you'd ever gotten during your

23    tenure at the company, correct?

24       A.  Yes.

25       Q.  And the OTIP award you got was also the highest
```

```
1    OTIP award you got during your tenure at the company,
2    correct?
3        A.  Correct.
4        Q.  And that was under Jeff Fralix?
5        A.  Yes.
6        Q.  Okay.
7        A.  We're done with this one?
8        Q.  Yeah, you can leave it -- yeah.
9        A.  Okay.  All right.
10       Q.  I don't know if we'll visit it later, but --
11       A.  Okay.  Okay.
12       Q.  -- it's fine there, thank you.
13           Okay.  And, I'm sorry, I asked you there was no
14   one else that you're alleging discriminated against you
15   based on your race other than Melinda Reeves and Jeff
16   Fralix, correct?
17       A.  Correct.
18       Q.  And there's no one -- who are you claiming
19   discriminated against you based on your age?
20       A.  Jeff Fralix.
21       Q.  Did Melinda Reeves discriminate against you based
22   on your age?
23       A.  Not -- no.
24       Q.  Okay.  So you are not claiming that the decision
25   she made regarding the VP of HR role was based on your
```

1    age?

2        A.   No.

3        Q.   You're not making that claim?

4        A.   No.

5        Q.   Okay.  How did Jeff Fralix discriminate against

6    you based on your age?

7        A.   Through the interview process and the selection

8    of Angie Moore.

9        Q.   For what position?

10       A.   The HR director position.

11       Q.   What did he do through the interview process that

12   you think was discriminatory based on your age?

13       A.   It was ultimate selection of someone who was less

14   qualified.

15       Q.   But what makes you think that that was based on

16   your age?

17       A.   I don't know.

18       Q.   Because you admitted earlier you have no idea how

19   old Angie Moore is, correct?

20       A.   Correct.

21       Q.   Okay.  And if it turns out that she is the same

22   age as you, it would be very difficult for you to

23   maintain that he discriminated against you based on your

24   age with respect to the HR director position, right?

25       A.   Yes.

1    Q.  Okay.  Did -- did Jeff Fralix do anything else to

2    you to discriminate against you based on your age other

3    than the selection for the HR director role?

4    A.  No.

5    Q.  What is Angie Moore's industry experience?

6    A.  I don't know.

7    Q.  You don't know?

8    A.  No.

9    Q.  What is your evidence that she was not qualified

10   for the HR director role?

11   A.  She doesn't have as much experience as I do.

12   Q.  How do you know that?

13   A.  Because in our conversations she doesn't have as

14   much experience as I do.  Nor were her experiences as

15   extensive as mine, and the feedback that even Jeff

16   provided about her feedback from clients and that I

17   personally heard from clients as well as conversations

18   Jeff had had.  Yeah, she wasn't near as qualified as I

19   was.

20   Q.  Okay.  What is her industry experience that makes

21   you think that she was not -- she did not have

22   sufficient qualifications?

23   A.  I don't recall.

24   Q.  Do you know how many years of experience she has

25   in the industry performing HR work?

1    A.  No.  No, --

2    Q.  Okay.

3    A.  -- no, no.

4    Q.  You don't know if it's more or less than you,

5  correct?

6    A.  To the best of my belief, it is less than what I

7  have.

8    Q.  What do -- that's your belief, right?

9    A.  Right.

10    Q.  You don't have any actual evidence or information

11  that she has less experience in the industry than you

12  do, correct?

13    A.  Correct.

14    Q.  Okay.  Since you don't have that information,

15  what is the basis of your claim then that she was not

16  qualified for the position?

17    A.  Based on my conversations with her, understanding

18  her background, as well as working with her.

19    Q.  How often did you work with Angie Moore?

20    A.  Practically every day.

21    Q.  Did you all collaborate together, or did you all

22  have separate responsibilities?

23    A.  We were peers.

24    Q.  And so did you all work on projects together for

25  the same client groups, or did she have her

1    A.  I don't know under what context I would have said
2    that she was as qualified as I was for the role.
3    Q.  Okay.  Well, I didn't ask you whether she was as
4    qualified as you were.  I was asking you whether or not
5    she was not qualified and whether there was anything
6    that led you to believe she didn't have experience for
7    the role.  And you said that based on what she shared
8    with you about her background led you to believe she
9    wasn't qualified for the role, right?
10   A.  That she did not have -- yeah, right.
11   Q.  Okay.
12   A.  That she didn't have as much experience as I did.
13   Q.  Okay.  But if you previously said that she did
14   have "decent experience," --
15   A.  Uh-huh.
16   Q.  -- would that have been accurate or inaccurate?
17   A.  I could -- yeah, she -- she has decent
18   experience, yes.
19   Q.  Okay.  And so would that decent experience have
20   qualified her for the HR director role?
21   A.  Not as qualified as I was.
22   Q.  I'm not asking you as qualified.  I'm asking you
23   whether or not it is your opinion that she was not
24   qualified at all.  Because I think you've testified
25   earlier that she wasn't qualified at all.  And so I'm

1    trying to get some clarification.  Is it your position

2    that she was not qualified at all for the role?

3        A.  I could not say that she was not qualified at

4    all.  She had some qualifications --

5        Q.  You think --

6        A.  -- for the role.

7        Q.  -- that you were better qualified?

8        A.  I think I was better qualified.

9        Q.  And you're basing that, even though you have no

10   information about what her specific qualifications are,

11   correct?

12       A.  Correct.

13       Q.  Okay.  Did you go through -- well, did you go

14   through an interview process for the HR director role?

15       A.  I did.

16       Q.  Let me back up and actually let's kind of add

17   some context here.  Between 2018 when Jeff Fralix became

18   your supervisor --

19       A.  Yes.

20       Q.  -- and 2019 --

21       A.  Yes.

22       Q.  -- it is my understanding that there was some

23   ongoing reorganization within Direct Energy; is that

24   right?

25       A.  It was always reorganizing, yes.

1    Q.  Okay.  They were always reorganizing through the

2    time that you were there?

3    A.  It seems like it, yeah.

4    Q.  Okay.  Was the 2019 reorganization the only one

5    that ever impacted your position?

6    A.  Yes.

7    Q.  What is your understanding about the

8    reorganization that occurred in 2019?

9    A.  There -- they were eliminating the HR business

10   partner roles and implementing a more process-focused HR

11   structure.

12   Q.  So did that reorganization impact only you?

13   A.  No.

14   Q.  Who did it impact?

15   A.  Several people.

16   Q.  What do you mean by several?

17   A.  It impacted the entire HR organization.

18   Q.  So your position was not the only position that

19   was being eliminated as a part of the 2019

20   reorganization, correct?

21   A.  Correct.

22   Q.  Do you think that there was anything about the

23   2019 reorganization related to your role and the impact

24   on your role that was discriminatory?

25   A.  No.

1    process, what that would look like.

2       Q.  Okay.  So let's kind of share -- like expand on

3    this for the jury.  You were notified that there was

4    going to be a reorganization that impacted the entire HR

5    organization, correct?

6       A.  Correct.

7       Q.  And you were informed that roles were being

8    eliminated, right?

9       A.  Yes.

10      Q.  Including your role?

11      A.  Yes.

12      Q.  And that new roles were being created, correct?

13      A.  Correct.

14      Q.  And that with respect to those new roles, that

15   candidates would have the opportunity to apply for and

16   interview for those new roles, correct?

17      A.  That candidates would have the opportunity to

18   apply for the roles.  It was not clear if interviews

19   would be conducted for each and every role.

20      Q.  Okay.  And did -- were you informed of any

21   alternatives to applying for those new roles so if you

22   did not apply for a new role or you didn't want to apply

23   for a new role were there other options available to you

24   under the reorganization?

25      A.  I'm not understanding your question.

1    A.  I don't recall.

2    Q.  Okay.  And so you learned shortly after it was

3    announced that there would be an HR director role,

4    correct?

5    A.  Yes.

6    Q.  And the two HR consulting roles?

7    A.  Yes.

8    Q.  And when did you make the decision to apply for

9    the HR director role when you learned that it was --

10   there was going to be this role?

11   A.  With discussions with Jeff.

12   Q.  Okay.  And then when did you make the decision

13   that you were going to apply for the HR consultant

14   roles?

15   A.  Same.  So after I evaluated the roles, that's

16   what I thought I would apply for, and in my

17   conversations with him that made sense to him, too.

18   Q.  When -- so this was a separate conversation that

19   you had with Jeff?

20   A.  Uh-huh.  We had regular one on ones.

21   Q.  And during one of your -- at least one of your

22   one on one's with Jeff you all discussed kind of what

23   the HR director and HR consultant roles would entail?

24   You discussed what those roles would look like?

25   A.  They -- we discussed me applying for them.

1    Q.  Okay.

2    A.  A lot of the details had yet to be outlined.

3    Q.  Okay.

4    A.  Especially for the HR consultancy roles.

5    Q.  Did he discourage you in any way from applying

6    for those roles?

7    A.  No.

8    Q.  I'm sorry?

9    A.  No.

10   Q.  Did he do anything to impede your ability to

11   apply for those roles?

12   A.  No.

13   Q.  And then eventually you applied for the roles,

14   correct?

15   A.  Yes.

16   Q.  Did you apply for the HR consultant roles at the

17   same time that you applied for the HR director roles or

18   was there some kind of lapse in time between the two?

19   A.  I believe I applied for all three at the same

20   time.

21   Q.  And did you interview for the HR director role?

22   A.  Yes.

23   Q.  With whom did you interview?

24   A.  Amanda Harrison and Jeff Fralix.

25   Q.  Who's Amanda Harrison?

1    A.  She was the hiring manager.  She sat globally.

2    So she was on video.

3    Q.  Okay.  This -- under the reorganization, the HR

4    director role and the consultancy roles would have

5    reported ultimately up to Amanda Harrison?

6    A.  Yes.

7    Q.  Okay.  Was she in a role that was sort of

8    equivalent to what Melinda Reeves had, understanding,

9    you know, the group had been reorganized a bit, but --

10   A.  Yes.

11   Q.  Okay.

12   A.  Yes.

13   Q.  Okay.  And how did your interview go for the HR

14   director role, from your perspective?

15   A.  I thought they went well.

16   Q.  Did Amanda Harrison say anything to you during

17   that interview that you found offensive or

18   discriminatory?

19   A.  No.

20   Q.  Did Jeff Fralix say anything to you during that

21   interview that you found offensive or discriminatory?

22   A.  No.

23   Q.  Do you think Amanda Harrison has done anything to

24   discriminate against you based on your race?

25   A.  No.

1    Q.  Do you think Amanda Harrison has done anything to

2    you to discriminate against you based on your age?

3    A.  No.

4    Q.  Do you think Amanda Harrison has done anything to

5    retaliate against you?

6    A.  No.

7    Q.  Okay.  Did you have just one interview for the HR

8    director role?

9    A.  No.  No.

10   Q.  Okay.  How many interviews did you have for the

11   HR director role?

12   A.  I recall two.

13   Q.  Do you know who interviewed for the HR director

14   role?

15   A.  I know Angie Moore interviewed and Brittany Smith

16   interviewed.  I'm not sure if anyone else interviewed.

17   Q.  Okay.  And Angie Moore ultimately got the role?

18   A.  Correct.

19   Q.  Okay.  And you -- and who made the decision to

20   select Angie Moore for the role?

21   A.  I don't know who ultimately made the decision.

22   Q.  But you think Jeff Fralix discriminated against

23   you with respect to the selection of Angie Moore for the

24   role?

25   A.  There was no -- I was more qualified than Angie

1  for the role.

2  Q. Right. So I'm just saying you don't know who the

3  decision makers are, --

4  A. Right.

5  Q. -- but you think it was Jeff who discriminated

6  against you with respect to the HR director role?

7  A. I'm -- yes.

8  Q. Okay. How did you learn that Angie Moore had

9  been selected for the role and that you had not been

10  selected for the role?

11  A. Jeff came to tell me.

12  Q. Approximately when did you learn in relation to

13  your interview?

14  A. I think shortly after the -- the last interview.

15  Q. Okay.

16  A. Yes.

17  Q. After your second interview?

18  A. Yes.

19  Q. Okay. And what did he tell you?

20  A. I don't remember the exact words, but the -- the

21  end result was that Angie had been selected for it.

22  Q. Did you tell him that you thought it was unfair?

23  A. No.

24  Q. Did you tell him that you thought it was

25  discriminatory?

1      A.  No.

2      Q.  Did you complain to anyone at the company that

3  you thought the selection of Angie Moore for the HR

4  director role was discriminatory?

5      A.  No.

6      Q.  Did you reach out to Amanda Harrison to talk to

7  her about the decision at any point?

8      A.  No, not that I recall, no.

9      Q.  And then did you interview for the consult -- did

10  you interview for the consultancy roles?

11      A.  Yes.

12      Q.  And there were two, correct?

13      A.  Correct.

14      Q.  And they would have been reporting to Angie Moore

15  in the new HR director role, correct?

16      A.  Correct.

17      Q.  Did those -- did your interview for the HR

18  consultancy roles occur after your interview for the HR

19  director role?

20      A.  Yes.

21      Q.  And who participated in that interview?

22      A.  Angie Moore.

23      Q.  It was just Angie Moore?

24      A.  Yes.

25      Q.  Okay.  And how many interviews, excuse me, did

1    Q.  Okay.  Okay.  When -- did Angie Moore say

2  anything to you during the interview that -- for the HR

3  consultancy roles that led you -- that you found to be

4  discriminatory?

5    A.  During the interview, no.

6    Q.  Okay.  Did Angie Moore ever say anything to you

7  that you thought was discriminatory?

8    A.  When she called to inform me that I had not been

9  selected.

10    Q.  What did she say?

11    A.  She said that -- I asked her -- and the decision

12  was made rather quickly, because I think I interviewed

13  with her, and then I'm driving home and she calls, and

14  it's I just want to let you know that I've decided to,

15  you know, go with the other two who had entered for the

16  roles.

17       And I asked her for feedback why, and she says,

18  you know, that I didn't make eye contact with her

19  throughout the interview.  And I told her, I said,

20  that's odd, because I was watching you take notes.

21  So --

22    Q.  And why do you think that was discriminatory?

23    A.  I think it was just a way for her to -- to -- to

24  justify why she did not select me.

25    Q.  Based on your -- but you thought it was

1    discriminatory --

2        A.   Based on my age.

3        Q.   -- based on your age?

4        A.   Yeah.

5        Q.   Because Chenee and Brittany are both African

6    American, right?

7        A.   Correct.

8        Q.   Okay.  So it -- Angie could not have been

9    discriminating against you based on your race in

10   connection with her selection of Brittany and Chenee,

11   correct?

12       A.   Correct.

13       Q.   All right.  And other than her telling you that

14   you did not make eye contact with her, did she say

15   anything else that you thought was discriminatory?

16       A.   No.

17       Q.   Or do anything else that you thought was

18   discriminatory?

19       A.   No.

20       Q.   Did you report this comment to the company or

21   make a complaint that you thought that Angie Moore was

22   being discriminatory against you when she made this

23   complaint?

24       A.   No.

25       Q.   You've talked and, you know, we've talked a bit

1    about your qualifications and some of your peers'

2    qualifications.  When you're applying for a job, was it

3    your understanding -- well, when you were applying for

4    these positions, the VP of HR position, the HR director

5    position and then the HR consultancy positions, --

6        A.  Yes.

7        Q.  -- was it your understanding that your

8    qualifications was a component of the selection

9    decision?

10       A.  Yes.

11       Q.  Okay.  Was it also your understanding that your

12   performance during the interview was a component of the

13   selection decision?

14       A.  Yes.

15       Q.  Do you know of anything else that might have been

16   a part of the selection decision?

17       A.  Maybe feedback from clients, feedback from

18   supervisors.

19       Q.  And do you -- you think -- I assume you think

20   it's fair that when you're interview -- applying for a

21   job that your qualifications would be evaluated,

22   correct?

23       A.  Yes.

24       Q.  And do you also think it's fair that your

25   performance during an interview would also be evaluated

1    to determine whether you're the correct person for a

2    position?

3         A.  Yes.

4         Q.  You don't have any issue with -- I understand you

5    may disagree with them, but you don't have any issue

6    with Jeff Fralix reviewing your interview performance in

7    connection with evaluating you for the HR director role,

8    correct?

9         A.  Correct.

10        Q.  And you don't have any issue with -- with Angie

11   Moore evaluating your interview performance in

12   connection with the selection process for the HR

13   consultancy roles, correct?

14        A.  Correct.

15        Q.  Okay.  How long have we been going?  I'm thinking

16   maybe we'll take a break.

17        A.  Because I'm about to say my Coke Zero's kicking

18   in.

19        Q.  Right.

20        A.  So I was like --

21        Q.  Okay.

22        A.  -- you have maybe one or two more and then I've

23   gotta --

24        Q.  We can take a break.

25        A.  Okay.

```
1        Q.   Were you --
2        A.   -- the allegation or --
3        Q.   Is the -- well, you claim that Jeff Fralix
4   retaliated against you by not giving you a raise.
5        A.   Correct.
6        Q.   Is that true?
7        A.   Is -- is -- could you rephrase the question?  Are
8   you asking me is that statement in that --
9        Q.   Is it true that Jeff -- is it your allegation --
10       A.   Okay.
11       Q.   -- that Jeff Fralix retaliated against you by not
12  giving you a raise?
13       A.   Yes.
14       Q.   It is.  Okay.  What was he retaliating against
15  you for when he didn't give you the raise, according to
16  your complaint?
17       A.   Filing a complaint against Melinda.
18       Q.   And when did he fail to give you a raise for
19  filing your complaint against Melinda?
20       A.   What was it?  2018 and 2019.
21       Q.   In fact, you had not gotten raises prior to that,
22  correct?
23       A.   Yes.
24       Q.   And, in fact, 2018, 2019 is the year that Jeff
25  Fralix gave you an exceeding expectations evaluation?
```

1    A.  Yes, my last rating for him was exceeding.

2    Q.  Jeff Fralix gave you that, right?

3    A.  Correct.

4    Q.  And he also was your supervisor that year when

5    you got the highest lump sum award you've ever gotten at

6    the company, correct?

7    A.  Yes.

8    Q.  And he was also your supervisor when you got the

9    highest OTIP award you've ever gotten at the company,

10   correct?

11   A.  Yes.

12   Q.  Okay.  But you think that he was retaliating

13   against you when he did not give you a raise that year?

14   A.  Yes.

15   Q.  Okay.  And what evidence do you have that Jeff

16   Fralix knew about your complaint against Melinda Reeves?

17   A.  I don't have any.

18   Q.  If he did not know about your complaint against

19   Melinda Reeves, you agree with me it would have been

20   hard for him to retaliate against you for filing a

21   complaint against her, right?

22   A.  Yes.

23   Q.  Okay.  And you don't have any evidence sitting

24   here today that you can offer to the jury that he

25   actually knew about that complaint when he made

1    decisions about your compensation in 2018 and 2019?

2        A.  Yes, correct.

3        Q.  Okay.  Thank you.

4        A.  Yes, correct.

5        Q.  So then why are you alleging that he retaliated

6    against you by not giving you a raise based on your

7    complaint against Melinda Reeves?

8        A.  Based --

9        Q.  I mean, if you don't know what he knows, how are

10   you making the assessment that he did that based on the

11   complaint?

12       A.  Right.  I don't know if he knew.  I believe he

13   did know.  The -- that HR organization had a really bad

14   reputation of maintaining secrets and maintaining

15   confidentialities.  And, like said, he and Mel were/are

16   good friends, worked together.  So there's no reason for

17   me to think that he did not know.

18           And as I asked for a raise and, you know, I

19   didn't get one, even after like, you know, hadn't had

20   one in three years.

21           MS. WILLIAMS:  Okay.  Objection, nonresponsive.

22       A.  Oh, that's --

23           MS. WILLIAMS:

24       Q.  I'm asking --

25       A.  -- fine.

1    A.  Correct.

2    Q.  -- are you claiming that the company

3    discriminated against you in any other respect?

4    A.  No.

5    Q.  Including based on your race?

6    A.  Ask that question again.

7    Q.  There is -- there's no other conduct that

8    occurred towards you during your employment other than

9    the nonselection of these roles -- for these roles that

10   form the basis of your race discrimination claim, right?

11   A.  Correct.

12   Q.  And, similarly, there's no other conduct that

13   occurred during the company other than your nonselection

14   for these roles that form the basis of your age

15   discrimination claim, correct?

16   A.  Correct.

17   Q.  Okay.  With respect to your retaliation claim, is

18   your complaint against Melinda Reeves the only activity

19   that you engaged in that you think you were retaliated

20   for?

21   A.  Yes.

22   Q.  There's no other action that you took that you

23   think the company retaliated against you for?

24   A.  No.

25   Q.  Okay.  And the retaliation occurred -- you

1  mentioned that you were retaliated against because you

2  were required to continue to report to Melinda, correct?

3    A.  Yes.

4    Q.  You view that as a form of retaliation, right?

5    A.  It was an unpleasant work environment, correct.

6    Q.  But you view that as retaliation?

7    A.  Yes.

8    Q.  And then you also view the fact that you had to

9  report to Jeff Fralix when he got the VP of HR role, you

10  view that as a form of retaliation, correct?

11    A.  Correct.

12    Q.  And then you've just shared with me that you

13  think that Jeff retaliated you by not giving you a

14  raise, you think that was a form of retaliation?

15    A.  Correct.

16    Q.  What else happened to you that you think was a

17  form of retaliation?

18    A.  Not being selected for the HR director nor the

19  two HR consultancy roles.

20    Q.  Okay.  And so you think Jeff retaliated against

21  you by not selecting you for the HR director role?

22    A.  Yes.

23    Q.  Did anybody else retaliate against you based on

24  your nonselection for the HR director role?

25    A.  No.

1    Q.   Just Jeff?

2    A.   Yes.

3    Q.   And you think Jeff retaliated against you based

4  on what conduct, based on what?  He retaliated you by

5  not selecting you for the HR director role because you

6  did what?

7    A.   Because I filed a complaint against Melinda.

8    Q.   Okay.  So this goes back to that original

9  complaint, as well?

10   A.   Yes.

11   Q.   Okay.  So it's your testimony that he didn't give

12 you a raise because of your complaint with Melinda,

13 correct?

14   A.   Correct.

15   Q.   And it's also your testimony that he didn't

16 select you for the HR, excuse me, director role because

17 of your complaint against Melinda, correct?

18   A.   Yes.

19   Q.   And with respect to the HR director role, your

20 testimony is the same, you don't know whether he even

21 knew about your complaint against Melinda when he made

22 the decision about the HR director role, correct?

23   A.   Correct.

24   Q.   Okay.  And who -- who retaliated against you with

25 respect to the HR consultancy roles?

1    A.  That would -- I still attach that to Jeff.

2    Q.  Okay.  What did Jeff do with respect to the HR

3  consultancy roles?

4    A.  My ultimate nonselection for roles, those two

5  roles.

6    Q.  Well, I think you testified earlier that Angie

7  Moore made the decision on those roles, correct?

8    A.  Yes.

9    Q.  And she's the only person who interviewed you,

10  right?

11    A.  Yes.

12    Q.  And so why do you think Jeff was retaliating

13  against you for Angie's selection related to the HR

14  consultancy roles?

15    A.  I believe that the process was designed such that

16  that would be the outcome.

17    Q.  What process?

18    A.  The selection process.

19    Q.  Whose selection process?

20    A.  The ultimate selection process for -- for both

21  roles.

22    Q.  For both of the consultancy roles?

23    A.  For the consultancy roles as well as the HR

24  director roles.

25    Q.  Okay.  What process was there, is what I'm trying

 1    allegation.  You don't think that Angie Moore retaliated

 2    against you, correct?

 3        A.  No.

 4        Q.  And so Jeff Fralix is the only person who

 5    retaliated against you with respect to the HR

 6    consultancy roles?

 7        A.  And the HR director role.

 8        Q.  Right.  I'm sorry, we talked about that one.  I

 9    was --

10        A.  Okay.

11        Q.  -- just focusing on the HR consultancy roles.

12        A.  Okay.  Okay.

13        Q.  I --

14        A.  All right.

15        Q.  I appreciate the clarification.

16        A.  Okay.

17        Q.  So Jeff is the only person that you allege

18    retaliated against you with respect to the HR

19    consultancy roles, correct?

20        A.  Oh, okay.  I'm -- okay.  Thank you for --

21    because -- all right.  Yes.  Yes.

22        Q.  Do you know what Jeff Fralix's role was in

23    selecting the successful candidates for the HR

24    consultancy roles?

25        A.  No.

1  and this is really just to make sure the record is

2  clear, because you've already testified about who was

3  selected for the two HR consultancy roles, right?

4       A.  Yes.

5       Q.  Okay.  That was Brittany Smith and Chenee

6  Franklin, correct?

7       A.  Yes.

8       Q.  In your interrogatory answers you indicate that

9  Direct Energy hired two younger Caucasian women for the

10  HR consultancy roles.  Who are the two -- who are the

11  two Caucasian women that you're -- you're referring to

12  in your discovery responses?

13      A.  I'd have to read it, but HR consultancy roles

14  that -- the two HR consultancy the roles, the level 6

15  ones, they were filled by Brittany Smith and Chenee

16  Franklin.

17      Q.  Who are both African American, correct?

18      A.  Yes.

19      Q.  And so -- and I appreciate you don't have it in

20  front of you.  I didn't -- I did not make extra copies,

21  because I'm just trying to clarify, but if you're

22  alleging or if you claim in your discovery responses

23  that two white women were hired for the HR consultancy

24  roles, that would be incorrect, right?

25      A.  Yes.

1    Q.  Okay.  And we should rely on your testimony here

2    today that the two HR consultancy roles went to Brittany

3    Smith and Chenee Franklin, who are both African

4    American, right?

5    A.  Correct.

6    Q.  Okay.  And I'm sorry, we were talking about the

7    raises that you talked to Jeff about.  About how many

8    times in 2018 did you go to Jeff to ask him about a

9    raise?

10   A.  I don't recall exactly.  I know at least once,

11   and somewhere between two and five.

12   Q.  Was anybody else present when you went to him to

13   ask him about a raise?

14   A.  No, these are during our one-on-one meetings.

15   Q.  Okay.

16   A.  Yes.

17   Q.  Did you think that he was denying you raises for

18   discriminatory reasons?

19   A.  For retaliation.

20   Q.  For retaliation.  And did you report this to

21   anyone at any time?

22   A.  No.

23   Q.  Okay.  So -- and, to be clear, it was not

24   discriminatory that he denied you a raise, but it was

25   retaliatory that he denied you a raise based on your

1    just to get them identified for the record.

2         [Exhibit 4 marked, July 31, 2019 Notice of

3    Layoff]

4    A.  Thank you.

5         MS. WILLIAMS:

6    Q.  I'm showing you what's marked as Exhibit 4,

7    right?

8    A.  Correct.

9    Q.  Of your deposition.  Do you recognize this

10   document?

11   A.  I do.

12   Q.  Okay.  What is it?

13   A.  It's my notice of layoff.

14   Q.  Okay.  Is this the -- the letter that you

15   received notifying you of the reorganization and the

16   job -- elimination of your position?

17   A.  Yes.

18   Q.  Okay.  And this document is Bates numbered Bible

19   33 through Bible, excuse me, 47.

20   A.  Uh-huh.  Yes.  Yes.

21   Q.  Does that look like the entire -- entirety of

22   what you received notifying you of your layoff?

23   A.  Yes.  Yes.

24   Q.  Okay.  Did you have any questions for any --

25   anyone about the contents of this notice when you

1    received it?

2      A.  No.

3      Q.  Okay.  And you were offered severance in

4    connection with the reorganization in the event you were

5    not selected for the positions, the HR director position

6    and the HR consultancy positions, correct?

7      A.  Correct.

8      Q.  Did you accept the severance?

9      A.  No.

10      Q.  And why not?

11      A.  I knew it was going to take me longer to find a

12    job.  Plus I felt like it was constructed so that I

13    would not have a job.

14      Q.  Okay.  Did you express that to anyone at the

15    time?

16      A.  No.  Last conversation I had with anybody was

17    Angie Moore.  Well, I take that back, and then I talked

18    to Sidney and Jonathan.  That was it.

19      Q.  You talked to Sidney and Jonathan after you got

20    the layoff notice?

21      A.  I talked to Sidney and Jonathan after Angie

22    called to tell me I wasn't selected.

23      Q.  Okay.  And what did you tell Sidney and Jonathan?

24      A.  I was -- I did not understand why I wasn't

25    selected for any of the roles.

```
 1          MS. WILLIAMS:  I actually have a few follow-ups.
 2          MR. HODGES:  Yeah, pass.
 3               FURTHER EXAMINATION BY MS. WILLIAMS
 4     Q.  I'm sorry.  I'm sorry.
 5     A.  I was like --
 6     Q.  You were almost done.
 7     A.  And I'm going to turn around.
 8     Q.  Okay.  Do you know what Jeff Fralix's educational
 9  background is?
10     A.  I do.
11     Q.  What is it?
12     A.  He has a bachelors from Baylor University.
13     Q.  Okay.  What else do you know about it, anything
14  else?
15     A.  That's it.
16     Q.  What about Angie Moore's educational background,
17  do you know what her background is?
18     A.  I do not.
19     Q.  Do you know if Jeff has any certifications?
20     A.  I don't believe he does.  I don't know, but I
21  don't believe he does.
22     Q.  Okay.  You don't know?
23     A.  Right.
24     Q.  Okay.  Do you know if he has any professional
25  licenses?
```

```
1      A.   Typically HR professionals, we don't have those.

2      Q.   Okay.

3      A.   So --

4      Q.   That's fine.  I'm just asking if you know --

5      A.   Right.  Okay.

6      Q.   -- if he has any.

7      A.   I don't believe so.

8      Q.   Do you know?

9      A.   I don't know.

10     Q.   Okay.

11     A.   Yeah.

12     Q.   Do you know if Angie Moore has any

13  certifications?

14     A.   I know she has a -- I think a PHR.

15     Q.   Okay.  What is a PHR, for the jury?

16     A.   Professional Human Resources.

17     Q.   Certification?

18     A.   Yes.

19     Q.   Do you know if she has any professional licenses?

20     A.   I don't know.

21     Q.   Okay.  How long was the interview for your -- the

22  HR consultant role?

23     A.   30 minutes max, maybe.

24     Q.   How long were the HR consultant role interviews

25  for Brittany Smith?
```

1    A.  I'm not sure.

2    Q.  And Chenee Franklin?

3    A.  I'm not sure.

4    Q.  You don't know if their interviews were longer or

5    shorter than yours, correct?

6    A.  Correct.

7    Q.  Okay.  How many years of experience does Jeff

8    Fralix have?

9    A.  At least two less than I do.

10   Q.  Okay.  How do you know that?

11   A.  We've talked about it.

12   Q.  Okay.  And how many years of experience does

13   Angie Moore have?

14   A.  I don't know.

15   Q.  When you applied for the HR director job -- well,

16   I'll break them up.  Excuse me.  When you applied for

17   the HR director job, did you prepare any type of

18   proposals or plans to submit as a part of your

19   application to show your qualifications?

20   A.  I had provided my resume.  I provided a cover

21   letter and letters of recommendation.

22   Q.  Is that it?

23   A.  Yes.

24   Q.  Okay.  When you applied for the HR consultancy

25   roles, did you prepare any type of proposals or plans

1   hired that you were -- you would be able to move levels

2   or to gain, I guess, more experience through Direct

3   Energy, you know, go up the ladder?

4       A.  Yes, I was -- yeah, it was an expectation that at

5   some point I would move through the ranks of Direct

6   Energy.

7       Q.  And do you know who gave you the -- told you that

8   or who gave you the expectations, or how did you -- how

9   did you expect that to happen?

10      A.  Through my performance and as roles came open.

11  In fact, I was being groomed, prepared to take on the

12  role when Zandra left.  Zandra was preparing me to take

13  on her role.  It was a level 4.  It was being regraded

14  to a level 5.  And -- and I was her top performer, had

15  the most experience.  So I was supposed to be, you know,

16  a great candidate for the role.

17      Q.  Did she ever tell you that you would be a great

18  candidate for the role?

19      A.  Yes.

20      Q.  And when did she say that?

21      A.  Oh, I don't remember the exact when, but in our

22  discussions about her role and as she was preparing to

23  leave, because the role was -- she was a 4.  It was

24  being reevaluated to a 5.  And so -- so when -- so when

25  the role was regraded as -- when Jeff came in and it was

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION

 3   SHEALONDRA BIBLE,              ]
           Plaintiff,              ]
 4                                 ]
     v.                            ]  CASE NO. 4:21-CV-00804
 5                                 ]
     DIRECT ENERGY, ET AL,         ]
 6   NRG LLC,                      ]
           Defendant.             ]
 7   --------------------------------------------------------

 8

 9               REPORTER'S CERTIFICATION

10             DEPOSITION OF SHEALONDA BIBLE

11                   JUNE 16, 2022

12        I, Shawn Kelley, Certified Shorthand Reporter

13   No. 3448 in and for the State of Texas, hereby certify

14   to the following:

15        That the witness, SHEALONDA BIBLE, was duly sworn

16   by the officer and that the transcript of the oral

17   deposition is a true record of the testimony given by

18   the witness;

19        That the deposition transcript was submitted on

20   _____, 2022, to Eddie Hodges, Jr.,

21   attorney for Plaintiff, for examination, signature, and

22   return to the offices of Nell McCallum & Associates,

23   Inc., by _____, 2022.

24        That the amount of time used by each party at the

25   deposition is as follows:
```

**NELL McCALLUM & ASSOCIATES, INC.**

1        Marlene Williams - (4 hours, 40 minutes)

2        Eddie Hodges, Jr. - (0 hours, 8 minutes)

3        That pursuant to information given to the

4   deposition officer at the time said testimony was taken,

5   the following includes all parties of record:

6        Eddie Hodges, Jr., Attorney for the Plaintiff

7        Marlene Williams, Attorney for the Defendant

8        I further certify that I am neither counsel for,

9   related to, nor employed by any of the parties in the

10  action in which this proceeding was taken, and further

11  that I am not financially or otherwise interested in the

12  outcome of the action.

13       Certified to by me this _____ day of _____,

14  2022.

15

16       _____

17       Shawn Kelley, Texas CSR No. 3448
         Expiration Date:  1/31/24
18       Nell McCallum & Associates
         Firm Registration No. 10095
19       Expiration Date:  1/31/23
         718 Westcott
20       Houston, Texas  77007
         (713) 861-0203

21

22

23

24

25

**NELL McCALLUM & ASSOCIATES, INC.**

## Baham, Shea

| | |
|---|---|
| **From:** | Kochman, Daniel |
| **Sent:** | Monday, August 14, 2017 9:47 AM |
| **To:** | Baham, Shea |
| **Subject:** | Re: NAH |

Thanks Shea. I know Mel decided the role needs to be a L4, and with other L4 and L5 candidates applying, feel they would have an easier time transitioning into the role. She'll definitely discuss more when you connect.

Thx,
Dan

Sent from my iPhone

On Aug 14, 2017, at 9:52 AM, Baham, Shea <Shea.Baham@directenergy.com> wrote:

> Thank you for letting me know. I would love to hear more about what was lacking from my application. I'll find some time to connect when you return from vacation. Enjoy!
>
> **Shea Baham**
> NA Home, HR Business Partner
> 12 Greenway Plaza; Suite 250
> Houston, TX 77046
> **Mobile:** (281) 414-9325
> **Office:** (713) 904-7354
> **Email:** shea.baham@directenergy.com
>
> <Picture (Device Independent Bitmap) 1.jpg>
> 
>
> ---
> **From:** Kochman, Daniel
> **Sent:** Sunday, August 13, 2017 7:52 AM
> **To:** Baham, Shea
> **Subject:** RE: NAH
>
> Hi Shea-
>
> I hope you had a great vacation! I'm actually heading out for one myself this week – which is why I'm emailing on a Sunday morning (apologies for that).
>
> I wanted to let you know that Mel and I connected before the weekend to discuss the internal candidates for the VP, NAH role.
>
> Based on the internal candidates in play, Mel has decided to move forward with a few other candidates at this time.



1

BIBLE000003

But, she was very happy you applied, and is going to schedule time to discuss with you in person this week.  Please look for an invite to come over from Tina if you haven't seen already.

Thanks  again,
Dan

*Sr. Manager, Talent Acquisition and Executive Recruitment*
194 Wood Avenue South, 2ᴺᵈ Floor
Iselin, NJ 08830
(p) 732-516-2656

<< OLE Object: Picture (Device Independent Bitmap) >>



---

**From:** Baham, Shea
**Sent:** Thursday, August 03, 2017 2:15 PM
**To:** Kochman, Daniel
**Subject:** RE: NAH

Thanks for reaching out!.  Let me know if there is anything further that I can provide in support of my application.

**Shea Baham**
NA Home, HR Business Partner
12 Greenway Plaza; Suite 250
Houston, TX  77046
**Mobile:**  (281) 414-9325
**Office:**  (713) 904-7354
**Email:**  shea.baham@directenergy.com



---

**From:** Kochman, Daniel
**Sent:** Thursday, August 03, 2017 12:09 PM
**To:** Baham, Shea
**Subject:** NAH

Hi Shea!

Thank you so much for applying to the VP, HR, NAH role.  Mel and I are actually speaking next Thursday about next steps and will circle back with you as soon as I can.

Thanks again,
Dan

2

BIBLE000004

**Dan Kochman**
*Sr. Manager, Talent Acquisition and Executive Recruitment*
194 Wood Avenue South, 2ᴺᵈ Floor
Iselin, NJ 08830
(p) 732-516-2656

<< OLE Object: Picture (Device Independent Bitmap) >>



3

BIBLE000005

## Baham, Shea

**From:** Kochman, Daniel
**Sent:** Sunday, August 13, 2017 7:52 AM
**To:** Baham, Shea
**Subject:** RE: NAH

Hi Shea-

I hope you had a great vacation!  I'm actually heading out for one myself this week – which is why I'm emailing on a Sunday morning (apologies for that).

I wanted to let you know that Mel and I connected before the weekend to discuss the internal candidates for the VP, NAH role.

Based on the internal candidates in play, Mel has decided to move forward with a few other candidates at this time.

But, she was very happy you applied, and is going to schedule time to discuss with you in person this week.  Please look for an invite to come over from Tina if you haven't seen already.

Thanks again,
Dan

*Sr. Manager, Talent Acquisition and Executive Recruitment*
194 Wood Avenue South, 2nd Floor
Iselin, NJ 08830
(p) 732-516-2656

 Simple. Friendly. Direct.



**From:** Baham, Shea
**Sent:** Thursday, August 03, 2017 2:15 PM
**To:** Kochman, Daniel
**Subject:** RE: NAH

Thanks for reaching out!.  Let me know if there is anything further that I can provide in support of my application.

1

BIBLE000006

**Shea Baham**
NA Home, HR Business Partner
12 Greenway Plaza; Suite 250
Houston, TX 77046
**Mobile:** (281) 414-9325
**Office:** (713) 904-7354
**Email:** shea.baham@directenergy.com
<< OLE Object: Picture (Device Independent Bitmap) >>

## Do you have an HR related question?



---

**From:** Kochman, Daniel
**Sent:** Thursday, August 03, 2017 12:09 PM
**To:** Baham, Shea
**Subject:** NAH


Hi Shea!

Thank you so much for applying to the VP, HR, NAH role.  Mel and I are actually speaking next Thursday about next steps and will circle back with you as soon as I can.

Thanks again,
Dan

**Dan Kochman**
*Sr. Manager, Talent Acquisition and Executive Recruitment*
194 Wood Avenue South, 2nd Floor
Iselin, NJ 08830
(p) 732-516-2656


<< OLE Object: Picture (Device Independent Bitmap) >>

## Do you have an HR related question?



2

BIBLE000007

3

BIBLE000008

On Track Incentive Plan – performance year 2016

# Your On Track Incentive Plan

**centrica**

On Track

## Your On Track Incentive Plan explained

The On Track Incentive Plan is deliberately simple. It rewards you for your performance with an award after the end of each performance year.

Your overall performance rating will mean you are eligible for an award from within a specific minimum and maximum range.

The potential award range increases steeply with each performance rating. Your actual award will be influenced by the Centrica Group Operating Cashflow performance and ultimately is determined at the discretion of your line manager.

How you receive your award will depend on your level within the business, your performance rating and employment status.

Awards are either made entirely in cash, or, part cash and part Centrica shares which are released after 2 and 3 years.

Your personal award opportunity is shown on the chart to the right along with confirmation of how you will receive your award.

If you are rated Below Expectations you may still receive an award at your manager's discretion. Any award will be deferred as shown and subject to performance improvement.

### Award as % of Base Salary

|  | Below Expectations | Achieving Expectations | Exceeding Expectations | Outstanding |
|---|---|---|---|---|
|  |  | 19.0% | 29.0% | 56.5% — Maximum award |
|  |  | 15.0% | 23.0% | 45.0% — Mid point |
|  |  | 11.0% | 17.0% | 33.5% — Minimum award |

| Performance Rating (% of OTIP Award) | Immediate Cash | Deferred Cash | Deferred Shares |
|---|---|---|---|
| Achieving Expectations | 100% | 0% | 0% |
| Exceeding Expectations | 100% | 0% | 0% |
| Outstanding | 75% | 0% | 25% |
| Below Expectations | 0% | 100% | 0% |

Note: The On Track Incentive Plan operates in accordance with the plan rules which may be changed in the future at Centrica's discretion.

**Visit the intranet.  My progress > On Track for all the information you need.**

CONFIDENTIAL

OTIP L6 NA

DIRECT ENERGY 000077

EXHIBIT
3
PENGAD 800-631-6989

**Strictly Private and Confidential – Addressee Only**

Shea Baham
6515 Nicholas Trl
Texas
77479

23 March 2017

Dear Shea

Further to our recent conversation where I outlined the business context which, along with your personal performance, has influenced this year's annual reward review, I am writing to confirm the outcome for you.

**2016 Performance Rating**
As discussed, following calibration of your performance relative to your peers, your overall performance rating for the 2016 performance year is Achieving Expectations.

**Salary Review**
In line with your performance rating and taking into consideration your position against internal peers and the external market, your skill level and experience and the budget available to me, I can confirm that your annual gross salary will remain unchanged.

**Lump Sum**
You have been granted a one-off lump sum of $4,050.00. This will be processed as a gross payment through the April payroll.

**On Track Incentive Plan (OTIP) Award**
In recognition of your performance relative to your peers, I have determined that you will receive a total OTIP award of 18.3% of your salary as of 31 December. This equates to a gross payment of $28,000.00 and will be processed through the March payroll.

**More information**
You can view your OTIP personal Opportunity Statement for the 2016 performance year in Workday by going to Personal Information > View > About Me > Compensation > Opportunity Statement.

The OTIP operates in accordance with the plan guide, which is available on the On Track pages of the Intranet.

Thank you for all your work in 2016. I look forward to continuing working with you in 2017.

Yours sincerely

**Zandra Magarino**
**VP, Human Resources, NA Home**

CONFIDENTIAL         DIRECT ENERGY 000078

On Track Incentive Plan – performance year 2017

# Your On Track Incentive Plan

**centrica**

On Track

## Your On Track Incentive Plan explained

The On Track Incentive Plan is deliberately simple. It rewards you for your performance with an award after the end of each performance year.

Your overall performance rating will mean you are eligible for an award from within a specific minimum and maximum range.

The potential award range increases steeply with each performance rating. Your actual award will be influenced by the Centrica Group Operating Cashflow performance and ultimately is determined at the discretion of your line manager.

How you receive your award will depend on your level within the business, your performance rating and employment status.

Awards are either made entirely in cash, or, part cash and part Centrica shares which are released after 2 and 3 years.

Your personal award opportunity is shown on the chart to the right along with confirmation of how you will receive your award.

If you are rated Below Expectations you may still receive an award at your manager's discretion. Any award will be deferred as shown and subject to performance improvement.

## Award as % of Base Salary

|  | Maximum award | 56.5% |
|---|---|---|
|  | Mid point | 45.0% |
|  | Minimum award | 33.5% |

29.0%
23.0%
17.0%

19.0%
15.0%
11.0%

| | Below Expectations | Achieving Expectations | Exceeding Expectations | Outstanding |
|---|---|---|---|---|
| Performance Rating (% of OTIP Award) | Immediate Cash | | Deferred Cash | Deferred Shares |
| Achieving Expectations | 100% | | 0% | 0% |
| Exceeding Expectations | 100% | | 0% | 0% |
| Outstanding | 75% | | 0% | 25% |
| Below Expectations | 0% | | 100% | 0% |

Note: The On Track Incentive Plan operates in accordance with the plan rules which may be changed in the future at Centrica's discretion.

**Visit the intranet. My progress > On Track for all the information you need.**

CONFIDENTIAL

DIRECT ENERGY 000079

OTIP 16 NA

**centrica**

**Strictly Private and Confidential – Addressee Only**

Shea Baham
6515 Nicholas Trl
Sugar Land
Texas
77479

23 March 2018

Dear Shea

Further to our recent conversation where I outlined the business context which, along with your personal performance, has influenced this year's annual reward review, I am writing to confirm the outcome for you.

**2017 Performance Rating**
As discussed, following calibration of your performance relative to your peers, your overall performance rating for the 2017 performance year is Achieving Expectations.

**Salary Review**
In line with your performance rating and taking into consideration your position against internal peers and the external market, your skill level and experience and the budget available to me, I can confirm that your annual gross salary will remain unchanged at $153,000.00.

**Lump Sum**
You will receive $2,034.90 as a lump sum payment in lieu of a merit increase. This will be processed as a gross payment through the April payroll.

**On Track Incentive Plan (OTIP) Award**
In recognition of your performance relative to your peers, I have determined that you will receive a total OTIP award of 13.5% of your salary as of 31 December. This equates to a gross payment of $20,655.00 and will be processed through the March payroll.

**More information**
You can view your OTIP personal Opportunity Statement for the 2017 performance year in Workday by going to Personal Information > View > About Me > Compensation > Reward Statements.

The OTIP operates in accordance with the plan guide, which is available on the On Track pages of the Intranet.

Thank you for all your work in 2017. I look forward to continuing working with you in 2018.

Yours sincerely

**Jeff Fralix**
**HR Partner - NA Home**

On Track Incentive Plan – performance year 2018

# Your On Track Incentive Plan

**centrica**

On Track

## Your On Track Incentive Plan explained

The On Track Incentive Plan is deliberately simple. It rewards you for your performance with an award after the end of each performance year.

Your overall performance rating will mean you are eligible for an award from within a specific minimum and maximum range.

The potential award range increases steeply with each performance rating. Your actual award will be influenced by the Centrica Group Operating Cashflow performance and ultimately is determined at the discretion of your line manager.

How you receive your award will depend on your level within the business, your performance rating and employment status.

Awards are either made entirely in cash, or, part cash and part Centrica shares which are released after 2 and 3 years.

Your personal award opportunity is shown on the chart to the right along with confirmation of how you will receive your award.

If you are rated Below Expectations you may still receive an award at your manager's discretion. Any award will be deferred as shown and subject to performance improvement.

### Award as % of Base Salary



| | Below Expectations | Achieving Expectations | Exceeding Expectations | Outstanding |
|---|---|---|---|---|
| | | 19.0% | 29.0% | 56.5% |
| | | 15.0% | 23.0% | 45.0% |
| | | 11.0% | 17.0% | 33.5% |

56.5% Maximum award
45.0% Mid point
33.5% Minimum award

| Performance Rating (% of OTIP Award) | Immediate Cash | Deferred Cash | Deferred Shares |
|---|---|---|---|
| Achieving Expectations | 100.0% | 0.0% | 0.0% |
| Exceeding Expectations | 100.0% | 0.0% | 0.0% |
| Outstanding | 75.0% | 0.0% | 25.0% |
| Below Expectations | 0.0% | 100.0% | 0.0% |

Note: The On Track Incentive Plan operates in accordance with the plan rules which may be changed in the future at Centrica's discretion.

**Visit the intranet. My progress > On Track for all the information you need.**

CONFIDENTIAL

OTIP L6 NA

DIRECT ENERGY 000081

**Strictly Private and Confidential – Addressee Only**

Shea Baham
6515 Nicholas Trl
Sugar Land
Texas
77479

22 March 2019

Dear Shea

Further to our recent conversation where I outlined the business context which, along with your personal performance, has influenced this year's annual reward review, I am writing to confirm the outcome for you.

**2018 Performance Rating**
As discussed, following calibration of your performance relative to your peers, your overall performance rating for the 2018 performance year is Exceeding Expectations.

**Salary Review**
In line with your performance rating and taking into consideration your position against internal peers and the external market, your skill level and experience and the budget available to me, I can confirm that your annual gross salary will remain unchanged.

**Lump Sum**
You will receive $4,605.30 as a lump sum payment in lieu of a merit increase.  This will be processed as a gross payment through the April payroll.

**On Track Incentive Plan (OTIP) Award**
In recognition of your performance relative to your peers, I have determined that you will receive a total OTIP award of 23% of your salary as of 31 December.  This equates to a gross payment of $35,190.00 and will be processed through the March payroll.

**More information**
You can view your OTIP personal Opportunity Statement for the 2018 performance year in Workday by going to Personal Information > View > About Me > Compensation > Reward Statements.

The OTIP operates in accordance with the plan guide, which is available on the On Track pages of the Intranet. Thank you for all your work in 2018.  I look forward to continuing working with you in 2019.

Yours sincerely

**Jeff Fralix**
**HR Partner - NA Home**

CONFIDENTIAL          DIRECT ENERGY 000082

# Your 2019 Incentive Opportunity Statement
**NA - Level 6**



This statement provides an overview of your incentive opportunity for Performance Year 2019.



## Eligibility
As a Level 6 Employee you are eligible to participate in Centrica's Annual Performance Incentive Plan (APIP) in recognition of your individual in-year contribution. If you are identified as a top quartile performer, you may also be eligible to participate in Centrica's Conditional Share Incentive Plan (CSIP) to align your compensation with the experience of our shareholders. If you receive a CSIP award, your APIP/CSIP mix will typically be 75%/25%.





## Your Earning Opportunity
Your target and maximum earning opportunities for both plans are detailed on the right. Based on Centrica's performance (see next section) and your own, your actual APIP/CSIP awards will be determined at the discretion of your manager from within this range and subject to a robust governance process to ensure fairness and equity.

## Centrica's Performance
The APIP and CSIP budgets are determined annually based on Centrica's performance against key performance indicators (currently Group Adjusted Operating Cashflow) and are subject to CEO recommendation to Centrica's Remuneration Committee.



## Your Payment/Vesting Schedule
Any APIP award relating to Performance Year 2019 will be paid in cash in March 2020 and subject to usual statutory payroll deductions. Your CSIP award will be converted in April 2020. The shares will be released in equal amounts on the 2nd and 3rd anniversary of the award subject to continuous service only (no performance conditions). Your payment/vesting schedule is described on the right. Malus and clawback rules may apply as set out in the plan rules.



## Need More Information?
Both the APIP and CSIP operate in accordance with the Plan Rules, which may be amended in the future at Centrica's discretion. For more information, please go to MyWorld, Workday or Computershare (following your first award) or speak to your manager or your HR Partner.

To check your incentive eligibility and/or historical awards, go to Workday > Compensation.



For information about your share awards (following your first award), go to Computershare:









CONFIDENTIAL



**centrica**

July 31, 2019

**BY HAND DELIVERY**
Shea Bible
6515 Nicholas Trl
Sugar Land, Texas 77479

Re:     **Notice of Layoff**

Dear Shea:

We are sorry to inform you that Centrica U.S. Holdings, Inc. will be conducting a reduction in force at its location at 12 Greenway Plaza, Suite 250, Houston, Texas 77046. As a consequence, twenty (20) employees will be permanently laid off on August 30, 2019 or the 14-day period commencing on that date, nineteen (19) employees will be permanently laid off on September 9, 2019 or the 14 day period commencing on that date, and thirty-five (35) employees will be permanently laid off on September 16, 2019 or the 14-day period commencing on that date. You are in the group of employees who will be permanently laid off on September 9, 2019. This layoff will be permanent, but the facility will remain open.

This layoff will be permanent, and bumping rights (that is, the right to avoid termination by displacing another employee) do not exist.

We are committed to treating our employees with fairness and respect as we work through this layoff. We also will assist you to identify potential opportunities for employment in the area by providing outplacement services during this time. Thank you for your contributions and continued support.

This notice is not a promise that your employment will continue to the date set out above or to any other time or date and does not alter the at-will nature of your employment. The information contained in this letter is based on the best information available to the Company at this time. If you have any questions, please contact Jonathan Phillips, Head of Employee Relations, North America, 713-904-7441.

Very truly yours,

Jonathan Phillips
Head of Employee Relations, North America



EXHIBIT
4

PENGAD 800-631-6989

BIBLE000033



July 31, 2019

DELIVERED BY HAND
PRIVATE & CONFIDENTIAL

**Shea Bible**

Dear Shea,

As discussed, it is with regret that we inform you that your current role as *HR Business Partner* will either end on or about September 9, 2019. To assist you in moving to your next career opportunity, the Company is prepared to provide you with a separation agreement, the details (approximate) of which are outlined below. You will be presented with the actual agreement closer to your separation date.

During the transition period, it is expected you will continue to maintain an adequate performance level and follow all applicable Company policies and procedures. Please note that should you voluntarily resign from the Company or are involuntarily terminated before September 9, 2019, you will not be eligible for the separation agreement:

- One lump sum payment equivalent to 8 weeks' base pay in the amount of **$23,538.46 USD**,
- One lump sum pro-rata 2019 payment for your service in 2019, based on your level and pursuant to your applicable bonus plan's good leaver rules. This amount will be will be put forth by your manager prior to your separation and reflected in your separation agreement, $22,950 → 75% $17,212.50 → 50% $11,475 ($5737)
- One lump-sum benefits continuation payment of **$2,000.00 USD**, and
- Outplacement services paid for directly by the Company.

*The Company reserves the right to modify the Severance Program at any time. Where required by law or statute, proper notice will be provided.*

Some additional information for your transition is provided below:

Professional career management assistance has been arranged by the Company to be provided to you by the firm of Lee Hecht Harrison (LHH). This will be available immediately and you are encouraged to utilize these services in order to assist you in making a smooth and successful transition. Please register online at www.lhh.com/Register or call 1-888-899-9306 if you would like outplacement support.

BIBLE000034



Please be advised that pursuant to the Confidentiality Agreement that you signed when you were hired, you have an ongoing legal obligation not to disclose to others (or use for your own benefit or the benefit of others) Confidential Information (as defined in that Agreement) which you acquired in the course of your employment, unless you have received prior written consent from the Company.

We understand this period of transition might be a difficult time for you.  The Company offers EAP services, at no cost to you, to help support this transition.  This confidential service, provided by Live and Work Well, is available 24 hours a day, seven days a week.  You may contact Live and Work Well at 1-866-248-4096.

If you have any questions about the terms of this letter, please contact **Jonathan Phillips** in Employee Relations.

Yours truly,


Jeff Fralix
HR Partner - NA Home

BIBLE000035



## SEPARATION AGREEMENT AND GENERAL RELEASE

**THIS AGREEMENT** is made as **September 9, 2019,** by and between **Direct Energy GP, LLC.,** a limited liability company (the "Company"), and **Shealonda Bible,** an individual working in the **State of Texas** (hereinafter "Employee"), because the parties are desirous of setting forth the terms and conditions of Employee's separation from employment with the Company.

The parties hereby confirm that Employee shall be separated from employment on the terms and conditions hereinafter set forth and that Employee enters into a general release of all claims he/she has or ever might have against the Company or any of the Released Parties (as defined below).

In consideration of the mutual covenants and promises hereinafter set forth, the Company and Employee hereby agree that:

1.    **Termination of Employment.** The parties acknowledge that Employee's employment with the Company ended as of **September 9, 2019** ("the Termination Date"). Employee acknowledges that he/she had no contract of employment with the Company at the time of cessation of his/her employment or at any time during the course of his/her employment with the Company.

2.    **Consideration.** In consideration for Employee's promises in this Agreement, including his/her general release and waiver of all claims against the Company, including those relating to his/her employment, the termination thereof or any other matter, the Company shall provide to Employee:

(a)    One severance payment in the amount of **Twenty-Three Thousand, Five Hundred Thirty-Eight Dollars and Forty-Six Cents ($23,538.46)** USD, equivalent to **Eight (8)** weeks base pay, less any applicable withholding and legal deductions, and after deduction of any money owed by Employee to the Company on account of advances made to Employee, personal purchases or unreturned samples ("Separation Payment"). Such Separation Payment shall be payable within thirty (30) days after the termination date and after the Company's receipt of the employee's execution of this agreement.

(b)    One lump-sum cash payment of **Seven Thousand, Nine Hundred Twenty-Two Dollars and Forty-Seven Cents ($7,922.47)** USD, which is equivalent to Employee's 2019 Annual Performance Incentive Plan Bonus. The amount is pro-rated for length of service, calculated at 50% of target, less applicable withholdings and deductions, and payable within thirty (30) days after the termination date and after the Company's receipt of the employee's execution of this agreement.

(c)    One lump-sum cash payment of **Two Thousand Dollars and Zero Cents ($2,000.00)** USD, which represents a benefits lump sum payment, less applicable withholdings and deductions, and payable within thirty (30) days after the termination date and after the Company's receipt of the employee's execution of this agreement.

The payments referenced in this paragraph 2 ("Separation Payment") shall be provided in consideration of Employee's release of and waiver of claims, and, except as provided in paragraph 3 hereof, in full satisfaction of any and all claims to salary, bonus, commissions, expense reimbursement or claims of any kind, and in full and complete satisfaction of any and all other sums, benefits or payments which may be owed to Employee by the Company. Employee, as a former employee of the Company, understands that he/she will not accrue benefits or receive contributions under any ERISA plan or any

1

BIBLE000036



Employee represents and warrants that he/she does not presently have on file, and further represents and warrants to the maximum extent allowed by law that he/she will not hereafter file, any lawsuits, claims, charges, grievances, or complaints against the Company and/or the Released Parties in or with any administrative, state, federal, or governmental entity, agency, board, or court, or before any other tribunal or panel or arbitrators, public or private, based upon any actions or omissions by the Company and/or the Released Parties occurring prior to the date of this Agreement.

6.    **No Interference with Rights:** Employee understands, agrees and acknowledges that nothing contained in this Agreement, including the provisions governing the release of claims, wavier of unknown claims, covenant not to sue, confidentiality, non-disparagement, and non-disclosure, will prevent him/her from filing a charge or complaint with, reporting possible violations of any law or regulation, making disclosures to, and/or participating in any investigation or proceeding conducted by, the National Labor Relations Board, Equal Employment Opportunity Commission, the Securities and Exchange Commission, and/or any governmental authority charged with the enforcement of any laws. Notwithstanding the foregoing, by signing this Agreement Employee agrees to waive his/her rights to individual relief based on claims asserted in any such charge or complaint, or asserted by any third-party on his/her behalf, except where such a waiver of individual relief is prohibited by law, and further agree that the Separation Payment he/she will receive as provided in this Agreement fully and completely satisfies any and all such claims. Further, nothing in this Paragraph or in the General Release or any other provision of this Agreement shall be construed or enforced in a manner that would interfere with Employee's ability to testify truthfully under oath in any legal proceeding, or Employee's rights under the National Labor Relations Act, if any, to discuss or comment on the terms and conditions of his/her employment.

7.    <u>**Release of Claims for Age Discrimination**</u>. Without in any way limiting the generality or scope of the General Release above, Employee hereby understands and agrees to release any and all claims, rights or benefits he/she may have arising out of or under the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, as amended, the Older Workers Benefit Protection Act, as amended, or any equivalent or comparable provision of federal, state or local law.

8.    <u>**Release of Unknown Claims**</u>. Employee understands and agrees, in compliance with any statute or ordinance which requires a specific release of unknown claims or benefits, that this Release includes a release of unknown claims, and Employee hereby expressly waives and relinquishes any and all claims, rights or benefits that he/she may have which are unknown to Employee at the time of the execution of this Release. Employee understands and agrees that if, hereafter, he/she discovers facts different from or in addition to those which Employee now knows or believes to be true, that the waivers and releases of this Release shall be and remain effective in all respects notwithstanding such different or additional facts or the discovery of such facts.

9.    <u>**Acknowledgements and Reporting**</u>. Employee acknowledges and agrees that Employee: (a) has been properly paid for all hours worked at Employer; (b) has not suffered any on-the job injury at Employer for which Employee has not already filed a claim; (c) has not suffered any unreported workplace injury at Employer through the Termination Date or re-aggravated any job injury Employee has already reported or for which Employee has already filed a worker's compensation claim; (d) has been properly provided any leave of absence at Employer because of Employee's or a family member's health condition; and, (e) has not been subjected to any improper treatment, conduct or actions by Employer due to or related to Employee's request for, or taking of, any leave of absence because of Employee's own or a family member's health condition.

10.    <u>**Non-Disclosure**</u>. Neither Employee nor any of his/her attorneys or representatives, including, but not limited to, his/her dependents, heirs, successors, assigns, or any other person advised by

3

BIBLE000037



period must be submitted, in writing, to the Company and must be mailed via USPS or electronically-mailed to the Company, in care of **Jonathan Phillips, 12 Greenway Plaza, Suite #250, Houston, Texas, 77046 or EmployeeRelations@directenergy.com.** This Agreement will become effective upon the expiration of the revocation period, provided Employee has not revoked the Agreement as set forth herein.

(c)     He/She was advised and hereby is advised in writing to consult with an attorney of his/her choice prior to signing this Agreement, that he/she has had an opportunity to consult with an attorney of his/her choice, and that he/she has fully and carefully read and understands all provisions of this Agreement.

(d)     Employee has read and fully understands the terms of this Agreement and has knowingly, voluntarily and of his/her own free will agreed to those terms for the purpose of fully and finally compromising and settling any and all claims, disputed or otherwise, of any kind or nature that he ever had or may now have against the Company arising out of his/her employment with, and separation from the Company, and arising out of any other matter, whether known or unknown to him/her at the time of execution of this Agreement;

(e)     Employee is not waiving any claims that may arise under the ADEA after the execution of this Agreement.

(f)     The Separation Payment exceeds the amount to which Employee would have otherwise been entitled from Employer and is, together with Employee's other promises under this Agreement, in exchange for him/her signing this Agreement; and

(g)     Employee has been provided with a listing setting forth the ages and job titles of all individuals in the same job classification or organizational unit who are eligible for this severance program, as well as those who are not eligible for this program and the applicable eligibility factors. *See* Exhibit A.

17.     **Governing Law; Jurisdiction; Service of Process.** This Agreement will be governed by the laws of the State of Texas without regard to conflicts of laws, principles, or rules. Any action or proceeding seeking to enforce any provision of, or based upon any right arising out of, this Agreement may be brought against either of the parties in the state court in Harris County, Texas, or in the federal court in the district covering Harris County, Texas; and each party irrevocably submits and consents to the jurisdiction and venue of such courts (and of the appropriate appellate courts) in any such suit, action or proceeding and waives any objection to venue laid therein.

5

BIBLE000038



**EXHIBIT A**

**OLDER WORKERS BENEFIT PROTECTION ACT ("OWBPA")
DISCLOSURE**

You and other employees selected for reduction-in-force are eligible to receive certain exit benefits from Direct Energy GP, LLC ("the Company") in connection with a group termination program. These are described in the Separation Agreement and General Release (the "Agreement") the Company has given you to consider. To receive the benefits described, you must sign the Agreement by the date indicated in the Agreement, which is more than 45 days after the date you received it, and not revoke the Agreement. You must not sign the Agreement before your last day of work at the Company. The signed Agreement must be returned to **Jonathan Phillips at 12 Greenway Plaza, Suite #250, Houston, Texas 77046** or **713-877-3500 or EmployeeRelations@directenergy.com** .

The Company is providing you with information showing the number of employees who are eligible and ineligible for the severance benefits under the group termination program, by age and job title. Employees are "eligible" for the group termination program because the Company selected them for termination and because they are eligible for the offered severance benefits in exchange for signing a Separation Agreement and General Release. Employees listed as "ineligible" are ineligible either because they will not be terminated, or because they are not eligible otherwise for the benefits of the group termination program. The footnotes, if any, indicate the reasons that certain individuals are not otherwise eligible for the benefits of this program as well as other information. The class, unit, or group considered for inclusion in the group termination program were employees within the NA Human Resources Function. Employees were selected for inclusion in the program based on job skills, business needs of the organization, and position elimination due to the Company's ongoing effort to find cost saving efficiencies with this area of the business. The last day of employment for the impacted individuals annotated on this exhibit is September 9, 2017.

The group termination program is available to you for at least 45 days from the date you were notified of your termination and received the Agreement and associated documents. If you sign and return a copy of the Agreement, you also have 7 days to revoke it.

The attached chart was prepared to be accurate as of September 2, 2019. This information is subject to change and may be affected by future employment decisions. If you have any questions about this information, or if you wish to receive more up-to-date information in the future, contact **Jonathan Phillips, at 12 Greenway Plaza, Suite #250, Houston, Texas 77046** or **713-877-3500 or EmployeeRelations@directenergy.com**.

| Position | Age | Number Eligible for the Program | Number Not Eligible for the Program |
|---|---|---|---|
| Training Manager | 64 | | 1 |
| Technical Development & Training Consultant | 61 | | 1 |
| Manager, Human Resources | 43 | | 1 |
| Manager - Technical Development & Training | 43 | | 1 |
| HR Systems Analyst | 31 | | 1 |
| Supervisor - Technical Development & Training | 34 | | 1 |

7

BIBLE000039

| | | | |
|---|---|---|---|
| Sr HR Employee Relations Consultant | 33 | | 1 |
| Sr HR Business Partner | 40 | | 1 |
| Technical Development & Training Consultant | 47 | 1 | |
| Associate HR Operations Analyst | 48 | | 1 |
| HR Operations Analyst | 31 | | 1 |
| Recruitment Consultant | 42 | | 1 |
| Recruitment Consultant | 46 | | 1 |
| HR Systems Analyst | 34 | | 1 |
| Manager - Recruitment | 47 | 1 | |
| Global Mobility Analyst | 32 | | 1 |
| Sr Benefits Analyst | 39 | | 1 |
| NA Payroll CoE Manager | 38 | | 1 |
| HR Systems Analyst | 48 | | 1 |
| Associate HR Operations Analyst | 28 | | 1 |
| Recruitment Consultant | 30 | 1 | |
| Technical Development & Training Consultant | 47 | 1 | |
| Director - HR Business Partnering | 51 | | 1 |
| HR Generalist | 44 | | 1 |
| Sr. Recruiter | 42 | | 1 |
| Supervisor - HR Systems | 42 | | 1 |
| Benefits Analyst | 44 | | 1 |
| Manager - HR Business Partnering | 40 | | 1 |
| Manager - HR Business Partnering | 48 | | 1 |
| Manager - HR Business Partnering | 33 | | 1 |
| Recruitment Consultant | 33 | | 1 |
| Manager - Talent Management | 39 | | 1 |

BIBLE000040



**Returning Your Severance Agreement**

## When Can I Sign/Return My Separation Agreement

Direct Energy provides you either fifteen (15), twenty-one (21) or forty-five (45) days after the date of separation to review and return the agreement to Direct Energy, depending on certain factors.  This period provides you ample time to have the agreement reviewed by a third party, such as an attorney.  However, the earliest you can return your agreement is the _day after your termination date_.  In other words, you cannot sign your agreement during the notice period (i.e. the period between your notification of separation and your actual separation date), but no later than either the fifteen (15), twenty-one (21), or forty-five (45) review period, one of which is clearly stated in your agreement.  If you do sign and return your agreement during the notice period, the agreement will be rejected, although you will be provided another opportunity to execute the agreement after your notice period expires.

## How Do I Return My Signed Agreement?

Once you've signed your severance agreement, you can return it to Direct Energy by one of two ways:

- Scan and email your signed agreement to EmployeeRelations@directenergy.com.  This is the preferred method of returning your agreement.  In the subject line, indicate _Return of Severance Agreement_, or

- Via certified mail NA Employee Relations c/o Jonathan Phillips, 12 Greenway Plaza, Suite #250, Houston, Texas 77046, USA.

If your agreement contains a seven (7) day revocation period (US only), Direct Energy will not process the agreement until expiration of this period.

Once the signed agreement is submitted for processing to CPS, it can take up to 30 days to receive payment.  All payments are subject to normal withholding and deductions, unless otherwise indicated.  You will receive your severance payment as you have historically received your salary (e.g. direct deposit).  For specific questions around the status of payment after you have submitted your signed agreement to the Company, please contact CPS at 1-866-370-8616.

**Version Date:** May 2018

**Simple. Friendly. Direct.**



# FAQ: Employees Exiting DE

## Table of Contents

Departure date and transition period:................................................................................................1

Severance:.............................................................................................................................................1

Paychecks, purchasing and expenses:..................................................................................................3

Health Insurance and other Insurance:................................................................................................3

Health Savings Account (HSA):.............................................................................................................4

Vacation:...............................................................................................................................................4

APIP, APIP Sales, DEC bonus plans and Commission............................................................................4

Employee Stock Purchase Plan (ESPP) & Awards stock:.......................................................................5

401k plan:.............................................................................................................................................6

Tuition Reimbursement & Employee Discount:...................................................................................6

Miscellaneous:......................................................................................................................................6

## Departure date and transition period:

**When is my last day of employment with DE? What will happen between now and my last day as a DE employee?**
- Your last day of employment will be confirmed to you by your manager.
- If you are asked to complete a transition of work before your last day of employment, your manager will share the details of your transition with you and any activities you will be required to complete, including knowledge transfer.

**Am I permitted to apply for other positions at Direct Energy?**
- After one year following your separation from DE, you are permitted to view and apply for open positions at www.directyourenergy.com .

**Am I eligible for re-hire with the Company?**
- Unless mentioned otherwise, you are generally eligible for re-hire after one year following separation from DE. Note, this does not mean you are guaranteed a future role with the Company but that future applications for employment will be considered pursuant to Direct Energy's normal recruitment and hiring process.

## Severance:

**Am I eligible for severance? How is my severance calculated?**
- Individuals whose roles with the organization that are eliminated or otherwise made redundant, are eligible to receive a severance payment.

## Paychecks, purchasing and expenses:

### When will I receive my last paycheck from DE?

- Your last paycheck from DE will be calculated based on your last day worked and direct deposited into the bank account currently set up with payroll, in accordance with DE's regular pay schedule. For specific questions about your last paycheck, please contact **CPS at (866) 370-8616.**

### I have a company p-card or credit card, am I able to continue to use it?

- Your p-card or credit card can be used until your termination date. Cards should be returned to DE and will be canceled on the termination date.

### What if I have outstanding expense reports?

- If you have outstanding expenses that require reimbursement, please complete and submit an expense form as soon as possible. The Company will ensure any expenses owed to you are paid quickly.
- If you owe the Company money (such as reimbursement of a corporate credit card) you are required to make a payment in full. If you fail to make such payment, the Company may deduct any owed expenses from your last paycheck and/or severance payment as allowed by law.

## Health Insurance and other Insurance:

### How long will my company-provided health insurance continue through DE?

- If you participate in any of DE's health insurance coverage, it will continue through until the last day of the pay period in which you were terminated.

### What happens once my health insurance through DE ends?

- Under DE's Separation Agreement, you will be offered a $2,000 lump sum benefits continuation payment to be used at your discretion.
- If you currently have health insurance (medical, dental and/or dental coverage) through DE, you can elect DE healthcare continuation, under COBRA.
- COBRA is available to you for up to 18 months after your DE healthcare ends.
- Information about COBRA will be sent to you by our third-party vendor (Wageworks) within 30 days after your DE healthcare ends
- You must still undergo the COBRA election process through which will require you to complete and submit a COBRA election form.
- If you have questions about COBRA, contact the Direct Energy Benefits Center at 800-588-9806.
- You may also choose to obtain health care coverage through other means, or the Health Insurance Marketplace, which is a series of exchanges operated within each state or on the federal level.

### When will my other DE insurance benefits end?

- All other DE benefits (include Life Insurance, AD&D, STD and LTD etc. end at midnight on your last day of employment with DE.

### Who do I contact for all other questions about DE Benefits?

- Please call the Direct Energy Benefits at 1-800-588-9806.

BIBLE00004

**Employee Stock Purchase Plan (ESPP) & Awards stock:**

**I have an ESPP account. Can I keep this account, or do I have to move it/close it? What will happen with my ESPP Matching?**

- If you are a member of the ESPP, you will receive a package from Computershare in the mail within six to eight weeks from your last day of work. If you do not receive the package, or have any questions please contact Computershare.

- Once your final share purchase has taken place with your payroll deductions, the Company will award one accelerated matching share for every two participant shares that have not previously been matched. This will occur approximately two months from your leave date.

- After the accelerated matching shares have settled in your Computershare account, Computershare will mail a letter to your home address with details on how to sell or transfer the shares from your Computershare account. You have three months from the date the letter is sent to sell or transfer your shares out of your Computershare account. If you do not take action, all shares will be sold and a check for the proceeds will be mailed to your home address.

**I have received Centrica equity Shares. What will happen with this equity? What is the vesting timing after I am no longer an employee?**

- Once Computershare has received your termination details from us, they will provide you with a leaver letter explaining what will happen to your equity holdings. This letter will be available in the 'Correspondence' section of your Computershare UK online account.

- In addition, each plan you have holdings in has a specific FAQ document located in the 'Plan Documentation' section of your Computershare UK online account. Each FAQ will provide full details on what happens to your holdings depending on your leave reason.

- It is strongly recommended that you update your Computershare UK online account with your personal email address to ensure all important communications in respect to your end of employment processes and any other processes moving forward that may be applicable.

- Computershare UK: centrica@computershare.co.uk . Should you have issues accessing your account, you can contact Computershare directly using the contact details on the login screen – please bear in mind that Computershare UK operates during UK business hours, so if you wish to call them please do so during UK business hours.

- For more information, contact the Computershare Call Center at +44 (0)370 707 1193, or email centrica@computershare.co.uk.

**To log into your Computershare account, please visit their website:**

- Website: www.uk.computershare.com/employee/login (please enter 'Centrica' or the company code 'CET' if prompted)

- User ID: This is your unique shareholder reference number (SRN), which is detailed in emails sent to you from Computershare or on behalf of Centrica Share Plans

  PIN: a 5 - 15 digit secure PIN. If you have never logged in to your account before you will need to request a reset via centrica@computershare.co.uk.

- Contact: Email - centrica@computershare.co.uk or call +44 370 707 1193 (please contact Computershare directly if you have forgotten your User ID or require any assistance)

BIBLE00004

**What if I accidentally leave personal items in the office?**

- Please contact your local human resources representative, who will help coordinate the return of any items at no cost to you.

**I feel very uncertain about my future. Is the any support Direct Energy can offer me?**

- You are eligible for Direct Energy's Employee Assistance Program (EAP). This confidential program provides support to qualifying individuals at no cost. We encourage you to take advantage of Direct Energy's EAP program to help you through this difficult period of transition. Moreover, Direct Energy is providing outplacement services through Lee Hecht Harrison (LHH). Information on how to contact the EAP program and LHH are contained in your packet (US only).



# Contact Information

As you transition from your role at Direct Energy, you may need to contact certain third-party vendors about your benefits:

| For Questions About... | Provider | Website | Phone Number |
|---|---|---|---|
| General Questions | Centrica US Benefits Center | www.MyCentricaUSBenefits.com | (800) 588-9806 |
| Payroll | Centrica People Services | www.nacentricapeopleservices@aonhewitt.com | (866) 370-8616 |
| Medical | United Healthcare | www.myuhc.com | (844) 269-5760 |
| Prescription Drug | CVS Caremark | www.caremark.com | (800) 434-4864 |
| Telemedicine | United Healthcare | www.myuhc.com | (844) 269-5760 |
| Dental | Delta Dental | www.deltadentalins.com/centrica | (800) 521-2651 |
| Vision | VSP | www.vsp.com | (800) 877-7195 |
| Flexible Spending Accounts and Commuter Benefits | UHC | www.myuhc.com | (844) 269-5760 |
| Health Savings Account | UHC/Optum | optumbank.com | (800) 791-9361 |
| Employee Assistance Program | Live and Work Well | www.liveandworkwell.com Access Code: "Centrica" | (866) 248-4096 |
| Life & Accidental Death & Disability Insurance | Securian Life | www.lifebenefits.com | (866) 293-6047 |
| Leave of Absence / FMLA | Metlife | www.mybenefits.metlife.com | (800) 438-6388 |
| 401(k) Plan | Fidelity | www.netbenefits.com | (800) 835-5095 |
| Backup Care | Bright Horizons | www.careadvantage.com/directenergy User name: "DEBackup" Password: "care4you" | (877) 242-2737 |
| Legal Protection & Hospital Indemnity & Group Home and Auto | MetLife | www.mybenefits.metlife.com | (800) 438-6388 |
| Cobra | Centrica US Benefits Center | www.MyCentricaUSBenefits.com | (800) 588-9806 |

**Version Date:** September 2019

BIBLE000046

**PROMISSORY NOTE, AGREEMENT AND AUTHORIZATION FOR PAYROLL DEDUCTIONS**

I, Shealonda Bible acknowledge Direct Energy, LP (the "Company") has given a loan to me of $2,942.31, with 0% interest over a period of 4 months.  I understand and agree that until I have repaid the Company for this loan, I will be subject to the repayment obligations specified in this Note.

If for any reason your pay frequency changes, Direct Energy reserves the right to amend this repayment schedule.

Repayment of said amount advanced to me shall be made as follows:

- In consideration for the value received, I promise to repay via payroll deduction the sum of ($2,942.31) which equals to my hourly rate x 40 hours (number of hours requested) over a period of 4 months/ 8 pay periods in the amount of $367.79. The date of the first deduction will be September 20, 2019.

- I hereby authorize the Company to deduct the above-mentioned installments from my paychecks on the dates identified above in paragraph 1, and in accordance with the Company's policy regarding such loans which I have reviewed, until such loan has been repaid in full.

- If, at the time of my separation from employment, the loan has not yet been repaid in full, I authorize the Company to deduct the remainder of the balance from my final paycheck.  I further agree to pay any balance that remains after such deduction within 15 days of my separation of employment to the address identified in Paragraph 1 above.

- If the loan is not repaid within 15 days of my separation of employee, the remaining loan balance will be reported as taxable wages and, if applicable, any taxes owed will be my responsibility to pay at the time of filing my end of year tax form. The personal check should be mailed to:

Centrica People Services
P.O. Box 661067
Dallas, TX 75266-1067

- I understand and agree that this Agreement does not change my employment relationship with the Company, which remains terminable at the will of either the Company or myself at any time.

BIBLE000047

**INTERNAL USE ONLY**
Equal Employment Opportunity Policy

Date : December 16, 2014
Version no: 1
Policy Owner - Primary: Manager, Resourcing Operations
Policy Owner - Secondary: Director, Workforce
Administration
Policy Type: Country Specific (USA & Canada excl. E&P)
Policy Number: 6-017



# Equal Employment Opportunity Policy

## Purpose and Scope

The purpose of the Equal Employment Opportunity Policy is to establish and communicate Direct Energy's (DE) commitment to providing a workplace that is free from discrimination and harassment, where employees, independent contractors, vendors, customers and other individuals that conduct business with DE are treated with respect and dignity. This policy applies to all terms and conditions of employment, including hiring, placement, promotion, termination, layoff, recall, transfer, leaves of absence, compensation and training.

The policy pertains to all employees, candidates, independent contractors, vendors and any other individual or group that conducts business with DE.

## Our Commitment to Equality

DE provides equal employment opportunities to all employees and applicants for employment without regard to race, color, religion, pregnancy, sex, sexual orientation, gender identity, national origin, age, disability, genetic information, marital status, veteran status, or any other protected status in accordance with applicable federal, state and local laws. DE complies with applicable state and local laws governing nondiscrimination in employment in every working environment, which includes: actual worksites, any setting in which work-related business is being conducted (whether during or after normal business hours), company-sponsored events, or company owned / company controlled property.

## Harassment is Prohibited

In accordance with the <u>Harassment and Discrimination Policy</u>, DE expressly prohibits any form of employee harassment based on race, color, religion, pregnancy, sex, sexual orientation, gender identity, national origin, age, disability, genetic information, marital status, veteran status, or any other status protected under applicable federal, state, and local laws. Improper interference with the ability of DE employees to perform their expected job duties is absolutely not tolerated.

## You Are Protected

DE encourages the reporting of all perceived incidents of discrimination or harassment. Moreover, DE prohibits retaliation against any individual who reports discrimination or harassment in "good faith" or who participates in an investigation of such reports. Conversely, individuals that make false and

**EXHIBIT**

**5**

PENGAD 800-631-6989

CONFIDENTIAL                    DIRECT ENERGY 000088

**INTERNAL USE ONLY**
Equal Employment Opportunity Policy

Date : December 16, 2014
Version no: 1
Policy Owner – Primary: Manager, Resourcing Operations
Policy Owner – Secondary: Director, Workforce
Administration
Policy Type: Country Specific (USA & Canada excl. E&P)
Policy Number: 6-017

malicious complaints of harassment, discrimination or retaliation (as opposed to complaints that, even if erroneous, are made in good faith) may be the subject of appropriate disciplinary action. Any legitimate reported allegations of discrimination, harassment or retaliation will receive a prompt, thorough, impartial and appropriate investigation in keeping with DE's Workplace Investigations Policy.

## Application

Employee Relations is responsible for the dissemination, implementation and administration of this policy. Employee Relations is also responsible for DE's overall compliance and will take appropriate action related to reported and/or suspected violations of this policy.

## Reporting and Compliance

Anyone that believes that this policy or the spirit of the policy has been violated, should report their concerns to a manager, or:

- "Speak Up" at 1-855-282-4792 or via the internet at  www.DirectEnergy.EthicsPoint.com
- Direct Energy Ethics Committee - EthicsCommittee@DirectEnergy.com
- Ethics and Compliance - EthicsAndCompliance@DirectEnergy.com

Or speak to your Human Resources representative

## Version History

| Version Date | Author | Change Description |
|---|---|---|
| 2014-12-16 | Human Resources | Revised policy and updated format to new policy template. |

## Related Direct Energy Policies

Harassment and Discrimination Policy
Speak Up Policy
Workplace Investigations Policy

## Related Centrica Policies

Centrica Group 'Speak Up' Policy
Centrica Group Human Rights Policy

## Minimum Review Cycle

Annual

CONFIDENTIAL          DIRECT ENERGY 000080

**INTERNAL USE ONLY**
Non-Discrimination/Anti-Harassment Policy
(with Illinois Addendum)

Date: January 19, 2018
Version no: 2
Policy Owner - Primary: HR Director, North America
Policy Owner - Secondary: Director, NA Employee Relations
Policy Type: Country Specific (USA & Canada)
Policy Number: 6-003



## Non-Discrimination/Anti-Harassment Policy

### Purpose and Scope

Direct Energy (DE) strives to create and maintain a work environment in which people are treated with dignity, decency and respect. DE will not tolerate unlawful discrimination or harassment of any kind.

All employees, regardless of their position, are covered by and are expected to comply with this policy. Appropriate disciplinary action will be administered when an employee is found to be in violation of this policy, up to and including possible termination of employment.

### Discrimination

It strictly prohibited by law and a violation of this policy to discriminate in the provision of employment opportunities, benefits or privileges; to create discriminatory work conditions; or to use discriminatory evaluative standards in employment if the basis of that discriminatory treatment is, in whole or in part, the person's race, color, national origin, age, religion, disability status, gender, sexual orientation, gender identity, genetic information or marital status.

### Harassment

DE prohibits harassment of any kind in the work environment. Harassment is any verbal or physical conduct designed or intended to disturb, threaten, intimidate, or coerce an employee, co-worker or any person working for or on behalf of DE. Verbal taunting is included in the definition of harassment. The work environment includes: actual worksites, any setting in which work-related business is being conducted (whether during or after normal business hours), company-sponsored events, or company owned / company controlled property.

### Sexual Harassment

Sexual harassment is a form of employment discrimination that is prohibited by law and is prohibited under this policy. There are two types of sexual harassment:

1. "Quid pro quo" harassment occurs when submission to harassment is used as the basis for employment decisions.

**EXHIBIT**

6

PENGAD 800-631-6989

CONFIDENTIAL                      DIRECT ENERGY 000004

**INTERNAL USE ONLY**
**Non-Discrimination/Anti-Harassment Policy**

Date:  January 19, 2018
Version no: 2
Policy Owner - Primary: HR Director, North America
Policy Owner - Secondary: Director, NA Employee
Relations
Policy Type: Country Specific (USA & Canada)
Policy Number: 6-003

2. "Hostile work environment" occurs when the harassment unreasonably interferes with an employee's work performance or creates an intimidating, hostile or otherwise offensive environment. A hostile work environment can be created by anyone in the work environment. Hostile environment harassment consists of verbiage of a sexual nature, unwelcome sexual materials or even unwelcome physical contact as a regular part of the work environment. Texts, e-mails, cartoons or posters of a sexual nature; vulgar or lewd comments or jokes; or unwanted touching or fondling all fall into this category.

Sexual harassment may take different forms. The following examples of sexual harassment are intended to be guidelines and are not exclusive or exhaustive when determining whether there has been a violation of this policy:

Verbal sexual harassment includes innuendoes, suggestive comments, jokes of a sexual nature, sexual propositions, lewd remarks and threats; requests for any type of sexual favor (this includes repeated, unwelcome requests for dates).

Nonverbal sexual harassment includes the distribution or display of any written or graphic material, including calendars, posters and cartoons that are sexually suggestive or show hostility toward an individual or group because of sex; suggestive or insulting sounds; leering; staring; whistling; obscene gestures; content in letters and notes, facsimiles, e-mail, photos, text messages, tweets and Internet postings; or other form of communication that is sexual in nature and offensive.

Physical sexual harassment includes, but is not limited to, unwelcome, unwanted physical contact, including touching, tickling, pinching, patting, brushing up against, hugging, cornering, kissing and fondling and forced sexual intercourse or assault.

## Retaliation is Not Permitted

No hardship, loss or penalty may be imposed on an employee in response to:

Filing or responding to a good faith complaint of discrimination or harassment
Appearing as a witness in the investigation of a complaint
Serving as an investigator of a complaint

Retaliation or attempted retaliation in response to lodging a complaint or invoking the complaint process is a violation of this policy. Any person who is found to have violated this aspect of the policy will be subject to discipline up to and including termination of employment.

CONFIDENTIAL          DIRECT ENERGY 000005

**INTERNAL USE ONLY**
**Non-Discrimination/Anti-Harassment Policy**

Date:  January 19, 2018
Version no: 2
Policy Owner - Primary: HR Director, North America
Policy Owner - Secondary: Director, NA Employee Relations
Policy Type: Country Specific (USA & Canada)
Policy Number: 6-003

## Confidentiality

During the complaint process, the confidentiality of the information received, the privacy of the individuals involved and the wishes of the reporting party will be protected to as great a degree as possible.

## Employee Assistance

The Employee Assistance Program (EAP) provides confidential counseling services to DE employees. Individuals wishing to discuss an incident confidentially or for those seeking information and advice of a personal nature are encouraged to contact the EAP. Counselors are available at:

> NA Employee Assistance Program: 1-866-248-4096 or www.liveandworkwell.com
> Canada Employee Assistance Program: 1-800-387-4765 or www.workhealthlife.com

The role of the EAP in such cases will be limited to personal counseling and treatment for the person who is then an EAP client. Contacting the EAP will not qualify as notification to DE of a potential harassment or discrimination issue (please see below for options on how to notify the Company of an issue or complaint).

## Application

In accordance with the Workplace Investigations Policy, DE will promptly and thoroughly investigate all reports and/or incidents of harassment, discrimination and of suspicious individuals or activities. To maintain workplace safety and the integrity of its investigation, DE may suspend employees suspected of harassment, either with or without pay, pending the outcome of the investigation.

## Reporting and Compliance

Anyone that believes that this policy or the spirit of the policy has been violated should report the matter for investigation. Policy violations and or suspected policy violations should be reported to:

> "Speak Up" at 1-855-282-4792 or via the internet at www.DirectEnergy.EthicsPoint.com
> Direct Energy Ethics Committee - EthicsCommittee@DirectEnergy.com
> Ethics and Compliance - EthicsAndCompliance@DirectEnergy.com
> Or speak to your Human Resources representative

CONFIDENTIAL          DIRECT ENERGY 000006

**INTERNAL USE ONLY**
Non-Discrimination/Anti-Harassment Policy

Date:  January 19, 2018
Version no: 4
Policy Owner - Primary: HR Director, North America
Policy Owner - Secondary: Director, NA Employee Relations
Policy Type: Country Specific (USA & Canada)
Policy Number: 6-003

## Addendum for Employees in the State of Illinois, United States

Pursuant to Public Act 87-1257, Illinois employees have the right to file formal charges with the Illinois Department of Human Rights (IDHR) and/or the United States Equal Employment Opportunity Commission (EEOC). A charge with IDHR must be filed within 180 days of the incident of sexual harassment. A charge with EEOC must be filed within 300 days of the incident.

Pursuant to ILCS 170/4.7, effective January 1, 2018, the following additional policy regarding sexual harassment shall apply to Illinois employees:

"Sexual harassment" means any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when: (i) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; (ii) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or (iii) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. For the purposes of this definition, the phrase "working environment" is not limited to a physical location an employee is assigned to perform his or her duties and does not require an employment relationship. Allegations of sexual harassment may be reported to a supervisor, the Ethics Officer, the Inspector General or the Department of Human Rights. Whistleblower protections are available under the State Officials and Employee Ethics Act, the Whistleblower Act, and the Illinois Human Rights Act.

## Version History

| Version Date | Author | Change Description |
|---|---|---|
| January 19, 2018 | Employee Relations | Policy revised and format updated to new template. |

## Related Direct Energy Policies

Equal Employment Opportunity Policy
Speak Up Policy
Workplace Violence Prevention Policy
Workplace Investigations Policy

CONFIDENTIAL          DIRECT ENERGY 000007

**INTERNAL USE ONLY**
Non-Discrimination/Anti-Harassment Policy

Date:  January 19, 2018
Version no: 2
Policy Owner - Primary: HR Director, North America
Policy Owner - Secondary: Director, NA Employee Relations
Policy Type: Country Specific (USA & Canada)
Policy Number: 6-003

## Related Centrica Policies

Our Code

Centrica Group Health and Safety Policy

Centrica Group Human Rights Policy

Centrica Group Security Policy

Centrica Group 'Speak Up' Policy

## Minimum Review Cycle

Annual

CONFIDENTIAL          DIRECT ENERGY 000008

**INTERNAL USE ONLY**
Workplace Investigations Policy

Date:  January 19, 2018
Version no: 2
Policy Owner - Primary: ER Director, North America
Policy Type: Country Specific (USA & Canada)
Policy Number: N/A



## Workplace Investigations Policy

### Purpose and Scope

Direct Energy (DE) is committed to ensuring that all company-initiated investigations are conducted in a fair, impartial, thorough, thoughtful, and reasonably prompt manner and in compliance with all applicable laws within the United States or the relevant jurisdiction. DE will initiate an appropriate investigation into all possible violations of law and DE policies, rules and standards of conduct.

This policy pertains to all employees, candidates, independent contractors, vendors and any other individual or group that conducts business with DE. If there is a conflict between this policy and a Collective Bargaining Agreement, the terms and conditions of the Collective Bargaining Agreement will apply.

### What are my Obligations During an Investigation

Employees are required to cooperate with investigations conducted by DE. DE prohibits retaliation against any individual who in "good faith" participates in an investigation. Any employee who fails to cooperate during an investigation or who knowingly makes false statements, misleading statements or whose statements contain material omissions during an investigation will be subject to disciplinary action up to and including termination.

### Confidentiality is Important

To the extent possible and permitted by law and company policy, complaints and information received during the investigation as well as the results of the investigation will remain confidential. The investigator will attempt to balance the need for confidentiality with the requirement to provide an environment free of discrimination and harassment.

No attempt will be made to identify a reporting party if they request anonymity. Whenever a reporting

**EXHIBIT**

7

PENGAD 800-631-6989

Simple. Friendly. Direct.

Page **1** of 3

CONFIDENTIAL

**INTERNAL USE ONLY**
**Workplace Investigations Policy**

Date:  January 19, 2018
Version no: 2
Policy Owner - Primary: ER Director, North America
Policy Type: Country Specific (USA & Canada)
Policy Number: N/A

party discloses their identity, it will be held in confidence to the fullest extent possible. Relevant information will be provided only to those persons who need to know, in order to achieve a timely resolution of the complaint, or as otherwise required by law.

DE may decide in some circumstances that in order to protect the integrity of the investigation, protect witnesses, and preserve evidence, it must maintain the investigation in strict confidence. If DE reasonably imposes such a requirement, anyone who inappropriately discloses confidential information related to the complaint or the investigation will be the subject of disciplinary action up to and including termination.

## Application

Employee Relations is responsible for the implementation, communication and administration of this policy. Moreover, Employee Relations will generally have primary responsibility for investigating complaints and incidents related to employee misconduct. However, depending on the circumstance, Ethics and Compliance and/or the Legal Department or the Legal Department's designee may also conduct DE investigations.

## Reporting and Compliance

Anyone that believes that this policy or the spirit of the policy has been violated should report the matter for investigation. Policy violations and or suspected policy violations should be reported to:

"Speak Up" at 1-855-282-4792 or via the internet at www.DirectEnergy.EthicsPoint.com
Direct Energy Ethics Committee - EthicsCommittee@DirectEnergy.com
Ethics and Compliance - EthicsAndCompliance@DirectEnergy.com
Or speak to your Human Resources representative

## Version History

| Version Date | Author | Change Description |
|---|---|---|
| January 19, 2018 | Employee Relations | Policy revised and format updated to new template. |

**Simple. Friendly. Direct.**

CONFIDENTIAL          DIRECT ENERGY 000100

**INTERNAL USE ONLY**
**Workplace Investigations Policy**

Date:  January 19, 2018
Version no: 2
Policy Owner - Primary: ER Director, North America
Policy Type: Country Specific (USA & Canada)
Policy Number: N/A

## Related Direct Energy Policies

Alcohol and Substance Abuse Policy
Non-Discrimination/Anti-Harassment Policy

## Related Centrica Policies

Our Code
Centrica Group Health and Safety Policy

## Minimum Review Cycle

Annual

CONFIDENTIAL

DIRECT ENERGY 000101

# Our Code

*centrica*

DIRECT ENERGY 000102

EXHIBIT

8

PENGAD 800-631-6989









Our Code sets out our minimum expectations for all those we work with or alongside and represents our commitment to doing the right thing and acting with integrity.

DIRECT ENERGY 000103

CONFIDENTIAL



DIRECT ENERGY 000104

CONFIDENTIAL

# Contents

## 1
### A message from Iain Conn




## 2
### Our purpose
We are an energy and services company.

## 3
### Our Values




## 4
### Our Code
- What is Our Code for?
- Who does Our Code apply to?
- Our Code and the law
- Our responsibilities under Our Code
- Additional expectations of our managers and team leaders

## 5
### Making good decisions

## 6
### Seeking further advice and raising a concern – Speak Up

CONFIDENTIAL

DIRECT ENERGY 000105

3 | Centrica | Our Code

## We protect our assets, information and interests

- We protect and maintain our data, information and records accurately
- We use company property and assets responsibly
- We protect our intellectual property
- We protect Centrica systems
- We use social media responsibly

### Assets, information and interests

## We work responsibly with communities and governments

- We engage in our communities
- We respect human rights
- We engage with governments and politicians responsibly
- We engage with the media responsibly
- We manage our impact on the environment

### Communities and governments

## We value our people

- We are inclusive and embrace diversity
- We do not tolerate harassment and bullying
- We offer fair reward and recognition

### Our people

## We treat our customers fairly

- We aim to deliver excellent customer service
- We advertise, sell and promote our products openly and fairly
- We respect customer privacy

### Customers

## We operate safely and securely

- We focus on health, safety and security
- We do not tolerate misuse of drugs or alcohol at work

### Safe and secure

## We conduct our business with integrity

- We do not offer or accept bribes
- We exchange gifts and hospitality responsibly
- We disclose and resolve conflicts of interest
- We respect trade controls
- We do not participate in money laundering
- We do not tolerate fraud
- We do not use or pass on insider information
- We compete fairly
- We require everyone we work with to operate responsibly

### Integrity



11
12
9
10
7
8

DIRECT ENERGY 000106

CONFIDENTIAL



# A message...

**Iain Conn**
Chief Executive Officer
Centrica PLC

Dear colleagues,

## This is Our Code.

This document applies everywhere to everyone working for Centrica and provides us with the freedom to operate safely and in an ethical and compliant manner no matter what we do for Centrica. It focusses on the most important principles and expectations which apply to us and is not optional. Our Code is an essential part of How Centrica Works alongside our purpose and our Values. It sets out what we stand for, covers our obligations to society, provides mandatory requirements and enables our licence to operate.

Our first priority at all times is to be safe and compliant in everything we do, but we operate in an environment where laws and regulations evolve. It is therefore important that Our Code reflects these changes and sets our boundaries, ensuring that we all do the right thing in the right way as we go about our work and business on a daily basis. By acting consistently with Our Code we will protect ourselves, the good name of Centrica and enable ongoing success. Our Code works in very close harmony with our Values, which clearly set out how we expect people to conduct themselves while working for us.

I believe that everyone working for Centrica will make the right decisions and Our Code should help us all to do that. If in doubt though don't hesitate to ask – this document will guide you to find out where to go for help.

From time to time things may not work out as we intended them to. At those moments, we all have a personal responsibility to raise any concerns, especially if we think that a customer has suffered or that a regulation, law or company policy may have been breached. In these moments, you should Speak Up and bring forward your concerns in line with the guidance set out in this document.

Please take the time to understand and familiarise yourself with Our Code.

CONFIDENTIAL

DIRECT ENERGY 000107

1



2

# Our purpose

We are an energy and services company. Everything we do is focused on satisfying the changing needs of our customers.

Our strategy is to deliver long term shareholder value through returns and growth. Further we aspire to be a trusted corporate citizen, an employer of choice and a 21st century energy and services company.






DIRECT ENERGY 000108

CONFIDENTIAL

# Our Code and our Values

Our Code is for all of us. It represents our minimum standards and expectations and defines the boundaries within which we operate. Our Values define who we are, what we stand for and who we aspire to be. Together they provide the freedom and clarity we all need to conduct our business successfully and in a way that builds trust.

## We stand for...

### delivery
We do things right and deliver

We value delivering great service and customer outcomes

We are rigorous, do things the right way, and follow best practice

We appreciate the journey as well as the results

We seek simplicity, efficiency and continuous improvement

### agility
We are nimble, curious and innovative

We don't stand still and know when to change

We seek out new things which will make a difference

We are restless, always looking to do better

We embrace the ideas and perspective of others

CONFIDENTIAL

3

DIRECT ENERGY 000109

DIRECT ENERGY 000110

## care

### We care deeply about our impact

The safety of our team and of others around us is paramount

We respect others, and the trust they place in us

We want to make a difference to society and those we touch

We have a sense of responsibility which goes beyond our job

## collaboration

Together we win

We enjoy working with others

We believe relationships and partnerships are fundamental

We are best when we work as a team

We seek out views and mutual understanding, even from our harshest critics

## courage

### We step up and take responsibility

We pursue the right outcome, knowing it is rarely easy

We are prepared to stand for what we believe

We will challenge where we believe the path is wrong

We face into the challenge and grasp the opportunity

CONFIDENTIAL

# Our Code

## What is Our Code for?

Our Code is more than just a set of rules. It sets out our minimum expectations for all those we work with or alongside. It is a guide to making good choices and represents our commitment to doing the right thing and acting with integrity.

Our Code forms the foundation of our Ethics & Compliance programme and represents a high-level summary of the key areas of Centrica Policies and Standards including how we:

- Operate safely and securely
- Conduct business with integrity
- Value our people
- Treat our customers fairly
- Protect our assets, information and interests
- Work responsibly with communities and governments

Further information is located on the How Centrica Works intranet site and through following links found throughout Our Code. Taken together, Our Code and Centrica Policies and Standards support our Values, demonstrate our commitment to being a responsible business and bind us together in the common pursuit of our strategy and purpose. We should all live Our Code, not just the rules, but the values that underpin it.

## Who does Our Code apply to?

Our Code applies to all of us, from our colleagues working on the frontline to members of the Board of Directors and to our affiliate companies. It also applies to all agency staff and consultants, whether working full-time, part-time, under a contract or on a temporary basis.

The actions of our business partners including joint venture partners and suppliers ('our third parties') can affect our reputation. We therefore want to work only with those third parties who share our commitment to doing the right thing, acting with integrity and who operate in a way that is consistent with Our Code.

This document replaces all previous company Codes of Conduct used throughout the Centrica Group, including the Centrica Business Principles and the Direct Energy Code of Conduct.

## Our Code and the law

We operate in many countries with different laws. Sometimes a law in one country may set a higher standard than Our Code. In those circumstances, we trust our colleagues to follow applicable laws and to do the right thing. If we do not obey these laws, Centrica and/or individuals could face fines, legal penalties or even imprisonment.

Breaches of Our Code can also damage our reputation and undermine the trust and confidence of our customers, our people and the communities in which we operate.

CONFIDENTIAL

DIRECT ENERGY 000111



4



**We should all live Our Code, not just the rules, but the spirit and values that underpin it.**

DIRECT ENERGY 000112

So, as well as obeying the laws of the country we work in, we should always comply with Our Code and never knowingly allow or encourage anyone to do anything that violates it. If we suspect a violation, we should report it or seek guidance (see section 6 – Seeking further advice and raising a concern – Speak Up).

## Our responsibilities under Our Code

Wherever Centrica operates we all have a responsibility to understand, follow and apply Our Code to our work at all times.

We also continue to represent Centrica outside of our contracted or normal hours of employment. In these instances, our behaviour can impact Centrica's reputation so we should ensure our actions are aligned with our Values and comply with Our Code.

**We will do this by:**

- Reading and being familiar with the information in Our Code

- Acting and making decisions in keeping with the spirit of Our Code and complying with all applicable laws and regulations

- Annually confirming that we have acted and will continue to act in line with Our Code

- Completing required training on Our Code

- Raising questions or reporting concerns if we become aware of possible breaches of Our Code or any law

- Participating fully and honestly in any investigation into suspected breaches of Our Code

- Making sure everyone who works for us or with us understands Our Code and knows how to apply it

- Working with partners, third parties and customers who share our ethical standards.

If anyone fails to observe or uphold Our Code and associated Policies and Standards, they could face disciplinary action up to and including dismissal. If a business partner or third party fails to uphold Our Code, we may terminate the relationship.

## Additional expectations of our managers and team leaders

**As managers and team leaders we have extra responsibilities to:**

- Be an example and role model Our Code and our Values every day

- Work collaboratively and provide an environment where Our Code and our Values are promoted

- Take direct action when the expectations of Our Code are not being met

- Help others understand Our Code and encourage colleagues to seek help and advice through our confidential Speak Up service if they are unsure about what to do, or are concerned that Our Code is being violated

- Ensure our teams know they will be supported for doing the right thing, are listened to when concerns are raised and protected from retaliation if they report a violation or help with an investigation

- Act consistently and fairly and demonstrate courage when holding people to account or enforcing Our Code.

CONFIDENTIAL



DIRECT ENERGY 000113

# Making good decisions

There may be instances when we face a difficult decision or a dilemma and need help to understand whether we are about to do the right thing. When in doubt there are lots of people we can ask and our Dilemma Wheel is designed to help guide us to the right decision.



How would
I feel if the
decision was
made public?





CONFIDENTIAL

5

DIRECT ENERGY 000114   12

Facing a dilemma?...



**1. Pause**
- Don't be impulsive
- Think it through for five minutes

**2. Ask**
Where appropriate ask a manager or find a helpful contact through Our Code to talk it over and help guide you to make the right decision

**3. Check**
- Does it comply with law, regulations and Our Code?
- How would it look printed in a newspaper?
- Have I fully understood the risks?
- Does it live our Values?

**4. Act**
With the confidence that you're doing the right thing

CONFIDENTIAL



# Seeking further advice and raising a concern – Speak Up

You can seek advice or raise a concern on any issue relating to Our Code by speaking with your line manager. Alternatively, concerns can be raised or advice sought from the specific functions highlighted throughout Our Code or through our Speak Up helpline.

Speak Up is an online and phone-based system provided by Centrica for the confidential reporting of violations of laws, regulations or company policies. It is managed by a third party and is available 24 hours a day, seven days a week. Employees, suppliers and business partners, as well as our wider stakeholders can seek advice or raise a concern relating to possible improper, unethical or illegal practice and/or conduct within the organisation, including potential or actual breaches of Our Code.

Concerns raised via Speak Up are kept confidential to the fullest extent possible and may be raised anonymously where allowed by applicable law and regulation.

## Do you want to seek advice or raise a concern relating to Our Code?



Do you feel comfortable approaching your line manager?
YES — Discuss your question or raise your concern with your line manager
NO — Do you feel comfortable approaching another manager in your team?

YES — Discuss your question or raise your concern with the manager
NO — Do you feel comfortable approaching someone in a function that supports you?

YES — Discuss your question or raise your concern with local HR, Legal, Ethics & Compliance, or Audit, or send an email to speakup@centrica.com
NO — Contact the Centrica Speak Up helpline

DIRECT ENERGY 00

CONFIDENTIAL

9

## Contacting the Centrica Speak Up helpline

**The Centrica Speak Up helpline can be reached by dialling the toll free numbers listed below, by country. Telephone calls are not recorded:**

- **Canada: 1-855-282-4792** – Language selection is available (English/French) once connected

- **Ireland: 1-800-550-000** – At the prompt please enter 855-282-4792

- **UK: 0808 234 6300**

- **USA: 1-855-282-4792** – Language selection is available (English/Spanish) once connected

Alternatively the Centrica Speak Up helpline can be contacted through the web portal at www.centrica.ethicspoint.com if you prefer or if your country is not listed above.

Concerns raised through Speak Up are reviewed by the Ethics & Compliance team who decide how and who should progress the matter. If appropriate, an investigation will be undertaken to establish relevant facts and determine whether action needs to be taken. If a breach of Our Code is found, appropriate steps will be taken to address the issue with those involved and may include disciplinary action.

The individual who raised the concern will be kept updated on the progress of any investigation and, where possible, provided with appropriate conclusions and recommendations once the matter is closed.

## Zero tolerance commitment on retaliation

We are committed to protecting those who raise concerns in good faith and do not tolerate any form of retaliation against colleagues who report possible or actual breaches of Our Code. We consider retaliation as gross misconduct. If any retaliation is identified this should be raised with line management, HR or via Speak Up.

**Speak Up is a system provided by Centrica for the confidential reporting of violations of laws, regulations or company policies.**

DIRECT ENERGY 000116 '4

CONFIDENTIAL

DIRECT ENERGY 000

Safe and secure



Our Code

CONFIDENTIAL

15 // Centrica // **Our Code**

# We operate safely and securely

Keeping our people and customers safe and secure is our top priority. We believe all work-related fatalities, injuries and illnesses can be prevented, which is why we are committed to working in a safe and responsible way.

## We focus on health, safety and security

We remain steadfast in our desire to do things safely and never compromise safety to achieve business targets.
It is our personal responsibility to ensure colleagues and business partners work to the highest safety and security standards in order to ensure compliance with applicable laws and Centrica Policies and Standards, while taking action to tackle unsafe behaviour. We ensure that we:

- Are aware of relevant health, safety and security Policies, Standards and Procedures

- Participate in relevant training on health, safety and security

- Intervene and stop work if we think it is unsafe

- Report and raise concerns relating to unsafe behaviours, conditions, accidents, injuries and illnesses (including near misses) using my HSES, local channels or available Health, Safety, Environment & Security reporting numbers.

Who can I speak to?
**Health, Safety, Environment & Security**





## We do not tolerate misuse of drugs or alcohol at work

We want our workplace to be free from illegal drugs and alcohol because the failure to do so could not only impact work duties but also put people at risk or in danger. As a result, we prohibit the possession or consumption of drugs at work locations with the exception of over the counter and prescription medication.

It is our personal responsibility to come to work free from the influence of drugs and alcohol and ensure that our performance is not impaired by drugs or alcohol including prescription or over the counter medication. We will inform HR or our line manager if we are taking medication that may require adjustments or accommodations for us to safely perform our work. We should all Speak Up if we observe unsafe or improper behaviour at work.

Who can I speak to?
**HR**

CONFIDENTIAL

DIRECT ENERGY 000118

16

7



# We conduct our business with integrity

We are committed to working with integrity, within the laws and regulations of all the countries in which we operate and in accordance with recognised international standards.

## We do not offer or accept bribes

It is not only illegal but unethical to offer or accept improper payments such as bribes and kickbacks, in order to gain or retain business. We do not therefore condone any payments we feel to be improper and take particular care when offering or receiving gifts and hospitality. Giving or accepting a bribe could result in substantial fines to the company, damage to our reputation and penalties for individuals including fines and imprisonment.

The only exception to this rule is a payment in circumstances where we may be in fear of personal harm; in which case a payment may be made but must be recorded and Ethics & Compliance informed as soon as possible. We should also take particular care when offering or receiving gifts or hospitality as governments and companies have strict rules and regulations, which if broken could constitute bribery.

We strive to ensure our business partners and third parties share our commitment to eliminate bribery and corruption.

Who can I speak to?
**Ethics & Compliance**

## We exchange gifts and hospitality responsibly

We recognise that the exchange of appropriate gifts and hospitality can be part of building business relationships, however we do not accept or offer gifts or hospitality that could appear to create an improper advantage for Centrica or influence us or any third parties improperly. The practice of offering gifts and hospitality can vary in different geographical locations, often depending on local laws and customs.

Regardless of where in the world we are operating, gifts and hospitality received from, or offered to, a business partner, supplier or customer must be in line with the Centrica Group Gifts & Hospitality Standard, which is available online.

Any gift or hospitality offered or received, whether accepted or declined, that exceeds set limits must be entered on the Gifts & Hospitality Register and have line management or relevant functional approval before any offer is made or accepted.

In addition, any gift or hospitality offered to or received from a public or government official including government employees, representatives of a government or government-owned entity, or any of their family members, of any value, whether accepted or declined, must have pre-approval from Ethics & Compliance, and be entered on the Gifts & Hospitality Register.

Any offer of a gift or hospitality that could influence our judgement improperly in favour of a third party should be politely rejected and recorded in the Gifts & Hospitality Register. There may be further restrictions for employees authorised to transact on respective financial markets and the Centrica Group Gifts & Hospitality Standard should be consulted.

Who can I speak to?
**Ethics & Compliance**

CONFIDENTIAL

DIRECT ENERGY 000119

**8**

# Integrity



## We disclose and resolve conflicts of interest

Conflicts of interest can arise when personal interests compete with Centrica's interests and impact our ability to make objective decisions. Therefore, we will never use our position, influence or company information, assets or resources in any way that improperly benefits ourselves or others.

Conflicts of interest can arise in many different situations, often occurring naturally as a consequence of a system or process and at any time, place or level within the business. The existence of a conflict of interest does not necessarily mean that something is wrong; however, it is important that we identify and declare actual, potential and suspected conflicts of interest to line management so that appropriate mitigating and management action can be taken.

A failure to recognise or take appropriate steps in relation to actual, potential or suspected conflicts of interest could on occasion result in criminal action, pose a major risk to the business, significantly affect reputation and/or undermine stakeholder confidence.

Who can I speak to?
**Ethics & Compliance**

## We respect trade controls

We respect and observe the trade controls of all the countries we operate in, including economic sanctions, import and export laws. This helps ensure that we do not do business with any countries, people or businesses that have trade sanctions or controls imposed against them.

We should always know who we are doing business with by following relevant due diligence procedures and ensuring that business partners, customers, merger/acquisition partners and other third parties are screened in accordance with existing due diligence procedures for concerns such as global sanctions, restricted jurisdictions and trade control lists.

Who can I speak to?
**Ethics & Compliance**



DIRECT ENERGY 000120    18

CONFIDENTIAL



## We do not participate in money laundering

We protect Centrica's products and services from being used for the purposes of money laundering and terrorist financing. Criminals could use companies like Centrica to launder the financial proceeds of criminal activity. In doing so, they may try to hide their identity or the identities of third parties as well as disguise the origin of the funds or assets that they are seeking to launder.

We should always evaluate businesses we want to work with by following relevant due diligence procedures and ensuring that business partners, customers, merger/acquisition partners and other third parties are screened against global restricted parties' lists.

Who can I speak to?
**Ethics & Compliance**



## We do not tolerate fraud

We are committed to the prevention, detection and investigation of fraud and do not tolerate it in our business. All forms of fraudulent conduct or dishonest behaviour are therefore prohibited at Centrica and we will report any serious matters to the relevant authorities. Where we are made aware of, or suspect a fraud, we will speak to our line manager, Ethics & Compliance or, alternatively, raise our concerns via Speak Up.

Who can I speak to?
**Ethics & Compliance**
**Internal Audit**
**Legal**



## We do not use or pass on insider information

Where we have access to unpublished, price-sensitive information about Centrica and our business partners we do not use it for our own or another's benefit.

We do not share any confidential information with our friends, family and/or acquaintances. There are large fines and potential imprisonment associated with insider dealing or trading both for Centrica and any individual involved.

As a company listed on the London Stock Exchange, Centrica complies with rules that require us to publicly announce inside information as soon as possible.

Who can I speak to?
**Company Secretariat**
**Ethics & Compliance**

CONFIDENTIAL

DIRECT ENERGY 000121

## We compete fairly

We compete vigorously and effectively but deal with our customers, competitors and business partners in a fair and ethical way and do not engage in any activity which is anti-competitive. We want the markets we operate in to be fair and competitive and therefore we will be objective and independent when we decide the markets we operate in, how we operate and the prices we charge.

Agreements or communications with competitors which lead to sharing markets, fixing prices, limiting production or collusive tendering are prohibited by law and we do not engage in these activities.

Certain organisations, businesses and projects within Centrica operate in a manner that requires commercially sensitive information and customer data to be maintained separately from the rest of Centrica Group.

Who can I speak to?
**Legal**
**Ethics & Compliance**



## We require everyone we work with to operate responsibly

We want to extend positive social and environmental impacts beyond our immediate operations, which is why we require our business partners and third parties to embed responsible business practices and to act consistently with Our Code. We proactively engage our supply chain in line with our Values and Our Code to ensure standards are upheld and take action if we find our business partners and third parties failing to meet expectations.

Who can I speak to?
**Procurement**



CONFIDENTIAL

DIRECT ENERGY 000122

20

# We value our people

Our people are fundamental to us achieving our goals. We work collaboratively to create a culture of mutual trust and respect, where our people feel motivated and able to develop their skills and experience, so that we can be an employer of choice and trusted corporate citizen. We believe that the health and wellbeing of our people is vital to our business success and recognise the potential impact that work can have on their physical and mental health and wellbeing.



## We are inclusive and embrace diversity

We promote an inclusive culture of sensitivity and respect for differences in which everyone has the opportunity to flourish, make a difference and realise their full potential.

Our success depends upon us accessing a diversity of talent, where our people bring the best of themselves to their roles and our processes help people to grow and progress. We make decisions regarding hiring, recruitment, development and promotion on the basis of individual capabilities in relation to the needs of our business.

We aim to provide equal opportunities to all of our employees and applicants and do not tolerate any form of discrimination, including where characteristics are protected by law, encouraging everyone to recognise and challenge discriminatory behaviour.

Who can I speak to?
HR

CONFIDENTIAL

DIRECT ENERGY 000123



# Our people

DIRECT ENERGY 000124



## We do not tolerate harassment and bullying

We are committed to maintaining a workplace that is free from harassment and where we all feel comfortable coming to work. We therefore prohibit any behaviour or conduct that may constitute harassment or bullying and expect our business partners and third parties to share this commitment. If any of us experience or have concerns about bullying or harassment in the workplace then we should report it to our line manager, HR or alternatively raise our concerns via Speak Up.

Harassment and bullying, including victimisation, can take many forms, from threatening behaviour to putting someone under unnecessary pressure or through unwanted physical contact. It is essential that we all consider how our behaviour can make others feel, and that we ensure we never behave in a way that could be offensive, intimidating, malicious or insulting.

Who can I speak to?
HR

## We offer fair reward and recognition

We operate fair and transparent reward and recognition processes that are supportive of employment rights, development and fair wages. We will pay at least the minimum wage or a fair representation of the prevailing sector wage and will comply with the laws on working hours and fair wages in the countries in which we operate.

Who can I speak to?
HR

CONFIDENTIAL



# We treat our customers fairly

In order to satisfy the changing needs of our customers it is vital that we understand and meet the needs of our customers now and in the future. We work hard to provide innovative products and services that help our customers keep their homes and businesses running smoothly and we ensure our customers understand how to use our products and services safely and responsibly. We ensure our customers are treated fairly and look out for customers who may need help.

## We aim to deliver excellent customer service

We operate in a highly competitive market and strive to differentiate ourselves from our competitors by delivering excellent customer service, tailored solutions and value for money. By innovating and disrupting the market with new products and services we are confident we can meet the changing needs of our customers.

**To achieve this, we strive to:**

- Innovate to deliver effective and competitive customer solutions
- Meet the differing and evolving needs of our customers
- Deliver simple and personalised customer experiences across all our products and services
- Ensure we are clear, accurate and transparent in customer interactions
- Resolve customer issues quickly and to their satisfaction
- Seek engagement with customers on new products.

Who can I speak to?
**Line manager**

CONFIDENTIAL

DIRECT ENERGY 00

## Customers





## We advertise, sell and promote our products openly and fairly

We demonstrate fairness and integrity in our advertising, sales and promotional activities in order to protect and enhance our reputation with customers and build trust in our sector. Our advertising, sales and promotional activities must be accurate, truthful and comply with all relevant laws and regulations.

Who can I speak to?
**Marketing**

## We respect customer privacy

We are committed to protecting the data and privacy of our customers. To do this we ensure adequate controls are in place to gather, handle, use, store, transfer and delete all customer data and information responsibly and legally wherever we operate.

Who can I speak to?
**Ethics & Compliance**
**Legal**

CONFIDENTIAL

24

DIRECT ENERGY 000127

# We protect our assets, information and interests

We are committed to safeguarding our infrastructure, systems and equipment that hold records and data. All our records, data and assets are therefore prepared with accuracy and treated with confidentiality.

## We protect and maintain our data, information and records accurately

Sometimes we are entrusted with information that we must keep confidential. This includes information that can relate to our customers, colleagues and business partners. Confidential information includes any type of information which is commercially or market sensitive.

**Examples of confidential information include:**

- Financial results
- Marketing strategies
- Business plans and processes
- Customer or employee data
- Merger or acquisition plans
- Price or management changes

We gather, handle, store and delete all personal data and information responsibly and legally. We also ensure that adequate controls are in place to protect data and information when they are transferred across borders and to third parties.

If we are unsure about the confidentiality of Centrica-related information, we seek guidance from our line managers, Legal, Ethics & Compliance or Corporate Affairs before sharing it externally.

All our financial information is supported by appropriate processes and documents that are set out in Centrica's accounting policies, to ensure an accurate and auditable record of transactions.

Who can I speak to?

**Finance**

**Digital Technology Services**

**Legal**

CONFIDENTIAL

## Assets, information and interests





11

25 // Centrica // Our Code





## We use company property and assets responsibly

We use company property and assets to perform our work in a responsible and careful manner. We keep all of Centrica's assets safe and secure, which include its facilities, property, computers, IS systems, information, corporate opportunities and funds.

We can, on a limited and occasional basis, make personal use of computers, phones, email and internet access so long as it does not interfere with work priorities, or present any risk or liability for the company.

In the absence of proper authorisation, other assets should not be used for personal activities.

Who can I speak to?
**Digital Technology Services**

## We protect our intellectual property

Centrica's intellectual property rights (IPR) are a valuable asset and we all have a responsibility to ensure they are managed safely and any unauthorised use or disclosure prevented. We will also respect the IPR of third parties. During our employment, we may have access to confidential information about the company's business, finances or affairs, including our trade secrets. We do not use or disclose confidential information, unless required to for the purpose of Centrica-related work.

The use of Centrica's brand or any of the brands that form part of the Centrica Group are strictly controlled and should not be used without appropriate approval.

Who can I speak to?
**Technology and Engineering**
**Legal**
**Marketing**

CONFIDENTIAL



## All our records, data and assets are therefore prepared with accuracy and treated with confidentiality.

## We protect Centrica systems



We take care when we use Centrica systems because our business relies heavily on effective and fully functioning information and systems, which are under constant attack from outside the company.

**We do not:**

- Download personal software to our work computer
- Share Centrica system and phone login details
- Leave computing devices and mobile phones unlocked and unattended
- Access company sensitive information in a public place.

Centrica checks, monitors and sometimes blocks emails and internet traffic as well as documents entering and leaving the company, particularly those containing explicit language or pictures. We may also monitor and record phone conversations for quality and content, or for training purposes. People who may have their phone conversations monitored or recorded will be told in advance.

We do not access inappropriate material, misuse company email or other systems. This is prohibited and breaches will be managed as a disciplinary matter and may also involve criminal actions.

Who can I speak to?
**Digital Technology Services**

## We use social media responsibly

We recognise that in some circumstances the use of social media can support our interests and assist us in understanding our customers and communities. A small number of colleagues are therefore authorised to use social media as part of their jobs on behalf of Centrica. Unless authorised, we ensure all other views expressed on social media are personal and do not represent the views of Centrica. We must understand that there are implications associated with what we say online and that our communications can affect Centrica and our reputation.

Who can I speak to?
**Corporate Affairs**

CONFIDENTIAL

DIRECT ENERGY 000129

12

# Communities and governments

## We work responsibly with communities and governments

We aspire to be a trusted corporate citizen and a 21ˢᵗ century energy and services company. We recognise that ultimately society provides us with our licence to operate and therefore strong relationships with governments, long-term partnerships with local communities and managing our impact on the environment are critical to a sustainable and successful business.



## We engage in our communities

We have a duty to understand how our business activities can affect the communities where we operate. We promote engagement with our neighbours and seek feedback on how their communities and natural habitats might be impacted. This enables us to address concerns, ensure we make a positive contribution to society and grow our business.

We seek to develop enduring relationships that help local communities thrive. We focus on contributing to issues that matter most to our business and our stakeholders – from supporting vulnerable people and developing skills to reducing energy's impact on climate change.

We support community organisations and encourage everyone to volunteer in appropriate charitable activities because we recognise our collective skills can make a meaningful difference in local communities.

Who can I speak to?
**Corporate Affairs**

CONFIDENTIAL



## We respect human rights

Wherever we work in the world we respect and uphold the fundamental human rights and freedoms of everyone who works for us, with us, or lives in our local communities. We support the United Nations Global Compact and use internationally recognised human rights standards such as the Guiding Principles on Business and Human Rights to influence our decision making.

We never knowingly cause or contribute to any activity or relationship that violates human rights, either directly or indirectly, and we will address adverse human rights impacts if they occur. We therefore never use or work with anyone who uses forced, compulsory, illegal or child labour. As part of this, any form of human trafficking is not tolerated.

We seek to prevent and mitigate adverse human rights impacts that are directly linked to our operations, products and services through our business relationships and we conduct due diligence and check the record of those we work with. If we work with someone who we discover is contravening our commitment to human rights, or has done so in the past, we will consider appropriate steps to be taken, which may include ending the relationship and reporting the abuse.

Who can I speak to?
**Corporate Affairs**
**Ethics & Compliance**

## We engage with governments and politicians responsibly

We operate on a politically neutral basis but regularly engage with political stakeholders, including governments, legislators and regulators, in order to shape proposals, manage risks and to inform policies on important issues that are relevant to Centrica, such as energy, environment, consumers and employment relations.

From time to time we need to communicate with external parties including regulators and politicians. Changes to laws and regulations can have a significant impact upon Centrica's operations and therefore engagement with politicians and regulators is important to our business.

These communications must be undertaken professionally and consistently, and therefore only employees who are approved by Corporate Affairs or Regulatory Affairs are authorised to undertake lobbying and communicate with any political stakeholder on behalf of Centrica.

We do not make contributions to political parties, individual politicians or government employees. This does not preclude membership of, or making donations to, a political party in a personal capacity. However, if we are involved in political activity outside of work, we ensure our involvement does not represent the views of Centrica or create a conflict of interest in relation to our work at Centrica.

Who can I speak to?
**Corporate Affairs**
**Regulatory Affairs**

CONFIDENTIAL

DIRECT ENERGY 000131





## We engage with the media responsibly

We do not talk to the media or financial community regarding matters which are in any way connected with our work at Centrica, unless we are expressly authorised to do so. We refer journalists and analyst enquiries to the Corporate Affairs or Investor Relations teams respectively.

If in doubt and in the event of any contact or communication that relates to our work at Centrica, we must consult with the Corporate Affairs or Investor Relations teams.

Who can I speak to?
**Corporate Affairs**
**Investor Relations**

## We manage our impact on the environment

We are committed to understanding, managing and reducing our environmental impact and to playing our part in the transition to low carbon energy.

We are doing this by giving our customers greater control and choice over their energy through investment in innovative and energy efficient products and by sourcing and producing energy from cleaner sources.

We recognise that our operations, together with the way we deliver our products and services, can have an adverse impact on the environment. We are therefore driving down emissions across our business through technology, innovation and cultural change, and we monitor and manage our water usage, waste production and local biodiversity, seeking to reduce our impacts wherever possible.

We will continue to adopt best practice in monitoring and reporting our environmental performance in a transparent way.

Who can I speak to?
**Health, Safety, Environment & Security**



CONFIDENTIAL

DIRECT ENERGY 000132

30











DC/CI/ENERGY 000133

CONFIDENTIAL

# ACKNOWLEDGEMENT FORM

By signing below, I acknowledge that I have reviewed and understand Direct Energy's Code of Conduct (the "Code"). I further acknowledge and agree that:

The Code provides a general overview of a number of our Company's Policies; but I am aware that additional Company policies exist which are not represented in this Code

I will comply with the Code, written policies, practices, rules, regulations, applicable law, or directives issued by Direct Energy.

I will contact my manager, Human Resources representative, Legal Department, Compliance Department, Ethics Committee or 'Speak Up' Helpline, as appropriate, if I have any questions concerning our Code, or any ethics-related behavior or situation, or am aware of any potential violations of the Code.

Failure to follow the Code may result in disciplinary action, up to and including termination of my employment.

_____
Employee Signature

_____
Date
10/5/15

_____
S. C. Baham
Employee Name [please print]

**Direct Energy**



30   DIRECT ENERGY Code of Conduct

CONFIDENTIAL

DIRECT ENERGY 000015

Uncontrolled when printed

**Centrica**

# Speak Up Procedure

**Version:**      2.0
**Owned by:**     Paul Hockley, Head of Ethics & Compliance Operations
**Approved by:**  Tim Langton, Group Ethics & Compliance Officer
**Date approved:** 16th March 2018



EXHIBIT
10
PENGAD 800-631-6989

CONFIDENTIAL

DIRECT ENERGY 000134

## 1.   Introduction

1.1   Our Code represents our commitment to doing the right thing and requires everyone working for Centrica to conduct our business with integrity. In spite of this commitment there may be occasions where conduct or practice within Centrica does not reach the minimum standards expected in Our Code. Where this is observed employees and business partners should Speak Up and raise their concerns, so that they can be addressed.

1.2   It is important for Centrica that we promote an open, transparent and safe working environment where employees and business partners feel able to Speak Up and raise concerns about suspected misconduct or malpractice without fear of retaliation. By promoting a Speak Up culture we can safeguard Centrica's reputation, success and continued ability to operate.

## 2.   Purpose

2.1   The purpose of this Speak Up Procedure is to set out how concerns can be raised by employees or business partners and then received, managed and if appropriate investigated within Centrica.

## 3.   Scope

3.1   This Procedure applies to all employees (full-time or part-time) within Centrica and any of its majority-owned or controlled business entities and is available to be used by our business partners, including third party intermediaries, contractors, suppliers and joint venture associates.

3.2   This Procedure replaces all pre-existing company Speak Up policies throughout the Centrica Group, but does not create or form part of any employee's contract of employment, where one exists, and may be amended at any time.

3.3   The Centrica Speak Up team within Group Ethics & Compliance Operations and relevant stakeholders will review this Procedure annually to ensure it continues to comply with legal and regulatory requirements.

## 4.   When to raise a concern

4.1   We encourage individuals to Speak Up and raise concerns internally whenever misconduct or malpractice is observed. Examples of conduct or practice that could be raised as Speak Up include (but are not limited to):

4.1.1   Fraud or financial irregularity;

4.1.2   Blackmail, corruption or bribery;

4.1.3   Conflicts of interest;

4.1.4   Human rights abuse;

4.1.5   Breach of data privacy;

4.1.6   Suspected insider activity;

4.1.7   Discrimination, bullying, violence or harassment;

4.1.8    Retaliation against those raising concerns in good faith;

4.1.9    Someone having committed, or suspected of being likely to commit, a criminal offence;

4.1.10    Failure to comply with any legal or regulatory obligation;

4.1.11    Miscarriage of justice;

4.1.12    Failure to address something that endangers the health or safety of an individual;

4.1.13    Failure to address damage to the environment;

4.1.14    Deliberate concealment of any 4.1.9 to 4.1.13;

4.1.15    Failure to resolve a security concern or threat.

4.2    Certain Speak Up concerns may also constitute whistleblowing. Generally, whistleblowers are protected in law from suffering any detriment because of making such a disclosure and would be able to bring a claim against Centrica if they were to suffer detriment. It is therefore important that we are able identify when someone is whistleblowing and that we manage the concern appropriately.

4.3    The definition of whistleblowing varies depending on the jurisdiction, but usually includes an employee making a disclosure raising certain types of wrongdoing, where the employee is either acting in good faith or reasonably believing that they are acting in the public interest. For more information on the definition of whistleblowing and what concerns constitute whistleblowing see Appendix 1.

4.4    All whistleblowing concerns should be forwarded to the Speak Up team either via email to speakup@centrica.com or to the Speak Up helpline in order to ensure that relevant protections are maintained. Whistleblowing is usually raised internally, however several jurisdictions have nominated prescribed organisations outside of Centrica to whom employees may raise whistleblowing matters. For more information see the Table under Section 8.

4.5    In most circumstances Speak Up should not be used to:

4.5.1    Report injuries and illnesses on site. Site first aiders/responders should be contacted to assist in the first instance;

4.5.2    Report emergency situations including threats to life or property. In such circumstances the emergency services should be contacted;

4.5.3    Raise a grievance of a personal nature, where the Centrica grievance procedure is a more suitable mechanism to address concerns that are personal to an employee;

4.5.4    Raise any concern or make any accusations that are known to be false; doing so may lead to disciplinary action.

## 5.   How to raise a concern

5.1    When raising a concern about misconduct or malpractice, including breaches of Our Code, employees are encouraged to utilise any of the multiple avenues available to them.  This includes, but is not necessarily limited to, their line manager, another member of management, supporting functions (eg. HR, Legal, Ethics & Compliance etc) or the Speak Up

helpline. The flow diagram below sets out the options and can help guide concerns to the appropriate channel.



## Speak Up helpline

5.2   The Speak Up helpline is a comprehensive and confidential internet and telephone based reporting tool provided and managed by an independent third party intermediary (Navex Global). It is available 24/7, 365 days a year.

5.3   Concerns can be raised by telephoning the Speak Up helpline on the toll-free numbers listed below, by country. Telephone calls are not recorded:

- **UK:    0808 234 6300**

- **Ireland:      1-800-550-000 - At the prompt please enter 855-282-4792.**

- **USA:    1-855-282-4792 – Language selection is available (English/Spanish) once connected.**

- **Canada:       1-855-282-4792 – Language selection is available (English/French) once connected.**

5.4   Concerns can also be raised with the Centrica Speak Up helpline (internet) online, either through the Speak Up pages on the Our Code intranet site or directly to the web portal at

- www.centrica.ethicspoint.com

The web portal is accessible to all employees regardless of geographical location.

## 6.    Safeguards

### Confidentiality

6.1   So far as possible, Centrica will not disclose the identity of any individual raising a concern unless it is reasonably necessary to do so for purposes of an investigation, to obtain legal advice, or to comply with a legal or regulatory obligation.

### Privacy

6.2   All reasonable steps will be taken to safeguard personal data from unauthorised access and processing. Personal data will only be disclosed to need-to-know employees and/or third parties (consultants, authorities etc.).

### Anonymity

6.3   Speak Up concerns can be raised anonymously, where permitted by local legislation.  We do however encourage individuals who are raising a concern to provide contact details as it is difficult, and in some circumstances impossible, to investigate a concern that has been raised anonymously.

### Reporting in good faith

6.4   Action will not be taken against anyone who raises a concern in good faith even if the subsequent investigation concludes that there was no wrongdoing.  However disciplinary action may be taken against anyone who raises a concern falsely, maliciously or for personal gain.

### Zero tolerance on retaliation

6.5   It is important that we promote an open, transparent and safe working environment where employees are protected and are able to ask question and raise concerns.  We actively encourage everyone to do the right thing and to Speak Up. In addition to the protections provided to those who whistleblow, any retaliation against a person who raises a concern or who is involved in the investigation of a Speak Up concern is considered a breach of Our Code (gross misconduct) and is cause for disciplinary action, up to and including termination of employment.  If you feel you or another employee has been retaliated against for speaking up, raise this immediately with your line manager, HR, the Speak Up team on speakup@centrica.com or via the Speak Up helpline.

## 7.    What happens after someone Speaks Up?

### Objective Assessment

7.1   When an individual raises a concern relating to misconduct or malpractice, utilising any of the routes available to them, an objective assessment should take place to assess the cause of the concern and to decide what action needs to be taken. Where a concern is raised directly with management, the manager may engage with a suitable function eg: HR, Legal, E&C, Finance etc to help resolve the concern. Alternatively, where concerns are raised directly with supporting functions these may be progressed through relevant functional processes.

7.2     The objective assessment should also consider whether the concern is of a significant nature
for Centrica[1]. Significant concerns include those that relate to misconduct or malpractice that
have the potential for serious and or adverse consequences for Centrica in terms of criminal
or civil liability, sanction by a customer or regulator and media coverage or publicity which has
the potential to result in significant monetary claims or damage to Centrica's reputation.
Concerns that are likely to be significant include (but are not limited to) those relating to:

7.2.1     Fraud or financial irregularity including accounting misconduct;

7.2.2     Blackmail, corruption or bribery;

7.2.3     Misreporting performance;

7.2.4     Misleading customers/treating customer unfairly;

7.2.5     Data breaches;

7.2.6     All whistleblowing – this definition will vary depending on the relevant jurisdiction; and

7.2.7     Any non-grievance related concerns relating to Managers of Level 5 and above.

All significant concerns must be forwarded to the Speak Up team on speakup@centrica.com
or the Speak Up helpline at the earliest opportunity to ensure that the concern is addressed
appropriately. The line manager or supporting function are responsible for ensuring that
significant concerns are referred to the Speak Up helpline or the Speak Up team. The referral
may be made by either the employee directly or the manager or supporting function using the
Managers Reporting form available at centricaspeakupmanager.ethicspoint.com.

7.3     Where an objective assessment is conducted by either a manager or function relating to
misconduct or malpractice, which concludes that the concern is not of a significant nature a
decision should still be made assessing how to address the concern, including whether an
investigation is required. Local investigatory processes may be followed. Managers and
functions may still choose to report the concern using the Managers Reporting form for input
and advice from the Speak Up team.

**Managers' Responsibilities**

7.4     Our Code provides some guidance on the expectations of managers and team leaders
relevant to Speak Up. A Speak Up Managers' Pack is available on the Centrica Speak Up
intranet page.

7.5     Under Our Code, managers are expected to show that they are:

•     Being an example and role modelling Our Code and our Values every day;

•     Working collaboratively and providing an environment where Our Code and our
Values are promoted;

•     Taking direct action when the expectations of Our Code are not being met;

•     Helping others understand Our Code and encouraging colleagues to seek help and
advice through our confidential Speak Up service if they are unsure about what to do,
or are concerned that Our Code is being violated;

---

[1] In North America, if a concern is raised first to a manager, that manager must consult with a suitable function to
perform the objective assessment to determine significance and what action, if any, should be taken.

CONFIDENTIAL       DIRECT ENERGY 000139

Speak Up Procedure    Document owner: Paul Hockley, Head of Ethics & Compliance Operations
Version 1.0

- Ensuring our teams know they will be supported for doing the right thing, are listened to when concerns are raised and protected from retaliation if they report a violation or help with an investigation;

- Acting consistently and fairly and demonstrate courage when holding people to account or enforcing Our Code.

## Investigation

7.6     When a concern is significant and escalated to the Speak Up team or raised directly with the Speak Up helpline the review and investigation process as set out in the diagram below will be followed.



### Case Review

7.7     For all concerns escalated internally to the Speak Up team or raised via the Speak Up helpline the Speak Up team will acknowledge receipt of the case to the individual raising the concern within 5 working days and conduct a case review within 7 working days of either the case being logged on the helpline or received by the Speak Up team. Where appropriate this case review will involve consultation with appropriate functional representatives depending on the nature of the concern including Legal. This case review will assess:

7.7.1    Whether the concern raised alleges malpractice and/or misconduct and if not whether an alternative process is available to address the concern;

7.7.2    Whether the concern raise is significant;

CONFIDENTIAL   DIRECT ENERGY 000140

7.7.3   Whether the concern needs to be investigated, by whom and the nature of any investigation to be conducted;

7.7.4   Whether enough information is available for the concern to be investigated;

7.7.5   Whether any investigation should be conducted under legal privilege;

7.7.6   Who is responsible for providing regular updates to the individual raising the concern.

**Follow up and updates**

7.8   The Speak Up team will inform the individual raising the concern of the outcome of this case review within 14 working days of the case being logged on the helpline or received by them. Those raising concerns either internally or via the Speak Up helpline are encouraged to provide contact details so that updates can be provided throughout the course of any investigation. Updates, as appropriate, should be provided to the individual raising the concern every 28 working days.

7.9   When a concern is referred to the Speak Up team or raised directly through the Speak Up helpline, a case reference number is generated and is provided to the individual raising the concern, either through the helpline or via the Speak Up team. At any time during the management of the concern the Speak Up team can post updates or follow up questions to the person raising the concern through the Speak Up helpline. In this way the individual raising the concern can follow up by phone or online at www.centrica.ethicspoint.com, quote the reference number and receive any update that has been posted. This system can be used to protect the anonymity of the reporter.  If necessary, the Speak Up team may request to meet the reporter in person or schedule a telephone call, in confidence, to discuss the concern and to obtain more information.

7.10   After a concern is raised via the Speak Up helpline, the reporter will be advised to check back regularly to view updates or answer any follow up questions logged by the Speak Up team.

**Conclusion of the investigation**

7.11   The conduct of any investigation will depend upon the nature, complexity of the concern raised and the jurisdiction. An investigation could be led by management, a supporting function such as E&C, Legal or HR or a trained investigator.

7.12   Any investigation should aim to be completed within 30 days; however, this will be dependent on the nature and complexity of the concern raised.

7.13   If misconduct or malpractice is found including any breach of Our Code, appropriate steps will be taken to address the issue with those involved and the disciplinary procedure may be followed.

7.14   Where circumstances permit, the individual raising the concern will be informed that the investigation has concluded either directly or through the Speak Up helpline. This will include an appropriate level of detail on the outcome of the investigation, taking into consideration the nature and sensitivity of the concern raised. Any information provided must be treated in the strictest confidence.

7.15   In order to ensure the effectiveness of the Speak Up process and to ensure that no retaliation has taken place follow up questionnaires will be provided to some individuals raising concerns within 28 days of closure of the investigation. Where agreed further follow up may take place within 6 months to confirm that the concern has been addressed and that no retaliation has taken place.  If you feel you have been retaliated against, do not wait for the follow up, you

CONFIDENTIAL

should raise this immediately with your line manager, HR, the Speak Up team on speakup@centrica.com or via the Speak Up helpline.

**Action management**

7.16    Following the conclusion of an investigation actions should be agreed to address any wrongdoing and to ensure that the wrongdoing cannot reoccur. Actions owners must be agreed and management actions will be tracked to a conclusion by the Speak Up team.

7.17    Monthly updates should be provided by action owners to the Speak Up team detailing the action to be taken, progress against the action and due date.

# 8.    Contacts

8.1    For any enquiries relating to the Speak Up Process or this Procedure, the Speak Up team can be contacted via email

- Email: speakup@centrica.com

This email should not be used to appeal the outcome of a grievance or if an individual disagrees with the outcome of an investigation.

## Ireland

8.2    The persons listed below are designated officers for the purposes of the Protected Disclosures Act 2014 in Ireland and in addition to the options set out within this Procedure concerns can be raised directly with them.  These designated officers will either deal with the matter personally or will nominate a management representative.

- **Joanne Ross**

Head of Legal, Bord Gáis Energy Limited

jross@bordgais.ie

- **Lorraine McCullen**

Head of HR, Bord Gáis Energy Limited

lmccullen@bordgais.ie

## Prescribed Organisations

| Country | Prescribed Organisation | When | Contact Details |
|---------|------------------------|------|-----------------|
| UK | Financial Conduct Authority (FCA) | Whistleblowing (as described in sections 4.1.9 to 4.1.14 above)<br><br>* Failure to comply with the firm's policies, | FCA Helpline:<br><br>Telephone:  020 7066 9200<br><br>Email:  whistle@fca.org.uk<br><br>Post:  Intelligence Department (Ref PIDA), Financial Conduct Authority, |

CONFIDENTIAL   DIRECT ENERGY 000142

| | | processes and procedures<br><br>* Behaviour that is likely to have an adverse effect on the reputation or financial wellbeing of Centrica or any of its subsidiaries | 12 Endeavour Square, London, E20 1JN<br><br>Website - www.fca.org.uk/firms/whistleblowing |
|---|---|---|---|
| UK | Prudential Regulation Authority (PRA) | Whistleblowing (as described in sections 4.1.9 to 4.1.14 above)<br><br>* Failure to comply with the firm's policies, processes and procedures<br><br>* Behaviour that is likely to have an adverse effect on the reputation or financial wellbeing of Centrica or any of its subsidiaries | PRA Confidential:<br><br>Telephone:  020 3461 8703<br><br>Email: PRAwhistleblowing@bankofengland.co.uk<br><br>Post: PRA CSS (W/B), 20 Moorgate, London EC2R 6DA |

* These are not protected disclosures under the Employment Rights Act 1986 as amended by the Public Interest Disclosure Act 1998 and Enterprise Regulatory Reform Act 2013 in the UK.

### Independent Whistleblowing Advice Line (UK)

For further independent and confidential advice, you can also contact Public Concern at Work (PCAW), the whistleblowing charity:

- Whistleblowing advice line:  020 7404 6609

  Email:  whistle@pcaw.org.uk

## 9.      Protection of personal data

9.1      All personal data provided in the Speak Up Procedure will be kept in accordance with the Speak Up data retention document.

CONFIDENTIAL      DIRECT ENERGY 000143

## Appendix 1 – Protected disclosures (Whistleblowing)

### UK

The Employment Rights Act 1986 as amended by the Public Interest Disclosure Act 1998 and Enterprise Regulatory Reform Act 2013 in the UK encourage you to raise wrongdoing internally or to a prescribed body about any malpractice or impropriety and offers protection to employees raising the following concerns in the reasonable belief that they are acting in the public interest:

This includes:

- Someone having committed, or being likely to commit, a criminal offence;

- A failure to comply with any legal or regulatory obligation;

- A miscarriage of justice;

- Something that endangers the health and safety of an individual;

- Damage to the environment;

- Deliberate concealment relating to any of the above.

The Financial Conduct Authority (FCA) and Prudential Regulation Services (PRA) are the prescribed bodies for financial services in the United Kingdom. You may raise concerns with them as described in the table in section 8 without raising a concern internally or at the same time or after raising a concern internally.

### Northern Ireland

The Public Interest Disclosure (NI) Order 1998 (PIDO) protects you if you raise concerns about certain types of wrongdoing. It mainly takes the form of amendments to the Employment Rights (Northern Ireland) Order 1996, and makes provision about the kinds of disclosures which may be protected; the circumstances in which such disclosures are protected and the persons who may be protected. The PIDO prescribes the Utility Regulator (UR), Northern Ireland Authority for Utility Regulation, as the person to whom such disclosures should be made. Further information is provided in the UR External Whistleblowing Guide December 2015 which is available at www.uregni.gov.uk.

### Republic of Ireland

The Protected Disclosures Act 2014 encourages you to raise relevant wrongdoing internally about any malpractice or impropriety.

This includes the following concerns when they are raised in good faith:

- Someone having committed, or being likely to commit, a criminal offence;

- A failure to comply with any legal or regulatory obligation;

- A miscarriage of justice;

- Something that endangers the health and safety of an individual;

- Damage to the environment;

CONFIDENTIAL   DIRECT ENERGY 000144

Speak Up Procedure       Document owner: Paul Hockley, Head of Ethics & Compliance Operations
                         Version 1.0

- Fraud or financial irregularity;

- Blackmail, corruption or bribery;

- Deliberate concealment relating to any of the above.