# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SHEALONDRA BIBLE, | ] |
| Plaintiff, | ] |
| | ] |
| v. | ] CASE NO. 4:21-CV-00804 |
| | ] |
| DIRECT ENERGY, ET AL, | ] |
| NRG LLC, | ] |
| Defendant. | ] |

--------------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF


SHEALONDA BIBLE


JUNE 16, 2022

--------------------------------------------------------

ORAL DEPOSITION OF SHEALONDA BIBLE, produced as a

witness at the instance of the Defendant, and duly

sworn, was taken in the above-styled and numbered cause

on the 16th of June, 2022, from 10:03 a.m. to 3:41 p.m.,

before Shawn Kelley, CSR No. 3448 in and for the State

of Texas, by machine shorthand and computer-aided

transcription, at 5120 Woodway Drive, Suite 10010,

Houston, Texas, pursuant to the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Nell McCallum & Associates Inc. Houston (713) 861-0203

```
 1                    APPEARANCES

 2      For the Plaintiff:

 3            Eddie Hodges, Jr.

 4            Attorney at Law

 5            Kennard Law

 6            5120 Woodway Drive, Suite 10010

 7            Houston, Texas  77056

 8      For the Defendant:

 9            Marlene C. Williams

10            Attorney at Law

11            Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

12            500 Dallas Street, Suite 3000

13            Houston, Texas  77002

14      Also Present:

15            Keitha Hanks, Videographer (713) 861-4700

16                    ------------

17                       INDEX

18
```

```
19   EXAMINATION BY MS. WILLIAMS                    4

20   EXAMINATION BY MR. HODGES                    226

21   FURTHER EXAMINATION BY MS. WILLIAMS          229

22   FURTHER EXAMINATION BY MR. HODGES            233

23

24   [Exhibit 1 marked, September 25, 2015 offer    65

25   letter from Kristin Johnson to Shea Baham]
```

**NELL McCALLUM & ASSOCIATES, INC.**

1    [Exhibit 2 marked, August 14, 2017 email from    107
2    Daniel Kochman to Shea Baham with attached
3    email string]
4    [Exhibit 3 marked, Your On Track Incentive    143
5    Plan documents]
6    [Exhibit 4 marked, July 31, 2019 Notice of    208
7    Layoff]
8    [Exhibit 5 marked, Direct Energy Equal    214
9    Employment Opportunity Policy]
10   [Exhibit 6 marked, Direct Energy    215
11   Non-Discrimination/Anti-Harassment Policy]
12   [Exhibit 7 marked, Direct Energy Workplace    215
13   Investigations Policy]
14   [Exhibit 8 marked, Centrica Our Code]    218
15   [Exhibit 9 marked, Acknowledgment Form for    219
16   code of conduct]
17   [Exhibit 10 marked, Centrica Speak Up    220
18   Procedure]
19
20
21
22
23
24
25

1    VIDEOGRAPHER:  Good morning.  Today's date is
2    Thursday, June 16th, 2022.  It is now 10:03, and we are
3    on the record.  Will the court reporter please swear in
4    the witness?
5                    SHEALONDA BIBLE,
6    having been first duly sworn, testified as follows:
7                    EXAMINATION BY MS. WILLIAMS
8        Q.  Good morning.  Will you state your full name for
9    the record, please?
10       A.  Shealonda Caryse Bible.
11       Q.  What was your -- what was the middle name?
12       A.  Caryse.
13       Q.  Caryse.  Can you spell your first and --
14       A.  Last -- okay.
15       Q.  -- middle name, please?
16       A.  My name is spelled S-h-e-a-l-o-n-d-a.  My middle
17   name, as well?
18       Q.  Yes, please.
19       A.  C-a-r-y-s-e Bible, B-i-b-l-e.
20       Q.  Ms. Bible, my name is Marlene Williams.  I'm an
21   attorney representing Direct Energy in the lawsuit that
22   you filed against the company.  We've never met before
23   today, have we?
24       A.  No, we have not.
25       Q.  Okay.  Have you ever given a deposition before?

1    A.  No.

2    Q.  Okay.  So before we get started into some of the

3  substantive questioning, I'm going to ask you or just go

4  over some of the background just so that you'll be

5  familiar with the process today.

6    A.  Can I clarify?  I've given a deposition as a

7  company witness.

8    Q.  Okay.

9    A.  Yeah, but --

10    Q.  So you --

11    A.  Right.  But in a case someone had, and I was the

12  representative for the company.

13    Q.  Okay.

14    A.  So I've done that.

15    Q.  Okay.

16    A.  Okay.

17    Q.  How many times have you given a deposition for --

18  whether as, you know, in your personal capacity or as a

19  company representative?

20    A.  My personal capacity, this will be the first one.

21    Q.  Okay.

22    A.  Professional capacity, two.

23    Q.  Okay.  And with what -- that was at -- for an

24  employer?

25    A.  At Shell Oil Company, --

1    Q.  Okay.

2    A.  -- yes.

3    Q.  Was that in connection with an -- employment

4    lawsuits that were filed against Shell?

5    A.  Yes, ma'am.

6    Q.  How long ago were those?

7    A.  I don't recall, but at least 15 years ago.

8    Q.  Okay.  So I'll go over just as a reminder -- some

9    of this, when I mention it, it may be familiar to you

10   from when you gave a deposition before, but, as you see,

11   we have a court reporter here who's taking down your

12   testimony and my questions, and we have a videographer.

13        It's really important -- one of the most

14   important things for you and me to do today is to not

15   speak over each other so that the court reporter has an

16   opportunity to take down my question in full and get

17   your answer in full.  Okay?

18   A.  Yes.

19   Q.  And it's also important, even though we have a

20   video recording of your deposition, for you to give oral

21   answers as opposed to nodding your head or saying uh-huh

22   or huh-uh, because it doesn't necessarily translate well

23   in the written transcript.  Okay?

24   A.  Yes.

25   Q.  Okay.  You understand you were given an oath

1    just, you know, at the start of your deposition.  You

2    understand that your testimony is under oath and subject

3    to penalties of perjury if you don't provide truthful

4    answers, right?

5         A.  Yes.

6         Q.  You understand that this is the same thing as if

7    you were in front of a judge or a jury giving testimony?

8         A.  Yes.

9         Q.  Okay.  We -- there are going to be, you know,

10   times where we might need to take breaks during the

11   deposition.  If you need a break, please let me know.  I

12   will find a spot in, you know, my questioning where we

13   can stop to accommodate that, but this is not a

14   marathon.  We don't expect you to be sitting here for

15   hours without taking some breaks.

16         So just let me know, and, obviously, your

17   attorney can do the same thing.  Okay?

18        A.  Yes.

19        Q.  Are you taking any medications today that might

20   affect your memory, recollection or ability to testify

21   today?

22        A.  No.

23        Q.  Are you on any medication at all?

24        A.  Yes.

25        Q.  What medication?

1    A.  Medication for high blood pressure and allergies.

2    Q.  Okay.  What's the allergy medication?

3    A.  Xyzal.

4    Q.  Okay.

5    A.  Nose sprays.

6    Q.  Okay.  But nothing that -- that would make you

7  drowsy or anything of that nature?

8    A.  No.

9    Q.  Okay.  Did you do anything to prepare for your

10  deposition today?

11    A.  Yes.

12    Q.  What did you do?

13    A.  Spoke to my attorney and reviewed my documents.

14    Q.  When did you speak to your attorney in

15  preparation for your deposition?

16    A.  Yesterday.

17    Q.  For how long?

18    A.  10 minutes.

19    Q.  And then you -- was that the only time you spoke

20  with your attorney in preparation for your deposition?

21    A.  Yes.

22    Q.  Okay.  And you said you reviewed your documents?

23  What documents are you referring to?

24    A.  The documents that were produced for discovery.

25    Q.  Did you review all of those documents or just

1    certain parts of that document --

2       A.  Just certain ones, --

3       Q.  -- production?

4       A.  -- yes.

5       Q.  Okay.  Which ones?

6       A.  Just the summary document, the -- I don't know

7    what it's called, but the complaint one.  I don't know

8    what it's called.

9       Q.  You reviewed the complaint that you filed against

10   the company?

11      A.  The -- it's a document that has like the summary

12   of, I guess, yeah, of my complaint.

13      Q.  Okay.

14      A.  Yeah.

15      Q.  And that document basically identified -- I just

16   want to make sure I -- we're talking about the same

17   document.  So that's a document that would have

18   identified the facts that you're alleging in this case

19   and then the claims that you're bringing?

20      A.  Yes.

21      Q.  Okay.  Any other documents you reviewed?

22      A.  No.

23      Q.  Just that one?

24      A.  Uh-huh.

25      Q.  Okay.  Was there anything you reviewed in the

1  complaint that you noticed was incorrect?

2     A.  No.

3     Q.  Are there things that are not in the complaint

4  that should be in the complaint related to your claims

5  against the company?

6     A.  I don't recall.  I -- yeah --

7     Q.  Did anything jump out at you --

8     A.  No.

9     Q.  -- about the, you know, factual allegations that

10  are not in your complaint?

11     A.  Nothing jumped out at me, no.

12     Q.  Okay.  So from your perspective, your complaint

13  as stated is an accurate reflection of the factual

14  allegations that you're making against the company?

15     A.  Yes.

16     Q.  There are no other facts that you can think of

17  that have not been included in your complaint; is that

18  right?

19     A.  Yes.

20     Q.  Okay.  And then I'm not asking you, you know, to

21  decipher the legal issues in the case.  That's something

22  for your lawyer and me to sort out.  But in terms of the

23  claims that were brought, --

24     A.  Uh-huh.

25     Q.  -- are you familiar with the claims that are

1  asserted in your lawsuit?

2    A.  Yes.

3    Q.  Okay.  What claims, to your recollection, have

4  you asserted in your lawsuit against Direct Energy?

5    A.  That I was discriminated against because of my

6  age, my race, as well as suffered retaliation and my

7  gender.

8    Q.  You have a gender claim in your lawsuit?

9    A.  If it's not in there, I'm -- I -- I'm -- I don't

10 recall.  I know it's age and race and retaliation.  I'd

11 have to consult with my attorney if gender's in there.

12   Q.  So whether it's in there or not, are you alleging

13 that Direct Energy discriminated against you based on

14 your gender in this lawsuit as a part of this action?

15   A.  I'm think -- I'm thinking.  I don't recall if

16 it's in there.  If it's in there, then yes.  If not,

17 then no.

18   Q.  Okay.  Can you think of any instances of gender

19 discrimination that you claim you suffered during your

20 employment at Direct Energy?

21   A.  Not at this moment, no.

22   Q.  We're going to get into the substance of your

23 complaint or your claims a little bit more later, but,

24 you know, to just sort of set the stage for our

25 discussion, you said you have an age discrimination

1  claim?

2     A.  Yes?

3     Q.  And a race discrimination claim?

4     A.  Yes.

5     Q.  And a retaliation claim?

6     A.  Yes.

7     Q.  What facts are related to your age discrimination

8  claim?  So what are you claiming Direct Energy did that

9  constitutes age discrimination?

10    A.  Yes.  So I was not selected for roles, and

11 instead younger with less experienced employees were

12 selected for roles.

13    Q.  Which roles were you not selected for that you

14 claim constitute age discrimination?

15    A.  I was not selected for the director role, nor was

16 I selected for the supervisor role or for a business

17 partner role.

18    Q.  Okay.  So your age -- in your age -- for your age

19 discrimination claim, you're alleging that you were not

20 selected for the HR director role?

21    A.  Yes.

22    Q.  And also you're -- for your age discrimination

23 claim you're alleging that you were not selected for the

24 HR consultant role?

25    A.  Yes.

 1    Q.  When were you not selected for the HR director

 2  role that forms the basis of your age discrimination

 3  claim?

 4    A.  It would be August 2019.

 5    Q.  And when were you not selected for the HR

 6  consultant role that forms the basis of your age

 7  discrimination claim?

 8    A.  September 2019.

 9    Q.  Are there any other roles that you claim you were

10  not selected for that form the basis of your age -- your

11  age discrimination claim?

12    A.  The -- I don't know the -- it was a vice

13  president of HR role that I was not selected for, and

14  that was in 2017.  Yes.

15    Q.  Okay.  Your nonselection for the VP of HR role is

16  one of the roles that form the basis of your age

17  discrimination claim?

18    A.  Yes.

19    Q.  Okay.  And that was in 2017?

20    A.  Yes.

21    Q.  Okay.  Are there any other roles that you were

22  not selected for that form the basis of your age

23  discrimination claim?

24    A.  No.

25    Q.  Okay.  And with respect to your race claim, --

1    A.  Yes.

2    Q.  -- what roles were you not selected for that form

3 the basis of your race discrimination claim?

4    A.  The vice president of HR role.

5    Q.  The one in 2017 that you just mentioned?

6    A.  Yes, ma'am.

7    Q.  Are there any other roles that you were not

8 selected for that form the basis of your race

9 discrimination claim?

10    A.  The director of HR role.

11    Q.  And when was that?

12    A.  2019, August.

13    Q.  That is the same role that forms the basis of

14 your age discrimination claim?

15    A.  Yes.

16    Q.  Okay.  Besides the VP of HR role and the HR

17 director role, are there any other roles that form the

18 basis of your race discrimination claim that you were

19 not selected for?

20    A.  No.

21    Q.  And then with respect to your retaliation claim,

22 what is the basis of your retaliation claim against

23 Direct Energy?

24    A.  Not being selected for the vice president of

25 human resources role.

1    Q.  The one in 2017?

2    A.  Yes.

3    Q.  How did Direct Energy retaliate against you with

4    respect to not selecting you for the VP of HR role?

5    A.  I filed a complaint against the hiring manager,

6    who was the SVP of HR, and after that there was

7    retaliation.

8    Q.  Is it your allegation that after you filed a

9    complaint related to the VP of HR role that you were

10   retaliated against by the company?

11   A.  Yes.

12   Q.  How did the company retaliate against you after

13   you filed the complaint regarding the VP of HR role?

14   A.  I was forced to report to the person who was

15   selected for the role, and, therefore, I was subject to

16   the retaliation from him and ultimately believe that

17   that's what led to my -- my departure.

18   Q.  So the fact that the company required you to

19   report to the person who was selected for the VP of HR

20   role, it's your allegation that that was retaliation for

21   making the complaint?

22   A.  And they -- excuse me, let me --

23   Q.  Well, I'm sorry, can you answer my question?

24   A.  Yes.

25   Q.  I'm sorry.

1     A.  Repeat your question, please.

2     Q.  The fact that that you were required to report to

3  the person who was selected for the VP of HR role, it's

4  your allegation that that was retaliation for filing the

5  complaint?

6     A.  Yes.

7     Q.  Okay.  And so you were about to, I think, add

8  something.

9     A.  Yes, and I was still in the -- the -- what is it

10  called, the line, the reporting line, of the SVP who I

11  filed the complaint against.

12     Q.  So the -- excuse me, the fact that you were --

13  you continued in the reporting line of the SVP that you

14  filed a complaint against also for -- it's your position

15  that that constitutes retaliation?

16     A.  Yes.

17     Q.  Who was the SVP that you filed a complaint

18  against?

19     A.  Melinda Reeves.

20     Q.  And who was the person who actually was selected

21  for the VP of HR role?

22     A.  Jeff Fralix.

23     Q.  Before you applied for the VP of HR role, did

24  your position report up to the VP of HR role?

25     A.  Yes.

1     Q.  Okay.  So the company didn't change the reporting

2  structure when it selected Jeff Fralix for the VP of HR

3  role, correct?

4     A.  No.

5     Q.  Okay.  But you said that -- you say that the

6  company forced you to report to him.  Did you want --

7  did you request to not have to report to Jeff Fralix?

8     A.  I requested an opportunity to -- to leave the --

9  to leave the company, because Jeff and Melinda were/are,

10  I don't know, still really good friends and --

11     Q.  So you -- I'm sorry, you requested an opportunity

12  to leave the company?

13     A.  [Witness moving head up and down]

14     Q.  Is that a yes?

15     A.  Yes.  I'm sorry, yes.

16     Q.  That's okay.

17     A.  Yes.

18     Q.  You're doing --

19     A.  Yeah.

20     Q.  -- fine so far.

21     Okay.  So after the complaint, after you filed

22  the complaint against Melinda Reeves and learned that

23  Jeff -- well, did you learn that Jeff Fralix was

24  selected for the VP of HR role before or after you filed

25  the complaint against Melinda Reeves?

1    A.  I don't recall.  I believe it was -- I believe I
2  found out after I filed the complaint.
3    Q.  Okay.  So you filed the complaint and then
4  learned that it was Jeff Fralix who was selected.  Is
5  that your best recollection?
6    A.  That's my best recollection, right, but it was --
7  it was, I'd say, well known that he was going to be
8  selected by her.
9    Q.  Well known to whom?
10    A.  Applicants.  I'm -- yeah, just --
11    Q.  By all the applicants?
12    A.  I'm -- it was a -- it was an assumption that --
13  that that was going to happen.
14    Q.  By whom?  Who assumed?
15    A.  I know I did and other applicants did, too.
16    Q.  Who were the other applicants who assumed that
17  Melinda Reeves was going to select Jeff Fralix?
18    A.  Martine Savage, Kristin Johnson, that's all I
19  recall.
20    Q.  And what -- why did you assume that Ms. Reeves
21  going to select Jeff Fralix for the VP of HR role?
22    A.  Because they were good friends.
23    Q.  And you assumed that before you applied for the
24  position?
25    A.  Yes, so I applied in spite of that assumption,

1  because I wanted a chance to -- to be interviewed and

2  to -- to demonstrate my skills and capabilities and have

3  that opportunity to -- to share my story, yes.

4      Q.  Okay.  And so you applied -- when you applied,

5  you had -- you already had the assumption that Jeff

6  Fralix would be selected for the position; is that -- is

7  that right?

8      A.  Yes.

9      Q.  Okay.  And do you know if Martine Savage assumed

10 that Jeff Fralix would be selected for the position --

11     A.  I don't --

12     Q.  -- when she applied?

13     A.  I don't know.  I mean, I'd have to -- I -- I

14 don't know.

15     Q.  Okay.

16     A.  Yeah.

17     Q.  And Kristin Johnson, do you know if she assumed

18 that Jeff Fralix would be selected for the position when

19 she applied?

20     A.  I don't know.

21     Q.  How did you learn that Martine Savage and Kristin

22 Johnson assumed that Jeff Fralix would be selected for

23 the position?

24     A.  So if you ask did I know, I don't know.  I just

25 know through some of our conversations it seemed that

1  that was the assumption, that it was going to be him.

2     Q.  Were these conversations before or after he was

3  selected for the position?

4     A.  Before.

5     Q.  Okay.  So before he was selected, you recall

6  having conversations Martine Savage and Kristin Johnson

7  where the three of you discussed the fact that it was

8  just assumed that Jeff Fralix would be selected?

9     A.  I know I had conversations with Kristin.  I'm not

10 sure if I had them with Martine.

11    Q.  Okay.

12    A.  But I -- but there were conversations had, and I

13 know I had some with Kristin, yes.

14    Q.  Okay.  And those conversations were before he was

15 actually selected or before you all learned that he had

16 been selected?

17    A.  Yes.

18    Q.  Okay.  Did you all have conversations after he

19 was selected about the fact that he was selected?

20    A.  Not that I recall.

21    Q.  And when I say did you all, I'm talking about

22 Martine Savage and Kristin Johnson?

23    A.  Oh, yeah, that's -- yeah, I -- that was my

24 assumption that you're asking, yeah, not that I recall.

25    Q.  Okay.  Okay.  And so you said -- you asked -- you

1    requested the opportunity to leave the company when you

2    learned that Jeff Fralix had been selected?

3        A.  I requested to leave after I filed a complaint

4    and was informed that nothing was going to be done

5    regarding what had -- regarding my complaint against

6    Melinda Reeves.

7        Q.  Okay.  So by the time -- do you remember when you

8    filed the complaint?

9        A.  I don't remember right now.  I could refer to my

10   notes later, but --

11       Q.  Okay.  This was in 2017, correct?

12       A.  That's what I recall.

13       Q.  And so chronologically at the time you filed the

14   complaint, you would have known or had learned already

15   that Jeff Fralix had been selected and you had not,

16   correct?

17       A.  I don't recall the exact timing of it.

18       Q.  But I guess what I'm trying to just drill down is

19   when you filed the complaint, you knew at that time that

20   Jeff Fralix had been selected?

21       A.  I'm not certain of -- I'm not certain of if it

22   had been officially made known at the time I filed my

23   complaint.

24       Q.  Whether it's official or unofficial, you had

25   received some information -- when you filed the

1  complaint you had received some information by that time

2  indicating that Jeff Fralix was selected for the

3  position?

4  A.  I'm not sure.

5  Q.  Why would you have filed a complaint if you

6  didn't know who had been selected for the position?

7  A.  I filed a complaint because of the interview that

8  I had with or the lack of interview I had with Melinda

9  Reeves.

10  Q.  Okay.  So your complaint was about the fact that

11  you didn't get interviewed?

12  A.  No, my complaint was about the racist remark that

13  she made during our interview.

14  Q.  Okay.  So your complaint was about the fact that

15  she made a racist remark during -- during what?

16  A.  During a one-on-one meeting.

17  Q.  And when did that take place?

18  A.  I don't recall the exact day.

19  Q.  Okay.  And after the investigation was

20  concluded --

21  A.  Yes.

22  Q.  -- you made a request -- you requested an

23  opportunity to leave the company; is that right?

24  A.  After I was informed of the lack of -- of -- of

25  action on behalf of Direct Energy, based on my

1    complaint, I felt like it was going to be hostile,

2    untenable work environment, and I requested an

3    opportunity to -- to leave.

4         MS. WILLIAMS:  Okay.  I'm going to object as

5    nonresponsive.

6    Q.  I forgot to mention that as a part of our

7    introduction.  There are --

8    A.  Yes, ma'am.

9    Q.  -- going to be times where your lawyer may make

10   objections, and there are going to be times where I

11   might make objections.  Unless your lawyer instructs you

12   otherwise, you'll still be required to answer --

13   A.  Yes.

14   Q.  -- the question.  I made an objection to your

15   answer as nonresponsive.  I just -- my question to you

16   was after you were -- well, let me -- Shawn, can you

17   read my last question back, because I don't quite

18   remember it.

19        [The record was read as requested]

20        MS. WILLIAMS:

21   Q.  Okay.  So that's my question.  After the

22   investigation was concluded, you made a request or you

23   requested the opportunity to leave the company; is that

24   right?

25   A.  Yes.

1    Q.   Okay.  Who did you make that request to?

2    A.   Jonathan Phillips and Sidney Watts.

3    Q.   I'm sorry, Jonathan --

4    A.   Phillips.

5    Q.   P-h-i-l-l-i-p-s?

6    A.   Yes.

7    Q.   Okay.  And then Sidney Watts?

8    A.   Sidney Watts.

9    Q.   Who is Jonathan Phillips?

10   A.   He was the employee relations director.

11   Q.   And when did you request the opportunity to leave

12   the company with Jonathan Phillips?

13   A.   It was when they talked to me about the -- the

14   results of the investigation.

15   Q.   And you said when they.  Who's they?

16   A.   Sidney.

17   Q.   So you had a meeting with -- a meeting where both

18   Jonathan and Sidney --

19   A.   Yes.

20   Q.   -- were present?

21   A.   Yes.

22   Q.   Okay.  Did you have any separate meetings with

23   Jonathan Phillips related to your request to leave the

24   company?

25   A.   Not that -- not that I recall.

1     Q. Okay. Did you have any separate meetings with

2 Sidney Watts related to your request to leave the

3 company?

4     A. Not -- not that I recall.

5     Q. Okay. And did you meet with Jonathan and Sidney

6 together only one time related to your request to leave

7 the company?

8     A. I believe so, yes.

9     Q. When was this meeting? I know it was after the

10 investigation they were giving you the results. Do you

11 recall approximately when that occurred?

12     A. I don't recall.

13     Q. Would it have been sometime in 2017?

14     A. Yes.

15     Q. And what was their response about your request to

16 leave the company?

17     A. That I -- they offered a standard severance

18 package, I think, if I recall correctly. Yeah.

19     Q. So they were receptive to your request to leave

20 the company?

21     A. Yes.

22     Q. Okay. And in connection with your request to

23 leave the company in 2017, they offered you a severance

24 package?

25     A. Yes.

1    Q.  Okay.  Do you recall the terms of that have

2    severance package?

3    A.  It would have been the standard one offered at

4    the time.

5    Q.  Do you know what the standard terms were at the

6    time?

7    A.  I don't recall, no.

8    Q.  And how did you respond to the offer?

9    A.  I did not take it.

10   Q.  Why did you not take it?

11   A.  Because of my level of experience and the terms,

12   I felt like it was -- not allow me enough time to find

13   another role commiserate with my experience and skills

14   and tenure in my field.

15   Q.  How much time were they offering to give you to

16   find another position?

17   A.  I don't recall.

18   Q.  Did either one of -- did either Jonathan or

19   Sidney tell you that you had to leave the company at the

20   time?

21   A.  No.

22   Q.  I'm sorry?

23   A.  No.

24   Q.  Did anyone tell you that you had to leave the

25   company at the time?

1  A. No.

2  Q. The idea of leaving the company in 2017 was your

3  idea, correct?

4  A. Yes, yes.

5  Q. Okay. We were -- we're going to come back a

6  little bit to that, but we were talking about

7  retaliation, and you said that you were forced to report

8  to Jeff Fralix and in your mind that was a form of

9  retaliation; is that right?

10  A. Yes.

11  Q. And that you were still required to report to

12  Melinda Reeves, and that was a form of retaliation,

13  correct?

14  A. Yes.

15  Q. Did you request to be reassigned somewhere else

16  so that you would not have to report to Jeff Fralix?

17  A. There wasn't -- the HR department was no small

18  that it all reported in to Melinda. Excuse me, ask your

19  question again.

20  Q. Did you request to be moved so you would not have

21  to report to Jeff Fralix?

22  A. No.

23  Q. Did you request to be moved so you would not have

24  to report to -- up to Melinda Reeves?

25  A. No.

1    Q.  And, in fact, to the point that you just made,

2  the HR department, the structure of the HR department,

3  your role, regardless of who actually got the VP of HR

4  position, that role, the role you had, would have

5  reported up to the VP of HR role, correct?

6    A.  Absolutely.

7    Q.  And regardless of who was selected for the VP of

8  HR role, the VP of HR role and your role would have

9  continued to report up to Melinda Reeves, right?

10    A.  Yes.

11    Q.  Okay.  Is there anything else that you allege

12  constitutes retaliation?

13    A.  Not that I can think of at this time.

14    Q.  And you think that you were retaliated against

15  for filing the complaint against Melinda Reeves,

16  correct?

17    A.  Yes.

18    Q.  Is there anything else that you did that you

19  think was the source of the alleged retaliation?  Was it

20  just your complaint against Melinda Reeves, or were

21  there other things you did that you think the company

22  retaliated against you for?

23    A.  I think it was just that.

24    Q.  Okay.  Okay.  And the only two forms of

25  retaliation you're alleging are being forced to report

1 to Jeff Fralix and being forced to report to Melinda

2 Reeves; is that right?

3     A.  Yes.

4     Q.  Okay.  So with respect to your retaliation claim,

5 are there any other facts that form the basis of your

6 retaliation claim that we haven't discussed?

7     A.  No.

8     Q.  Okay.  I want to get a little bit of background

9 information from you.  Are you currently employed?

10     A.  I am.

11     Q.  Where are you employed?

12     A.  Catalyst.

13     Q.  What kind of company is Catalyst?

14     A.  It's a nonprofit focused on women's leadership.

15     Q.  And what role do you have at Catalyst?

16     A.  Director of corporate engagement.

17     Q.  How long have you been working for Catalyst?

18     A.  Since February 7, 2022.  That is this year,

19 right?

20     Q.  Yes.

21     A.  Okay.

22     Q.  Since you started with Catalyst, have you been

23 working as the director of corporate engagement, or have

24 you had other roles?

25     A.  At Catalyst?

1    Q.  Yes.

2    A.  No, yeah, that's been my sole role, yes.

3    Q.  Okay.  And what is your compensation at Catalyst?

4    A.  100,000.

5    Q.  Do you have benefits there?

6    A.  Yes.

7    Q.  Is there a bonus program that you're eligible

8    for?

9    A.  No.

10   Q.  What type of benefits do you have at Catalyst?

11   A.  Standard, health, welfare, dental.

12   Q.  Before Catalyst where were you employed?

13   A.  I was unemployed for two and a half years.

14   Q.  When did you stop working at Direct Energy?

15   A.  September 2019.

16   Q.  It's your testimony that you were -- excuse me,

17   not employed from September 2019 until February 7th,

18   2022?

19   A.  I did -- I had contract assignments, but I was

20   not -- that was not a full-time employee anywhere.

21   Q.  Okay.  Well, I'm not asking whether it's full

22   time, part time, temporary.

23   A.  Oh, okay.

24   Q.  Any employment that you've had.  What employment

25   of any kind did you have before Catalyst, before you --

1    A.   I --

2    Q.   -- started at Catalyst?

3    A.   Okay.  I did contract work for the City of

4  Houston, and I did contract work for Miss Academy.

5    Q.   For what was that?

6    A.   Miss, M-i-s-s, Academy.  And I had a little

7  contract work with my own HR consultant practice, but

8  most of it was unemployment insurance.

9    Q.   When did you do contract work for the City of

10  Houston, what time frame?

11   A.   The beginning of 2021, as best I recall.  I know

12  it was early 2021.

13   Q.   Until when?

14   A.   April.  And I also had another contract role with

15  the -- within the city of Houston -- the county of

16  Houston.  Let me -- I'm sorry, it was Harris County.

17   Q.   The contract work that you're talking about now

18  is with Harris County?

19   A.   It's with Harris County, yes, ma'am.  My

20  apologies.

21   Q.   There is no City of Houston contract --

22   A.   No.

23   Q.   -- work?  Okay.

24   A.   No, my apologies.

25   Q.   That's okay.

1     A.  Harris County.  And I had -- I did two contract

2  roles with them.  One was -- ended in April.  I think

3  the other one ended in June of 2021.

4     Q.  Okay.  So you had two contract roles with Harris

5  County, one from early 2021 until about April 2021?

6     A.  Uh-huh.

7     Q.  Is that right?

8     A.  Yes, yes.

9     Q.  And then there was a second contract role with

10  Harris County?

11     A.  Yes.

12     Q.  And what was the time frame for that one?

13     A.  That one probably started around March of 2021,

14  ended June-ish 2021.

15     Q.  So there was an overlap between the two roles?

16     A.  A slight overlap, yes.

17     Q.  Okay.  What kind of contract work did you do for

18  Harris County?

19     A.  Recruiting.

20     Q.  And then the contract work you did for Miss

21  Academy, when was that?

22     A.  HR onboarding.

23     Q.  I'm sorry, when?

24     A.  Oh, I'm sorry.

25     Q.  That's okay.

1    A.  Oh, no.  That would have started 20 -- beginning

2    of 2020.

3    Q.  Until when?

4    A.  Present.

5    Q.  So you still do contract work for Miss Academy?

6    A.  Yes.

7    Q.  Okay.  Is it ongoing contract work, or does it

8    last for a particular term and end and then a new

9    assignment starts, or how does that work?

10   A.  It's ad hoc.

11   Q.  Okay.

12   A.  It's -- it's like onboarding an employee.  So

13   it's, I guess, defined chunks of work.

14   Q.  And so starting at the beginning of 2020, Miss

15   Academy, would they reach out to you when they had an

16   onboarding assignment, and then you would take that

17   assignment and complete that particular onboarding

18   assignment, then you would be done with that assignment?

19   A.  Yes.

20   Q.  And generally how many assignments have you had

21   at a single time with Miss Academy?

22   A.  At a single time?

23   Q.  Yeah.

24   A.  Oh, one or two.

25   Q.  Okay.

1    A.   Yeah.

2    Q.   And how many in total have you had?

3    A.   I do not recall.  I'd have to -- yeah, I --

4    Q.   Is it hundreds or --

5    A.   No.

6    Q.   Okay.

7    A.   I'd say somewhere between 10 and 15.

8    Q.   Around 15, you said?

9    A.   10 to 15.  Yeah.

10   Q.   Okay.  And it was just onboarding work that

11   you've done for Miss Academy?

12   A.   Policy creation.

13   Q.   Anything else with Miss Academy?

14   A.   No.

15   Q.   And how does the policy creation work go?  They

16   would -- explain to me how you get a policy creation

17   assignment at Miss Academy.

18   A.   It's creating the policies of the -- the

19   president reached out and says -- it's a new company and

20   didn't have any HR policies or practices in place.  So I

21   was creating some of the basic ones for them.

22   Q.   Are you still doing policy creation work for

23   them?

24   A.   Uh-huh.  Yes.  Sorry.  Yes.

25   Q.   That's okay.  When was the last assignment you

1    got from Miss Academy?

2        A.  Last assignment?  Onboarding of someone at one of

3    their -- at one of the new sites.  What is this, June?

4    May.  Mid-May, yeah.

5        Q.  And so that would have been while you were

6    working for Catalyst?

7        A.  Yes.

8        Q.  Is your position with Catalyst a full-time

9    position?

10       A.  Yes.

11       Q.  So how does that work if you work full time for

12   Catalyst and you get an assignment for Miss Academy, how

13   do you manage those?

14       A.  In my off time.  In my -- yeah.

15       Q.  So you can onboard during off time, your off time

16   at Catalyst?

17       A.  Yes.

18       Q.  Okay.  And do you presently continue a plan to

19   continue to accept assignments from Miss Academy?

20       A.  Yes.

21       Q.  When was your last assignment with Harris County?

22   Was that the June 2021?

23       A.  Yes.

24       Q.  Are you still accepting assignments from Harris

25   County?

 1    A.   No.

 2    Q.   And then you said you did contract work through

 3  your own HR consulting practice?

 4    A.   Yes.

 5    Q.   When did you form your own HR consulting

 6  practice?

 7    A.   December 2019.

 8    Q.   And how -- do you still have your HR consulting

 9  practice?

10    A.   Yes.

11    Q.   What kind of work do you do in your HR consulting

12  practice?  Obviously HR, but can you give me an overview

13  of what that entails?

14    A.   It could be policy creation, team buildings,

15  onboarding, leadership consulting, the full gamut, I

16  mean, the full spectrum of HR.  So whatever is in there.

17    Q.   Do you do did HR investigations through your

18  consulting practice?

19    A.   I have not.

20    Q.   Is that something you offer, though?

21    A.   I could, yes.

22    Q.   The work that you do for Miss Academy, --

23    A.   Uh-huh.

24    Q.   -- is that through your HR consulting practice?

25    A.   That's -- yes, that's how I am compensated

1  through there, yes.

2     Q.  Okay.  And then the work you did for Harris

3  County, was that also through your HR consulting

4  practice?

5     A.  No.

6     Q.  That was separate in your individual capacity?

7     A.  Ask the question again.

8     Q.  For the consulting work you did for -- for Harris

9  County, --

10    A.  Right.

11    Q.  -- was that through your HR consulting practice?

12    A.  No.

13    Q.  Okay.  So that was just in your individual

14 capacity?

15    A.  That was through a temporary agency via Harris

16 County.

17    Q.  What temp agency?

18    A.  One was called A-1 Personnel, and the other one

19 was called Evans.

20    Q.  When -- when did you sign up with A-1 Personnel

21 for temp work?

22    A.  January 2021.  Excuse me.  Excuse me.

23    Q.  January of when?  I'm sorry.

24    A.  2021.

25    Q.  And when did you sign up with Evans?

1    A.  It would have been April, March, April 2021.

2    Q.  Are you still signed up with A-1 Personnel for

3  work?

4    A.  No.

5    Q.  Are you still signed up with Evans for work?

6    A.  No.

7    Q.  Are you signed up with any temp agencies

8  currently for work?

9    A.  No.

10    Q.  Are those the only two temp agencies you ever

11  signed up for work since your departure from Direct

12  Energy?

13    A.  Yes.

14    Q.  What kind of companies did you do HR consulting

15  work for through your HR consultant practice?  So I know

16  you said Miss Academy --

17    A.  Uh-huh.

18    Q.  -- went through your consulting practice.

19    A.  Yes.

20    Q.  What other companies did you work for through

21  your HR consulting practice?

22    A.  The name of the company or the type of company?

23    Q.  Let's go with the name, thank you.

24    A.  Okay.

25    Q.  Yeah, I made that unclear.  Let's do the name.

1    A.  Okay.

2    Q.  Thank you.

3    A.  Collins Aerospace.  That was one.

4    Q.  Okay.  Any others?

5    A.  No.

6    Q.  Okay.  So Miss Academy and Collins Aerospace are

7    the only two companies that you have done work for

8    through your HR consulting practice?

9    A.  Yes.

10   Q.  What kind of work did you do for Collins

11   Aerospace?

12   A.  It was a team building workshop.

13   Q.  Was it just one assignment?

14   A.  Yes.

15   Q.  How much did you earn for the contract work that

16   you did with Harris County?

17   A.  I don't recall, but I can get it for you.

18   Q.  Okay.  Do you have a ballpark idea?

19   A.  I -- I don't, no.

20   Q.  Okay.

21   A.  Yeah.

22   Q.  What about for Miss Academy, how much do you earn

23   for the work you've done for Miss Academy?

24   A.  I don't exactly recall.  I want -- it's like

25   under 2,000.

1    Q.  In total?

2    A.  I believe so, yes.

3    Q.  How much money have you earned or has the HR

4  consultant practice that you have earned through

5  assignments that you had?

6    A.  Between eight and ten thousand.

7    Q.  And that would include the Miss Academy work,

8  correct?

9    A.  Yes.

10    Q.  And it would also include the Collins Aerospace

11  work, correct?

12    A.  Yes.

13    Q.  Does Catalyst -- does your current employer know

14  that you're here today giving a deposition?

15    A.  No.

16    Q.  Do they know about your lawsuit against Direct

17  Energy?

18    A.  No.

19    Q.  Have you ever made a complaint against any prior

20  employer?

21    A.  No.

22    Q.  Okay.  When did you start, excuse me, with Direct

23  Energy?

24    A.  October 2015.

25    Q.  And you left September 2019, correct?

1     A.  Yes.

2     Q.  Okay.  We're going to kind of jump back before

3  Direct Energy.

4     A.  Okay.

5     Q.  Let's talk about your educational background.  Do

6  you have a college degree?

7     A.  I do.

8     Q.  What's your degree?

9     A.  I have a bachelors degree in business

10  administration from the University of Tennessee in

11  Knoxville.  I have a masters degree -- masters degree in

12  human resources management from Texas A&M University

13  College Station.

14     Q.  From, I'm sorry, Texas A&M?

15     A.  Texas A&M University in College Station.

16     Q.  When did you get your bachelors degree?

17     A.  I received my bachelors degree in May of 1993.

18     Q.  And when did you get your masters?

19     A.  In December of 1994.

20     Q.  Between the time that you got your bachelors

21  degree and your masters degree, did you work?

22     A.  Oh, wait, hold one.

23     Q.  I know that's a while ago.

24     A.  I know.  And -- did I work in that summer?

25     Q.  It would have been for about a year, a little bit

1  more than a year?

2     A.  No, it would have been -- no, no, it would

3  have -- it would have been a summer.  I graduated in May

4  of 1993.  I started in August of 1993 in my masters

5  degree.

6     Q.  Oh, okay.  I'm sorry.

7     A.  So it would have been a summer, like three

8  months.

9     Q.  Okay.  When did you get your -- complete your

10 masters?

11    A.  I completed my masters in December of 1994.

12    Q.  Okay.  And that's what I'm asking.  I guess

13 between the time you got your bachelors degree and you

14 got your masters, were you working?

15    A.  Yes.

16    Q.  Okay.  Okay.

17    A.  That's so long ago.  Yes.

18    Q.  Yeah, I know.

19    A.  I'm like wait a minute.  Okay.  Yes.  So I

20 received a fellowship, for one, to -- from Texas A&M to

21 pursue my masters, but I was also a substitute teacher

22 in the Cy-Fair ISD school district on days when I was

23 not at school.

24    Q.  Okay.  So during that period from about May 1993

25 to December 1994 you had a fellowship from Texas A&M,

1    and you -- you were doing substitution -- substitute

2    teaching work?

3        A.  Yes.

4        Q.  Okay.  After you got your masters, what did you

5    do?

6        A.  January of 2000 -- wait a minute.  January 1995,

7    I started with Shell Oil Company.

8        Q.  Okay.

9        A.  And, excuse me, I need some water.

10       Q.  Yes, of course.

11       A.  Okay.

12       Q.  Yes.

13           I'll ask you some questions about Shell in just a

14   minute, but do you have any other degrees besides your

15   bachelors and your masters degree?

16       A.  No.

17       Q.  Okay.  Do you have any other -- any certificates

18   or --

19       A.  I do.

20       Q.  Okay.  What are -- what are those?

21       A.  I'm a Certified Senior Professional Human

22   Resources.

23       Q.  I'm sorry?

24       A.  Certified Senior Professional Human Resources.

25       Q.  And who is that certification from?

1    A.  Through the HR Certification Institute, HRCI.

2  It's a certification agency for HR professionals.

3    Q.  Okay.  And when did you get that certification?

4    A.  1996?  '6?  Wait.  1999.

5    Q.  Okay.

6    A.  '98, '99.  It's -- I've had it a while.

7    Q.  Okay.  Is it something that you have to renew?

8    A.  Yes.

9    Q.  Okay.  On what -- on what schedule do you have to

10  renew it, every year or other term?

11    A.  I think it was like every five years.

12    Q.  Okay.  And you are current and still certified --

13    A.  Yes.

14    Q.  -- through HRCI?

15    A.  Yes.

16    Q.  And any other certifications you hold?

17    A.  No.

18    Q.  Okay.  When you started with Shell Oil, what

19  position did you have?

20    A.  HR analyst.

21    Q.  And how long did you work for Shell Oil?

22    A.  20 years.

23    Q.  In the 20-year period that you were at Shell Oil,

24  did you have other positions besides the HR analyst

25  position?

1    A.  Yes.

2    Q.  Okay.  Can you list for me the positions you had?

3   So we've got HR analyst.  What position did you have

4   after that?

5    A.  I would have had an HR -- what did we call it --

6   an HR business partner role.  I would have had HR

7   manager roles.  Would you like me to like go

8   chronologically through them?

9    Q.  If you could, yes.

10   A.  Okay.

11   Q.  Are there -- so you started off as an HR analyst,

12  yes?

13   A.  Yes.  And then I became an HR representative.

14  I'm trying to think of like the exact titles that they

15  called at the time.

16   Q.  That's fine.

17   A.  It just -- so I'm just -- just more progression.

18  So HR analyst, HR representative, and I just progressed

19  through the HR ranks there, left Deer Park, went to

20  another role where I was the HR manager for -- oh, my

21  gosh, I think that was HR manager for the employee -- I

22  don't recall exact title, but I became a manager that

23  oversaw all of the onboarding for the company.

24      Then I left that role, and I was an HR manager

25  for the policies and processes group for the pipeline

1    division.  And then I left that role, and I was the --

2    an HR partner for -- within the IT division.

3        Then I left that role and was an HR manager of

4    policies and payroll at Deer Park again.  And then I

5    left Deer Park and where did I go?  And then I -- then I

6    went into an HR role in policy, like a senior HR policy

7    advisor role and then left that and went into a learning

8    development advisor, senior learning development advisor

9    role, and that was the last role I had at Shell.

10   Q.  So your last role was the learning development

11   advisor?

12   A.  I believe it's -- I believe it was like a senior

13   learning and development advisor role.

14   Q.  Okay.  Were there times that you went from an HR

15   manager role back to an HR partner role?

16   A.  Yes.

17   Q.  Okay.  So, for example, you mentioned at one

18   point you were an HR manager over policies and process

19   for pipeline, but then after that you were an HR partner

20   for the IT division?

21   A.  Yes.

22   Q.  What was -- and is -- was -- during your tenure

23   at Shell was a manager role more senior to an HR partner

24   role?

25   A.  Yes.

1   Q.  So what was -- explain sort of the -- the

2   circumstances where you went from an HR manager to an HR

3   partner at Shell.

4   A.  The -- there was always -- there was a plan with

5   the type of experiences you needed to have to continue

6   to progress.  And so oftentimes you would have

7   individual contributor roles, or you would have

8   manager/people leader roles, and it was about the

9   experience different business units.  So they were all

10  with progressing responsibility and increasing

11  expectations.  So it wasn't unusual.

12  Q.  Did any of -- did you -- during your time at

13  Shell, were there any reorganizations that impacted your

14  role as -- in HR there?

15  A.  By impacted --

16  Q.  Where your role was changed, eliminated or

17  otherwise affected in any way.

18  A.  Shell had lots of reorganizations.  I'm sure that

19  sometimes my role was redefined, but I wasn't personally

20  impacted by any of them until I left in December 2014.

21  Q.  What happened in December 2014?

22  A.  They had a reorganization, and my role was

23  eliminated.

24  Q.  Did you get any type of severance --

25  A.  Yes.

1    Q.  -- from Shell?

2    A.  Yes.

3    Q.  Did you have any complaints about the fact that

4    your role was eliminated at Shell?

5    A.  No.

6    Q.  Did you have any complaints at all related to

7    your employment at Shell during the time you were there?

8    A.  No.

9    Q.  Okay.  And then after Shell where did you work?

10   A.  I was unemployed for 10 months.

11   Q.  And then what did you do after?

12   A.  I started at Direct Energy in October 2015.

13   Q.  We've been going for, I guess, about an hour.  Do

14   you want to take a quick break?

15   A.  I would love to take a quick brick.

16       MS. WILLIAMS:  Okay.  Let's do that.

17       THE WITNESS:  Okay.

18       VIDEOGRAPHER:  It is 10:59.  We are off the

19   record.

20       [Recess]

21       VIDEOGRAPHER:  It is 11:09.  We are back on the

22   record.

23       MS. WILLIAMS:

24   Q.  Ms. Bible, since our break is there anything you

25   want to add to the testimony that you've already

1  provided?

2     A.  No.

3     Q.  Okay.  Do you hold any professional licenses?  I

4  know we talked about certifications, but do you have any

5  professional licenses?

6     A.  No.

7     Q.  Are you currently married?

8     A.  No.

9     Q.  Have you been married before?

10     A.  Yes.

11     Q.  To whom?

12     A.  I was married to Craig Baham, and I was married

13  to Harlan Davis.

14     Q.  Harlan Davis?

15     A.  H-a-r-l-a-n Davis.

16     Q.  Okay.  When were you married to Craig Baham?

17     A.  I was going to say it was so long ago.  Hold on.

18  Wait a minute.

19     Q.  Very sorry.

20     A.  Hold on.  Okay.  Wait a minute.  I married him

21  March 3rd, 1996.  Yes.  And we were divorced, ooh wee,

22  oh, gosh, 2003, March, April, May, June.

23     Q.  That's fine.

24     A.  Okay.

25     Q.  And what about --

1    A.  It's been almost 20 years.

2    Q.  Okay.

3    A.  Okay.

4    Q.  And Harlan Davis, when were you married to Harlan

5  Davis?

6    A.  Okay.  June 1993, divorced June 1994.

7    Q.  Do you have any children?

8    A.  I do.

9    Q.  How many children?

10   A.  Two.

11   Q.  And what are their names?

12   A.  Guy Baham and Madison Baham.

13   Q.  How old is Guy?

14   A.  23.

15   Q.  23?

16   A.  Yes.

17   Q.  And how old is Madison?

18   A.  20.

19   Q.  Do Guy and -- does Guy still live with you?

20   A.  No.

21   Q.  Does Madison still live with you?

22   A.  Yes.

23   Q.  Is Madison in school?

24   A.  Yes.

25   Q.  Where is she in school?

1     A.  The University of Texas San Antonio.

2     Q.  Other than Madison, is there anyone else who

3  currently lives with you?

4     A.  No.

5     Q.  Does Madison rely on you for all of her financial

6  support?

7     A.  Yes, she does.

8     Q.  I have a 22 year old, a 20 -- 19 year old, 17.  I

9  understand.

10    A.  Yes.  Yes, she does.

11    Q.  Have you ever served in the military?

12    A.  No.

13    Q.  Have you ever been convicted of a crime?

14    A.  No.

15    Q.  Have you ever been arrested?

16    A.  No.

17    Q.  Okay.  Just background stuff we ask.  I'm sorry.

18  Okay.  When you -- your H -- your HR consultancy

19  business, --

20    A.  Yes.

21    Q.  -- do you have -- is there a name, --

22    A.  Yes.

23    Q.  -- a business name for that business?

24    A.  Yes.

25    Q.  What is it?

1    A.   Blue Topaz Consulting.

2    Q.   Blue Topaz Consulting?

3    A.   Yes, ma'am, LLC.

4    Q.   And are you the only member?

5    A.   Yes.

6    Q.   You've had Blue Topaz Consulting in -- has been

7    operating -- Blue Topaz Consulting has been operating

8    continuously since December -- I forgot the date.

9    A.   2019.

10   Q.   2019; is that right?

11   A.   Yes.

12   Q.   Okay.  Has it been profitable?

13   A.   No.

14   Q.   Have you personally collected any income or fees

15   from Blue Topaz Consulting?

16   A.   Ask the question --

17   Q.   Have you collected any fees or income personally

18   from Blue --

19   A.   Okay.

20   Q.   -- Topaz Consulting?

21   A.   Yes.

22   Q.   Okay.  How much?

23   A.   Between eight and ten thousand.

24   Q.   Okay.  Has -- does Blue Topaz Consulting have any

25   employees?

1    A.  No.

2    Q.  Has it ever had any employees?

3    A.  No.

4    Q.  Has Blue Topaz Consulting ever received

5    compensation for services other than cash payments, so

6    in kind payments of any -- of any kind?  Do you --

7    A.  No.

8    Q.  Okay.

9    A.  No.

10   Q.  It's all been cash payments?

11   A.  Well, yes.

12   Q.  Yeah.

13   A.  Checks.

14   Q.  Checks?

15   A.  Okay.

16   Q.  Cash?  Yeah.

17   A.  Yeah.  I was like yeah.

18   Q.  Is there a bank account for Blue Topaz

19   Consulting?

20   A.  Yes.

21   Q.  Okay.  Through what bank?

22   A.  Bank of America.

23   Q.  And that bank account is still active?

24   A.  Yes.

25   Q.  Okay.  Have you ever -- I think we touched on

1  this a little.  I want to make sure the record is clear.

2  Have you ever filed any kind of grievances, complaints

3  or made any allegations against any employers that

4  you've had other than Direct Energy?

5      A.  No.

6      Q.  Your professional life since your masters degree,

7  have all of your -- has all of your work been in the HR

8  space?

9      A.  Yes.

10     Q.  And your work with Catalyst is also currently in

11 the HR space?

12     A.  No.

13     Q.  What is it?

14     A.  It's -- how would you describe it?  It's -- it's

15 called corporate engagement, but it's, excuse me, a

16 relationship manager with supporters of Catalyst.

17     Q.  Explain that to the jury.

18     A.  Okay.  So a relationship manager is I have a

19 portfolio of 50 supporters, and I maintain the

20 relationship with their respective focal point and

21 ensuring that they are getting the full benefits and use

22 of their support of Catalyst.

23     Q.  And you said Catalyst is a nonprofit doing

24 women's leadership work?

25     A.  Yes, women's leadership work.

1     Q.   What specifically do -- does Catalyst do with

2     respect to women's leadership?

3     A.   Catalyst has researched into the barriers to

4     advancement, inclusion for women and including the

5     intersectionality of women in the workplace and through

6     that research generate solutions reports, learning

7     opportunities.  So, for example, the research into

8     barriers to advancement for women would then become

9     maybe a workshop that a supporter could -- could

10    utilize.

11    Q.   And the supporters, are these donors, or are

12    these actually women who come to Catalyst for services?

13    A.   These are companies.

14    Q.   Oh, companies.  Okay.  So companies hire Catalyst

15    for research?

16    A.   No.  No.

17    Q.   Okay.

18    A.   So companies pledge support to Catalyst, and

19    in -- and as a part of that pledge, they have access to

20    all of Catalyst resources and research, but it's not an

21    HR role.

22    Q.   And then there are women who come to Catalyst for

23    services related to, you know, gaining leadership

24    skills?

25    A.   No, it's strictly companies.

1      Q.  Strictly companies.

2      A.  Yes.

3      Q.  Okay.  And what kind of companies are supporters

4  of Catalyst?

5      A.  All kinds.  So --

6      Q.  Can you name a few or --

7      A.  Baker Hughes, McDermott, Michels Corporation,

8  Epsilon, Experian, --

9      Q.  Okay.

10      A.  -- Shell Oil Company, Motiva.

11      Q.  Okay.  When you applied for the position at

12  Catalyst -- I'm sorry, what is the name of the position

13  again?

14      A.  Director of corporate engagement.

15      Q.  When you -- is that the position you applied for

16  at --

17      A.  Yes.

18      Q.  -- Catalyst?

19      A.  Yes.

20      Q.  Did you know that it was not an HR role --

21      A.  Yes.

22      Q.  -- at the time you applied?

23          What attracted you to that position?

24      A.  What attracted me to the position was a -- it was

25  a job offer after two and a half months -- two and a

1    half years, excuse me, of unemployment, and it was

2    the -- the DENI, excuse me, the diversity, equity and

3    inclusion work that they do and the mission of the

4    company.

5        Q.  Do you have plans to cross over back into HR

6    work?

7        A.  No, not at this time.

8        Q.  Are you seeking -- actively looking for other

9    work at this time?

10       A.  I am.

11       Q.  Where?

12       A.  Wherever I can put an application in, but I am

13   looking right now at HarperCollins.

14       Q.  Are these HR roles that you're looking for?

15       A.  Yes.

16       Q.  And what is the role at HarperCollins that you're

17   looking at?

18       A.  Vice president of human resources.

19       Q.  Where is that located?

20       A.  Would be remote.

21       Q.  Do you have an application in?

22       A.  No.

23       Q.  Are you planning to put an application in?

24       A.  If I need to, yeah, yeah.

25       Q.  Explain that to me, if you need to.  I'm sorry.

1    A.  Oh, I haven't been asked to.

2    Q.  So you said but you're -- you're looking at the

3  role?

4    A.  Right, so I've -- I've been contacted about a

5  possible role there.

6    Q.  Contacted by the company?

7    A.  Yes.

8    Q.  And so what are you waiting for in order to put

9  in an application?

10   A.  Nothing in particular.  I just -- I'm -- I -- I

11 haven't been asked to apply for the role.

12   Q.  Is the role actually open at this point?

13   A.  I think it is, yes.

14   Q.  Is there anything preventing you from applying?

15   A.  No.

16   Q.  So why haven't you applied, is what I'm trying to

17 understand.

18   A.  No particular reason, just sometimes when you're

19 approached you start talking to folks, and eventually

20 you get to the application process.

21   Q.  Okay.  How long has the application been open, do

22 you know?

23   A.  I don't know.

24   Q.  Have you been monitoring it with plans to submit

25 an application?

1    A.  No.

2    Q.  Any other positions that you're looking at for HR

3  roles other than HarperCollins?

4    A.  No.

5    Q.  Are you actively looking still, though, for HR

6  roles?

7    A.  No.  I just started Catalyst in February.  So I'm

8  still coming up to speed with that.

9    Q.  Okay.  Okay.  I want to talk -- how did you learn

10  about the position at Direct Energy that you applied for

11  and got in October 2015?

12    A.  A former Shell colleague contacted me and told me

13  that there was a role there and connected me with the

14  hiring manager.

15    Q.  Who was this former colleague?

16    A.  Oh, Nicky is her first name.

17    Q.  Was she working at Direct Energy at the time?

18    A.  A former Shell colleague.

19    Q.  Right.

20    A.  No.

21    Q.  Okay.  So she was at Shell, but she heard about

22  something at Direct Energy?

23    A.  Because -- yeah, her --

24    Q.  Okay.

25    A.  Her friend is Kristin Johnson.

1    Q.   Okay.

2    A.   Yeah.

3    Q.   So Nicky knows Kristin Johnson?

4    A.   Yes.

5    Q.   And tell me about the -- the process for applying

6    to the -- what was the position you applied for at

7    Direct Energy in 2015?

8    A.   HR business partner.

9    Q.   And what was your understanding of what that role

10   was?

11   A.   HR generalist, having a client group, providing

12   advice and counsel to assigned clients.

13   Q.   And did you have to enter -- did you submit an

14   application for the position?

15   A.   Yes.

16   Q.   And did you interview for the role?

17   A.   Yes.

18   Q.   Do you recall who you interviewed with?

19   A.   I interviewed with Kristin Johnson, Zandra

20   Koeppel and Jeff Fralix.

21   Q.   Did you know Kristin Johnson at the time you

22   interviewed?

23   A.   No.

24   Q.   Did you know Zandra Koeppel at the time you

25   interviewed?

1    A.  No.

2    Q.  Did you know Jeff Fralix at the time you

3 interviewed?

4    A.  No.

5    Q.  Did you only have one interview with the three of

6 them together?

7    A.  No.

8    Q.  Were they three separate interviews?

9    A.  They were three separate interviews.

10    Q.  Okay.

11    A.  And, actually, I need to correct something.  I

12 was supposed to interview with Zandra.  She couldn't

13 make it.  So I interviewed with Jeff instead.

14    Q.  I see.

15    A.  Yes.  Okay.

16    Q.  So you had two interviews, one with Kristin

17 Johnson, right?

18    A.  Yes.

19    Q.  And then one with Jeff Fralix?

20    A.  Yes.

21    Q.  Who filled in for Zandra Koeppel?

22    A.  Yes.

23    Q.  Okay.  Other than those two interviews, did you

24 interview with anyone else for the HR business partner

25 position?

1    A.  Not that I recall.  Not that I recall.

2    Q.  Did you know before you started this position

3  what client group you would be serving?

4    A.  No.

5    Q.  How was your interview with Kristin Johnson?  I

6  mean, obviously, you got the position, but generally how

7  did that -- that interview go from your perspective?

8    A.  I thought it went well.  She clearly outlined

9  what the role would entail and the types of challenges

10  the role might present.

11    Q.  Okay.  And then how did your interview with Jeff

12  Fralix go, from your perspective?

13    A.  It was less structured.  It was apparent he had

14  not prepared, and it was surface type of interview.

15    Q.  Okay.  What was the -- did you -- at Direct

16  Energy were positions assigned job grade classifications

17  or job grade levels?

18    A.  Yes.

19    Q.  Did you know at the time you interviewed what job

20  grade level the HR VP role was?

21    A.  I don't recall if I knew at the time.

22    Q.  Did you come to know?

23    A.  Yes.

24    Q.  Okay.  And what was the level or job grade

25  classification for the HR VP role?

1    A.  Level 6.

2    Q.  Did you know what level -- well, what was Kristin

3  Johnson's position at the time she interviewed you, if

4  you recall?

5    A.  I don't recall her direct -- her exact title, but

6  she was my supervisor.

7    Q.  Okay.  So you would have come into the role

8  reporting to Kristin Johnson?

9    A.  Yes.

10    Q.  And do you recall what Jeff Fralix' role was when

11  you interviewed for the HR VP role?

12    A.  I believe he was in a talent acquisition role.

13    Q.  Do you know what his job grade classification was

14  at the time?

15    A.  I don't recall.

16    Q.  Do you know what Kristin Johnson's job grade

17  classification was at the time?

18    A.  A 5.

19    Q.  Was a -- is an L5 in Direct Energy structure a

20  more senior position than an L6 position?

21    A.  Yes.

22    Q.  So they have sort of an inverse classification,

23  where the lower the number the higher the ranking?

24    A.  Yes.

25    Q.  Okay.  What happened after you interviewed with

1  Kristin and Jeff, what happened next in the process for
2  you?
3       A.  I received a job offer from Kristin.
4       Q.  Was that -- was that orally or in writing or --
5       A.  Orally.
6       Q.  Okay.  She called you?
7       A.  I don't know if -- actually, I don't know if she
8  called me or the recruiter called me, and I don't
9  know -- I can't recall who the recruiter was at the
10 time.
11      Q.  Okay.
12      A.  Yeah.
13      Q.  Did -- did Direct Energy have internal
14 recruiters?
15      A.  Yes.
16      Q.  Okay.  And so it would have been either Kristin
17 or an internal Direct Energy recruiter who called you?
18      A.  Yes.
19      Q.  And do you recall what they told you about the
20 offer?
21      A.  I was offered the role, and the salary would be,
22 I believe, 150,000 with 10 percent bonus, benefits, et
23 cetera.
24      Q.  Did you -- and you knew that it would be
25 reporting to Kristin Johnson at that time?

1    A.  Yes.

2    Q.  Okay.  Did you ultimately receive a written job

3  offer letter?

4    A.  I'm sure I did.

5         MS. WILLIAMS:  Okay.  I'm going to mark this

6  here.  Can I mark this as Exhibit 1?

7         [Exhibit 1 marked, September 25, 2015 offer

8  letter from Kristin Johnson to Shea Baham]

9    A.  I can --

10        MS. WILLIAMS:

11   Q.  Yes.

12   A.  Oh, okay.

13   Q.  Ms. Bible, I'm showing you what's been marked as

14  Exhibit 1 to your deposition.

15   A.  Yes.

16   Q.  Do you recognize that document?

17   A.  Yes.

18   Q.  What is that document?

19   A.  It looks like my offer letter.  Yeah.  Yep.

20   Q.  Okay.  And this is the offer letter that we were

21  just discussing that you said you recalled receiving?

22   A.  Yes.

23   Q.  Okay.  And it identifies that you started the --

24  you were offered the HR business partner position at

25  Direct Energy effective October 5th, 2015, correct?

1    A.  Yes, yes.

2    Q.  It also identifies your biweekly salary

3  annualized to 150,000, correct?

4    A.  Yes.

5    Q.  Okay.  And then other benefits, including the

6  incentive plan, benefits, 401(k), et cetera, right?

7    A.  Yes.

8    Q.  Okay.  Did you have any questions at the time the

9  offer was made about any of the terms?

10    A.  Yes.

11    Q.  What questions did you have?

12    A.  I asked if there could be a sign-on bonus.

13    Q.  And what was the answer?

14    A.  No.

15    Q.  Did you have any issues about that or --

16    A.  No.  Ultimately they granted a $5,000 sign-on

17  bonus, but it was part of the negotiation.  So, yeah.

18    Q.  So they said no, but then they gave you --

19  they --

20    A.  Through the negotiation, --

21    Q.  Okay.

22    A.  -- right.

23    Q.  So you asked for a sign-on bonus.  They said no?

24    A.  And then we came to the agreement on 5,000.

25    Q.  Okay.  So you ultimately did get a sign-on bonus?

1     A.   Yes.

2     Q.   Who did you negotiate that with?

3     A.   I believe it was the recruiter.

4     Q.   When you started at Direct Energy as an HR

5     business partner, what were your responsibilities?

6     A.   Advice and counsel to leaders and employees

7     regarding the HR space.

8     Q.   Did you service any particular client group?

9     A.   I did.

10     Q.   Which client group?

11     A.   I do not recall which ones I had at first.

12     Q.   Was it more than one client group at a time, or

13     did you have one specific client group?

14     A.   It could vary.

15     Q.   And I'm focusing on the start of your employment.

16     A.   Uh-huh.

17     Q.   When you started there, were you assigned to one

18     or more client groups, if you recall?

19     A.   Initially I was -- initially I don't know I was

20     assigned to any one client --

21     Q.   Okay.

22     A.   -- group.  Ultimately I was assigned to the

23     Direct Energy solar business, and they were my -- my --

24     my client.

25     Q.   Okay.  And how long were you assigned to the

1  Direct Energy solar business, if you recall?

2      A.  2015, '16, '17.  I would say through 2017 until

3  the business was dissolved.

4      Q.  So from 2015 until 2017?

5      A.  Yes.

6      Q.  And during the time that you were assigned and

7  supporting the solar business, were you reporting to

8  Kristin Johnson for that entire period?

9      A.  No.

10     Q.  Okay.  When you started you were reporting to

11  Kristin Johnson, correct?

12     A.  Yes.

13     Q.  When did you stop reporting to Kristin Johnson?

14     A.  When she moved into a different role, and I don't

15  recall what the name of that role was.

16     Q.  But it would have been before 2017?

17     A.  Yes.

18     Q.  Okay.  And then who did you start reporting to?

19     A.  Zandra Koeppel.

20     Q.  At the time that you started at Direct Energy,

21  was -- was Melinda Reeves there?

22     A.  Yes.

23     Q.  What was Melinda Reeves' position when you

24  started at Direct Energy?

25     A.  I believe SVP of human resources.

 1     Q.  So the group that you were hired into reported up

 2  to Melinda Reeves at the time you started?

 3     A.  Yes.

 4     Q.  And it continued that way until Melinda Reeves

 5  left the company?

 6     A.  Yes.

 7     Q.  Okay.  Do you recall when Melinda Reeves left the

 8  company?

 9     A.  Perhaps 2018.

10     Q.  So you've described that in your capacity as an

11  HR business partner you provided advice and counsel to

12  leaders and employee -- employees in the HR space.  What

13  specifically did that entail for you?

14     A.  That would entail attending leadership team

15  meetings, consulting with leaders on -- on the business

16  as it related to human resources, sorting through

17  employee complaints, leadership development, leadership

18  coaching, employee development, anything that was HR

19  related, that's what I did.

20     Q.  Did you conduct investigations into employee

21  complaints?

22     A.  Sometimes, yes.

23     Q.  How many investigations would you say you've --

24  you conducted during the time you worked at Direct

25  Energy?

1   A.   I don't know the exact number.

2   Q.   At least 10?

3   A.   At least.

4   Q.   At least 20?

5   A.   At least.

6   Q.   At least 50?

7   A.   I'd say less than 50.

8   Q.   So somewhere between 20 and 50?

9   A.   That sounds fair, yeah.

10  Q.   What type of issues were involved in the

11  investigations that you conducted during your time at

12  Direct Energy?

13  A.   Unfair treatment, discrimination, race, gender,

14  age, retaliation, hostile work environment, theft.  Did

15  I say sexual harassment?

16  Q.   I don't think you did.

17  A.   Okay.

18  Q.   Any others you can think of?

19  A.   Not that I can think of.

20  Q.   Okay.  The investigations that you participated

21  in, did you actually conduct and lead those

22  investigations at Direct Energy?

23  A.   Sometimes.  Sometimes it was depending on the

24  type of investigation it was.  Sometimes it was funneled

25  through our employee relations department where I

1  partnered with my employee relations advisor on the

2  investigation.

3      Q.  Did you have a particular employee relations

4  advisor that was assigned to you, or did you work with

5  various employee relation -- relations advisors?

6      A.  I worked with various employee relations

7  advisors.

8      Q.  And so there were some investigations that you

9  handled solo; is that right?

10     A.  Yes.

11     Q.  And then there was, excuse me, some

12 investigations that you handled together with someone

13 from employee relations, --

14     A.  Yes.

15     Q.  -- correct?  Was there a difference in terms of

16 why or when you would get -- conduct an investigation

17 solo versus one that you would conduct with employee

18 relations?

19     A.  Yes.

20     Q.  What was that?

21     A.  The level of complexity.

22     Q.  The more complex it was, then you would work with

23 employee relations on that?

24     A.  Yes.

25     Q.  Okay.  What's meant by complexity?

1    A.   If there was like a claim of discrimination or

2    something more complex, a hostile work environment, so

3    those types of complaints I would work in conjunction

4    with employee relations department.

5    Q.   Were there discrimination complaints that you

6    handled solo?

7    A.   No.

8    Q.   So every discrimination complaint you had you

9    handled it in conjunction with someone from employee

10   relations; is that right?

11   A.   Yes.

12   Q.   What kind of complaints did you handle solo?

13   A.   It could be like a -- a complaint about a manager

14   or employees, two employees, having disagreements.

15   Q.   Were you familiar -- in your capacity as an HR

16   business partner at Direct Energy, were you familiar

17   with Direct Energy's policies and procedures related to

18   discrimination complaints?

19   A.   Yes.

20   Q.   In fact, it would have been important for you to

21   be familiar with that, because that was a part of your

22   job, right?

23   A.   Yes.

24   Q.   And in your capacity as an HR business partner at

25   Direct Energy, were you also familiar with the company's

1  processes, procedures and policies related to workplace
2  investigations?
3     A.  Yes.
4     Q.  And, in fact, that would have been important for
5  you to be familiar with, because that was a part of your
6  job, as well, right?
7     A.  Yes.
8     Q.  Okay.  Would you say that you were very
9  proficient at managing investigations when they came to
10  you either solo or with the employee relations
11  representative?
12     A.  Could you -- what do you mean by --
13     Q.  I mean, were you good at that?
14     A.  Oh, absolutely.  I'm -- I'm great at my job.
15     Q.  Okay.  And were you also good at managing or
16  understanding the company's discrimination policies and
17  procedures and how -- how to appropriately respond to
18  claims of discrimination?
19     A.  Yes.
20     Q.  Was there any aspect of the company's
21  antidiscrimination policy that you weren't familiar
22  with?
23     A.  No.
24     Q.  Were there any aspects of the company's workplace
25  investigation policies that you weren't familiar with?

1    A.   No.

2    Q.   I'm sorry?

3    A.   No.

4    Q.   Okay.  And would you -- would you say that you

5    were extremely familiar with all of those, with the

6    discrimination policy?

7    A.   I would say that I was familiar with the

8    discrimination policy as well as the workplace --

9    Q.   Investigation --

10   A.   -- investigations, yes.

11   Q.   -- policy?

12   A.   Right.

13   Q.   Okay.  Well, in fact, maybe I jumped the gun a

14   little bit.  Did Direct Energy have policies in place

15   related to antidiscrimination?

16   A.   Yes, they had a policy in place with respect to

17   antidiscrimination and workplace hostile work

18   environments, workplace harassment.

19   Q.   And you were really familiar with those in your

20   capacity as an HR business partner; is that right?

21   A.   I was familiar with them, yes.

22   Q.   Not very familiar, just familiar?

23   A.   I would need to reread them.  I'm just --

24   Q.   But I mean during the time that you were there,

25   you were very familiar with those policies, --

1   A.  Yes.

2   Q.  -- right?  Because you -- in fact, --

3   A.  That's --

4   Q.  -- you had to work with them --

5   A.  Right.

6   Q.  -- regularly, right?

7   A.  Right, right, right.

8   Q.  Okay.  And then did Direct Energy also have a

9   policy related to workplace investigations during the

10  time that you were there?

11  A.  I don't know if they had a policy with respect to

12  it.  There -- I don't even know if there was a process.

13  I just know that if I worked with my employee relations

14  advisors.  Sometimes I took my complaints to them.

15  Sometimes they came in through the integrity or

16  complaint hotline.  Sometimes the employees called them

17  directly.

18  Q.  So you said you don't recall if there was an

19  actual written policy or process related to workplace

20  investigations; is that right?

21  A.  I don't recall.

22  Q.  If -- but in your experience there, there were

23  actual processes and procedures related to workplace

24  investigations, correct?

25  A.  Yes.

1      Q.  And during the time you were there you were very

2   familiar with what those policies and procedures were,

3   correct?

4      A.  Yes.

5      Q.  Did -- did -- and I'm asking this question to

6   determine whether it was something separate and distinct

7   from the policies we've already talked about or a part

8   of the same policies, but --

9      A.  Okay.

10      Q.  -- did -- did Direct Energy have sort of

11   reporting procedures, like an ethics complaint procedure

12   where employees could lodge complaints that they had

13   through some type of hotline or other process?

14      A.  Yes.

15      Q.  Was that something that's separate from the

16   antidiscrimination policy and workplace investigation

17   policy that we've talked about?

18      A.  Yes.

19      Q.  Okay.  So there was a separate, distinct policy

20   related to the ethics reporting procedures?

21      A.  It might have been mentioned in those policies,

22   but it was a separate process.

23      Q.  Okay.  And I was -- I was going to make that

24   distinction.

25      A.  Okay.

1    Q.   So thank you very much.   So it was its own

2    particular policy, correct, to your recollection?

3    A.   To my recollection, yes.

4    Q.   But, obviously, incorporated into the

5    discrimination policy and the investigation policy,

6    correct?

7    A.   Yes.

8    Q.   Okay.   Do you recall what -- was it called like

9    EthicsPoint, or do you recall what the name was?

10   A.   There's so many of them.   I -- I referred to it

11   as the ethics hotline.

12   Q.   Okay.   And would you say in your capacity as an

13   HR business partner you were very familiar with the

14   policy and procedures related to the ethics hotline at

15   Direct Energy?

16   A.   Yes.

17   Q.   Because, again, that would have been a part of

18   your responsibilities as an HR business partner to be

19   familiar with and implement those policies, correct?

20   A.   Yes.

21   Q.   Okay.   Did -- sorry, did Direct Energy have a

22   code of conduct during the time that you worked for the

23   company?

24   A.   Yes.

25   Q.   And was that code of conduct separate from the

1  policies we've described, we've been discussing?

2      A.  I'm not certain what would have been included

3  as -- I don't know.

4      Q.  Okay.  Sitting here right now, do you have a

5  recollection of it being something separate and distinct

6  from the antidiscrimination policy, for example?

7      A.  I believe they were separate.

8      Q.  Okay.  And in your capacity as an HR business

9  partner, were you very familiar with the code of conduct

10  at Direct Energy during the time you worked there?

11      A.  I was familiar with it, yes.

12      Q.  Okay.  Familiar, were you very familiar with it?

13      A.  I would not say that I could recite it.  So when

14  you asked me if I'm very familiar with something, I --

15  could I recite it or -- and I could not do that.  But

16  did I understand the intent of the policy?  Yes.

17      Q.  Okay.  And, in fact, that would have been

18  important -- it would have been important for you to be

19  familiar with the policy, because it would have been a

20  part of your responsibilities as an HR business partner

21  to implement some parts of the code of conduct from time

22  to time, correct?

23      A.  Yes.

24      Q.  When you started at Direct Energy, did you have

25  to go through any type of training related to the

1  company's policies?

2  A.  I'm sure there was.

3  Q.  Okay.  And do you recall during your employment

4  at Direct Energy, did you participate in any type of

5  annualized training or training on some other, you know,

6  schedule related to the company's policies?

7  A.  Yes.

8  Q.  How often was this training?

9  A.  Best I recall, every year.

10  Q.  Okay.  And so just so the record's clear, to the

11  best of your recollection, you recall receiving training

12  at the start of your employment at Direct Energy related

13  to the company's various HR policies, correct?

14  A.  I recall that there was training on various

15  policies.  I don't recall exactly when I received those.

16  Q.  Okay.  Every year, in any event, you did receive

17  training on the company's HR policies; --

18  A.  Every year --

19  Q.  -- is that correct?

20  A.  I'm sorry, I'm sorry.  Every year I recall

21  receiving training.  The type of training varied by

22  year.

23  Q.  What -- what training do you recall receiving

24  during the time that you worked at Direct Energy?

25  A.  I recall receiving training on -- what is it

1 called -- IT safety.  So using IT, technical stuff like

2 the technology being -- so that you don't get -- like

3 compromise the systems like that.

4      There was safety training.  And I also recall --

5 I don't recall code of conduct training, but I'm sure

6 that there was.  There had to be.  That's all I recall.

7      Q.  Do you recall training on the company's

8 antidiscrimination policy?

9      A.  I don't recall, but, yeah, there could have been,

10 yeah.

11      Q.  Okay.  What about on the company's investigation

12 policy?

13      A.  I don't recall, but there could have been

14 there, --

15      Q.  Okay.

16      A.  -- too, yeah.

17      Q.  And then on the -- the EthicsPoint policy, do you

18 recall that being a part of any training you received?

19      A.  I don't recall that one, either.

20      Q.  Okay.  How did you become familiar with the

21 company's policies, the ones we've been discussing?

22      A.  They were either online or written or -- yeah.

23      Q.  When you started at Direct Energy, you mentioned

24 that Melinda Reeves was the SVP of HR, correct?

25      A.  I believe that was her title, --

1    Q.  Okay.

2    A.  -- yes.

3    Q.  Do you know who the -- what the reporting

4    structure was kind of flowing down from Melinda Reeves

5    at the time you started?

6    A.  As best I recall, Kristin Johnson reported in to

7    her, Zandra reported in -- Zandra Koeppel reported in to

8    her, and some functional leaders reported in to her.

9    Q.  Were there other HR business partners in the

10   department when you started?

11   A.  Yes.

12   Q.  Who were they?

13   A.  I don't recall their names.

14   Q.  Do you recall any of -- did some of the HR

15   business partners report to Kristin Johnson as you did

16   and then some reported to Zandra?

17   A.  Yes.

18   Q.  Okay.  So they were split between the two of them

19   in terms of reporting?

20   A.  It was split based on the business.

21   Q.  Okay.

22   A.  So, yes.

23   Q.  Were Kristin and Zandra, to your understanding,

24   basically peer level?

25   A.  Yes.

1    Q.  Okay.  And then each of them had HR business

2  partners who reported up to them?

3    A.  Yes.

4    Q.  Okay.  Do you recall just roughly how many HR

5  business partners were in the department when you

6  started?

7    A.  I don't.

8    Q.  You -- you said earlier that for some -- for some

9  period of time you were supporting the solar business

10 group?

11   A.  Yes.

12   Q.  And you think that that ended sometime in 2017

13 when the business dissolved?

14   A.  Yes.

15   Q.  At the time the business dissolved, the solar

16 business dissolved, were you reporting to Kristin

17 Johnson or Zandra Koeppel?

18   A.  I think I was reporting to Zandra at that time.

19   Q.  Okay.  And then what -- what other business group

20 did you support after the solar business group was

21 dissolved?

22   A.  I supported the sales and marketing team.  I

23 supported the digital innovation team.  I supported the

24 strategy team.

25   Q.  These are all at different times, or did you

1    support them --

2        A.  All at the same time.

3        Q.  All at the same time.  So after you -- after the

4    solar business group dissolved, you were assigned sales

5    and marketing, digital innovation and the strategy team

6    all at the same time?

7        A.  Yes.

8        Q.  And so that would have -- they -- your support of

9    those business groups would have started in 2017?

10       A.  That's -- yes, that seems about right, yes.

11       Q.  And how long did you support sales and marketing,

12   digital innovation and strategy?

13       A.  Until I was -- until I left.

14       Q.  Until 2019?

15       A.  Yes.

16       Q.  Was there -- between 2017 and 2019 was there a

17   period where anything changed about the groups that you

18   were supporting where you either lost a group or gained

19   a group, or did it stay consistent with those three for

20   that entire period?

21       A.  I don't recall.

22       Q.  Sitting here today you don't recall any other

23   groups that you supported besides solar business, sales

24   and marketing, digital innovation and strategy during

25   your employment at Direct Energy; is that right?

1   A.  I also supported the annuities business.

2   Q.  Okay.  When was that?

3   A.  When as -- while I was supporting the solar

4   business, I also supported them, too.

5   Q.  Okay.  So let me just kind of recap for the

6   record.  You supported solar and annuities at the same

7   time between 2015 and 2017; is that correct?

8   A.  At some point within that time period I also

9   picked up the annuities business.

10  Q.  Okay.

11  A.  And I don't recall exactly when.

12  Q.  Okay.  And then after the solar business, excuse

13  me, dissolved, you stopped supporting annuities,

14  correct?

15  A.  Yes.

16  Q.  And you picked up sales and marketing, digital

17  innovation and strategy; is that right?

18  A.  The annuities business was a part of the sales

19  and marketing portfolio.

20  Q.  Okay.  So you continued supporting annuities

21  through your support of sales and marketing?

22  A.  Yes.

23  Q.  Okay.  So we've identified five groups.  Any

24  other groups that you can recall that you supported

25  during your employment at Direct Energy?

1    A.  No.

2    Q.  Okay.  Did your responsibilities as an HR

3 business partner change based on the groups that you

4 were supporting?

5    A.  Could you ask the question again?

6    Q.  Did your responsibilities as an HR business

7 partner change based on the groups that you were

8 supporting?

9    A.  No.

10    Q.  Do you have an understanding as to -- so the -- I

11 asked earlier about the job grade classifications.  You

12 were a level 6, correct, when you started?

13    A.  Yes.

14    Q.  Did you -- what was your job grade classification

15 throughout your employment at Direct Energy?

16    A.  A level 6.

17    Q.  So you were a level 6 from October 2015 when you

18 started through September 2019 when you left?

19    A.  Yes.

20    Q.  Okay.  Is level -- to your understanding, is

21 level 6 designated for certain job titles or positions?

22    A.  Yes.

23    Q.  Okay.  What job -- and, obviously, the HR

24 business partner is one of them.  Do you know any other

25 job titles or positions at Direct Energy that were

1  designated as level 6 when you were there?

2      A.  Not that I can recall.

3      Q.  Okay.  And the level 5 job grade classification

4  was senior to level 6, correct?

5      A.  Yes.

6      Q.  Do you know what positions or job titles had the

7  level 5 designation?

8      A.  It would be director level roles.

9      Q.  And then for level 4 positions, do you know what

10  job titles or positions had level 4 job grade

11  classifications?

12      A.  That would be vice president level roles.

13      Q.  I'm sorry?

14      A.  Vice president level roles.

15      Q.  Earlier we talked about the VP of HR role that

16  you applied for.  Do you recall that?

17      A.  Yes.

18      Q.  In 2017?

19      A.  Yes.

20      Q.  What level role was that, to your recollection?

21      A.  That would have been a level 4.  I believe level

22  4, yes.

23      Q.  And at the time you applied for that you were a

24  level 6?

25      A.  Yes.

1    Q.  And then the HR director role that you applied

2    for in 2019, what role was that?

3    A.  A level 5.

4    Q.  And at the time you applied for that you were a

5    level 6, correct?

6    A.  Yes.

7    Q.  And then there were the HR consultant roles that

8    you applied for in 2019.  What level roles were those?

9    A.  Level 6.

10   Q.  And at the time you applied for that, you were

11   level 6?

12   A.  Yes.

13   Q.  Okay.  Do you recall -- I know you said you

14   couldn't recall who else -- who the other HR business

15   partners were at the time that you were reporting to

16   Kristin Johnson.

17   A.  Right.

18   Q.  Do you recall the -- any other HR business

19   partners in the group at any point during your

20   employment at Direct Energy, who they were?

21   A.  I -- she wasn't necessarily an HR business

22   partner.  She was a more junior employee.  At any time?

23   Q.  Yeah.

24   A.  Okay.  Brittany, I forgot her last name.

25   Q.  This is the one that you said is the more junior

employee?

A.  She is more junior, yes, but she was an HR business partner.

Q.  Okay.  Okay.  So you were -- you said there was someone who was a more junior employee.  Was that Brittany or somebody else?

A.  Oh, someone else.

Q.  Okay.  All right.  So we have Brittany, who was an HR VP?

A.  Right.

Q.  And then who else?

A.  Chenee Franklin, Angie Moore -- I'm drawing a complete blank.  I'm drawing a blank.  I'm sorry.

Q.  Okay.  That's fine.  If you recall any, just --

A.  Yeah.

Q.  -- let me know.  Throughout the day something may pop up.  Do you recall what was -- is it Brittany Smith? Does that sound right to you?

A.  Yes.

Q.  Her last name?

What was Brittany's -- or what is Brittany's race?

A.  Black.

Q.  Do you know how old Brittany is?

A.  Probably early 30s.

```
 1    Q.  I'm sorry?

 2    A.  Probably mid -- mid-30s.

 3    Q.  Do you know for a fact what her age is or are

 4  you --

 5    A.  No.

 6    Q.  -- just making a guess?

 7    A.  I don't know for a fact.

 8    Q.  Okay.  So do you know Brittany Smith's age?

 9    A.  No.

10    Q.  Okay.  Chenee Franklin, what is her race?

11    A.  Black.

12    Q.  Do you know Chenee Franklin's race -- I'm sorry,

13  age?

14    A.  No.

15    Q.  And Angie Moore, what is her race?

16    A.  White.

17    Q.  Do you know Angie Moore's age?

18    A.  No.

19    Q.  What is Melinda Reeves' race?

20    A.  I believe she's Caucasian.

21    Q.  Do you know Melinda Reeves' age?

22    A.  No.

23    Q.  Kristin Johnson, what is her race?

24    A.  Black.

25    Q.  Do you know her age?
```

1    A.  No.

2    Q.  Zandra Koeppel, what is her race?

3    A.  Hispanic.

4    Q.  Do you know her age?

5    A.  No.

6    Q.  Jeff Fralix, what is his race?

7    A.  White.

8    Q.  Do you know his age?

9    A.  He is -- I don't know exactly, no.

10   Q.  With respect to your age discrimination claim, I

11   think you testified earlier that your age claim is based

12   on the HR director role, correct?

13   A.  Yes.

14   Q.  And then the HR consultant roles?

15   A.  Yes.

16   Q.  There were two HR consultant roles in 2019 that

17   opened, correct?

18   A.  Yes.

19   Q.  Okay.  And so you're complaining about the fact

20   that you did not get either one of those, correct?

21   A.  Yes.

22   Q.  Okay.  Who got the HR director role?

23   A.  Angie Moore.

24   Q.  Okay.  And how do you know that she's younger

25   than you?

1    A.  I don't know her exact age.

2    Q.  Okay.  So when you allege that that role went to

3  a younger employee, you don't actually know if it went

4  to a younger employee, correct?

5    A.  Correct.

6    Q.  Okay.  The HR consultant roles, who -- who got

7  those roles?

8    A.  Brittany Smith and Chenee Franklin.

9    Q.  And you've testified that you don't know either

10 of their ages, correct?

11   A.  Correct.

12   Q.  So how do you know that the HR consultant roles

13 went to younger employees?

14   A.  I don't know their ages.

15   Q.  What is the basis -- what evidence do you have or

16 are you presenting to the jury that the HR director role

17 was given to a younger employee?

18   A.  Based upon Angie's tenure, as well as her stage

19 in life.  I know that she was younger than me.

20   Q.  How do you know that she was younger than you?

21 That is what I'm trying to understand.

22   A.  Direct Energy had a -- I don't know her exact

23 age.  So --

24   Q.  So what evidence are you presenting to the jury

25 to prove that the HR director role went to Angie, who

1    was younger -- who you claim was younger than you?

2        A.  I don't know.  I'm -- I don't know.

3        Q.  It's just your own belief that she's younger than

4    you; is that what you're working on?

5        A.  Based upon our conversations, her stage in life,

6    her level of experience, her years of experience, that,

7    yes, that she and the others are -- are younger than I

8    am.

9        Q.  It is your belief based on this information that

10   she's younger, but you don't actually have any proof

11   that she's younger, correct?

12       A.  Yes, I don't know her exact age, correct.

13       Q.  Okay.  And with respect to the HR consultant

14   roles, what evidence are you planning to present to the

15   jury to establish that those roles were given to younger

16   employees?

17       A.  It is my belief that based upon their experience

18   and our conversations, their stage in life, that they

19   are younger than I am.

20       Q.  Sitting here today, you don't have any evidence

21   that Brittany Smith or Chenee Franklin are actually

22   younger than you, correct?

23       A.  I don't have anything.

24       Q.  Okay.  The VP of HR role, you're also alleging

25   that that went to a younger employee, correct?

1    A.  Yes.

2    Q.  And that would be Jeff Fralix?

3    A.  Yes.

4    Q.  What evidence do you have that Jeff Fralix is

5  younger than you?

6    A.  Jeff and I had a conversation about his age.

7    Q.  Okay.  And what -- what did he tell you about his

8  age in that conversation?

9    A.  We discovered that he is one or two years younger

10  than I am.

11    Q.  How old were you at the time in 2017?  Sorry.

12  What is your date of birth?

13    A.  There we go.

14    Q.  Yes.

15    A.  November the 20th, 1970.  Why don't we figure

16  that out.

17    Q.  Okay.  So -- and at the time you were hired by

18  the company, it looks like you would have been about 45.

19  Does that sound right?

20    A.  44.

21    Q.  44?

22    A.  Going on 45, yes.

23    Q.  Okay.  And so in 2017 you would have been about

24  47?

25    A.  46, 47, yeah.

1    Q.  Okay.  And you had a conversation with Jeff where

2    he confirmed that he's one or two years younger than

3    you?

4    A.  Yes.

5    Q.  Okay.  And the fact that he's one or two years

6    younger than you is what you are relying upon to support

7    your age discrimination claim related to the VP of HR

8    role; is that right?

9    A.  Yes.

10   Q.  Okay.  Earlier you testified that with respect to

11   your race claim you're complaining about the VP of HR

12   role and the HR director role, correct?

13   A.  I'm sorry, ask the question again.

14   Q.  Regarding your race discrimination claim you

15   testified that you're complaining about the VP of HR

16   role and the HR director role, correct?

17   A.  Specifically the VP of HR role.

18   Q.  Okay.  Not the HR director role?

19   A.  No.

20   Q.  So in this lawsuit the only role that forms the

21   basis of your race discrimination claim is -- is the VP

22   of HR role that you did not get in 2017?

23   A.  I'm sorry, I'm -- I need a break.  I'm -- it's

24   my --

25   Q.  I can give you one.  I just want to get that --

1      A.   Okay.  I am --

2      Q.   -- clarification.

3      A.   -- so sorry.  I'm just like spinning right now.

4  Okay.

5      Q.   Just take a breath.

6      A.   It's -- it's literally with all this allergy

7  medicine I'm taking.  Okay.  Folks.  I am so sorry.

8  Continue.

9      Q.   That's okay.

10     A.   Okay.  Ask it again.

11     Q.   For your race discrimination claim, --

12     A.   Yes.

13     Q.   -- you're complaining about the VP of HR role,

14  correct?

15     A.   Yes.

16     Q.   That was in 2017, yes?

17     A.   Yes.

18     Q.   Are you also complaining about the HR director

19  role in connection with your race discrimination claim?

20     A.   Yes.

21     Q.   Okay.  All right.

22     A.   Yes.

23     Q.   So let's get --

24     A.   Yes.

25     Q.   -- the record clear.

1    A.  Yes.

2    Q.  Your race discrimination claim is about the VP of

3    HR role?

4    A.  Yes.

5    Q.  And also about the HR director role?

6    A.  Yes.

7    Q.  Is it about the HR consultant roles?

8    A.  No.

9    Q.  Okay.  And why is that?

10   A.  Because both Brittany and Chenee share the same

11   race as I do.

12   Q.  Okay.  So the two individuals who got that role

13   are both African American, as well?

14   A.  Yes.

15   Q.  Okay.  And so you agree that in connection with

16   your claims, if there is a similarity in your race or

17   age with the individuals who got the roles, that that

18   would not support your claims, right?

19   A.  Yes.

20   Q.  Okay.  So, for example, if Angie Moore is the

21   same age as you, that would indicate that the company

22   did not discriminate against you because of your age,

23   right?

24   A.  Yes.

25   Q.  And if Jeff Fralix is the same age as you, that

1  would also indicate that the company did not
2  discriminate against you because of your age, correct?
3      A.  Yes.
4      Q.  Okay.  How well did you know Melinda Reeves when
5  you worked at Direct Energy?
6      A.  Not very well.
7      Q.  Did you interact with her much during the time
8  that you both were there?
9      A.  About once a month we had one-on-one meetings or
10 skip-level meetings.
11     Q.  Okay.  And your interactions with her, generally
12 how would you describe those?
13     A.  They were okay.
14     Q.  Did you have any negative interactions with her
15 up till the time that you claim that you had a
16 conversation with her where she made a racist comment?
17     A.  Not that I recall.
18     Q.  When was the conversation where you claim she
19 made the racist comment?
20     A.  Around mid -- mid-2017.
21     Q.  Okay.  And that was following the VP of HR
22 application process, right?
23     A.  That was during the process.
24     Q.  Okay.  When you met with her, you had already --
25 you had learned that you did not get the VP of HR role?

1    A.  No.

2    Q.  You did not know?

3    A.  No.

4    Q.  Okay.  What was the point of you meeting with her

5    at that time?

6    A.  The point, I thought, was to have an interview

7    for the role.

8    Q.  Do you -- I know this is probably pushing it a

9    little bit.  Do you remember how you found out you did

10   not get -- from whom you found -- you learned that you

11   did not get the VP of HR role?

12   A.  I don't recall from who.

13   Q.  Do you -- do you know who Daniel Kochman is?

14   A.  Yes.

15   Q.  Okay.  Who's Daniel Kochman?

16   A.  He would have been a recruiter in talent

17   acquisition.

18   Q.  Okay.  Do you recall communicating with Daniel

19   Kochman about the status of the VP of HR role that you

20   applied for?

21   A.  Yes.

22   Q.  Okay.  How did you and Daniel Kochman communicate

23   about that?

24   A.  Via email.

25   Q.  Okay.  Do you recall learning from Daniel Kochman

1 that you did not get the VP of HR role?

2    A.  That sounds right, yeah.

3    Q.  Okay.  If there's an email that shows that he

4 notified you on or about August 13th that you did not

5 get the VP of HR role, would that sound about right to

6 you?

7    A.  Yes.

8    Q.  And I'm sorry, August 13th, 2017?

9    A.  Yes.

10    Q.  Okay.  And if there are records showing that you

11 met with Melinda Reeves on Tuesday, August 15th, 2017,

12 after you learned from Daniel Kochman that you didn't

13 get the role, would that sound about right?

14    A.  Yes.

15    Q.  Okay.  So to clarify the record, when you met

16 with Melinda Reeves on August 15th, you had already been

17 informed that you did not get the VP of HR role from

18 Daniel Kochman, correct?

19    A.  I recall meeting with her and being surprised

20 that I wasn't even going to be offered an interview for

21 the role.  So, yeah, so that's what I recall.  And I --

22    Q.  But my question is by the time you met with her,

23 you already had some indication that you were not going

24 to get the role, correct?

25    A.  I don't recall it that way.

1    Q.  Okay.

2    A.  Yeah.

3    Q.  Okay.  Tell me about this meeting that you had

4    with -- with Melinda Reeves where you claim she made a

5    racist comment.

6    A.  We -- we were whatever floor it was on, whatever

7    floor she sits on, in the --

8        REPORTER:  I'm sorry.

9        MS. WILLIAMS:

10   Q.  I'm sorry.

11   A.  I am so sorry.  Can I take a break?  I mean, I'll

12   answer this one, but I just want to take a break.  I

13   just feel like I need to get up and -- and stretch.

14   Q.  Sure.

15   A.  So --

16   Q.  Do you need a break now, or do you want to finish

17   this question and then we take a break?  I mean, I'd

18   prefer to get the question answered, if we can.

19   A.  I'll answer it.

20   Q.  And then --

21   A.  Yeah, yeah.

22   Q.  Okay.

23   A.  Yeah, yeah.  I just -- okay.  Realizing y'all

24   didn't understand whatever I just said, it's obvious,

25   okay, I need to stand up and go get some fresh air.

1    Okay.  With respect to the meeting, she started

2    off by telling me that I did -- that she really didn't

3    know me and that she felt like I intentionally missed

4    like one-on-one meetings with her and that I just turned

5    them down.

6        And I informed her that sometimes they were

7    scheduled when I was on a plane, because her assistant

8    did not look at calendars.  And just she told me that

9    she was the SVP of HR, and I took from that that I

10   needed to have -- I don't -- I don't know, but it

11   just -- it didn't -- it wasn't -- I didn't take it in a

12   positive manner.

13       And then she informed me that I wasn't going to

14   be interviewed for the role, and when I asked why,

15   because, you know, I'm like you said you don't know me,

16   and that's how you get to know somebody.  She told me

17   that she needed someone in the role who she could trust.

18   And all of my bells and whistles and red flags went off

19   in terms of the word trust in terms of being a black

20   woman and not being trustworthy.

21       And, yeah, I -- that's all I recall from the -- I

22   don't recall anything else.  And I recall walking away

23   feeling, yeah, dismissed, and, yeah, it wasn't a very

24   pleasant feeling after I walked away from that meeting.

25   Q.  Okay.  I have follow-up, but -- obviously, but

1 why don't we take the break --

2 A. Thank you.

3 Q. -- and then we can kind of pick up.

4 A. Thank you.

5 MS. WILLIAMS: Okay.

6 VIDEOGRAPHER: It is 12:19, and we are off the

7 record.

8 [Recess]

9 VIDEOGRAPHER: It is 12:45, and we are back on

10 the record.

11 MS. WILLIAMS:

12 Q. Ms. Bible, we've had a break. Is there anything

13 that you want to change or add to your previous

14 testimony?

15 A. No.

16 Q. Okay. When we took the break, we were talking

17 about your meeting with Melinda Reeves, and you said

18 that she -- she made a couple of comments during the

19 meeting. One was she told you she did not -- that she

20 did not know you; is that right?

21 A. Yes.

22 Q. Was it true that she did not know you very well?

23 A. No.

24 Q. You all knew each other well?

25 A. I don't -- I mean, I wouldn't define it as well,

1  but she knew me.

2  Q.  Okay.  Did you think, when she said she didn't

3  know you, that she meant she didn't know you at all?

4  A.  I took it as she did not know my background in

5  terms of HR.

6  Q.  Okay.  Did she know your background as a -- in

7  HR?

8  A.  I don't know.

9  Q.  Okay.  So do you have any basis to believe that

10  when she said she didn't know about your background in

11  HR that she was not being truthful when she said that?

12  A.  No.

13  Q.  Okay.  And then she said that you

14  intentionally -- or she implied that you intentionally

15  missed meetings with her?

16  A.  Yes.

17  Q.  Okay.  Did you actually miss some meetings with

18  her?

19  A.  No, not intentionally.

20  Q.  Did you ever miss any meetings with her, whether

21  it was intentional or not?

22  A.  No, not that I recall.

23  Q.  Okay.  Did you ever, during that meeting, excuse

24  me, try to explain to her that you missed meetings

25  because there were some calendar issues with your

1  calendar and her assistant who was setting up the

2  meetings?

3     A.  I explained to her that sometimes when meetings

4  were scheduled I was not available.

5     Q.  Okay.  And so that would -- may have been the

6  meetings that you missed that she was referring to,

7  right?

8     A.  They would have been rescheduled.

9     Q.  Okay.  But those were the meetings that she was

10 referring to?

11    A.  That's my assumption, yes.

12    Q.  Okay.  And so there were some actual meetings

13 that were scheduled that you couldn't make that you had

14 to reschedule with her, correct?

15    A.  Absolutely, yes.

16    Q.  Okay.  And then you said she made a comment that

17 she wanted somebody in the role that she could trust?

18    A.  Yes.

19    Q.  And you said bells went off in your mind when she

20 said that?

21    A.  Yes.

22    Q.  Okay.  Why did bells go off in your mind when she

23 said she wanted somebody in the role that she could

24 trust?

25    A.  A, she did not know me, and, B, untrustworthiness

1  is a typical stereotype of a black person.

2  Q.  Okay.  So she didn't know you.  If you don't know

3  somebody, it's kind of hard to trust them, right?

4  A.  And so what basis she made her assumption was or

5  her -- her statement, it's like why -- why would she

6  make that?

7  Q.  Well, you said she didn't -- excuse me.  You said

8  she didn't know you, right?

9  A.  Right.

10  Q.  And so if she didn't know you, it's also possible

11  that she would not have a basis to trust you, right?

12  A.  Yes.

13  Q.  Okay.  Did she say anything else to you -- so

14  when she said she couldn't trust you, you thought -- you

15  took that -- is that the racist statement that she made

16  that you're claiming happened during that meeting?

17  A.  Yes.

18  Q.  Okay.  Did she say anything else in that meeting

19  that you're alleging was a racist statement?

20  A.  No.

21  Q.  So just the fact that she could not trust you?

22  A.  Yes.

23  Q.  Okay.  Did she mention your race during that

24  meeting at all?

25  A.  No.

1    Q.  Did you mention your race during that meeting?

2    A.  No.

3    Q.  When she said she couldn't trust you, you took

4 that to be a racist comment.  Did you take that to be a

5 comment that was discriminatory based on your age?

6    A.  No.

7    Q.  Okay.  Did she say anything during the meeting

8 about your age?

9    A.  No.

10    Q.  Did you say anything during the meeting about

11 your age?

12    A.  No.

13    Q.  In all of your employment at Direct Energy, has

14 anybody ever made any comments to you that was

15 derogatory regarding your race?

16    A.  Hold on, that's a span of four years.  Let me

17 think.  No.

18    Q.  And in your -- during your tenure with Direct

19 Energy, has anyone ever said -- did anyone ever say

20 anything to you that was derogatory regarding your age?

21    A.  No.

22    Q.  I'm sorry?

23    A.  No.

24    Q.  Okay.  So how long did the meeting with Melinda

25 Reeves last?

1    A.  I don't recall.  I would say probably 30 minutes,

2    maybe.

3    Q.  Okay.

4    A.  Yeah.

5    Q.  And how did you all end the meeting?  Did you all

6    have any plans for any follow-up meetings or any next

7    steps?

8    A.  Not that I recall.

9    Q.  And I think you testified that when you went into

10   the meeting you thought you were going to be

11   interviewed?  You thought that was your interview

12   meeting?

13   A.  Yes.

14        MS. WILLIAMS:  Okay.  I'm going to mark --

15        [Exhibit 2 marked, August 14, 2017 email from

16   Daniel Kochman to Shea Baham with attached email string]

17        THE WITNESS:  Thank you.

18        MS. WILLIAMS:

19   Q.  I'm showing you what's been marked as Exhibit 2

20   to your deposition.  Do you recognize this?  It's -- do

21   you recognize these pages?

22   A.  Let me see.  From Dan and other -- okay.  Yes.

23   Q.  Okay.

24   A.  Yes.

25   Q.  And, just for the record, can you describe for

1    the record what this document is?

2        A.   It's an email exchange between Dan Kochman and I.

3        Q.   Okay.

4        A.   Well, that's what it looks like.

5        Q.   And it's Bates labeled Bible 3 through Bible 8;

6    is that right?

7        A.   Oh, at the very bottom?

8        Q.   Yes.

9        A.   Yes.

10       Q.   Okay.  And it looks like it's the email

11   communication between you and Daniel started on August

12   3rd, and the last message was on Monday, August 14th,

13   2017; is that right?

14       A.   Yes.

15       Q.   Okay.  All right.  So I want to turn your

16   attention to the bottom of the first page of Exhibit 2,

17   the email message from Daniel on Sunday, August 13th.

18   Do you see that part?

19       A.   Yes.

20       Q.   And the second paragraph of his message he says I

21   wanted to let you know that Mel and I connected before

22   the weekend to discuss the internal candidates for the

23   VP, NAH role?

24       A.   Yes.

25       Q.   And then the next paragraph based on the internal

1   candidates in play Mel has decided to move forward with

2   a few other candidates at this time.  Do --

3       A.  Yes.

4       Q.  -- you see that?

5       A.  Yes.

6       Q.  Did I read that correctly?

7       A.  Yes.

8       Q.  And then you responded on August 14th in the

9   morning and said thank you for letting me know.

10      A.  Uh-huh.

11      Q.  I would love to hear more about what was lacking

12  from my application.

13      A.  Yes.

14      Q.  I'll find some time to connect when you return

15  from vacation?

16      A.  Yes.

17      Q.  Okay.  Does that refresh your recollection --

18      A.  Yes.

19      Q.  -- that when you went into the meeting with Mel,

20  Melinda, you already knew that you weren't being

21  interviewed for the job?

22      A.  Yes.

23      Q.  Okay.  Does that change your testimony then as to

24  whether or not you went into the meeting expecting to be

25  interviewed?

1    A.  Yes.

2    Q.  Okay.  So, to clarify, when you went into that

3  meeting, were you expecting to be interviewed?

4    A.  No.

5    Q.  And, in fact, you already knew that you were not

6  going to be interviewed, correct?

7    A.  Yes.

8    Q.  Based on your email exchange with Daniel?

9    A.  Yes.

10   Q.  Okay.  Do you know who else applied for the VP of

11  HR role?

12   A.  To the best of my recollection, Kristin Johnson

13  and Martine Savage applied.

14   Q.  Okay.  And I think you said they were both -- do

15  you know what level they were?

16   A.  L5.

17   Q.  Okay.  And then Jeff Fralix also applied?

18   A.  Obviously, yes.

19   Q.  Okay.

20   A.  And he was an L4.

21   Q.  And he was an L4.

22   A.  Uh-huh.

23   Q.  Do you know if anybody else applied?

24   A.  I don't know.

25   Q.  Do you know if any other L6 employees applied?

1    A.  I don't know.

2    Q.  Okay.  Okay.  So after your meeting with -- well,

3  when Daniel told you that you were not selected --

4    A.  Uh-huh, yes.

5    Q.  -- for the role, did you have any concerns at

6  that time?

7    A.  What type of concerns?

8    Q.  About being treated unfairly.

9    A.  I was concerned that I was not offered an

10 interview.

11   Q.  Do you know if there were other individuals who

12 were not offered interviews?

13   A.  I don't know.  I do know that Kristin and Martine

14 had interviews.

15   Q.  Okay.  But you don't know if there were other

16 candidates who applied who also did not get interviews?

17   A.  Correct.

18   Q.  Okay.  Is the -- did the fact that you did not

19 get an interview, did that cause you to believe you were

20 being discriminated against?

21   A.  Excuse me.  Yes.  Yes.

22   Q.  When did you develop the concern that not getting

23 the interview was discriminatory?

24   A.  Once I had a conversation with -- with Melinda

25 and she said that she didn't know me, but she still made

1  a decision about not even interviewing me, that's -- as

2  I said, that's when red flags, bells and whistles went

3  off in my head.  I'm like well, what assumptions did she

4  make about me if she did not know me and then did not

5  take the opportunity to know me, which is part of the

6  interview process.

7      Q.  Okay.  So when you -- when you learned that you

8  didn't get the interview from Daniel, you didn't think

9  it was discriminatory at that time; you later came to

10 believe it was discriminatory when you actually met with

11 Melinda Reeves; is that right?

12     A.  Yes.

13     Q.  Okay.  And that's based on the comment she made

14 that she didn't know and didn't know if she could trust

15 you; is that right?

16     A.  Yes.

17     Q.  Okay.  But you don't know if there were other

18 individuals who also were not interviewed, correct?

19     A.  Correct.

20     Q.  Okay.  If you learned that there were other

21 individuals who were not interviewed, would that change

22 your opinion about whether you were being discriminated

23 against by not being interviewed?

24     A.  No.

25     Q.  Okay.  Why not?

1    A.  Because of the level of skills and experience

2  that I brought.  My level of skills and experience that

3  I brought were actually level 5, but I entered Direct

4  Energy at a level 6, and I was actually qualified to do

5  that level 4 role.

6    Q.  Okay.  So let me make sure I understand.  So not

7  getting the interview, in your mind, was discriminatory,

8  correct?

9    A.  I should have been interviewed, yes.

10    Q.  Okay.  And do you think -- discriminating against

11  you for what reason, based on what?  You think it was

12  discriminatory because of your race, because of your

13  age, because of both?

14    A.  I think of both.

15    Q.  Okay.  So the fact that you did not get

16  interviewed, you believe was discriminatory against you

17  because you're a black woman, yes?

18    A.  Yes.

19    Q.  And because of your age at the time?

20    A.  Yes.

21    Q.  Okay.  And if you found out that there was, for

22  example, a white woman who had not been interviewed in

23  that process, as well, you would still think that you

24  were being discriminated against because you're a black

25  woman?

1     MR. HODGES:  Objection, speculation, but you can

2 answer if you can understand the question.

3     A.  Okay.  No one there had the level of skills and

4 experience I did.  And even if there was a white woman

5 there, I'm hard pressed to think of anybody who had

6 level of skills and experience that I had.  So --

7     Q.  So -- but you think that you didn't get

8 interviewed because you're black, correct?

9     A.  Right, and my age, which relates to my level of

10 skills and experience, yes.

11    Q.  Okay.  So let's -- I'm going to break that up.

12    A.  Okay.

13    Q.  So you think that you were not interviewed

14 because you're black, correct?

15    A.  I think that that played a role in it, yes.

16    Q.  Okay.  Kristin Johnson's black, right?

17    A.  Yes.

18    Q.  Kristin Johnson was interviewed, right?

19    A.  Yes.

20    Q.  Okay.  And you think that you were not

21 interviewed because of your age, right?

22    A.  Yes.

23    Q.  But you -- you don't know Kristin Johnson's age,

24 right?

25    A.  No.

1    Q.  And you don't know Martine's age, correct?

2    A.  Right.

3    Q.  And you don't know Jeff Fralix's age?

4    A.  Correct.

5    Q.  Okay.  And you don't know if there were other

6    people who were -- who submitted applications for the VP

7    of HR role, correct?

8    A.  Correct.

9    Q.  Okay.  And you said that there was no one else

10   who had the level of skills and experience that you had

11   for the VP of HR role; is that right?

12   A.  Correct.

13   Q.  Was that your testimony?  Were you more

14   experienced than Kristin Johnson?

15   A.  Yes.

16   Q.  And -- and Martine Savage?

17   A.  Yes.

18   Q.  And Jeff Fralix?

19   A.  Absolutely.

20   Q.  What was -- what evidence do you have that you

21   were more experienced that Jeff Fralix?

22   A.  Our years of industry experience.

23   Q.  How long -- how many years of industry experience

24   did you have?

25   A.  What was that?  Probably 20 -- over 20 -- well, I

1   would say over 20.  So probably 22, 23 at the time.

2       Q.  How many years of industry experience did Jeff

3   Fralix have at the time?

4       A.  Less than I did.  So --

5       Q.  How much?

6       A.  Say, I don't know, 20.  I don't know.

7       Q.  How -- how much industry experience did Kristin

8   Johnson have?

9       A.  About the same as Jeff.

10      Q.  And then how much industry experience did Martine

11  Savage have?

12      A.  About the same as Kristin and Jeff.

13      Q.  So you all were in the 20 years of experience

14  range at the time of the VP -- at the time the VP of HR

15  role was posted?

16      A.  Yes.

17      Q.  Okay.  What makes you think that Jeff Fralix was

18  unqualified for the position?  Well, do you think Jeff

19  Fralix was unqualified for the position?

20      A.  Yes.

21      Q.  Okay.  What makes you think he was unqualified

22  for the position?

23      A.  Jeff was -- when I first started with Direct

24  Energy, one of the first meetings I attended Melinda was

25  describing the new HR organization to the HR team, and

1  in this meeting Jeff Fralix did not have a role.  I

2  think that's when he was in the talent, global talent

3  advisor role, and he didn't have a position, and she

4  started crying, because --

5      Q.  Melinda Reeves started crying?

6      A.  Yes, because, you know, her friend, dear Jeff,

7  was not --

8      Q.  I'm sorry, her friend what?

9      A.  Dear Jeff, our friend, dear Jeff, was not going

10  to be with the organization anymore.  Then a role opened

11  up miraculously, and he got another job.  But prior to

12  that he supported a group that I sat next to, and they

13  would turn and ask -- the vice president would ask me

14  questions, and I would say well, you know, you should

15  talk to Jeff.  And they would say well, I have, I

16  haven't heard from him or he's unresponsive.

17      And so there was a -- he had a reputation of

18  being unresponsive and -- what is the word --

19  superficial, so so, just did the bare minimum.

20      So then when the vice president of HR role was --

21  came open, again, he was going to be without a job, and

22  then he was the successful candidate for the role.

23      Q.  And you think he was successful because he was

24  friends with Melinda Reeves?

25      A.  Yes.  They had worked together at USAA for years.

1    They carpooled together.

2        Q.  So she knew him?

3        A.  Yes.

4        Q.  Do you have any information about Jeff Fralix's

5    experience in HR throughout his career before Direct

6    Energy?

7        A.  No.

8        Q.  Do you know what roles he had at Direct -- well,

9    do you know when he started at Direct Energy?

10       A.  I don't recall, no.

11       Q.  Was it before you did or after?

12       A.  Yes, before I did, yes.

13       Q.  Okay.  And do you know what roles he had

14   throughout his tenure at Direct Energy before you

15   started there?

16       A.  No.

17       Q.  Have you described for me all of the reasons that

18   you think Jeff Fralix was not qualified for the VP of HR

19   role?

20       A.  Yes.

21       Q.  Okay.  After your meeting with Melinda Reeves --

22   and I'm sorry, I asked this, but just to follow up, did

23   you all have any plans to -- you and Melinda Reeves to

24   follow up after that meeting?

25       A.  Not that I recall.

1    Q.  Okay.  Did you all actually follow up regarding

2  anything that you discussed during that meeting?

3    A.  Not that I recall, no.

4    Q.  Excuse me.  When she made the comment that she

5  couldn't trust you, did you tell her that -- well, did

6  that comment offend you?

7    A.  Absolutely.

8    Q.  Did you tell her that it offended you?

9    A.  Melinda was not the kind of person you could say

10  that to.

11    MS. WILLIAMS:  Objection, nonresponsive.

12    Q.  Did you tell her that it offended you?

13    A.  I did not tell her it offended me.

14    Q.  Okay.  Did you tell anyone that what she said

15  offended you?

16    A.  Yes.

17    Q.  Who did you tell?

18    A.  Jonathan Phillips.

19    Q.  This is in employee relations?

20    A.  Yes, employee relations director.

21    Q.  Okay.  When did you tell Jonathan Felix?

22    A.  Phillips?

23    Q.  Phillips, I'm sorry.

24    A.  That's all right.  Excuse me.  I don't remember

25  the exact day or time.  Must have been late 2017.

1    Q.  How long after your meeting with Melinda Reeves

2   did you talk to Jeff -- I'm sorry, Jonathan Phillips

3   about your conversation with her and that you --

4   expressing that you were offended by what she said?

5    A.  I don't recall exactly how long it was

6   afterwards.

7    Q.  I mean, did you go to him immediately?

8    A.  No.

9    Q.  Why not?

10   A.  I wanted to process it and make sure that I was

11  being thoughtful about it and not overreacting, just

12  to --

13   Q.  Okay.  So approximately how long did it take you

14  to be thoughtful about it before you went to Jonathan

15  Phillips to tell him that you were offended by what

16  Melinda Reeves said?

17   A.  I don't recall exactly.  I would say probably

18  within two to four weeks.

19   Q.  Did Melinda Reeves do anything to you in those

20  two to four weeks that added to the concerns that you

21  had?

22   A.  No.

23   Q.  And when you went to Jonathan Phillips two to

24  four weeks later, did you -- did you call him, did you

25  meet with him in person, did you email him, which one,

1   or --

2   A.   We --

3   Q.   -- all of the above?

4   A.   We met in person.

5   Q.   Did he office in the same building with you?

6   A.   Yes.

7   Q.   And you scheduled a meeting with him?

8   A.   I don't believe I scheduled one, no.

9   Q.   Okay.  And so tell me about your meeting with

10  him.

11  A.   We went for a walk and ended up sitting in the

12  lobby of one of the -- the Greenway plaza buildings.

13  Q.   Uh-huh.  Did he know what -- in advance what you

14  were coming to talk to him about?

15  A.   No, I don't believe so.

16  Q.   Okay.  And just for timing purposes so I can make

17  sure, if your meeting with Melinda was sometime in

18  mid-August, --

19  A.   Uh-huh.

20  Q.   -- your meeting with Jonathan Phillips was

21  sometime late August to mid-September; is that right?

22  A.   As best I can recall.

23  Q.   Is it possible it was a little bit later?

24  A.   It's possible.

25  Q.   Okay.  And so you met in the lobby -- was anyone

1  else present when you met with Jonathan Phillips in the

2  lobby of Greenway Plaza?

3      A.  No.

4      Q.  And what did you tell him?

5      A.  I shared the exchange I had with -- with Melinda.

6      Q.  And what did he say?

7      A.  That he was obligated to report it.

8      Q.  Did you agree that he was obligated to report it?

9      A.  Yes.

10     Q.  Did you think you were obligated to report it?

11     A.  Yes.

12     Q.  Did you -- before you went to Jonathan Phillips,

13  had you reported this to anyone else?

14     A.  No.

15     Q.  And when he told you he was obligated to report

16  it, what was your reaction?

17     A.  I was concerned, because I knew that although I

18  share -- I tell like the clients I support that they

19  should use the investigation and complaint line, I had

20  never used it myself, and I was truly concerned that --

21  of the reaction that Melinda would have.

22     Q.  Did you have the ability to make a complaint

23  through the ethics line if you wanted to?

24     A.  Yes.

25     Q.  Okay.  You chose not to do that?

1    A.   Yes.

2    Q.   For what reason?

3    A.   I would have been easily identified.  So --

4    Q.   Is there a way to make an anonymous complaint?

5    A.   It would have been anonymous, but to the facts

6    that I would have been relaying would have clearly

7    pointed back to me.

8    Q.   Okay.  Did you tell him that you were concerned

9    for those reasons?

10    A.   Yes.

11    Q.   And what did he say?

12    A.   He understood why I'd be concerned.

13    Q.   And then what -- what did you all decide?

14    A.   He went and filed the complaint.

15    Q.   Was that the extent of your conversation with

16    him?

17    A.   I believe so, yes.

18    Q.   Okay.  How did -- how did he file the complaint?

19    A.   I'm not certain.

20    Q.   And after he filed the complaint, what happened

21    next?

22    A.   Shortly thereafter I was connected to -- I don't

23    know her specific role, but she was someone who asked

24    questions about the complaint.

25    Q.   Like an investigator?

1    A.  Yes.  Yes.  It was external to the company.

2    Q.  Okay.

3    A.  Uh-huh.

4    Q.  So you met with an investigator related to your

5    complaint?

6    A.  Yes.

7    Q.  Did you ever see the complaint that Jonathan

8    Phillips submitted?

9    A.  No.

10   Q.  Okay.  Did the -- based on your interactions with

11   the investigator, did she have an understanding as to

12   what your complaint was?

13   A.  It seems as -- yes.

14   Q.  And you said you think the investigator was

15   external to the company.  Do you recall her name?

16   A.  No, I don't recall her.

17   Q.  How many times did you meet with the

18   investigator?

19   A.  Once.

20   Q.  In person or over the phone?

21   A.  In person.

22   Q.  And the investigator asked you questions related

23   to your complaint; is that right?

24   A.  Yes.

25   Q.  And did you give her all of the -- were you able

1 to share with her all of the information you had related

2 to your complaint?

3     A.  Yes.

4     Q.  Did she prevent you in any way from sharing all

5 of the information that you had regarding the complaint?

6     A.  No.

7     Q.  Okay.  Do you know if the investigator met with

8 anyone else --

9     A.  I don't --

10     Q.  -- related to your complaint?

11     A.  I do not know.

12     Q.  Did the investigator, excuse me, ever follow up

13 with you by phone to ask you any follow-up questions

14 after -- or to meet with you by phone for any reason

15 related to your complaint after you met with her in

16 person?

17     A.  No.

18     Q.  Okay.  And is there anything that you experienced

19 during your interactions with the investigator that led

20 you to believe that she was not taking your complaint

21 seriously and gathering all of the information to -- to

22 review your complaint?

23     A.  No.

24     Q.  Do you know what happened at the -- I assume you

25 know the investigation concluded at some point, right?

1    A.  Yes.

2    Q.  Do you know when that was?

3    A.  No.

4    Q.  Do you know about how long between the time you

5  met with Jonathan and he submitted the complaint and

6  then the time the investigation concluded?

7    A.  I don't recall.

8    Q.  Okay.  How -- do you know how long it was between

9  the time you met with Jonathan and the time he actually

10 submitted your complaint?

11   A.  I don't know.

12   Q.  Other than the investigator, did you meet with

13 anyone else regarding your complaint against Melinda?

14   A.  No.

15   Q.  And I should clarify that.  Other than Jonathan

16 Phillips and the investigator, --

17   A.  Okay.

18   Q.  -- did you meet about anyone else regarding your

19 complaint against Melinda Reeves?

20   A.  No.

21   Q.  At some point did you learn the results of the

22 investigation?

23   A.  Yes.

24   Q.  From whom?

25   A.  Jonathan and Sidney.

1    Q.  And this is the conversation we discussed

2    earlier, correct?

3    A.  Yes.

4    Q.  And they -- what did they inform you about the

5    results of the investigation?

6    A.  That there was -- I don't -- I forgot their exact

7    words, but basically that nothing was going to happen.

8    And I told them that this is my fear from the beginning,

9    and now I have to continue to work in this environment.

10   I was in tears.  I was upset.  It was a clear glass.  I

11   was embarrassed.

12   Q.  When you told them you had to continue to work in

13   the environment, what environment are you talk -- are

14   you referring to?

15   A.  An environment where Melinda would have oversight

16   into my career.

17   Q.  After this complaint, did Melinda ever do

18   anything else to you that you thought was discriminatory

19   based on your race?

20   A.  No.

21   Q.  After this complaint, did Melinda ever do

22   anything else to you that you thought was discriminatory

23   based on your age?

24   A.  Not that I know of.

25   Q.  After this complaint, did Melinda ever

1  communicate in a way with you that you thought was

2  derogatory or offensive?

3      A.  No.

4      Q.  With respect to the VP of HR role, is Melinda the

5  only person that you think discriminated against you

6  with respect to that role, or were there others

7  involved?

8      A.  She was the only one.

9      Q.  Okay.  And so Jonathan and Sidney, you've

10  explained to them your fears and you were embarrassed.

11  What else happened during that meeting?

12      A.  I asked for a copy of the complaint and the

13  investigation.  I was told I couldn't have it, and

14  I ended up leaving.  I was really upset.  I was in

15  tears, and people are sitting outside, and there's

16  glass, so I was -- I just left.

17      Q.  You left for the day?

18      A.  I don't know.  Probably.  I know I left -- I

19  walked out of there.

20      Q.  Okay.  When you asked for the complaint and the

21  investigation, in your experience as an HR professional

22  at Direct Energy was it typical that the -- that

23  complaints and investigation reports would not be

24  distributed?

25      A.  I'm trying to think of a time when I -- yeah,

1    right, no.

2        Q.  That was normal, correct?

3        A.  Yes.

4        Q.  Okay.  So them not giving you the complaint or

5    the investigation wasn't anything unusual under the

6    company's policies and procedures, correct?

7        A.  Right.

8        Q.  Okay.

9        A.  I did want them to provide me a written summary

10   or written like say an outcome of it.  That's what I --

11   I wanted something in writing to say that it had been

12   investigated and this was their outcome.  So I could

13   have gotten that.

14       Q.  They did not give you a summary, either?

15       A.  No.

16       Q.  Okay.  But in your experience as an HR

17   professional, investigation reports are generally not

18   distributed?

19       A.  Yes.

20       Q.  That's -- that's correct, right?

21       A.  Yes.

22       Q.  Okay.  Okay.  And so you left.  I think earlier

23   you testified that you had some discussion with Jonathan

24   and Sidney about you wanting to leave the company.

25       A.  Yes.

1    Q.   Okay.  When did that discussion take place?

2    A.   As a part of that meeting.

3    Q.   The same meeting before you left --

4    A.   Yes.

5    Q.   -- that meeting?

6         Okay.  And neither one of them told you that you

7    had to leave, correct?

8    A.   Correct.

9    Q.   In fact, up until the reorganization in 2019

10   where you applied for and did not get the roles, nobody

11   ever told you you had to leave the company, right?

12   A.   Correct.

13   Q.   Okay.  And when you told them that you wanted to

14   leave the company, they seemed to be, based on what you

15   described, supportive of that, yes?

16   A.   Ask the question again.  I'm sorry.

17   Q.   When you told them that you wanted to leave the

18   company --

19   A.   Yes.

20   Q.   -- they were supportive of that?

21   A.   Yes, if that's what I wanted to do.

22   Q.   But they weren't commanding it, right?

23   A.   Correct.

24   Q.   Okay.  And so when did you -- what did -- what

25   was their response when you told them you wanted to

1    leave the company?

2        A.  They could understand and, you know, figure out a

3    way to help make that transition.  So --

4        Q.  Okay.  And did they, in fact, try to help to make

5    the transition?

6        A.  Like I said, I was offered a severance package.

7        Q.  Was that them trying to help you make the

8    transition?

9        A.  I don't think so, but that's what was offered,

10   yes.

11       Q.  Why do you think they were not trying to help you

12   when they offered the severance?

13       A.  Because I explained how because of my skills and

14   qualifications and my experience within the industry

15   that it was going to take me longer than two, three

16   months to find another role that was commensurate with

17   my skills and experience.

18       Q.  So it was the part -- the part of the package

19   that you had an issue with was the fact that you would

20   not be given enough time to look for new employment?

21       A.  Correct.

22       Q.  Okay.  And how much time were they offering you?

23       A.  I don't specifically recall.  It feels like it

24   was two, three months, something like that.

25       Q.  Okay.  So they offered you two to three months to

1  find new employment.  You wanted more, correct?

2      A.  Yes.  I don't recall exactly how many months,

3  what was offered, but, yes, --

4      Q.  Okay.

5      A.  -- it wasn't -- it did not match what I thought I

6  needed to make the transition.

7      Q.  And so you made the decision to stay on at Direct

8  Energy as a result of that, correct?

9      A.  I made the decision to stay on and to -- and to

10  try to find other employment, yes.

11      Q.  Okay.  Were you actively looking for other

12  employment from that point on?

13      A.  Yes.

14      Q.  Until the time you actually left Direct Energy?

15      A.  Yes.

16      Q.  Were you ever successful in getting another

17  position that you applied for?

18      A.  No.

19      Q.  Okay.  How many positions do you -- did you apply

20  for when you were actively looking to leave Direct

21  Energy?

22      A.  I don't recall.

23      Q.  Roughly?

24      A.  I -- I have -- I can't even do a rough.  I do not

25  recall that one.

1    Q.  Were you pretty engaged, though, in the process

2    of looking for other employment?

3    A.  No.

4    Q.  Okay.

5    A.  I'd say I was minimal -- minimally engaged --

6    Q.  Okay.

7    A.  -- at that time.

8    Q.  But you did submit applications for other

9    positions at other companies?

10   A.  Yes.

11   Q.  Okay.  And none of those were successful?

12   A.  Yes.

13   Q.  Okay.  So after you learned about the results of

14   the investigation and the severance process didn't work

15   out, --

16   A.  Uh-huh.

17   Q.  -- you continued on in your role as HR business

18   partner, correct?

19   A.  Correct.

20   Q.  And you were, at that point, reporting to Jeff

21   Fralix now?

22   A.  Yes.

23   Q.  Okay.  When did you start reporting to Jeff

24   Fralix?

25   A.  When he started in the role.  So -- I'd say --

1    Q.  That would have been -- I'm sorry.

2    A.  -- early 2018.

3    Q.  Do you have any complaints about how Jeff Fralix

4    treated you when he was -- when you were reporting to

5    him?

6    A.  No.

7    Q.  Did he ever do anything to you that you think was

8    discriminatory based on your race?

9    A.  I do.

10   Q.  Okay.  What -- what did he do that you think was

11   discriminatory based on your race?

12   A.  It was -- we were -- we were having an all-hands

13   meeting, and before the meeting he told me that he

14   wanted me to not be Shea and that he said he was doing

15   it for my own good and basically just wanted me to

16   attend the meeting and be quiet.

17   Q.  When was this?

18   A.  January 2018.

19   Q.  January 2018?

20   A.  January, whenever the all-hands meeting was.

21   So -- it was prior to that.  I'm sorry.

22   Q.  I'm sorry, I'm just -- you said --

23   A.  January 2018.

24   Q.  So this would have been about the time that he

25   became your -- your supervisor?

1    A.  Whenever, yeah, I don't recall the exact time of

2    the meeting, but it was the -- it might have been March.

3    Sometime, I think, early 2018.

4    Q.  Of 2018.  Okay.

5    A.  Yeah.

6    Q.  And why do you think that was discriminatory

7    based on your race?

8    A.  So often, as a black woman, we are told to tone

9    it down and to not be ourselves, and that was just

10    another time.  That was what I remember.

11    Q.  Did he mention your race in this discussion?

12    A.  No.

13    Q.  Did -- did Jeff Fralix ever bring up your race in

14    any discussions you had with him?

15    A.  Not that I recall.

16    Q.  This was your interpretation of what he said, you

17    think it was about your race?

18    A.  It was another instance of the systemic racism

19    that exists, yes.

20    MS. WILLIAMS:  Objection, nonresponsive.

21    Q.  This was your interpretation of what he said?

22    You think that he is talking about your race, that was

23    your interpretation, right?

24    A.  Yes.

25    Q.  Okay.  Did you report this to anyone?

1  A. No, because I reported something similar and

2  nothing had been done.

3  MS. WILLIAMS: Objection, nonresponsive after no.

4  Q. But I guess I'll follow up. You said nothing had

5  been done. They did actually investigate your complaint

6  against Melinda Reeves, right?

7  A. Yes.

8  Q. Okay. You were not happy with the results of the

9  investigation, right?

10  A. I don't -- I don't know what the results were.

11  Q. Well, you said they told you nothing was going to

12  be done or they didn't find anything wrong.

13  A. They told me nothing was going to be done,

14  correct.

15  Q. Okay. But you said they didn't do anything.

16  They actually did investigate, right?

17  A. They did investigate.

18  Q. Okay. And so you knew at least if you made a

19  report that the company would investigate it, right?

20  A. Yes.

21  Q. And you made the decision not to report this

22  comment that you say Jeff Fralix made sometime in the

23  early part of 2018, correct?

24  A. Yes.

25  Q. Okay. Did Jeff Fralix do anything else to you

1  that you believe reflects, you know, race discrimination

2  against you?

3      A.  No.

4      Q.  Did he ever treat you unfairly in terms of how he

5  evaluated you as a supervisor?

6      A.  I believe so.

7      Q.  In what respect?

8      A.  I didn't get a raise for years, and although I

9  was rated highly and thought of -- well respected across

10  my peers as well as the business leaders, and, yeah,

11  I've -- I -- I was -- just didn't get a raise for years

12  and --

13      Q.  When you say for years, what are -- what are you

14  talking about?

15      A.  At least two years, maybe even three by the

16  time -- yeah.

17      Q.  Under -- when Jeff Fralix was supervising you or

18  throughout your employment?

19      A.  No, I received a raise the first -- my first full

20  year there, yes.

21      Q.  Okay.  Who was your supervisor then?

22      A.  Kristin.

23      Q.  And then your second full year there -- so we're

24  talking about 2016 was your first full year, right?

25      A.  So that would have been in 2017 -- hold on.  I

1  started 2015.  Then I would have worked -- it would have

2  been in 2017.

3      Q.  Your first full year would have been 2016, right?

4      A.  But I started late in 2015.  So I wouldn't have

5  qualified for --

6      Q.  Right, but I guess you would have been

7  evaluated -- the first year --

8      A.  Yes.

9      Q.  -- that you would have been evaluated would have

10  been 2016, correct?

11      A.  Yes, correct.

12      Q.  And you would have gotten -- I think what you're

13  saying is you would have gotten a raise in 2017 based on

14  your performance in 2016, correct?

15      A.  Right.

16      Q.  Okay.  In 2016 you were reporting to Kristin

17  Johnson, right?

18      A.  Yes.

19      Q.  Okay.  For the year 2017 to whom were you

20  reporting?

21      A.  Oh, was it -- maybe it was Zandra between there.

22      Q.  And you --

23      A.  Yes, Zandra, yes.

24      Q.  Okay.  And then 2018, for that year, Jeff

25  Fralix -- you would have been reporting to Jeff Fralix,

1  correct?

2    A.  Yes.

3    Q.  And you would have continued reporting to Jeff

4  Fralix effectively until the time you left?

5    A.  Yes.

6    Q.  Okay.  And you said you received a raise for the

7  year 2016 when you were reporting to Kristin Johnson; is

8  that right?

9    A.  Yes.

10    Q.  And did you receive a raise when you were

11  reporting to Zandra in the year 2017?

12    A.  That would have been effective, what, 2018?  No.

13    Q.  And did you receive a raise when you were

14  reporting to Jeff Fralix for the year 2018?

15    A.  No.

16    Q.  Okay.  And is it your testimony that it was race

17  discrimination when you did not get a raise under Jeff

18  Fralix in 2018?

19    A.  I thought that your question was did I -- did he

20  treat me unfairly.

21    Q.  Okay.  Was it unfair that he didn't give you a

22  raise based on your performance in the year 2018?

23    A.  Yes.

24    Q.  Do you think that that was based on your race?

25    A.  I don't know what it was based on.

1    Q.  Okay.  Are you claiming in this lawsuit that it

2    was based on race?

3    A.  No.

4    Q.  Okay.  And when you say you didn't get a raise,

5    describe that to me.  So you had a base salary at Direct

6    Energy, correct?

7    A.  Uh-huh.

8    Q.  And what were you eligible for based on your

9    performance at the company?

10   A.  It could vary depending on what the budget was.

11   Q.  Okay.  So your base compensation could be

12   increased based on your performance and -- and budget?

13   A.  Yes.

14   Q.  Did you -- were you eligible for any bonuses or

15   other payments based on your performance and company

16   performance?

17   A.  Yes.

18   Q.  What were those?

19   A.  The -- what was it called incentive on --

20   Q.  Uh-huh.  The incentive --

21   A.  On Track.

22   Q.  -- plan?

23   A.  Yeah, the --

24   Q.  Okay.

25   A.  -- incentive plan, yeah.

```
 1        Q.   Okay.  And --
 2        A.   That's it.  That's all.
 3        Q.   Throughout your employment, did you receive
 4   payment through the On Track incentive program?
 5        A.   Yes.
 6        Q.   Including under Jeff Fralix?
 7        A.   Yes.
 8        Q.   Okay.  You received performance evaluations
 9   throughout your employment?
10        A.   Yes.
11        Q.   Do you recall what ratings you received?
12        A.   I received satisfactory ratings with the
13   exception of the last one where I received exceptional
14   rating.
15        Q.   So the first -- for -- for your performance in
16   2016 you got a satisfactory rating, correct?
17        A.   Yes.
18        Q.   And for your performance in 2017 you got a
19   satisfactory rating, correct?
20        A.   Yes, I believe so.
21        Q.   And then for your performance in 2018, which was
22   the last full year that you worked for the company -- I
23   understand you were still there in 2019, but you didn't
24   complete a full year, correct?
25        A.   [Witness moving head up and down]
```

**NELL McCALLUM & ASSOCIATES, INC.**

1    Q.  So your last full year was 2018.  You received an

2    exceptional rating?

3    A.  Yes.

4    Q.  And who did you get that rating from?

5    A.  From Jeff Fralix.

6    Q.  Okay.  Did you think he was treating you unfairly

7    when he rated you as exceptional in 2018?

8    A.  No.  I earned that rating.

9    Q.  Okay.  So he was fair in assessing your

10   performance?

11   A.  Yes.

12   Q.  Okay.  Did you think that Kristin and Zandra were

13   treating you unfairly when they gave you lower

14   performance ratings than Jeff did?

15   A.  It was a matter of my tenure and a practice that

16   Direct Energy had that even if you performed

17   exceptionally well, if you were new you did not get the

18   exceptional ratings.  You would get the -- the standard

19   rating.

20   Q.  So is your answer no?  Do you think that Kristin

21   and Zandra treated you unfairly when they --

22   A.  No.

23   Q.  -- gave you the satisfactory rating?

24   A.  No, I don't.

25   Q.  Okay.  Other than what you described about Jeff

1    Fralix and then the complaint you had against Melinda

2    Reeves, --

3        A.   Uh-huh.

4        Q.   -- did anyone else discriminate against you based

5    on your race at Direct Energy?

6        A.   No.

7        Q.   And the comment that Jeff made about you not

8    being Shea and being quiet, do you think that was based

9    on your age or just based on your race?

10       A.   My race.

11       Q.   Okay.  Why don't we do this.  Mark this.

12           [Exhibit 3 marked, Your On Track Incentive Plan

13   documents]

14       A.   Thank you.  Who can read this little biddy

15   writing?  There we go.  Now we can read it.

16           MS. WILLIAMS:

17       Q.   Do you recognize these documents?

18       A.   Yes.

19       Q.   Okay.  Can you describe for us what these

20   documents are?

21       A.   It is a description of the Centrica On Track

22   program for each year for level 6 for 2017 -- excuse me,

23   two thousand -- yeah, wait, 2016 and through the time

24   that I left.

25       Q.   Okay.  And the documents are Bates labeled Direct

1  Energy 77 through 83; is that right?

2      A.  83, correct.

3      Q.  Okay.  And just for further clarification for the

4  record, for the year 2016 you have the On Track

5  incentive plan followed by a letter dated in 2017

6  related to your 2016 performance, correct?

7      A.  Correct.

8      Q.  And then there is a 2017 On Track incentive plan

9  document followed by a letter dated in 2018 regarding

10  your 2017 performance, correct?

11      A.  Correct.

12      Q.  And then finally there is a 2018 On Track

13  incentive plan document followed by a letter dated in

14  2019 regarding your 2018 performance, correct?

15      A.  Correct, yes.

16      Q.  Okay.  And these documents would indicate that --

17  what your performance rating was, correct?

18      A.  Correct.

19      Q.  Your salary review, correct?

20      A.  Correct.

21      Q.  A lump sum payment you received, correct?

22      A.  Yes.

23      Q.  And then your OTIP award, correct?

24      A.  Correct.

25      Q.  All right.  If you'll look at page -- the second

1  page of Exhibit 3, the one that's Bates numbered 78.

2      A.  Correct.

3      Q.  So this is -- 2016 was your first full year,

4  correct?

5      A.  Correct.

6      Q.  All right.  And it looks like under salary review

7  it indicates that Zandra is informing you that your

8  annual gross salary remain unchanged, right?

9      A.  Yes.

10     Q.  Okay.  So for 2017, based on your 2016

11 performance, you did not get a change in your gross

12 salary, correct?

13     A.  Correct.

14     Q.  You did receive a lump sum award, yes?

15     A.  Correct.

16     Q.  And you also received an OTIP award?

17     A.  Correct.

18     Q.  Okay.  And then if we'll move on to the document

19 that's marked Bates number Direct Energy 80 --

20     A.  Okay.

21     Q.  Okay?  It has your performance rating there?

22     A.  Yes.

23     Q.  And it also has salary review, correct?

24     A.  Yes.

25     Q.  And it shows there that your annual salary

1    remained -- remained unchanged at 153?

2        A.  Yes.

3        Q.  Correct?

4        A.  Yes, correct.

5        Q.  And then you received a lump sum award?

6        A.  Yes.

7        Q.  And you also received an OTIP award?

8        A.  Yes.

9        Q.  Okay.  And then finally for 2018 it shows that

10   your performance rating on the document that's Direct

11   Energy 82?

12       A.  Correct.

13       Q.  And it also indicates that your annual salary

14   remain unchanged?

15       A.  Yes.

16       Q.  And that you got a lump sum award?

17       A.  Yes.

18       Q.  And an OTIP award?

19       A.  Yes.

20       Q.  And it looks to me like the lump sum award you

21   got in 2019 based on your performance in 2018 was the

22   highest lump sum award you'd ever gotten during your

23   tenure at the company, correct?

24       A.  Yes.

25       Q.  And the OTIP award you got was also the highest

OTIP award you got during your tenure at the company,

correct?

     A.  Correct.

     Q.  And that was under Jeff Fralix?

     A.  Yes.

     Q.  Okay.

     A.  We're done with this one?

     Q.  Yeah, you can leave it -- yeah.

     A.  Okay.  All right.

     Q.  I don't know if we'll visit it later, but --

     A.  Okay.  Okay.

     Q.  -- it's fine there, thank you.

          Okay.  And, I'm sorry, I asked you there was no

one else that you're alleging discriminated against you

based on your race other than Melinda Reeves and Jeff

Fralix, correct?

     A.  Correct.

     Q.  And there's no one -- who are you claiming

discriminated against you based on your age?

     A.  Jeff Fralix.

     Q.  Did Melinda Reeves discriminate against you based

on your age?

     A.  Not -- no.

     Q.  Okay.  So you are not claiming that the decision

she made regarding the VP of HR role was based on your

1  age?

2      A.  No.

3      Q.  You're not making that claim?

4      A.  No.

5      Q.  Okay.  How did Jeff Fralix discriminate against

6  you based on your age?

7      A.  Through the interview process and the selection

8  of Angie Moore.

9      Q.  For what position?

10     A.  The HR director position.

11     Q.  What did he do through the interview process that

12  you think was discriminatory based on your age?

13     A.  It was ultimate selection of someone who was less

14  qualified.

15     Q.  But what makes you think that that was based on

16  your age?

17     A.  I don't know.

18     Q.  Because you admitted earlier you have no idea how

19  old Angie Moore is, correct?

20     A.  Correct.

21     Q.  Okay.  And if it turns out that she is the same

22  age as you, it would be very difficult for you to

23  maintain that he discriminated against you based on your

24  age with respect to the HR director position, right?

25     A.  Yes.

1    Q.   Okay.  Did -- did Jeff Fralix do anything else to

2 you to discriminate against you based on your age other

3 than the selection for the HR director role?

4    A.   No.

5    Q.   What is Angie Moore's industry experience?

6    A.   I don't know.

7    Q.   You don't know?

8    A.   No.

9    Q.   What is your evidence that she was not qualified

10 for the HR director role?

11    A.   She doesn't have as much experience as I do.

12    Q.   How do you know that?

13    A.   Because in our conversations she doesn't have as

14 much experience as I do.  Nor were her experiences as

15 extensive as mine, and the feedback that even Jeff

16 provided about her feedback from clients and that I

17 personally heard from clients as well as conversations

18 Jeff had had.  Yeah, she wasn't near as qualified as I

19 was.

20    Q.   Okay.  What is her industry experience that makes

21 you think that she was not -- she did not have

22 sufficient qualifications?

23    A.   I don't recall.

24    Q.   Do you know how many years of experience she has

25 in the industry performing HR work?

1    A.  No.  No, --

2    Q.  Okay.

3    A.  -- no, no.

4    Q.  You don't know if it's more or less than you,

5    correct?

6    A.  To the best of my belief, it is less than what I

7    have.

8    Q.  What do -- that's your belief, right?

9    A.  Right.

10   Q.  You don't have any actual evidence or information

11   that she has less experience in the industry than you

12   do, correct?

13   A.  Correct.

14   Q.  Okay.  Since you don't have that information,

15   what is the basis of your claim then that she was not

16   qualified for the position?

17   A.  Based on my conversations with her, understanding

18   her background, as well as working with her.

19   Q.  How often did you work with Angie Moore?

20   A.  Practically every day.

21   Q.  Did you all collaborate together, or did you all

22   have separate responsibilities?

23   A.  We were peers.

24   Q.  And so did you all work on projects together for

25   the same client groups, or did she have her

1    responsibilities for her client groups and you had your

2    responsibilities for your client group?

3        A.  We had different client groups.

4        Q.  Okay.  What did she say to you that led you to

5    believe that -- about her background that led you to

6    believe she wasn't qualified for the HR director role?

7        A.  I don't specifically recall.

8        Q.  So sitting here today, you can't tell us any

9    information that she shared with you that led you to

10   believe that she didn't have enough experience to

11   qualify for the HR director role?

12       A.  Correct.

13       Q.  Okay.  If you have previously stated that she

14   actually did have experience, would that be correct or

15   incorrect?

16       A.  I'm sorry, ask the question again.

17       Q.  If you -- in connection with this lawsuit, --

18       A.  Right.

19       Q.  -- if you have previously stated that --

20       A.  Yes.

21       Q.  -- Angie Moore actually did have experience for

22   the role, --

23       A.  Okay.

24       Q.  -- would that -- would that statement have been

25   incorrect or correct?

1    A.   I don't know under what context I would have said
2    that she was as qualified as I was for the role.
3    Q.   Okay.  Well, I didn't ask you whether she was as
4    qualified as you were.  I was asking you whether or not
5    she was not qualified and whether there was anything
6    that led you to believe she didn't have experience for
7    the role.  And you said that based on what she shared
8    with you about her background led you to believe she
9    wasn't qualified for the role, right?
10    A.   That she did not have -- yeah, right.
11    Q.   Okay.
12    A.   That she didn't have as much experience as I did.
13    Q.   Okay.  But if you previously said that she did
14    have "decent experience," --
15    A.   Uh-huh.
16    Q.   -- would that have been accurate or inaccurate?
17    A.   I could -- yeah, she -- she has decent
18    experience, yes.
19    Q.   Okay.  And so would that decent experience have
20    qualified her for the HR director role?
21    A.   Not as qualified as I was.
22    Q.   I'm not asking you as qualified.  I'm asking you
23    whether or not it is your opinion that she was not
24    qualified at all.  Because I think you've testified
25    earlier that she wasn't qualified at all.  And so I'm

1   trying to get some clarification.  Is it your position

2   that she was not qualified at all for the role?

3       A.  I could not say that she was not qualified at

4   all.  She had some qualifications --

5       Q.  You think --

6       A.  -- for the role.

7       Q.  -- that you were better qualified?

8       A.  I think I was better qualified.

9       Q.  And you're basing that, even though you have no

10  information about what her specific qualifications are,

11  correct?

12      A.  Correct.

13      Q.  Okay.  Did you go through -- well, did you go

14  through an interview process for the HR director role?

15      A.  I did.

16      Q.  Let me back up and actually let's kind of add

17  some context here.  Between 2018 when Jeff Fralix became

18  your supervisor --

19      A.  Yes.

20      Q.  -- and 2019 --

21      A.  Yes.

22      Q.  -- it is my understanding that there was some

23  ongoing reorganization within Direct Energy; is that

24  right?

25      A.  It was always reorganizing, yes.

1    Q.  Okay.  They were always reorganizing through the

2  time that you were there?

3    A.  It seems like it, yeah.

4    Q.  Okay.  Was the 2019 reorganization the only one

5  that ever impacted your position?

6    A.  Yes.

7    Q.  What is your understanding about the

8  reorganization that occurred in 2019?

9    A.  There -- they were eliminating the HR business

10  partner roles and implementing a more process-focused HR

11  structure.

12    Q.  So did that reorganization impact only you?

13    A.  No.

14    Q.  Who did it impact?

15    A.  Several people.

16    Q.  What do you mean by several?

17    A.  It impacted the entire HR organization.

18    Q.  So your position was not the only position that

19  was being eliminated as a part of the 2019

20  reorganization, correct?

21    A.  Correct.

22    Q.  Do you think that there was anything about the

23  2019 reorganization related to your role and the impact

24  on your role that was discriminatory?

25    A.  No.

1   Q.  How did you learn about the reorganization that
2   occurred in 2018?  I'm sorry, 2019.
3       A.  I don't remember the exact method, but either
4   emails, team meetings.
5       Q.  Did you have any questions or concerns when you
6   learned about the reorganization?
7       A.  Yes.
8       Q.  Okay.  And did you go to anyone to express those
9   questions and concerns?
10      A.  Yes.
11      Q.  Who did you go to?
12      A.  I asked questions during the meetings.  I wanted
13  to know what the process was going to be, and I was
14  informed that the process hadn't been outlined.
15      Q.  Who informed you of that?
16      A.  It was a joint meeting of either Jonathan
17  Phillips or Jeff was -- was leading it.
18      Q.  Okay.  Did they answer your questions
19  satisfactorily based on the information that was
20  available at the time?
21      A.  No.
22      Q.  Okay.  What did they not answer that was -- that
23  was not satisfactory to you?
24      A.  How the interview process would be, yeah.  What
25  the interview process would be, interview and selection

1    process, what that would look like.

2        Q.   Okay.  So let's kind of share -- like expand on

3    this for the jury.  You were notified that there was

4    going to be a reorganization that impacted the entire HR

5    organization, correct?

6        A.   Correct.

7        Q.   And you were informed that roles were being

8    eliminated, right?

9        A.   Yes.

10       Q.   Including your role?

11       A.   Yes.

12       Q.   And that new roles were being created, correct?

13       A.   Correct.

14       Q.   And that with respect to those new roles, that

15   candidates would have the opportunity to apply for and

16   interview for those new roles, correct?

17       A.   That candidates would have the opportunity to

18   apply for the roles.  It was not clear if interviews

19   would be conducted for each and every role.

20       Q.   Okay.  And did -- were you informed of any

21   alternatives to applying for those new roles so if you

22   did not apply for a new role or you didn't want to apply

23   for a new role were there other options available to you

24   under the reorganization?

25       A.   I'm not understanding your question.

1     Q.   So were you required, I guess, to apply for the

2  new roles that were being created?

3     A.   No.

4     Q.   Okay.  You had the option to leave and not apply

5  for the new roles, right?

6     A.   Yes.

7     Q.   If you had opted to leave, were there any

8  provisions made for employees like yourself who might

9  have decided not to apply for new roles?

10    A.   Yes.

11    Q.   What were those?

12    A.   Severance options.

13    Q.   Okay.  And at some point did you get more

14 clarification on the process?  You said during the

15 meeting with Jonathan and/or Jeff they didn't really

16 kind of explain the interview process well, but at some

17 point did you get clarification on that?

18    A.   No, not really.

19    Q.   Okay.  At some point did you learn about the new

20 roles that were being created?

21    A.   Yes.

22    Q.   When did you learn about the new roles that were

23 being created?

24    A.   I guess shortly after it was announced.

25    Q.   Okay.  Before or after this meeting?

1    A.  I don't recall.

2    Q.  Okay.  And so you learned shortly after it was

3    announced that there would be an HR director role,

4    correct?

5    A.  Yes.

6    Q.  And the two HR consulting roles?

7    A.  Yes.

8    Q.  And when did you make the decision to apply for

9    the HR director role when you learned that it was --

10   there was going to be this role?

11   A.  With discussions with Jeff.

12   Q.  Okay.  And then when did you make the decision

13   that you were going to apply for the HR consultant

14   roles?

15   A.  Same.  So after I evaluated the roles, that's

16   what I thought I would apply for, and in my

17   conversations with him that made sense to him, too.

18   Q.  When -- so this was a separate conversation that

19   you had with Jeff?

20   A.  Uh-huh.  We had regular one on ones.

21   Q.  And during one of your -- at least one of your

22   one on one's with Jeff you all discussed kind of what

23   the HR director and HR consultant roles would entail?

24   You discussed what those roles would look like?

25   A.  They -- we discussed me applying for them.

1   Q.  Okay.

2   A.  A lot of the details had yet to be outlined.

3   Q.  Okay.

4   A.  Especially for the HR consultancy roles.

5   Q.  Did he discourage you in any way from applying

6   for those roles?

7   A.  No.

8   Q.  I'm sorry?

9   A.  No.

10  Q.  Did he do anything to impede your ability to

11  apply for those roles?

12  A.  No.

13  Q.  And then eventually you applied for the roles,

14  correct?

15  A.  Yes.

16  Q.  Did you apply for the HR consultant roles at the

17  same time that you applied for the HR director roles or

18  was there some kind of lapse in time between the two?

19  A.  I believe I applied for all three at the same

20  time.

21  Q.  And did you interview for the HR director role?

22  A.  Yes.

23  Q.  With whom did you interview?

24  A.  Amanda Harrison and Jeff Fralix.

25  Q.  Who's Amanda Harrison?

1      A.  She was the hiring manager.  She sat globally.

2  So she was on video.

3      Q.  Okay.  This -- under the reorganization, the HR

4  director role and the consultancy roles would have

5  reported ultimately up to Amanda Harrison?

6      A.  Yes.

7      Q.  Okay.  Was she in a role that was sort of

8  equivalent to what Melinda Reeves had, understanding,

9  you know, the group had been reorganized a bit, but --

10     A.  Yes.

11     Q.  Okay.

12     A.  Yes.

13     Q.  Okay.  And how did your interview go for the HR

14  director role, from your perspective?

15     A.  I thought they went well.

16     Q.  Did Amanda Harrison say anything to you during

17  that interview that you found offensive or

18  discriminatory?

19     A.  No.

20     Q.  Did Jeff Fralix say anything to you during that

21  interview that you found offensive or discriminatory?

22     A.  No.

23     Q.  Do you think Amanda Harrison has done anything to

24  discriminate against you based on your race?

25     A.  No.

1  Q.  Do you think Amanda Harrison has done anything to

2  you to discriminate against you based on your age?

3  A.  No.

4  Q.  Do you think Amanda Harrison has done anything to

5  retaliate against you?

6  A.  No.

7  Q.  Okay.  Did you have just one interview for the HR

8  director role?

9  A.  No.  No.

10  Q.  Okay.  How many interviews did you have for the

11  HR director role?

12  A.  I recall two.

13  Q.  Do you know who interviewed for the HR director

14  role?

15  A.  I know Angie Moore interviewed and Brittany Smith

16  interviewed.  I'm not sure if anyone else interviewed.

17  Q.  Okay.  And Angie Moore ultimately got the role?

18  A.  Correct.

19  Q.  Okay.  And you -- and who made the decision to

20  select Angie Moore for the role?

21  A.  I don't know who ultimately made the decision.

22  Q.  But you think Jeff Fralix discriminated against

23  you with respect to the selection of Angie Moore for the

24  role?

25  A.  There was no -- I was more qualified than Angie

1  for the role.

2  Q.  Right.  So I'm just saying you don't know who the

3  decision makers are, --

4  A.  Right.

5  Q.  -- but you think it was Jeff who discriminated

6  against you with respect to the HR director role?

7  A.  I'm -- yes.

8  Q.  Okay.  How did you learn that Angie Moore had

9  been selected for the role and that you had not been

10  selected for the role?

11  A.  Jeff came to tell me.

12  Q.  Approximately when did you learn in relation to

13  your interview?

14  A.  I think shortly after the -- the last interview.

15  Q.  Okay.

16  A.  Yes.

17  Q.  After your second interview?

18  A.  Yes.

19  Q.  Okay.  And what did he tell you?

20  A.  I don't remember the exact words, but the -- the

21  end result was that Angie had been selected for it.

22  Q.  Did you tell him that you thought it was unfair?

23  A.  No.

24  Q.  Did you tell him that you thought it was

25  discriminatory?

1    A.  No.

2    Q.  Did you complain to anyone at the company that

3  you thought the selection of Angie Moore for the HR

4  director role was discriminatory?

5    A.  No.

6    Q.  Did you reach out to Amanda Harrison to talk to

7  her about the decision at any point?

8    A.  No, not that I recall, no.

9    Q.  And then did you interview for the consult -- did

10  you interview for the consultancy roles?

11    A.  Yes.

12    Q.  And there were two, correct?

13    A.  Correct.

14    Q.  And they would have been reporting to Angie Moore

15  in the new HR director role, correct?

16    A.  Correct.

17    Q.  Did those -- did your interview for the HR

18  consultancy roles occur after your interview for the HR

19  director role?

20    A.  Yes.

21    Q.  And who participated in that interview?

22    A.  Angie Moore.

23    Q.  It was just Angie Moore?

24    A.  Yes.

25    Q.  Okay.  And how many interviews, excuse me, did

1  you have for the HR consultancy roles?

2      A.  One.

3      Q.  How did the interview go, from your perspective?

4      A.  It seemed like it was a check-the-box exercise

5  for her.

6      Q.  Why do you think she was just trying -- just

7  checking the box?

8      A.  Because she had made up her mind about who she

9  wanted in the roles.

10      Q.  Who do you think she wanted in the roles?

11      A.  Not me.  So it ended up -- it ended up being

12  Brittany and Chenee.

13      Q.  Do you think that she had a preference for

14  Brittany and Chenee?

15      A.  Ask your question again.

16      Q.  Do you think that she had a preference to have

17  Brittany and Chenee in those roles?

18      A.  Yes.

19      Q.  And you think she had that preference even before

20  she interviewed you?

21      A.  Yes.

22      Q.  Okay.  And why do you think she preferred

23  Brittany and Chenee?

24      A.  They were younger than I am.

25      Q.  Both of them are younger than you?

1    A.  Yes.

2    Q.  But you don't know how old Brittany is, correct?

3    A.  Correct.

4    Q.  And you don't know how old Chenee is, correct?

5    A.  Correct.

6    Q.  Okay.  It's just your subjective belief that they

7  are younger than you, correct?

8    A.  Correct.

9    Q.  Okay.  If you find out that one or both of them

10  is actually the same age or close in age to you, would

11  that change your opinion about Angie Moore preferring

12  them because they're younger than you?

13    A.  Would it change my opinion?  Not necessarily.

14    Q.  So even though -- even if they -- one or both of

15  them is the same age as you, you would -- it would still

16  be your opinion that Angie Moore preferred them because

17  they're younger than you?

18    A.  If one or -- if -- if both of them are the same

19  age as I am, then that would change my opinion.

20    Q.  Okay.  If one of them is the same age as you --

21    A.  That would not change my opinion.

22    Q.  -- you would think that she preferred the person

23  who's the same age as you because they're younger than

24  you?

25    A.  Based on my qualifications and experience.

1  Neither one of them had a performance rating.  They were

2  brand new to the organization.

3      Q.  But --

4      A.  So --

5      Q.  -- your age doesn't have anything to do with

6  specific qualifications.  So regardless of what the

7  qualifications are, what would make you think that Angie

8  Moore preferred a younger worker if she selected someone

9  who's the same age as you?

10     A.  If both of them were the same age, that would

11  change my opinion.

12     Q.  Okay.

13     A.  And it just seemed like it was trying to go

14  towards a younger population.  So I'm just -- that's my

15  belief.

16     Q.  Okay.  But I'm asking like what would -- what

17  would be your reason for suing the company for

18  discriminating against you based on your age if they

19  selected people who were the same age as you?

20     A.  That wouldn't be a -- there wouldn't be a cause

21  in that situation.

22     Q.  Okay.  And if you found out, for example, that

23  one or both of these candidates for the consultancy

24  position, they were a year or two younger than you, you

25  would still think that they were being selected based on

1 their age because they're younger than you?

2    A. If both of them were similar in age to me,

3 then -- then I'd rethink my --

4    Q. Okay.

5    A. -- my claim.

6    Q. All right. And fair enough. So if you find out

7 with respect to these positions that one or more of

8 these individuals are actually the same age or close in

9 age to you, that would cause you to rethink your age

10 discrimination claim, right?

11    A. Yes.

12    Q. Because, in fairness, if the company selected

13 somebody for these roles who are the same age or close

14 in age to you, that would not -- that would suggest that

15 they weren't treating you differently because of your

16 age, right?

17    A. That would be -- that would be the suggestion,

18 correct.

19    Q. Okay. And you would rethink your allegation that

20 decisions were made based on your age if that is the

21 case, correct?

22    A. Yes.

23    Q. Okay. And, to confirm, you don't know Angie

24 Moore's age, right?

25    A. Correct.

1    Q.  Okay.  Okay.  When -- did Angie Moore say

2  anything to you during the interview that -- for the HR

3  consultancy roles that led you -- that you found to be

4  discriminatory?

5    A.  During the interview, no.

6    Q.  Okay.  Did Angie Moore ever say anything to you

7  that you thought was discriminatory?

8    A.  When she called to inform me that I had not been

9  selected.

10    Q.  What did she say?

11    A.  She said that -- I asked her -- and the decision

12  was made rather quickly, because I think I interviewed

13  with her, and then I'm driving home and she calls, and

14  it's I just want to let you know that I've decided to,

15  you know, go with the other two who had entered for the

16  roles.

17        And I asked her for feedback why, and she says,

18  you know, that I didn't make eye contact with her

19  throughout the interview.  And I told her, I said,

20  that's odd, because I was watching you take notes.

21  So --

22    Q.  And why do you think that was discriminatory?

23    A.  I think it was just a way for her to -- to -- to

24  justify why she did not select me.

25    Q.  Based on your -- but you thought it was

1   discriminatory --

2     A.  Based on my age.

3     Q.  -- based on your age?

4     A.  Yeah.

5     Q.  Because Chenee and Brittany are both African

6   American, right?

7     A.  Correct.

8     Q.  Okay.  So it -- Angie could not have been

9   discriminating against you based on your race in

10  connection with her selection of Brittany and Chenee,

11  correct?

12     A.  Correct.

13     Q.  All right.  And other than her telling you that

14  you did not make eye contact with her, did she say

15  anything else that you thought was discriminatory?

16     A.  No.

17     Q.  Or do anything else that you thought was

18  discriminatory?

19     A.  No.

20     Q.  Did you report this comment to the company or

21  make a complaint that you thought that Angie Moore was

22  being discriminatory against you when she made this

23  complaint?

24     A.  No.

25     Q.  You've talked and, you know, we've talked a bit

1 about your qualifications and some of your peers'

2 qualifications.  When you're applying for a job, was it

3 your understanding -- well, when you were applying for

4 these positions, the VP of HR position, the HR director

5 position and then the HR consultancy positions, --

6     A.  Yes.

7     Q.  -- was it your understanding that your

8 qualifications was a component of the selection

9 decision?

10    A.  Yes.

11    Q.  Okay.  Was it also your understanding that your

12 performance during the interview was a component of the

13 selection decision?

14    A.  Yes.

15    Q.  Do you know of anything else that might have been

16 a part of the selection decision?

17    A.  Maybe feedback from clients, feedback from

18 supervisors.

19    Q.  And do you -- you think -- I assume you think

20 it's fair that when you're interview -- applying for a

21 job that your qualifications would be evaluated,

22 correct?

23    A.  Yes.

24    Q.  And do you also think it's fair that your

25 performance during an interview would also be evaluated

1  to determine whether you're the correct person for a

2  position?

3     A.  Yes.

4     Q.  You don't have any issue with -- I understand you

5  may disagree with them, but you don't have any issue

6  with Jeff Fralix reviewing your interview performance in

7  connection with evaluating you for the HR director role,

8  correct?

9     A.  Correct.

10    Q.  And you don't have any issue with -- with Angie

11  Moore evaluating your interview performance in

12  connection with the selection process for the HR

13  consultancy roles, correct?

14    A.  Correct.

15    Q.  Okay.  How long have we been going?  I'm thinking

16  maybe we'll take a break.

17    A.  Because I'm about to say my Coke Zero's kicking

18  in.

19    Q.  Right.

20    A.  So I was like --

21    Q.  Okay.

22    A.  -- you have maybe one or two more and then I've

23  gotta --

24    Q.  We can take a break.

25    A.  Okay.

1     VIDEOGRAPHER:  It is 2:11, and we are off the
2  record.
3     [Recess]
4     VIDEOGRAPHER:  It is 2:19, and we are back on the
5  record.
6     MS. WILLIAMS:
7     Q.  Ms. Bible, we've taken a break.  Is there
8  anything you want to add to or change about your
9  previous testimony since our break?
10    A.  No, ma'am.
11    Q.  Okay.  I want to clarify a couple of things to
12 make sure that we are all on the same page --
13    A.  Yes, ma'am.
14    Q.  -- about what -- what you're alleging in your
15 lawsuit.  Do you recall responding to written discovery
16 in the case where there were some questions asked and
17 you provided answer to those questions in writing?
18    A.  Yes.
19    Q.  Okay.  And you recall signing a verification
20 saying that those answers were truthful?
21    A.  Yes.
22    Q.  Okay.  In one of your responses you allege
23 that -- that you were denied a raise by Jeff Fralix.  Is
24 that true?
25    A.  Is --

1    Q.  Were you --

2    A.  -- the allegation or --

3    Q.  Is the -- well, you claim that Jeff Fralix

4    retaliated against you by not giving you a raise.

5    A.  Correct.

6    Q.  Is that true?

7    A.  Is -- is -- could you rephrase the question?  Are

8    you asking me is that statement in that --

9    Q.  Is it true that Jeff -- is it your allegation --

10   A.  Okay.

11   Q.  -- that Jeff Fralix retaliated against you by not

12   giving you a raise?

13   A.  Yes.

14   Q.  It is.  Okay.  What was he retaliating against

15   you for when he didn't give you the raise, according to

16   your complaint?

17   A.  Filing a complaint against Melinda.

18   Q.  And when did he fail to give you a raise for

19   filing your complaint against Melinda?

20   A.  What was it?  2018 and 2019.

21   Q.  In fact, you had not gotten raises prior to that,

22   correct?

23   A.  Yes.

24   Q.  And, in fact, 2018, 2019 is the year that Jeff

25   Fralix gave you an exceeding expectations evaluation?

1    A.  Yes, my last rating for him was exceeding.

2    Q.  Jeff Fralix gave you that, right?

3    A.  Correct.

4    Q.  And he also was your supervisor that year when

5    you got the highest lump sum award you've ever gotten at

6    the company, correct?

7    A.  Yes.

8    Q.  And he was also your supervisor when you got the

9    highest OTIP award you've ever gotten at the company,

10   correct?

11   A.  Yes.

12   Q.  Okay.  But you think that he was retaliating

13   against you when he did not give you a raise that year?

14   A.  Yes.

15   Q.  Okay.  And what evidence do you have that Jeff

16   Fralix knew about your complaint against Melinda Reeves?

17   A.  I don't have any.

18   Q.  If he did not know about your complaint against

19   Melinda Reeves, you agree with me it would have been

20   hard for him to retaliate against you for filing a

21   complaint against her, right?

22   A.  Yes.

23   Q.  Okay.  And you don't have any evidence sitting

24   here today that you can offer to the jury that he

25   actually knew about that complaint when he made

1   decisions about your compensation in 2018 and 2019?

2       A.  Yes, correct.

3       Q.  Okay.  Thank you.

4       A.  Yes, correct.

5       Q.  So then why are you alleging that he retaliated

6   against you by not giving you a raise based on your

7   complaint against Melinda Reeves?

8       A.  Based --

9       Q.  I mean, if you don't know what he knows, how are

10  you making the assessment that he did that based on the

11  complaint?

12      A.  Right.  I don't know if he knew.  I believe he

13  did know.  The -- that HR organization had a really bad

14  reputation of maintaining secrets and maintaining

15  confidentialities.  And, like said, he and Mel were/are

16  good friends, worked together.  So there's no reason for

17  me to think that he did not know.

18          And as I asked for a raise and, you know, I

19  didn't get one, even after like, you know, hadn't had

20  one in three years.

21          MS. WILLIAMS:  Okay.  Objection, nonresponsive.

22      A.  Oh, that's --

23          MS. WILLIAMS:

24      Q.  I'm asking --

25      A.  -- fine.

1  Q.  -- you what is the basis for your -- I mean, how

2  do you make the statement that he retaliated against you

3  by not giving you a raise because of your complaint

4  against Melinda if you don't actually know that he knows

5  about that complaint?  What -- what is the foundation

6  and basis of that allegation if you don't know that he

7  knew about that?

8  A.  Yeah, I don't know that he knew.

9  Q.  Okay.  This is all just your speculation and

10  belief, correct?

11  A.  Correct.

12  Q.  And you said you asked for a raise and didn't get

13  one.  Who did you ask for a raise?

14  A.  Jeff.

15  Q.  When?

16  A.  I don't remember exactly when.  Must have been

17  shortly during the -- the merit cycle.

18  Q.  Okay.  So that would have been when you learned

19  about it in early 2019?

20  A.  I believe I was asking for it through 2018, and

21  when -- from when he started.  I believe I was asking

22  for it throughout and to have -- to be able to get a

23  raise, yeah.

24  Q.  But you -- I mean, Jeff was not the only person

25  who supervised you who did not give you a raise, right?

1    A.  Zandra was the other person who --

2    Q.  Okay.  And I -- and I think you said at some

3    point Kristin was, as well?

4    A.  This, what, Exhibit 3 demonstrated that it was

5    Zandra, Jeff and Jeff --

6    Q.  Okay.

7    A.  -- were the -- were the three.  So it was need to

8    correct that.

9    Q.  Okay.  So Jeff was not the only person who did

10   not give you a raise, right?

11   A.  Correct.

12   Q.  Okay.  And you were asking him throughout 2018

13   for a raise, but that was the first year that he was

14   actually supervising you, correct?

15   A.  The first full --

16   Q.  Full year.

17   A.  -- year, yes.

18   Q.  So when you were asking him throughout 2018,

19   would that have been based on Zandra's decision not to

20   give you a raise?

21   A.  No.

22   Q.  Okay.  Because Zandra's the person who evaluated

23   you -- or at least for part of 2017 you were reporting

24   to Zandra, correct?

25   A.  Zandra left in 2017.

1    Q.   Okay.  So part of that year would have been based

2    on work -- your performance with Zandra, correct?

3    A.   Correct.

4    Q.   Because if I'm remembering correctly, the -- Jeff

5    would have become your supervisor sometime late in 2017

6    or early 2018, right?

7    A.   Yes, correct.

8    Q.   And so he's not the person that would have been

9    really evaluating your performance for 2017, because he

10   was not really your supervisor for that period, right?

11   A.   Yes.

12   Q.   So if you didn't get a raise in 2018 based on

13   your performance in 2017, that was not based on Jeff's

14   evaluation, correct?

15   A.   The performances was based upon Zandra's

16   evaluation.  Your merit is forward looking, and Jeff

17   could have adjusted that.

18   Q.   Right, but I -- what -- all I'm trying to -- to

19   clarify is that when you were notified in 2018 about

20   whether you were going to get a raise and a lump sum and

21   an OTIP award, that was based on your performance in

22   2017, correct?

23   A.   The performance and the OTIP, yes.  The merit is

24   forward looking.

25   Q.   But the merit is based on how you've performed,

1 right?

2    A. Yes, --

3    Q. Which is --

4    A. -- that's part of it.

5    Q. -- backwards looking, right?

6    A. That is part of it, correct.

7    Q. Okay. And so that period, 2017, was really under

8 Zandra not under Jeff, correct?

9    A. I was evaluated -- yeah, Zandra was my supervisor

10 in 2017, yes.

11    Q. Okay. And all of that really is to drill down on

12 fact that Jeff was not the only person who made a

13 decision not to give you a raise with respect to your

14 base salary at the company, right?

15    A. Yes, Zandra was the other evaluator, yes.

16    Q. Okay. Other than the VP of HR role, --

17    A. Uh-huh.

18    Q. -- the HR director role and the two HR

19 consultancy roles, --

20    A. Uh-huh. Yes.

21    Q. -- did you ever apply for any other roles at the

22 company that you were not selected for?

23    A. No.

24    Q. And other than your nonselection for those

25 roles, --

1    A.  Correct.

2    Q.  -- are you claiming that the company

3  discriminated against you in any other respect?

4    A.  No.

5    Q.  Including based on your race?

6    A.  Ask that question again.

7    Q.  There is -- there's no other conduct that

8  occurred towards you during your employment other than

9  the nonselection of these roles -- for these roles that

10  form the basis of your race discrimination claim, right?

11    A.  Correct.

12    Q.  And, similarly, there's no other conduct that

13  occurred during the company other than your nonselection

14  for these roles that form the basis of your age

15  discrimination claim, correct?

16    A.  Correct.

17    Q.  Okay.  With respect to your retaliation claim, is

18  your complaint against Melinda Reeves the only activity

19  that you engaged in that you think you were retaliated

20  for?

21    A.  Yes.

22    Q.  There's no other action that you took that you

23  think the company retaliated against you for?

24    A.  No.

25    Q.  Okay.  And the retaliation occurred -- you

1  mentioned that you were retaliated against because you

2  were required to continue to report to Melinda, correct?

3      A.  Yes.

4      Q.  You view that as a form of retaliation, right?

5      A.  It was an unpleasant work environment, correct.

6      Q.  But you view that as retaliation?

7      A.  Yes.

8      Q.  And then you also view the fact that you had to

9  report to Jeff Fralix when he got the VP of HR role, you

10  view that as a form of retaliation, correct?

11      A.  Correct.

12      Q.  And then you've just shared with me that you

13  think that Jeff retaliated you by not giving you a

14  raise, you think that was a form of retaliation?

15      A.  Correct.

16      Q.  What else happened to you that you think was a

17  form of retaliation?

18      A.  Not being selected for the HR director nor the

19  two HR consultancy roles.

20      Q.  Okay.  And so you think Jeff retaliated against

21  you by not selecting you for the HR director role?

22      A.  Yes.

23      Q.  Did anybody else retaliate against you based on

24  your nonselection for the HR director role?

25      A.  No.

1    Q.  Just Jeff?

2    A.  Yes.

3    Q.  And you think Jeff retaliated against you based

4  on what conduct, based on what?  He retaliated you by

5  not selecting you for the HR director role because you

6  did what?

7    A.  Because I filed a complaint against Melinda.

8    Q.  Okay.  So this goes back to that original

9  complaint, as well?

10    A.  Yes.

11    Q.  Okay.  So it's your testimony that he didn't give

12  you a raise because of your complaint with Melinda,

13  correct?

14    A.  Correct.

15    Q.  And it's also your testimony that he didn't

16  select you for the HR, excuse me, director role because

17  of your complaint against Melinda, correct?

18    A.  Yes.

19    Q.  And with respect to the HR director role, your

20  testimony is the same, you don't know whether he even

21  knew about your complaint against Melinda when he made

22  the decision about the HR director role, correct?

23    A.  Correct.

24    Q.  Okay.  And who -- who retaliated against you with

25  respect to the HR consultancy roles?

A.  That would -- I still attach that to Jeff.

Q.  Okay.  What did Jeff do with respect to the HR consultancy roles?

A.  My ultimate nonselection for roles, those two roles.

Q.  Well, I think you testified earlier that Angie Moore made the decision on those roles, correct?

A.  Yes.

Q.  And she's the only person who interviewed you, right?

A.  Yes.

Q.  And so why do you think Jeff was retaliating against you for Angie's selection related to the HR consultancy roles?

A.  I believe that the process was designed such that that would be the outcome.

Q.  What process?

A.  The selection process.

Q.  Whose selection process?

A.  The ultimate selection process for -- for both roles.

Q.  For both of the consultancy roles?

A.  For the consultancy roles as well as the HR director roles.

Q.  Okay.  What process was there, is what I'm trying

1  to understand?

2      A.  The --

3      Q.  You said that you believe that there was a

4  process designed specifically about you with respect to

5  those roles?

6      A.  Yes.

7      Q.  Okay.  And what is the process that you think was

8  set up?

9      A.  The selection and interview process.

10     Q.  Okay.  What about the selection process was

11  designed against you?

12     A.  I was told that the process was designed so that

13  they could get Shea out.

14     Q.  Who told you that?

15     A.  One of the employee relations advisors.

16     Q.  Who?

17     A.  Angela Wilson.

18     Q.  When did she -- Angela tell you this.

19     A.  I don't recall specifically.

20     Q.  It would have been after you were not selected?

21     A.  Absolutely.

22     Q.  Did you -- did you make a complaint about this?

23     A.  I was gone.

24     Q.  Okay.  Could you still have notified the company

25  that you think that there was something wrong about the

1 selection process?

2    A.  I had already filed my compliant.

3    Q.  You had already filed your charge --

4    A.  Yes, ma'am.

5    Q.  -- when you learned this from Angela?

6    A.  Yes, ma'am.

7    Q.  Okay.  So you're -- do you know when you filed

8 your charge?

9    A.  It was January 20 -- I don't know exact date,

10 but, yes.

11    Q.  So what were the circumstances where you were

12 speaking to Angela Wilson and she told you that the

13 selection process was set up or designed to get you out?

14    A.  It was just a conversation.  I just reached out,

15 and we were just talking and, yeah.

16    Q.  You reached out to her because of your charge of

17 discrimination?

18    A.  No.

19    Q.  Are you friends with Angela Wilson?

20    A.  I was, yeah.

21    Q.  Are you still?

22    A.  I --

23    Q.  Your are?

24    A.  Yeah.  Well, yeah, we -- yeah, yes.

25    Q.  When was the last time you spoke to Angela

1   Wilson?

2       A.   It's been awhile.

3       Q.   What does that mean?

4       A.   Year.

5       Q.   Okay.

6       A.   A couple of years, yeah.

7       Q.   Would that have been the last time you spoke to

8   Angela Wilson?

9       A.   Absolutely, yes.

10      Q.   Have you spoken to her to ask her to testify in

11  your behalf in this trial?

12      A.   No.

13      Q.   Okay.  Do you plan to?

14      A.   Whatever my attorneys --

15      Q.   I mean, do you think she would be helpful to you?

16  Do you want her to testify?

17      A.   What -- I'm just whatever my attorneys say, yeah.

18      Q.   Do you think she's helpful to you in -- with

19  respect to your claims against the company?

20      A.   Yes.

21      Q.   Okay.

22      A.   Yeah, probably, yeah.

23      Q.   And so she told you the process was designed to

24  get you out.  Did she tell you specifically how it was

25  designed to get you out?

1      A.   No.

2      Q.   Okay.  Did you ask her what did she mean by that?

3      A.   No.

4      Q.   Were you curious?

5      A.   That was -- that -- what is it -- that validated

6    my suspicion.  So it was -- it's validated what I had

7    already thought, and which is why I asked the question

8    when they -- like what would the process be, and, yeah,

9    it was -- it just validate what I had already thought,

10   what I was suspicious of.

11     Q.   Well, the process was you would submit an

12   application, you would be interviewed, and they would

13   select from those, correct?

14     A.   Yes.

15     Q.   And you did submit applications for the HR

16   director role and the consultancy roles, right?

17     A.   Yes.

18     Q.   And you were interviewed for those roles, right?

19     A.   Yes.

20     Q.   And they made a decision, right?

21     A.   Yes.

22     Q.   Was there something else in the process that

23   you're -- you're claiming occurred that targeted you?

24     A.   No.

25     Q.   Okay.  All right.  So let's get back to your

1  allegation.  You don't think that Angie Moore retaliated

2  against you, correct?

3     A.  No.

4     Q.  And so Jeff Fralix is the only person who

5  retaliated against you with respect to the HR

6  consultancy roles?

7     A.  And the HR director role.

8     Q.  Right.  I'm sorry, we talked about that one.  I

9  was --

10     A.  Okay.

11     Q.  -- just focusing on the HR consultancy roles.

12     A.  Okay.  Okay.

13     Q.  I --

14     A.  All right.

15     Q.  I appreciate the clarification.

16     A.  Okay.

17     Q.  So Jeff is the only person that you allege

18  retaliated against you with respect to the HR

19  consultancy roles, correct?

20     A.  Oh, okay.  I'm -- okay.  Thank you for --

21  because -- all right.  Yes.  Yes.

22     Q.  Do you know what Jeff Fralix's role was in

23  selecting the successful candidates for the HR

24  consultancy roles?

25     A.  No.

1    Q.  Do you know if he had any input at all?

2    A.  No.

3    Q.  Okay.  So why do you think he retaliated against

4    you with respect to those roles?  What -- why do you

5    think he did?

6    A.  Based upon his friendship an allegiance to -- to

7    Melinda.

8    Q.  But if he did not -- if he was not involved in

9    this selection process for the HR consultancy roles, how

10   would he have retaliated against you in the selection

11   for those roles?

12   A.  It's just my belief that that is part of the --

13   the -- the ultimate retaliation for filing a complaint

14   against his close friend and mentor.

15   Q.  Okay.  How many complaints did you file against

16   Melinda Reeves?

17   A.  One.

18   Q.  And that's the one in 2017?

19   A.  Yes.

20   Q.  And I think we clarified this, but other than

21   that complaint, you never filed any other complaints

22   against anybody else at the company during your time at

23   Direct Energy, correct?

24   A.  Correct.

25   Q.  Okay.  In your responses to written discovery,

1    and this is really just to make sure the record is

2    clear, because you've already testified about who was

3    selected for the two HR consultancy roles, right?

4        A.  Yes.

5        Q.  Okay.  That was Brittany Smith and Chenee

6    Franklin, correct?

7        A.  Yes.

8        Q.  In your interrogatory answers you indicate that

9    Direct Energy hired two younger Caucasian women for the

10   HR consultancy roles.  Who are the two -- who are the

11   two Caucasian women that you're -- you're referring to

12   in your discovery responses?

13       A.  I'd have to read it, but HR consultancy roles

14   that -- the two HR consultancy the roles, the level 6

15   ones, they were filled by Brittany Smith and Chenee

16   Franklin.

17       Q.  Who are both African American, correct?

18       A.  Yes.

19       Q.  And so -- and I appreciate you don't have it in

20   front of you.  I didn't -- I did not make extra copies,

21   because I'm just trying to clarify, but if you're

22   alleging or if you claim in your discovery responses

23   that two white women were hired for the HR consultancy

24   roles, that would be incorrect, right?

25       A.  Yes.

```
 1      Q.  Okay.  And we should rely on your testimony here
 2   today that the two HR consultancy roles went to Brittany
 3   Smith and Chenee Franklin, who are both African
 4   American, right?
 5      A.  Correct.
 6      Q.  Okay.  And I'm sorry, we were talking about the
 7   raises that you talked to Jeff about.  About how many
 8   times in 2018 did you go to Jeff to ask him about a
 9   raise?
10      A.  I don't recall exactly.  I know at least once,
11   and somewhere between two and five.
12      Q.  Was anybody else present when you went to him to
13   ask him about a raise?
14      A.  No, these are during our one-on-one meetings.
15      Q.  Okay.
16      A.  Yes.
17      Q.  Did you think that he was denying you raises for
18   discriminatory reasons?
19      A.  For retaliation.
20      Q.  For retaliation.  And did you report this to
21   anyone at any time?
22      A.  No.
23      Q.  Okay.  So -- and, to be clear, it was not
24   discriminatory that he denied you a raise, but it was
25   retaliatory that he denied you a raise based on your
```

1   allegations, right?

2       A.  Yes.

3       Q.  Okay.  Between 2018 -- after your complaint

4   against Melinda Reeves, which was late 2017, through

5   2019, did anything else happen to you with respect to

6   your position at the company, your role as an HR

7   business partner, that you had problems with or

8   complaints about?

9       A.  No.

10      Q.  Okay.

11      A.  Despite that I've maintained my HR

12  professionalism and did my job to the best of my

13  ability.

14          MS. WILLIAMS:  Objection, nonresponsive after no.

15      Q.  And the complaint that you made in 2017 against

16  Melinda Reeves, which you conveyed through Jonathan

17  Phillips, that was just about race, right?

18      A.  Yes.

19      Q.  Okay.  You did not allege at the time that she

20  discriminated against you because of your age, correct?

21      A.  Yes, correct.

22      Q.  That's correct?

23      A.  Yeah, that's correct.

24      Q.  Okay.  Is there any -- are there any other facts

25  that form the basis of your retaliation claim other than

1  what we've discussed?  Do you want me to recap what I

2  think we've discussed?

3      A.  No, I think I've got this one.

4      Q.  Okay.  Okay.

5      A.  No.  No.

6      Q.  Okay.  What are you asking the jury to award you

7  in this case?

8      A.  Monetary damages is -- yeah.

9      Q.  I'm sorry, I heard monetary damages, and I didn't

10  hear the rest.

11      A.  I just -- that's all I said, yeah.

12      Q.  How much?

13      A.  Oh, I am -- I don't know.

14      Q.  Have you calculated what you believe your

15  economic damages are in this case?

16      A.  Yes.

17      Q.  What are they?

18      A.  It's at least -- I was out of work for two and a

19  half years.  I'm not making near as much as I was making

20  there, and it's at least 750,000.

21      Q.  You've made that calculation that it's 750,000 in

22  economic damages?

23      A.  Yes.

24      Q.  Are you asking for anything else besides economic

25  damages?

1    A.   I don't know.

2    Q.   Have you been harmed in any other way besides the

3    lost wages that you're alleging?

4    A.   From -- right, yes.

5    Q.   How else have you been harmed?

6    A.   Just the time that it took me to find another

7    job.  It seemed like it was -- I'd get close and then

8    something would happen.  And it just was the toll that

9    it took on me from an emotional standpoint, the

10   emotional tax that -- yeah.

11   Q.   How did it affect you emotionally?

12   A.   I mean, to know that something that I love, this

13   field of HR, and to be denied opportunities to interview

14   for roles, and then to have to continue to work in an

15   environment for somebody that -- it was just really

16   hard.

17        But I continued to do what I -- what -- my job to

18   the best of my ability, because I -- I wanted -- I

19   wanted Jeff to be successful, too, in spite of anything.

20   And it was just -- it was just really hard to get

21   through that.  So --

22   Q.   Have you had to receive -- well, have you

23   received any type of counseling or treatment related to

24   any emotional injury you're claiming in this lawsuit?

25   A.   No.

1    Q.  Have you seen any doctors or other health care

2  providers in connection with any injuries you're

3  claiming in this lawsuit?

4    A.  No.

5    Q.  When did you start looking for another job after

6  you left Direct Energy?

7    A.  Immediately.

8    Q.  And how did you go about looking for another job?

9    A.  Job boards, networking.

10    Q.  How much -- oh, I'm sorry was that it?

11    A.  Uh-huh.

12    Q.  Okay.  How much time were you devoting to looking

13  for another job when you left Direct Energy?

14    A.  It was a full-time job.

15    Q.  So every day?

16    A.  Every day.

17    Q.  For how many hours?

18    A.  At least four hours a day.  And when I wasn't

19  actively applying, I was following up on leads.

20    Q.  In discovery you produced some documents showing

21  applications that you made for positions in 2021 and

22  2022.

23    A.  Uh-huh.  Okay.

24    Q.  I didn't see anything for 2019, 2020 or the early

25  part of 2021.  Why is that?

1    A.   COVID.

2    Q.   What does that mean?

3    A.   COVID hit in what, 2020?

4    Q.   Uh-huh.

5    A.   And so opportunities weren't there.  And in --

6    they started opening back up, I guess, late 2020, early

7    2021.

8    Q.   So were you not submitting applications in 2020?

9    A.   I don't recall very many of them, because the

10   world was shut down.

11   Q.   If you did submit applications in 2020, do you

12   have records of those?

13   A.   If I did, I'm sure they're somewhere, yeah.

14   Q.   I'm just trying to get a sense of whether

15   every -- so you produced records related to applications

16   you made 2021, 2022.

17   A.   Uh-huh.

18   Q.   Do you have records related to efforts you made

19   in 2019 and 2020 that you have not produced?

20   A.   No.

21   Q.   So the absence of those records, I'm just trying

22   to understand what I take from that.  Like are there no

23   records related to efforts you made in 2019 and 2022?

24   I'm sorry, and 2020?

25   A.   I must not have filed them away and just did not

1    have them.

2        Q.   Okay.

3        A.   Yeah.

4        Q.   Do you have -- are you able, excuse me, to

5    identify applications you made in 2019 and 2020?

6        A.   Not off the -- not right now, yeah.

7        Q.   But, I mean, for example, I've asked in discovery

8    to identify that.  Are you able to supplement your

9    discovery responses and identify for me the positions

10   you applied for in 2019 and 2020?

11       A.   I'll go and look again.

12       Q.   Okay.

13       A.   Yeah.

14       Q.   Do you know about how many positions you would

15   have applied for in 2019?

16       A.   It would have been a handful, because I was

17   released in September 20 -- at the end of the year, and

18   opportunities dry up at the end of the year, anyway.  So

19   it was a poor time to be let go.

20            I also started my HR consulting practice, and

21   then the first part of the year of 2020, the first part

22   of the year is usually slow, as well, and then in

23   February and March of 2020 COVID hit and companies were

24   shutting down.  They weren't doing any hiring.

25            Yeah, so then it started opening back up, and

1  then that's when the -- the bulk of the opportunities

2  started in 2021, and ultimately I was successful this

3  past year.

4      Q.  Okay.  And when you say a handful in 2019, we're

5  talking about five?  Is that what you're --

6      A.  I'd say, --

7      Q.  -- kind of thinking?

8      A.  -- yeah, about five, yeah.

9      Q.  Okay.  In 2020 how many do you think you --

10 applications you put in for positions?

11     A.  Probably five.

12     Q.  Okay.  And during -- when did you -- I think you

13 mentioned earlier you were receiving unemployment --

14     A.  Yes.

15     Q.  -- compensation?  When did your unemployment

16 start?

17     A.  September, October 2019, I believe.

18     Q.  And it continued until when?

19     A.  There were COVID extensions.  So it was extended,

20 I believe, end of October of 2020.

21     Q.  So you received unemployment from September or

22 October 2019, excuse me, to October 2020?

23     A.  That sounds about right, yes.

24     Q.  Okay.  And how much were you receiving in

25 unemployment?

1    A.  I don't exactly recall.

2    Q.  Do you have records showing what that was?

3    A.  Yes.

4    Q.  Okay.  Do you know -- I don't recall seeing them.

5    Do you have them available to produce in response to

6    discovery requests for them?

7    A.  I thought I signed where y'all could get them,

8    yeah.

9    Q.  Okay.  But do you -- I mean, I'm asking if you

10   actually have the records.

11   A.  On me?  I don't know.  You're talking about like

12   on me or can I --

13   Q.  Not --

14   A.  -- get them?

15   Q.  -- here, but --

16   A.  Oh, okay.

17   Q.  -- in your possession.

18   A.  Yeah, I can -- sure, I can get that number, yes.

19   Q.  Okay.  And you can't estimate how much you

20   received in total from unemployment?

21   A.  Maybe 12,000.

22   Q.  For the -- over the course of that year?

23   A.  Yeah.  Let's say 12 to 15 thousand.  But, I mean,

24   I -- I will get that number for you.

25   Q.  Okay.

1    A.  So just -- yeah.

2    Q.  Other than the unemployment insurance that you

3   received and then the work that I guess you had, were

4   you receiving unemployment insurance while you were

5   doing the HR consultancy work?

6    A.  No, no.

7    Q.  Okay.  Your HR consultancy started in December of

8   2019?

9    A.  Yeah, but there wasn't -- it was -- COVID hit.

10   Q.  Okay.

11   A.  And so all that stuff dried up.

12   Q.  But, I mean, during the period that you were

13  actually receiving unemployment insurance, did you ever

14  receive any money for services performed through your

15  consultancy company?

16   A.  No.

17   Q.  That all came after your unemployment ended?

18   A.  Yes.

19   Q.  Okay.  When you were receiving unemployment

20  insurance, did you -- were you -- did you get

21  compensation from any other source?

22   A.  No.  I wish.  I'm sorry, I said I wish.

23   Q.  Okay.  Did you have any other forms of income

24  during the period that you were receiving unemployment

25  insurance?

1    A.  My savings.

2    Q.  Okay.  What savings are those?  Are we talking

3 401(k) or your like a savings account or both?

4    A.  All of the above, both.

5    Q.  Okay.  So you were tapping into your savings

6 account and your 401(k) --

7    A.  Yes.

8    Q.  -- during this time?

9    A.  Yes.

10    Q.  How much in your savings and 401(k) did you tap

11 into during this period?

12    A.  200,000.

13    Q.  Do you still have funds left in savings?

14    A.  Very little in savings.  Might even more than

15 that and not near as much as I had in my 401 -- my

16 401(k).

17    Q.  You still have some in your 401(k)?

18    A.  I do.

19    Q.  Okay.  Were you getting financial support from

20 any other sources -- after you left Direct Energy and

21 during the time that you were looking for work, were you

22 getting financial assistance from any other sources

23 besides unemployment?

24    A.  For a portion up until June 2020 I was also

25 receiving some child support until my daughter graduated

1  high school.

2  Q.  So that was through June 2020?

3  A.  Correct.

4  Q.  And how much was that?

5  A.  600, I think.

6  Q.  A month?

7  A.  Six -- yes.

8  Q.  Okay.  Any other financial assistance of any kind

9  during that period?

10  A.  I've said unemployment, child support, savings.

11  No.

12  MS. WILLIAMS:  Okay.  Can we take maybe three

13  minutes, just let me kind of go through and see what I

14  have to wrap up on?

15  VIDEOGRAPHER:  It is 2:58.  We are off the

16  record.

17  [Recess]

18  VIDEOGRAPHER:  It is 3:01 -- oh, sorry, 3:02, and

19  we are back on the record.

20  MS. WILLIAMS:

21  Q.  Ms. Bible, we took a short break.  Is there

22  anything you want to add to or change about your

23  testimony since our break?

24  A.  No, ma'am.

25  Q.  Okay.  And I'm going to ask -- just kind of

1 bounce around a bit with some follow-up.

2        The -- you indicated that you had some emotional

3 stress related to -- you know, that you're alleging in

4 this lawsuit?

5    A.  Yes, ma'am.

6    Q.  Have -- have you -- since you were -- since

7 you -- your job at Direct Energy ended, have there been

8 any other major life events that you've had that have

9 contributed to any emotional stress you've experienced?

10   A.  No.

11   Q.  Okay.  Have you spoken to anyone about testifying

12 on your behalf in this lawsuit?

13   A.  I have not.

14   Q.  Have you spoken to anyone other than your lawyers

15 about this lawsuit?

16   A.  Yes.

17   Q.  Who have you spoken to about this lawsuit?

18   A.  Personal friend.

19   Q.  Who are they?

20   A.  Damon Russell.

21   Q.  Okay.  Anyone else?

22   A.  Joselyn Darby.

23   Q.  These are all friends of yours?

24   A.  Yes.

25   Q.  Anyone else?

1      A.   No.  Oh, my parents.  My children don't even
2  know.
3      Q.  Okay.  Does Damond and has Damond ever worked for
4  Direct Energy?
5      A.   No.
6      Q.  What about Joselyn?
7      A.   No.
8      Q.  Okay.  And your parents, I assume they have not
9  worked for Direct Energy, either?
10      A.  Correct.
11      Q.  Okay.  Have you spoken to any employees or former
12  employees of Direct Energy about your lawsuit?
13      A.   No.
14      Q.  If you were going to identify people who might be
15  witnesses for you related to your claims in this
16  lawsuit, who would they be?
17      A.  It would be people from the employee relations
18  department and those like Jeff Fralix, Brittany Smith,
19  Chenee Franklin, Angie Moore, be folks like that.
20      Q.  Who from the ER department, employee relations
21  department?  I'm sorry.
22      A.  Oh, sorry, it would be like Jonathan Phillips and
23  looking at like Priscilla Garza, Angie Wilson, Angela
24  Wilson.
25      Q.  You said Priscilla Garza?

1    A.  Yes, ma'am.

2    Q.  And Angela Wilson?

3    A.  Yes, ma'am.

4    Q.  Anyone else?

5    A.  No.

6    Q.  Okay.  And I apologize if I asked you this.  I

7  know I asked you with respect to some of the positions,

8  but do you know who all applied for the HR consultancy

9  role?

10   A.  I do not.

11   Q.  And what about for the HR director role, do you

12  know who all applied for that position?

13   A.  I do not.

14   Q.  Okay.

15   A.  No, I do not.

16   Q.  Okay.  Did you talk to Brittany Smith about the

17  HR consultancy role when you all were applying for it?

18   A.  Ask it again.

19   Q.  Did you -- excuse me.  I knew that was coming.

20  Did you talk to Brittany Smith about the HR consultancy

21  role when you all were applying for it?

22   A.  Yeah, we all talked about the reorganization and

23  the roles.

24   Q.  Okay.

25   A.  Correct, yeah.

1    Q.  Did you express any concerns you had about your

2    chances of getting selected for the role with Brittany

3    Smith?

4    A.  No.

5    Q.  Did you talk to Chenee Franklin about the HR

6    consultancy role when you all were applying for it?

7    A.  Possibly.

8    Q.  Do you recall expressing any concerns you had

9    about your chances of getting the role?

10    A.  No, I had no concerns.  There was no reason for

11    me not to be selected for the --

12    Q.  Okay.

13    A.  -- HR consultancy role.

14    Q.  Okay.  So you didn't go in with any concerns?

15    A.  No.

16    Q.  And then similarly with the HR director role, did

17    you talk to anybody about -- I think you -- you said you

18    didn't know who else applied --

19    A.  Correct.

20    Q.  -- other than Angie Moore, right?

21    A.  Correct.

22    Q.  Did you speak to anyone about the HR director

23    role when you were kind of in the process of applying

24    and interviewing for it?

25    A.  Yes.

 1    Q.  Who was that?

 2    A.  Jeff and I spoke about the roles, yes.

 3    Q.  Okay.  Other than Jeff, anyone else?

 4    A.  I solicited letters of recommendation --

 5    Q.  Uh-huh.

 6    A.  -- from my -- the vice presidents I was

 7  supporting at the time.

 8    Q.  From your client group?

 9    A.  Correct.

10    Q.  Okay.  Do you recall who the -- who you got

11  letters of recommendation from?

12    A.  Urusa Nawaz, Jay -- last name just escaped me.

13    Q.  Okay.

14    A.  And there was one more that -- but, yeah.

15    Q.  I'm sorry, and you submitted those letters of

16  recommendation as a part of your application for the HR

17  director role?

18    A.  Yes.

19    Q.  To whom?

20    A.  I sent them, I think, to Amanda and Jeff.

21    Q.  Anyone else you spoke to about the HR director

22  role besides Jeff and then these three client group

23  members?

24    A.  Not that I recall.

25    Q.  Okay.  I'm going to just show you a few documents

just to get them identified for the record.

　　　　[Exhibit 4 marked, July 31, 2019 Notice of
Layoff]

　　A.　Thank you.

　　　　MS. WILLIAMS:

　　Q.　I'm showing you what's marked as Exhibit 4,
right?

　　A.　Correct.

　　Q.　Of your deposition.　Do you recognize this
document?

　　A.　I do.

　　Q.　Okay.　What is it?

　　A.　It's my notice of layoff.

　　Q.　Okay.　Is this the -- the letter that you
received notifying you of the reorganization and the
job -- elimination of your position?

　　A.　Yes.

　　Q.　Okay.　And this document is Bates numbered Bible
33 through Bible, excuse me, 47.

　　A.　Uh-huh.　Yes.　Yes.

　　Q.　Does that look like the entire -- entirety of
what you received notifying you of your layoff?

　　A.　Yes.　Yes.

　　Q.　Okay.　Did you have any questions for any --
anyone about the contents of this notice when you

1  received it?

2      A.  No.

3      Q.  Okay.  And you were offered severance in

4  connection with the reorganization in the event you were

5  not selected for the positions, the HR director position

6  and the HR consultancy positions, correct?

7      A.  Correct.

8      Q.  Did you accept the severance?

9      A.  No.

10     Q.  And why not?

11     A.  I knew it was going to take me longer to find a

12  job.  Plus I felt like it was constructed so that I

13  would not have a job.

14     Q.  Okay.  Did you express that to anyone at the

15  time?

16     A.  No.  Last conversation I had with anybody was

17  Angie Moore.  Well, I take that back, and then I talked

18  to Sidney and Jonathan.  That was it.

19     Q.  You talked to Sidney and Jonathan after you got

20  the layoff notice?

21     A.  I talked to Sidney and Jonathan after Angie

22  called to tell me I wasn't selected.

23     Q.  Okay.  And what did you tell Sidney and Jonathan?

24     A.  I was -- I did not understand why I wasn't

25  selected for any of the roles.

1    Q.  And what did they tell you?

2    A.  They sympathized, you know.  And I asked if

3  anything more could be done to help supplement what I

4  knew was going to be a long and arduous -- you know,

5  unbeknownst to anybody, we were going to have a whole

6  year plus of -- and they went and -- well, they say they

7  went and came back, and it was going to still be the

8  same package.  So --

9    Q.  Did you tell Jonathan and Sidney that you thought

10  Angie's decision -- that the -- so you went to them

11  about the HR consultancy role, not about the HR director

12  role?

13    A.  I went to them -- it was after -- there was -- I

14  was completely shocked that I did not get the HR

15  consultancy role.  And once I went to them afterwards --

16  because I think I was informed like the day before was

17  supposed to be my last day.  What is this?  What does it

18  say?  Yeah.  And I went to them just, you know,

19  devastated and not understanding and asked them if

20  any -- what, if anything else, could be done, yeah.

21    Q.  Okay.  And so my question was did you -- you went

22  to them when you learned about the HR consultancy role,

23  right?  Roles, correct?

24    A.  Yes.

25    Q.  You did not go to them after you learned about

1    the HR director role, correct?

2        A.  Correct.

3        Q.  Okay.  And you went to them about the HR

4    consultancy role, because I think you just testified you

5    were shocked that you didn't get one of them, right?

6        A.  Correct.

7        Q.  And did you tell them that you thought you were

8    discriminated against at the time?

9        A.  I don't recall.

10       Q.  Okay.

11       A.  I was -- it was a very emotional moment for me.

12   I don't recall what -- what I said to them over the

13   phone.

14       Q.  Okay.  Do you think -- is it possible you're

15   going to recall after the deposition?  Because I'm

16   trying to get, you know, a sense of what you're going to

17   be telling the jury about --

18       A.  Yes, ma'am.

19       Q.  -- your claim.  And so what I -- I've asked you,

20   you know, multiple times if you've made any complaints

21   about discrimination, --

22       A.  Yes.

23       Q.  -- any other complaints other than the specific

24   ones --

25       A.  Yes.

1    Q.  -- we talked about.  And so this conversation

2    that you've had with Jonathan and Sidney, --

3    A.  Yes.

4    Q.  -- I'm just trying to drill down on whether or

5    not you raised any concerns about discrimination with

6    them during that discussion.

7    A.  I don't believe so.

8    Q.  Okay.

9    A.  Yeah.

10   Q.  And so you were working with them with respect to

11   the severance package, and you tried to negotiate some

12   different terms in the severance package; is that right?

13   A.  Correct.

14   Q.  And did you get -- obviously, you didn't accept

15   the severance package, but did the company make any --

16   update its offer to you at any point --

17   A.  No.

18   Q.  -- during that process?

19   A.  No, ma'am.

20   Q.  Okay.  And you did not take the severance

21   package, because you knew that -- well, it wasn't giving

22   you enough time in terms of the severance it was

23   providing?

24   A.  Correct.

25   Q.  And you knew that it was -- it was your opinion

1  that you were going to -- it was going to take you a

2  while to find another position, correct?

3     A.  Based upon finding -- taking 10 months to find

4  the Direct Energy role after I left Shell, it was my

5  experience that it was going to take me at least 10

6  months to find another role.

7     Q.  Were you surprised -- I mean, obviously, COVID

8  happened, but then after COVID it still took you a while

9  to find another role, right?

10     A.  Correct.

11     Q.  And to this day you have not found another HR

12  role, right?

13     A.  Correct.

14     Q.  Has that surprised you?

15     A.  Not really, because I believe that the -- the --

16  the world has changed, and -- and I -- and I think

17  the -- I just think the world has changed.  So I think

18  it took it a minute to figure out what was going to be

19  next, it being the world, like what was going to be next

20  in terms of working.  So not necessarily.  I'm grateful

21  that I have this role at -- at Catalyst.

22     Q.  Okay.

23     A.  Yeah.

24     Q.  Okay.  Just a couple more documents I want to

25  just introduce for the record.

1            [Exhibit 5 marked, Direct Energy Equal Employment

2    Opportunity Policy]

3            MS. WILLIAMS:

4        Q.   I'm showing you what's been marked as Exhibit 5

5    to your deposition.  Do you recognize this document?

6        A.   Yes.

7        Q.   What is it?

8        A.   It's an equal -- it's our equal employment

9    opportunity policy.

10       Q.   For Direct Energy?

11       A.   Correct.

12       Q.   Okay.  And were you familiar with this policy

13   during your employment with the company?

14       A.   Yep.  Yes.

15       Q.   And in your capacity as an HR business partner,

16   you would have been responsible for implementing and

17   enforcing this policy?

18       A.   Absolutely.

19       Q.   Okay.  And you were familiar with this policy

20   throughout your employment at Direct Energy, correct?

21       A.   Throughout my HR career, yeah.

22       Q.   Okay.

23       A.   They read the same.

24       Q.   Okay.  But specifically at Direct Energy you were

25   familiar with it?

1    A.   Yes.

2         [Exhibit 6 marked, Direct Energy

3    Non-Discrimination/Anti-Harassment Policy]

4    A.   Thank you.

5         MS. WILLIAMS:

6    Q.   I'm showing you what's marked --

7    A.   Yes.

8    Q.   -- as Exhibit 6 to your deposition.

9    A.   Yes.

10   Q.   Do you recognize this?

11   A.   Yes.

12   Q.   What is this?

13   A.   The non-discrimination/anti-harassment policy for

14   Direct Energy.

15   Q.   And was this policy in effect during your

16   employment at Direct Energy?

17   A.   Yes.

18   Q.   Okay.  Were you familiar with this policy during

19   your employment at Direct Energy?

20   A.   Yes.

21   Q.   And in your capacity as an HR business partner,

22   would it have been part of your responsibility to

23   enforce and implement this policy?

24   A.   Absolutely, yes.

25        [Exhibit 7 marked, Direct Energy Workplace

1 Investigations Policy]

2 A.  Thank you.

3 MS. WILLIAMS:

4 Q.  I'm showing you what's been marked as Exhibit 7

5 to your deposition.

6 A.  Yes.

7 Q.  Do you recognize this document?

8 A.  I do not.

9 Q.  Okay.  What is the document?

10 A.  It's the workplace investigation policy.

11 Q.  Okay.  Do you see at the top there's a date, it

12 shows January 19th, 2018?

13 A.  Yes.

14 Q.  Okay.  Were you -- you were employed at Direct

15 Energy during that time period, right?

16 A.  Yes.

17 Q.  Is it your testimony that you've never seen this

18 document?

19 A.  I don't recall, but it make perfect sense.  So,

20 yes, it -- it's, yeah, the policy on how to conduct

21 workplace investigations.

22 Q.  Okay.  And I think earlier in your testimony you

23 said that you -- you were aware that Direct Energy had

24 some type of policy or practice --

25 A.  A process.

1    Q.  -- related to investigations, right?

2    A.  Yes.

3    Q.  Okay.  This would have been related to those

4    processes?

5    A.  Yes.

6    Q.  Okay.

7    A.  And that's why I was like I didn't recall

8    policy, --

9    Q.  Yes.

10   A.  -- but I recall practice.

11   Q.  Okay.

12   A.  So -- and --

13   Q.  Okay.

14   A.  -- this is -- but over my career --

15   Q.  Uh-huh.

16   A.  -- there is a process and a policy, and this

17   would mimic that.  So --

18   Q.  Okay.

19   A.  -- I don't necessarily need to have seen that one

20   existed there, if that makes sense.

21   Q.  Okay.

22   A.  Okay.

23   Q.  And I know, I mean, the document is about two

24   pages.  It spills over into a third page, but -- and we

25   can take a minute for you to review that.  I just wanted

1  you to -- if you could identify for me if there's

2  anything that you notice in this investigations policy

3  that doesn't comport with what your understanding of

4  Direct Energy's practices were with respect to

5  investigations.

6      A.  No, this is --

7      Q.  It looks to be --

8      A.  -- consistent.

9      Q.  -- consistent?

10     A.  Yes, absolutely.

11     Q.  Okay.  Thank you.

12         [Exhibit 8 marked, Centrica Our Code]

13     A.  Thank you.

14         MS. WILLIAMS:

15     Q.  I'm showing you what's been marked as Exhibit 8

16  to your deposition.  Do you recognize this document?

17     A.  I do not.

18     Q.  Okay.  What is this document?

19     A.  It is the -- looks like the code of --

20     Q.  Uh-huh.

21     A.  -- conduct for Centrica.

22     Q.  Okay.  And did you ever see a document or a some

23  document similar to this during your employment at

24  Direct Energy?

25     A.  Yes.

1    Q.  Okay.  So what is your testimony, that you saw

2  this one or something similar to it?

3    A.  Something similar.

4        [Exhibit 9 marked, Acknowledgment Form for code

5  of conduct]

6    A.  Thank you.

7        MS. WILLIAMS:

8    Q.  I'm showing you what's marked as Exhibit 9 to

9  your deposition.  Can you tell us what that document is?

10   A.  Oh, acknowledgment form looks like for the code

11 of conduct.

12   Q.  Okay.

13   A.  Yeah.

14   Q.  And I understand that what we looked at as

15 Exhibit 8 may not be exactly --

16   A.  Right.

17   Q.  -- what you had, --

18   A.  Right.

19   Q.  -- but do you recall signing this acknowledgment

20 form?

21   A.  Yes, yeah.

22   Q.  And that reflects that you did receive the

23 company's code of conduct during your employment,

24 correct?

25   A.  Yeah, I signed this on my first day of employment

1   at Direct Energy, which is typical.

2       Q.  Okay.  And then did you have access to the code

3   of conduct throughout your employment?

4       A.  Absolutely.

5       Q.  Okay.  And, similarly, with respect to the other

6   policies we've just looked at, you would have had access

7   to those throughout your employment, as well?

8       A.  Yes.

9           [Exhibit 10 marked, Centrica Speak Up Procedure]

10      A.  Thank you.

11          MS. WILLIAMS:

12      Q.  I'm showing you what's been marked as Exhibit 10

13  to your deposition.

14      A.  Yes.

15      Q.  Can you tell us what that is?

16      A.  It's the Centrica Speak Up Procedure.

17      Q.  Okay.  Are you familiar with this document?

18      A.  No.

19      Q.  Okay.  You don't recall seeing this document

20  through your employment?

21      A.  Not in this format.

22      Q.  Okay.  And, just for the record, the document on

23  the first page is indicating an approval date of March

24  16th, 2018; is that right?

25      A.  Yes.

1    Q.  So that would have been in effect during the time
2  you were there, correct?
3    A.  Yes.
4    Q.  And is it your testimony that you saw another --
5  some other version of the speak up procedure during your
6  employment?
7    A.  No.
8    Q.  Okay.
9    A.  It's my testimony that I'm familiar with the
10  speak up line.  I haven't seen -- and speak up generally
11  went through the employee relations.  Actually was its
12  own entity.  So --
13    Q.  Okay.  And just to clarify, earlier we were
14  talking about an ethics line.
15    A.  Right.
16    Q.  Is that the same thing as speak up?
17    A.  Yes.
18    Q.  Okay.  All right.  Speak up or the ethics line
19  would have been one avenue to report complaints, right,
20  that employees had at Direct Energy, right?
21    A.  Yes.
22    Q.  What were some of the other avenues that
23  employees had to report complaints if they had any?
24    A.  To their supervisor, to an HR business partner,
25  to -- directly to employee relations and speak up.  So

1  those would be the avenues that someone had.

2  Q.  Okay.  During your time at Direct Energy and when

3  you participated in investigations, did you ever

4  participate in any investigations related to an

5  employee's complaint that they were not selected for a

6  position?

7  A.  I don't recall specifically.

8  Q.  During your time at --

9  A.  Yeah.

10  Q.  -- Direct Energy when you investigated employee

11  complaints related -- did you have discrimination

12  complaints from employees?

13  A.  Yes.

14  Q.  And you participated in investigations of

15  those --

16  A.  Yes.

17  Q.  -- from time to time?

18  A.  From time to time.

19  Q.  Were there times when you investigated and found

20  that the employee's complaint was not substantiated by

21  the evidence?

22  A.  Yes.

23  Q.  Okay.  How often did that happen?

24  A.  I couldn't guess.

25  Q.  Okay.  When you -- when you testified in prior

1   depositions as a representative of Shell, --

2       A.  Okay.

3       Q.  -- were you testifying on behalf of the company

4   or the employee?

5       A.  The company.

6       Q.  Okay.  And were -- if you recall, were those

7   decisions based on -- or were those cases based on

8   decisions that you made related to those employees who

9   were bringing those claims?

10      A.  Which decisions?

11      Q.  Well, I don't know what they are, and I'm sorry,

12  probably not the best question.  So in the two -- I

13  think you said there were two depositions that you

14  participated in at Shell?

15      A.  There was at least one.

16      Q.  At least one?

17      A.  Yes, at least one.

18      Q.  Okay.  For that -- do you recall what type of

19  complaint was being brought?

20      A.  Yes.

21      Q.  What was it?

22      A.  It was a termination for substance abuse,

23  violation of substance abuse policy.

24      Q.  Okay.  And did -- did you actually conduct the

25  investigation related to that employees issue?

1    A.  I -- no.  No.  I oversaw the -- the team that --

2  that oversaw the policy, information in the policy.

3    Q.  So when you were testifying, were you testifying

4  as a fact witness?

5    A.  Yes.

6    Q.  But not in the capacity of a decision maker?

7    A.  Correct.

8    Q.  And you were not testifying in the capacity of

9  the HR person who actually investigated the issue; --

10    A.  Correct.

11    Q.  -- is that right?

12       Okay.  Have you ever testified on behalf of Shell

13  related to a complaint an employee made where you

14  conducted an investigation into the employee's

15  complaint?

16    A.  No.

17    Q.  Okay.  I don't know if I asked you this.  So I

18  apologize.  Just trying to be kind of wrap up and get

19  the record clear.  Do you know what Chenee Franklin's

20  experience is, what her industry experience is?

21    A.  I do not.

22    Q.  What about Brittany Smith?

23    A.  I do not.

24    Q.  Are you -- is it your position that Brittany

25  Smith was not qualified for the HR consultant role?

1     A.  No.

2     Q.  Okay.  Do you believe she was qualified for that

3 role?

4     A.  It was an entry level role, yes.

5     Q.  Okay.  Do you believe -- is it your testimony

6 that Chenee Franklin was not qualified for the HR

7 consultancy role?

8     A.  No.

9     Q.  Was Chenee Franklin qualified for the HR

10 consultancy role?

11     A.  Yes.

12     Q.  Other than the economic damages that we've talked

13 about and the emotional issues, are there any other

14 damages that you're claiming or seeking to recover in

15 this case?

16     A.  Attorney's fees.

17     Q.  Okay.  Do you know what your attorney's fees are?

18     A.  As of today, yes.

19     Q.  Okay.  What are they?

20     A.  I think it was $30,000.

21     Q.  30?

22     A.  Yeah.

23     Q.  Okay.  All right.  Anything else?

24     A.  No, ma'am.

25     MS. WILLIAMS:  Okay.  I think I'll pass the

1    witness.

2                    EXAMINATION BY MR. HODGES

3        Q.  All right, Ms. Bible, I just have a -- just a

4    couple of follow-up questions.  I won't be that long.

5    So what I want to ask is kind of about the level,

6    position levels.  So can you explain the difference in

7    qualifications between an L6 and an L5 employee?

8        A.  An L5 would be close to an individual

9    contributor, junior manager type of role.  An L5 would

10   be senior manager, director level.  An L4 would be

11   senior director, vice president level type of

12   experience.

13       Q.  And so would each level differ as it relates to

14   an individual's experience or education?

15       A.  Yes.

16       Q.  And can you explain the difference in levels

17   between -- for education-wise for level 5 and level 6?

18       A.  So the -- the difference would be in terms of

19   experience that -- that each role would require.  Level

20   5s usually had supervisory experience and -- and more

21   impact from a -- to the -- to the bottom line of profit

22   and loss of the statements.  So you should have -- and

23   my experience was commensurate with a level 5, although

24   I entered at a level 6 with the -- the -- the desire to

25   move to a level 5 over the course of my tenure there.

1    Q.  And would you say that your education plays a
2  part in which level you would -- would apply to or
3  qualify for?
4    A.  It does.  When I received my masters degree I was
5  compensated more than I would have been if I just solely
6  entered as a -- with my bachelors degree.
7    Q.  Do you know if Brittany Smith has her masters
8  degree?
9    A.  I do not.
10    Q.  What about Chenee Franklin?
11    A.  I do not.
12    Q.  In regards to the HR consulting -- consultant
13  position, how did you prepare for that interview?
14    A.  Some -- there really wasn't much time to prepare
15  for that interview.  That interview was -- I found it to
16  be rushed and harried, and, like I said, it was just a
17  check-the-box exercise.  But the way I prepared would
18  have been the way I prepared for any interview, and that
19  was to be able to talk through and provide examples of
20  my experience in that -- for those specific
21  responsibilities.
22    Q.  Were you given any feedback after the interview?
23    A.  The consultancy role?
24    Q.  And what feedback was that?
25    A.  Angie Moore called and said that I -- I asked her

1  for why was I not selected.  She says because you didn't

2  make any eye contact during the interview.

3  And I asked her, I said, Angie, it's like I find

4  that interesting, because I was literally watching you

5  take notes.  And then she said I don't know, Shea,

6  you've just got to talk to Jeff about it.  And she's

7  like I've got to go, and that was the end of our

8  conversation.

9  Q.  Did Angie Moore know that you applied for the HR

10  director position?

11  A.  I'm sure she did.

12  Q.  And why do you believe that you are more

13  qualified than Angie Moore?  I think it may have been

14  asked, but if you can answer.  Why do you think -- why

15  do you believe you were more qualified than Angie Moore

16  for the HR director position?

17  A.  I have more years of experience, my masters

18  degree, my HR certification and the feedback that I was

19  receiving from leaders, my business partners,

20  unsolicited comments from even some of her supporters.

21  So it wasn't just my qualifications, but it was

22  my performance within the organization.

23  MR. HODGES:  Okay.  I have no further questions.

24  I will pass the witness.  But I also want to say on the

25  record that we would like to read and sign.

1          MS. WILLIAMS:  I actually have a few follow-ups.

2          MR. HODGES:  Yeah, pass.

3              FURTHER EXAMINATION BY MS. WILLIAMS

4     Q.  I'm sorry.  I'm sorry.

5     A.  I was like --

6     Q.  You were almost done.

7     A.  And I'm going to turn around.

8     Q.  Okay.  Do you know what Jeff Fralix's educational

9  background is?

10    A.  I do.

11    Q.  What is it?

12    A.  He has a bachelors from Baylor University.

13    Q.  Okay.  What else do you know about it, anything

14  else?

15    A.  That's it.

16    Q.  What about Angie Moore's educational background,

17  do you know what her background is?

18    A.  I do not.

19    Q.  Do you know if Jeff has any certifications?

20    A.  I don't believe he does.  I don't know, but I

21  don't believe he does.

22    Q.  Okay.  You don't know?

23    A.  Right.

24    Q.  Okay.  Do you know if he has any professional

25  licenses?

1 A. Typically HR professionals, we don't have those.

2 Q. Okay.

3 A. So --

4 Q. That's fine.  I'm just asking if you know --

5 A. Right.  Okay.

6 Q. -- if he has any.

7 A. I don't believe so.

8 Q. Do you know?

9 A. I don't know.

10 Q. Okay.

11 A. Yeah.

12 Q. Do you know if Angie Moore has any

13 certifications?

14 A. I know she has a -- I think a PHR.

15 Q. Okay.  What is a PHR, for the jury?

16 A. Professional Human Resources.

17 Q. Certification?

18 A. Yes.

19 Q. Do you know if she has any professional licenses?

20 A. I don't know.

21 Q. Okay.  How long was the interview for your -- the

22 HR consultant role?

23 A. 30 minutes max, maybe.

24 Q. How long were the HR consultant role interviews

25 for Brittany Smith?

1     A.  I'm not sure.

2     Q.  And Chenee Franklin?

3     A.  I'm not sure.

4     Q.  You don't know if their interviews were longer or

5  shorter than yours, correct?

6     A.  Correct.

7     Q.  Okay.  How many years of experience does Jeff

8  Fralix have?

9     A.  At least two less than I do.

10    Q.  Okay.  How do you know that?

11    A.  We've talked about it.

12    Q.  Okay.  And how many years of experience does

13  Angie Moore have?

14    A.  I don't know.

15    Q.  When you applied for the HR director job -- well,

16  I'll break them up.  Excuse me.  When you applied for

17  the HR director job, did you prepare any type of

18  proposals or plans to submit as a part of your

19  application to show your qualifications?

20    A.  I had provided my resume.  I provided a cover

21  letter and letters of recommendation.

22    Q.  Is that it?

23    A.  Yes.

24    Q.  Okay.  When you applied for the HR consultancy

25  roles, did you prepare any type of proposals or plans

1   describing how you would approach the roles?

2       A.  There was no time to do that.

3       Q.  Okay.  So is the answer no?

4       A.  Correct.

5       Q.  Okay.  With respect to the level, the job grade

6   classifications, someone who is a level 4, for example,

7   within the organization is senior to someone who's a

8   level 6, correct?

9       A.  Yes.

10      Q.  And you said that's a senior director -- I'm

11  sorry, senior vice president level?

12      A.  I said that would be like senior director, vice

13  president level.

14      Q.  Okay.  Somebody who's applying -- who is a level

15  4 and is applying for a level 4 position, in theory, is

16  qualified for a level 4 position, right?

17      A.  In theory.

18      Q.  Okay.  And based on what you're describing,

19  somebody who's in a level 5 position, in theory, would

20  have more experience and more responsibility than

21  someone in a level 6 position, correct?

22      A.  In theory.

23      Q.  In theory.  Okay.  When you started at a level 6,

24  did you ever complain to anyone about your job

25  classification as a level 6?

1     A.   No.

2          MS. WILLIAMS:  Okay.  Pass the witness.

3               FURTHER EXAMINATION BY MR. HODGES

4     Q.   From your experience, how often do employees go

5  from different levels, so either -- for example, go from

6  level 6 to level 5 or go from a level 6 to level 4?  How

7  often have you seen that?

8          MS. WILLIAMS:  Objection -- well, never mind.

9     A.   Ask your question again, please.

10         MR. HODGES:

11    Q.   Yes, how often have you seen from your experience

12 working for Direct Energy, how often have you seen an

13 employee go from a level 6 to a level 5 or -- or just

14 change levels throughout your employment?

15    A.   At Direct Energy there are very few processes

16 when it came to that.  In fact, yeah, I -- so whenever

17 the manager got approval to make that change.

18    Q.   So is it -- was it your expectation to stay

19 within the same level throughout your entire employment

20 there?

21    A.   Absolutely not.  Throughout my career at Shell I

22 had success, progressively more challenging roles, more

23 responsibility, and there was no reason for me to not

24 expect the same thing at Direct -- at Direct Energy.

25    Q.   And were you given any indication when you were

1    hired that you were -- you would be able to move levels

2    or to gain, I guess, more experience through Direct

3    Energy, you know, go up the ladder?

4        A.  Yes, I was -- yeah, it was an expectation that at

5    some point I would move through the ranks of Direct

6    Energy.

7        Q.  And do you know who gave you the -- told you that

8    or who gave you the expectations, or how did you -- how

9    did you expect that to happen?

10       A.  Through my performance and as roles came open.

11   In fact, I was being groomed, prepared to take on the

12   role when Zandra left.  Zandra was preparing me to take

13   on her role.  It was a level 4.  It was being regraded

14   to a level 5.  And -- and I was her top performer, had

15   the most experience.  So I was supposed to be, you know,

16   a great candidate for the role.

17       Q.  Did she ever tell you that you would be a great

18   candidate for the role?

19       A.  Yes.

20       Q.  And when did she say that?

21       A.  Oh, I don't remember the exact when, but in our

22   discussions about her role and as she was preparing to

23   leave, because the role was -- she was a 4.  It was

24   being reevaluated to a 5.  And so -- so when -- so when

25   the role was regraded as -- when Jeff came in and it was

1  a 4, it's like but it was supposed to be a 5.  So it

2  just -- there were lots of -- all sorts of --

3      Q.  And do you -- when you say Zandra --

4      A.  Zandra.

5      Q.  Zandra.

6      A.  Uh-huh.

7      Q.  Do you, by chance, recall Zandra's

8  qualifications?

9      A.  Yes.

10     Q.  Do you know her education?

11     A.  I know she has her HR and her law degree.

12         MR. HODGES:  Okay.  And -- okay.  I'll pass the

13  witness.

14         MS. WILLIAMS:  I don't have any further

15  questions.  We'll reserve the rest for trial.

16         MR. HODGES:  We'll reserve the rest for trial, as

17  well.

18         VIDEOGRAPHER:  It is 3 --

19         MS. WILLIAMS:  That's official.

20         VIDEOGRAPHER:  It is 3:41, and we are off the

21  record.

22                          ---------

23

24

25

CHANGES AND SIGNATURE

DEPOSITION OF SHEALONDA BIBLE, JUNE 16, 2022

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |
| ____ | ____ | _____ | _____ |

Signature:_____ Date:_____

SIGNATURE OF WITNESS

    I, SHEALONDA BIBLE, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted above.

_____

SHEALONDA BIBLE

THE STATE OF _____]

COUNTY OF _____]

    Before me, _____, on this day personally appeared SHEALONDA BIBLE, known to me (or proved to me on the oath of _____ or through _____ (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

    Given under my hand and seal of office this _____ day of _____, _____.

_____

NOTARY PUBLIC

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                        HOUSTON DIVISION

3   SHEALONDRA BIBLE,            ]
            Plaintiff,           ]
4                                ]
    v.                           ] CASE NO. 4:21-CV-00804
5                                ]
    DIRECT ENERGY, ET AL,        ]
6   NRG LLC,                     ]
            Defendant.           ]
7
    ---------------------------------------------------------
8

9                    REPORTER'S CERTIFICATION

10             DEPOSITION OF SHEALONDA BIBLE

11                      JUNE 16, 2022

12         I, Shawn Kelley, Certified Shorthand Reporter

13   No. 3448 in and for the State of Texas, hereby certify

14   to the following:

15         That the witness, SHEALONDA BIBLE, was duly sworn

16   by the officer and that the transcript of the oral

17   deposition is a true record of the testimony given by

18   the witness;

19         That the deposition transcript was submitted on

20   _____, 2022, to Eddie Hodges, Jr.,

21   attorney for Plaintiff, for examination, signature, and

22   return to the offices of Nell McCallum & Associates,

23   Inc., by _____, 2022.

24         That the amount of time used by each party at the

25   deposition is as follows:
```

**NELL McCALLUM & ASSOCIATES, INC.**

1      Marlene Williams - (4 hours, 40 minutes)

2      Eddie Hodges, Jr. - (0 hours, 8 minutes)

3      That pursuant to information given to the

4 deposition officer at the time said testimony was taken,

5 the following includes all parties of record:

6      Eddie Hodges, Jr., Attorney for the Plaintiff

7      Marlene Williams, Attorney for the Defendant

8      I further certify that I am neither counsel for,

9 related to, nor employed by any of the parties in the

10 action in which this proceeding was taken, and further

11 that I am not financially or otherwise interested in the

12 outcome of the action.

13      Certified to by me this _____ day of _____,

14 2022.

15

16      _____

17      Shawn Kelley, Texas CSR No. 3448
        Expiration Date: 1/31/24
18      Nell McCallum & Associates
        Firm Registration No. 10095
19      Expiration Date: 1/31/23
        718 Westcott
20      Houston, Texas 77007
        (713) 861-0203

21

22

23

24

25